UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNE DE LACOUR, ANDREA WRIGHT, and LOREE MORAN individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>COLGATE-PALMOLIVE CO., and TOM'S OF MAINE INC.,<br><br>Defendants. | No. 16 Civ. 08364 (RA) (AJP) |

# EXPERT DECLARATION OF DR. RAN KIVETZ

HIGHLY CONFIDENTIAL: UNDER PROTECTIVE ORDER

TABLE OF CONTENTS

Page

ASSIGNMENT AND QUALIFICATIONS ........ 1

SUMMARY OF CONCLUSIONS ........ 6

A. [redacted] ........ 6

B. Consumers Vary In Their Understanding Of The Challenged "Natural" Claim And Do *Not* Commonly Perceive This Claim To Mean That The Disputed Tom's Products Do Not Contain Any Artificial Ingredients ........ 7

C. The Tom's Of Maine Internal Research Cited By Plaintiffs And Their Experts Does *Not* Support Plaintiffs' And Their Experts' Contentions ........ 7

D. The Dennis Survey Is Fatally Flawed And Cannot Be Used To Reach Any Valid Conclusions About The Alleged "Price Premium" Or The Materiality Of The Challenged "Natural" Claim ........ 8

E. Mr. Weir's "Price Premium Damages" Model And Estimation Are Fatally Flawed, And It Is *Not* Possible In This Case To Reliably Calculate Damages On A Class-Wide Basis ........ 9

F. It Is *Not* Possible To Identify Putative Class And Subclasses Members In A Reliable And Valid Manner By Using Either Consumer Self-Identification Or Loyalty Card Data ........ 10

A. [redacted] ........ 12

A.1. Surveys to Evaluate the Materiality of the Challenged "Natural" Claim ........ 13

A.1.1. Surveys' Objective and Conclusions ........ 13

A.1.2. Survey Methodology ........ 22

A.1.2.1. Overview ........ 22

A.1.2.2. Surveys' Universes and Participant Screening Procedures ........ 25

Page

A.1.2.3. Surveys' Administration and Interviewing Locations ....... 27

A.1.2.4. Main Questionnaires ........................................................ 28

A.1.2.5. Survey Validation........................................................... 36

A.1.3. Survey Findings................................................................................ 37

A.1.3.1. Survey Findings from the Tom's Peppermint Antiplaque & Whitening Toothpaste Nationwide Survey ......................................................................... 37

A.1.3.2. Survey Findings from the Tom's Long Lasting Unscented Deodorant State-specific (CA, FL, & NY) Survey ......................................................................... 41

A.2. Academic Research And Plaintiffs' Depositions Indicate That Consumers Purchase The Disputed Tom's Products For A Variety Of Reasons ................................................................................. 44

A.3. The Challenged "Natural" Packaging Claim Is *Not* Likely To Influence Consumers' Re-Purchase Decisions And Brand Loyalty ........... 46

A.4. The Putative Class Members Are Likely To Differ From Each Other In Terms Of Their Purchase Decisions ...................................................... 48

B. CONSUMERS VARY IN THEIR UNDERSTANDING OF THE CHALLENGED "NATURAL" CLAIM AND DO *NOT* COMMONLY PERCEIVE THIS CLAIM TO MEAN THAT THE DISPUTED TOM'S PRODUCTS DO NOT CONTAIN ANY ARTIFICIAL INGREDIENTS............ 52

B.1. The Context In Which The Challenged "Natural" Claim Appears Is *Unlikely* To Create Common Perceptions That Tom's Toothpastes And Deodorants Do *Not* Contain Any Artificial, Synthetic, Or Chemically-Processed Ingredients ........................................................... 53

B.2. Consumers Are *Not* Likely To Make Inferences About The Meaning Of The Challenged "Natural" Claim ........................................................ 62

B.3. Many Consumers Are Skeptical About "Natural" Claims.......................... 64

B.4. Consumers Who Are Concerned about Artificial or Chemically-processed Ingredients Would *Not* Assume – Based on a "Natural" Packaging Claim – that Tom's Toothpastes and Deodorants Do Not Contain *Any* Artificial Ingredients ........................................................... 66

C. THE CONCLUSIONS DRAWN FROM TOM'S INTERNAL RESEARCH BY PLAINTIFFS AND THEIR EXPERTS ARE NEITHER SUBSTANTIATED NOR VALID ..................................................................... 71

**Page**

D. EVALUATION OF THE DENNIS SURVEY AND ITS ALLEGED "PRICE PREMIUM" ESTIMATION .......... 81

D.1. [redacted] .......... 84

D.1.1. [redacted] .......... 87

D.1.2. [redacted] .......... 97

D.1.3. [redacted] .......... 102

D.1.4. [redacted] .......... 107

D.2. [redacted] .......... 112

D.3. [redacted] .......... 114

D.4. [redacted] .......... 116

E. EVALUATION OF MR. WEIR'S "PRICE PREMIUM DAMAGES" ESTIMATION AND WHETHER, IN THIS CASE, IT IS POSSIBLE TO RELIABLY CALCULATE DAMAGES ON A CLASS-WIDE BASIS .......... 124

E.1. [redacted] .......... 125

E.2. [redacted] .......... 127

E.3. [redacted] .......... 128

E.4. [redacted] .......... 129

Page

E.5. [redacted] ............ 130

F. IT IS *NOT* POSSIBLE TO IDENTIFY PUTATIVE CLASS AND SUBCLASSES MEMBERS IN A RELIABLE AND VALID MANNER BY USING EITHER CONSUMER SELF-IDENTIFICATION OR LOYALTY CARD DATA ............ 132

F.1. The Putative Class And Subclasses Members Cannot Self-Identify In A Reliable And Valid Manner ............ 132

F.2. In This Case, Retailer Loyalty Card Data Would *Not* Allow To Reliably Identify The Class Members ............ 136

## ASSIGNMENT AND QUALIFICATIONS

1. My name is Dr. Ran Kivetz. I have been asked by Colgate-Palmolive Co. and Tom's of Maine Inc. (hereafter, collectively "Defendants" or "Tom's") to evaluate: (*a*) whether the "natural" and other related representations challenged by the Plaintiffs (hereafter the "challenged 'natural' claim") are a material (causal) factor in influencing decisions to purchase the disputed Tom's products commonly across the putative Class and Subclasses members;[1] (*b*) whether consumers vary in their understanding of the challenged "natural" claim, and relatedly, whether consumers are likely to commonly perceive this claim to mean that the disputed Tom's products do not contain any "ingredients that are synthetic, artificial, and chemically processed";[2] (*c*) the validity of the conclusions drawn from Tom's internal research by Plaintiffs and their expert, Mr. Colin B. Weir; (*d*) Dr. J. Michael Dennis's Expert Report ("Dennis Report") and the choice-based-conjoint survey that he conducted on behalf of the Plaintiffs ("Dennis Survey"); (*e*) the conclusions and damages estimates drawn from the Dennis Survey by Mr. Weir and reported in his declaration ("Weir Declaration"), and relatedly, whether it is possible to reliably calculate any alleged damages -- premised on an impact of the challenged "natural" claim -- on a class-wide basis and using a methodology and proof that is common to the Class and Subclass; and (*f*) whether the putative Class and Subclasses members can be identified in a reliable and valid manner by using either consumer self-identification or loyalty card data. I have personal knowledge of the matters set forth in this declaration and, if called to testify at a hearing or trial in this matter, would so state.

2. I am the Philip H. Geier, Jr., Professor of Marketing at Columbia University Business School. A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

---

[1] See*, e.g.*, *First Amended Class Action Complaint*, ¶¶ 1 – 4; *Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel* (hereafter "*Memo ISO Motion for Class Certification*"), pp. 1 - 3.

[2] *Memo ISO Motion for Class Certification*, p. 3.

3. I earned a Ph.D. in Business from Stanford University, Graduate School of Business; a Master's degree in Psychology from the Stanford University Psychology Department; and a Bachelor's degree from Tel Aviv University with majors in Economics and Psychology.

4. My field of expertise is consumer behavior; survey methods; marketing management; behavioral economics; human judgment, perception, and decision making; consumer and sales incentives; and branding. Most of my research has focused on buyers' purchase behavior; survey design; and the effect of product characteristics (*e.g.*, brand, features, quality, price), the competitive context, and marketing activities (*e.g.*, advertising, branding, promotions, incentives, loyalty programs) on buying decisions and perceptions.

5. I have received multiple research awards and nominations, including: (a) the "*Ferber Award*" from the Association for Consumer Research, which is the largest association of consumer researchers in the world; (b) the "*Best Competitive Paper Award*" from the Society of Consumer Psychology, which is the premier association of consumer psychologists in the world; (c) the "*Early Contribution Award*" from the Society of Consumer Psychology; (d) five finalist nominations, for the 2016, 2011, 2009, 2007, and 2005 "*O'Dell Award*," given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (e) two finalist nominations for the 2007 and the 2005 "*Green Award*," given to the *Journal of Marketing Research* article published in the prior year that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing"; (f) three finalist nominations for the awards for the "*Best Article*" published in the *Journal of Consumer Research* between 2002 and 2005, between 2006 and 2009, and between 2011 and 2014; (g) having my research selected by *The New York Times* in its *Annual Year in Ideas* as one of the "Best Ideas in 2006"; (h) being rated as the third most prolific scholar in the leading

marketing journals during 1982–2006;[3] and (i) being ranked by the American Marketing Association as one of the Top 50 most productive scholars in the premier marketing journals during 2009–2013 and during 2010–2014.

6. At Columbia University, I have taught MBA and Executive MBA courses on Marketing Strategy and Management, Customer Centricity and Innovation, High-Technology Marketing and Entrepreneurship, and Marketing of a Nation, covering such topics as developing marketing strategies, buyer behavior, customer segmentation, customer acquisition and retention, competitive strategies, branding, pricing, advertising, sales promotions, and behavioral economics. In addition to teaching MBA and Executive MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets. I also taught in various executive education programs, including programs for senior executives, programs for marketing managers in high-technology companies, programs for marketing managers in pharmaceuticals, programs in entrepreneurship, programs on marketing and innovation, and programs on customer centricity.

7. I have taught several doctoral courses. One doctoral course, titled "Bridging Behavioral Economics and Marketing Science," examines human judgment and decision making and its application to marketing science. It focuses on understanding, predicting, and quantitatively modeling different phenomena and biases in judgment and decision making, including by employing conjoint analysis models. A second doctoral course deals with consumer behavior, covering such topics as the processes underlying choices and judgments, influences on purchase decisions, attitudes, and persuasion. Both of these courses focus on modeling the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions. I have guided and supervised numerous Ph.D. students in their research. I have also

[3] Seggie, Steven H. and David A. Griffith (2009), "What Does It Take to Get Promoted in Marketing Academia? Understanding Exceptional Publication Productivity in the Leading Marketing Journals," *Journal of Marketing,* 73, 122–132.

served as the advisor for multiple Ph.D. students who are now professors at such institutions as The University of Chicago Booth School of Business, Harvard Business School (HBS), National University of Singapore (NUS), Tsinghua University, and The Wharton School at the University of Pennsylvania.

8. I have conducted, supervised, or evaluated well over 1,000 marketing research surveys, including many related to consumer behavior and decision-making, sales promotions, marketing strategies, branding, trademark, and advertising-related issues. I serve on three editorial boards and as a frequent reviewer, including for leading journals in our field, such as the *Journal of Marketing Research*. I have served as a Guest Editor for the *Journal of Marketing Research* and as a Guest Associate Editor for *Marketing Science* and *Management Science*. I have served on the editorial board of, and received the "*Outstanding Reviewer Award*" from, the *Journal of Consumer Research*. I have also served on the editorial boards of the *Journal of Consumer Psychology* and the *International Journal of Research in Marketing*. I am a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. I have also worked as a consultant for companies and organizations on a variety of strategy, marketing, consumer behavior and perception, promotions, branding, advertising, and incentives topics. Additionally, I have served as an expert in litigations and adversarial proceedings, including in front of the National Advertising Division of the Council of Better Business Bureaus ("NAD"), involving various marketing and buyer behavior issues, false advertising, market surveys, patent infringement, trademark and trade dress related matters, branding, retailing, promotions, and other areas. I have also been invited to present at the annual NAD Law Conference and I have served as an expert witness for the United States Federal Trade Commission.

9. A list of cases in which I provided sworn testimony at trial and/or by deposition during the past four years is attached as Exhibit B. I am being compensated at

a rate of $875 an hour. My compensation does not depend in any way on my opinion or the outcome of this matter.

10. My analyses are based, among other things, on the brands, products, and packaging found in the personal care industry; existing scientific research regarding consumer behavior, decision-making, and survey design; general principles of marketing; and two consumer surveys that I conducted in order to determine whether the challenged "natural" claim has a material effect on consumers' purchase decisions. The surveys were also intended to shed light on the considerations that drive consumers to purchase the disputed Tom's of Maine toothpaste and deodorant products. In conducting my analysis, I, or support staff at my direction, reviewed certain documents, including, but not limited to, documents that were made available to me in connection with the preparation of this *Expert Declaration*. Those documents are referenced herein and/or listed in Exhibit C. I also visited various brick & mortar stores, as well as online stores, that sell toothpaste and deodorant products.

11. Any, and all, of the opinions expressed herein are held to a reasonable degree of professional certainty. The information on which I relied consists of the type of information that is reasonably relied upon in my field of expertise.

******************

## SUMMARY OF CONCLUSIONS

A. [redacted]

12. [redacted]

13. [redacted]

[4] See, *e.g.*, *First Amended Class Action Complaint*, ¶¶ 1 – 4 & Ex. A; *Memo ISO Motion for Class Certification*, pp. 1 - 3.

B. [redacted]

14. [redacted].

15. ***First***, academic research indicates that the *context* in which the challenged "natural" claim appears is unlikely to create common consumer perceptions that Tom's toothpastes and deodorants do *not* contain any artificial, synthetic, or chemically-processed ingredients.

16. ***Second***, academic research indicates consumers are *not* likely to make inferences about the meaning of the challenged "natural" claim.

17. [redacted]

18. [redacted]

C. <u>The Tom's Of Maine Internal Research Cited By Plaintiffs And Their Experts Does *Not* Support Plaintiffs' And Their Experts' Contentions</u>

19. [redacted].

20. [redacted].

21. [redacted]

22. [redacted]

23. [redacted].

24. [redacted].

25. [redacted]

D. The Dennis Survey Is Fatally Flawed And Cannot Be Used To Reach Any Valid Conclusions About The Alleged "Price Premium" Or The Materiality Of The Challenged "Natural" Claim

26. My review and analysis of the Dennis Survey indicates that this survey violated multiple fundamental principles and requirements of scientific surveys and is therefore fatally flawed and unreliable.

27. [redacted]

5 [redacted].

[redacted]

28. [redacted]

29. [redacted]

30. [redacted].

E. Mr. Weir's "Price Premium **Damages**" Model And Estimation Are Fatally Flawed, And It Is *Not* Possible In This Case To Reliably Calculate Damages On A Class-Wide Basis

31. [redacted]

32. [redacted]

33. [redacted]

34. [redacted]

35. [redacted].

36. [redacted]

37. [redacted]

F. <u>It Is *Not* Possible To Identify Putative Class And Subclasses Members In A Reliable And Valid Manner By Using Either Consumer Self-Identification Or Loyalty Card Data</u>

38. Consumers will *not* be able to self-identify in a valid and reliable manner into the putative Class or Subclasses. Plaintiffs' ability to ascertain and manage the putative Class and Subclasses relies on consumers' ability to accurately self-identify and remember: (*i*) whether they bought the disputed Tom's toothpastes and deodorants; *and* (*ii*) because the class period does *not* cover the entire period of sales of Tom's disputed products, when they purchased the disputed Tom's products (*i.e.*, during the putative Class period *or* before?). As detailed in Section F of this *Expert Declaration*, such self-identification will *not* be valid or reliable given various inaccuracies and biases arising from the limitations of consumers' memory.

39. Plaintiffs may argue that, if consumer self-identification is unreliable, then retailer loyalty card data can ascertain the putative Class and Subclasses. However, as explained herein, academic and industry research, as well as other sources, indicate that in the present litigation retailer data would *not* permit to reliably identify the Class and Subclasses members.

*****************

A. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

## A.1. Surveys to Evaluate the Materiality of the Challenged "Natural" Claim

### A.1.1. Surveys' Objective and Conclusions

[redacted] [redacted]

[redacted] [redacted].

[6] See, *e.g.*, *First Amended Class Action Complaint*, ¶¶ 1 – 4 & Ex. A.
[7] *Memo ISO Motion for Class Certification*, p. 4; see also *First Amended Class Action Complaint*, ¶ 33.
[8] *Memo ISO Motion for Class Certification*, p. 4.; see also *First Amended Class Action Complaint*, ¶¶ 34 – 36.

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

---

10 [redacted]

[redacted]

[redacted].

******************

[12] See Exhibit Exhibits J.1 & K.1.
[13] See Exhibit Exhibits J.2 & K.2.
[14] [redacted]

[redacted]

[redacted]

[redacted]

[15] The results, which are summarized in this subsection, are subsequently detailed in Subsection A.3 (titled "Survey Findings"). Exhibits L & M to this declaration provide the computer tables with the screening data, the purchase likelihood results, and the coding of participants' purchase explanations for the nationwide survey and the state-specific surveys, respectively.
[16] See Exhibit L, Table 5, p. 5.
[17] See *Ibid*.
[18] See *Ibid*.

[redacted]

[redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted] [redacted]

[redacted] [redacted]

---

19 See Exhibit L, Table 5, p. 5.
20 See *Ibid*.
21 See *Ibid*.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[22] See Exhibit L, pp. 6 - 16.
[23] See Exhibit L, Table 6, pp. 6 - 20.
[24] See *ibid*, Table 6, p. 8.
[25] See *ibid*, p. 8.

[redacted].

A.1.2. Survey Methodology

A.1.2.1. Overview

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]

[redacted] [redacted]

[redacted]

---

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted].

### A.1.2.2. Surveys' Universes and Participant Screening Procedures

[redacted]

> [redacted]

- [redacted]
- [redacted]
- [redacted]

[redacted]

> [redacted]

- [redacted]
- [redacted]
- [redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]
- [redacted] [redacted]

[redacted]

[redacted]

A.1.2.4. Main Questionnaires

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

28 [redacted].

> [redacted]

[redacted] [redacted]

[redacted] [redacted]

> [redacted] [redacted]

[redacted] [redacted]

---

[29] See *Ibid*.

A.1.2.5. Survey Validation

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

A.1.3. Survey Findings

A.1.3.1. Survey Findings from the Tom's Peppermint Antiplaque & Whitening Toothpaste Nationwide Survey

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted] [redacted]

[redacted] [redacted] [redacted] [redacted]

[redacted] [redacted]

[30] See Exhibit L, pp. 6 - 16.
[31] See *ibid*.

[redacted]

[32] See Exhibit L, Table 7, pp. 21 - 27.
[33] See *ibid*, Table 6, p. 8.

[redacted].

### A.1.3.2. Survey Findings from the Tom's Long Lasting Unscented Deodorant State-specific (CA, FL, & NY) Survey

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[34] See Exhibit M, Table 6, pp. 6 - 20.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

35 See *ibid*, Table 7, pp. 21 - 27.
36 See *ibid*, Table 6, p. 8.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] [redacted] [redacted]

A.2. <u>Academic Research And Plaintiffs' Depositions Indicate That Consumers Purchase The Disputed Tom's Products For A Variety Of Reasons</u>

118. Academic research is consistent with my surveys' findings regarding the causal determinants of consumers' purchase decisions. More specifically, as detailed next, academic studies and Plaintiffs' testimony support the notions that consumers buy

---

[redacted] [redacted]

the disputed Tom's products for myriad reasons and that the challenged "natural" claim does *not* commonly drive purchase decisions.

119. ***First***, scientific consumer research suggests that an important factor motivating purchases of the disputed toothpaste and deodorant products is the Tom's of Maine brand name and brand equity.[38] Academic research has shown that, in purchase decisions involving consumer-packaged goods, brand name is a highly important attribute and sometimes a dominant choice heuristic. Further, research utilizing eye tracking methodologies demonstrates that consumers pay a great deal of attention to brand name information and that consumers do so under conditions of both high and low time pressure.[39]

120. ***Second***, academic research that has directly investigated consumers' attitudes towards "natural" products and the effect on consumers' purchase decisions has documented substantial heterogeneity (variations across consumers) in whether, and how much, consumers value "natural" products. One study of over 800 USA consumers investigated how much consumers said they were willing to pay for "natural" beef (as opposed to "regular" beef).[40] The researchers documented substantial heterogeneity that is captured in five distinct consumer segments. Two of the segments, comprising 46% of consumers, have very low willingness to pay for "natural" beef. Only one of the segments, comprising 13% of the sample, demonstrates high willingness to pay for "natural" beef. The researchers found that consumers' valuation of the "natural" claim varied with demographics, including gender, city residence, number of children, and income.[41] In the survey, people's willingness to pay a premium, if any, for "natural" beef

---

[38] See, e.g., W. Hoyer and S. Brown (1990), "Effects of Brand Awareness for a Common Repeat-Purchase Product," *Journal of Consumer Research,* 17 (September), 141 - 198.
[39] R. Pieters and L. Warlop (1999), "Visual Attention During Brand Choice: The Impact of Time Pressure and Motivation," *International Journal* of *Research in Marketing*, 16, 1 – 16.
[40] Ziehl, A., D. D. Thilmany and W. Umberger (2005), "A Cluster Analysis of Natural Beef Product Consumers by Shopping Behavior, Importance of Production Attributes, and Demographics," *Journal of Food Distribution Research*, 36(1), p. 209-217.
[41] See also Umberger, W., D. D. Thilmany McFadden, A. R. Smith (2009), "Does Altruism Play a Role in Determining U.S. Consumer Preferences and Willingness to Pay for Natural and Regionally Produced Beef?" *Agribusiness* 25(2), 268-285.

in relatively unprocessed products (*e.g.*, rib eye steaks) was higher than for more processed products (*e.g.*, beef stroganoff and chili verde) and varied by age, presence of children, and income.[42] Income-constrained and price sensitive consumers were the least willing to pay a premium for a natural product.

121. The above examples demonstrate that academic research supports the notions that consumers purchase Tom's products for a variety of reasons. Additional such evidence is provided in Plaintiffs' deposition testimony. For example, Plaintiff Moran testified that she decided to purchase the Tom's deodorant product for a variety of reasons, including, but not limited to, the "No aluminum" packaging claim, the Tom's of Maine brand name, another person's recommendation, and the scent listed on the product's label.[43]

122. Overall, relevant academic research and Plaintiffs' testimony indicate that myriad factors influence consumers' decisions to purchase the disputed Tom's products. Such purchase considerations not only vary across consumers, but also include many factors and attributes that are *not* related to the "natural" claim challenged by the Plaintiffs.

### A.3. The Challenged "Natural" Packaging Claim Is *Not* Likely To Influence Consumers' Re-Purchase Decisions And Brand Loyalty

123. The Plaintiffs' greatly overestimate the effect of the challenged "natural" claim on sales of the disputed Tom's products due to Plaintiffs' failure to consider the importance of repeat purchases and customer loyalty and retention. Assuming arguendo that the challenged "natural" claim influenced the initial purchases of at least some of the putative Class and Subclasses members, the challenged "natural" claim would *not* be likely to induce repeat purchases.

124. Research in marketing has demonstrated that repeat purchases and customer loyalty/retention are key determinants of firms' performance and sales. In particular, evidence that customer retention is more important than acquisition and that some

---

[42] *Ibid*.
[43] Moran Deposition, pp. 68 – 71.

customers are more profitable than others has led many companies to focus on stimulating product re-purchase and customer loyalty.[44] Related research has also found that increasing customer retention (likelihood of re-purchase) by some percentage leads to a greater increase in the lifetime value of customers (LTVC) and in the overall sales of the firm than does increasing the amount spent in each single purchase occasion by the same percentage.[45] Thus, the extent to which the Tom's of Maine brand, as well as Tom's toothpastes and deodorants, motivate re-purchase and loyalty is an important determinant of the disputed products' overall sales and market performance. As explained next, misperceptions or confusion regarding the challenged "natural" claim are *not* likely to play a major role in driving repeat-purchase decisions.

125. By definition, the decision whether or not to re-purchase a product occurs after the consumer has acquired and consumed the product. Therefore, retention and re-purchase depend on the consumer's satisfaction with the product experience and quality and on various dynamics related to the costs and benefits of using the product.[46] In the context of Tom's disputed toothpaste and deodorant products, re-purchase decisions and retention are likely to depend, among other factors, on the consumer's experiences in using the product (*e.g.*, the satisfaction with the toothpaste's taste/flavor; the satisfaction with the deodorant's scent and lasting effect), on the cost associated with buying and using the Tom's of Maine toothpastes and deodorants (*e.g.*, their prices), and on brand equity. For example, academic research and frameworks demonstrate that, in purchase

---

[44] R. Kivetz and I. Simonson (2002), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39 (2), 155-170. This article was a finalist for the 2007 *William O'Dell Award*, given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years.

[45] S. Gupta and D.R. Lehmann (2005), *Managing Customers as Investments*. Philadelphia: Wharton School Publishing.

[46] R. Kivetz, O. Urminsky, and Y. Zheng, (2006), "The Goal-Gradient Hypothesis Resurrected: Purchase Acceleration, Illusionary Goal Progress, and Customer Retention," *Journal of Marketing Research*, 43 (1), February, 39-58. This article was a finalist for the 2011 *William O'Dell Award*, as well as a finalist for the 2007 Paul Green Award, given to the *Journal of Marketing Research* article published in the prior year that "demonstrates the most potential to contribute significantly to the practice of marketing research and research in marketing."

decisions involving repeat-purchase CPGs, many consumers make purchase decisions based on brand awareness and brand equity, with brand name being a highly important factor and sometimes a dominant choice heuristic.[47] Further, research utilizing eye tracking methodologies demonstrates that consumers devote considerable attention to brand name information and that consumers do so under conditions of both high and low time pressure.[48]

126. Repeat purchases and customer retention are unlikely to depend on perceptions of a packaging claim, which is unrelated to the actual product experience and satisfaction. Thus, customer retention and re-purchase, and not the challenged "natural" claim, have a large impact on the sales performance of disputed Tom's of Maine products.

### A.4. The Putative Class Members Are Likely To Differ From Each Other In Terms Of Their Purchase Decisions

127. As I have taught my PhD, MBA, and Executive MBA students at Columbia University Business School, one of the most fundamental principles in marketing is that consumers are heterogeneous, and accordingly, that marketing managers must segment their customer base.[49] Voluminous research demonstrates that consumers systematically differ from each other with respect to their attitudes, perceptions, preferences, behaviors, and product usage patterns.[50] My own research on consumers' response to promotions, rewards, products, and other marketing tactics has uncovered considerable consumer heterogeneity. In my research, I have found that consumers systematically vary in their

[47] See, *e.g.*, D. Aaker (1991), *Managing Brand Equity*, Free Press, New York, NY; W. Hoyer and S. Brown (1990), "Effects of Brand Awareness for a Common Repeat-Purchase Product," *Journal of Consumer Research,* 17 (September), 141-198; K. L. Keller (2008), *Strategic Brand Management*: *Building*, *Measuring*, *and Managing Brand Equity*, Upper Saddle River, NJ: Pearson Prentice Hall.
[48] R. Pieters and L. Warlop (1999), "Visual Attention During Brand Choice: The Impact of Time Pressure and Motivation," *International Journal* of *Research in Marketing*, 16, 1–16.
[49] Kotler, P. (1997), *Marketing Management: Analysis, Planning, Implementation, and Control.* Upper Saddle River, New Jersey: Prentice-Hall; Wedel, Michel and Wagner A. Kamakura (2000). Market Segmentation: Conceptual and Methodological Foundations. Amsterdam: Kluwer.
[50] G. M. Allenby, N. Arora, and J. L. Ginter (1998), "On the Heterogeneity of Demand," *Journal of Marketing Research*, 35 (3), 384-389; G. M. Allenby and J. L. Ginter (1995), "Using Extremes to Design Products and Segment Markets," *Journal of Marketing Research*, 32 (4), 392-403.

preferences and behaviors due to individual differences related to emotions of guilt about indulging, time and risk preferences, hedonism, social comparison tendencies, belief in the protestant work ethic, psychological reactance, and other factors.[51] For example, consumer differ in their tendency to accelerate their efforts and purchases as they near goals, with some consumer segments exhibiting pronounced acceleration (i.e., a strong "goal gradient" effect), some demonstrating weaker acceleration, and some even manifesting deceleration (reduced effort as a function of goal proximity).[52]

128. Relatedly, research demonstrates that consumers differ in how they value products, and in how important various product attributes and benefits are in their purchase decisions. Holding constant the specific perceptions, inferences, and expectations that consumers form about product attributes, an additional source of heterogeneity has been found to emerge from the unique and subjective value that each consumer may attach to advertised product attributes and benefits. Specifically, the perceived value from a given product's attributes and benefits has been conceptualized and shown to vary significantly between individuals.[53] As Zeithaml wrote: "What constitutes value – even in a single product category – appears to be highly personal and idiosyncratic."[54]

129. Customer heterogeneity and segmentation is directly relevant to the question of whether the putative Class members are similar to, or different from, each other with regards to their purchase drivers and the impact, if any, of the challenged

---

[51] R. Kivetz and Y. Zheng (2006), "Determinants of Justification and Self-Control," *Journal of Experimental Psychology: General*, 135 (4), 572-587; R. Kivetz and I. Simonson (2002); R. Kivetz and I. Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40 (4), 454-467; R. Schrift, O. Netzer, and R. Kivetz (2011), "Complicating Choice," *Journal of Marketing* Research, 48 (2), 308-326 (*Winner*, 2010 *Best Competitive Paper Award*, *Society of Consumer Psychology*); J. Levav, R. Kivetz, and K. C. Cho (2010), "Motivational Compatibility and Choice Conflict," *Journal of Consumer* Research, 37 (3), 429-442; R. Kivetz (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31 (4), 725-736.

[52] See, R. Kivetz, O. Urminsky, and Y. Zheng, (2006).

[53] *E.g.*, Zeithaml, V. A. (1988), "Consumer Perceptions of Price, Quality and Value: A Means-End Model and Synthesis of Evidence," *Journal of Marketing*, 52 (3), p. 13.

[54] *Ibid.*

“natural” claim on their purchase decisions. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted].

130. In conclusion, the aforementioned differences between the putative Class members demonstrate that the putative Class members do *not* represent a homogeneous group of consumers with common purchase criteria. My professional opinion is that the putative Class members differ from one another in multiple significant ways, including in terms of their purchase motivations, preferences, and perceptions. Such differences mean that there is meaningful and substantial variation across the putative Class members in terms of their purchase drivers and in terms of the effect, if any, of the challenged "natural" claim on their purchase decisions.

---

[55] See, e.g., COLGATETOMS00005158, COLGATETOMS00005284, and COLGATETOMS00005503. See also Subsection A.3 of this *Expert Declaration* for the results of my consumer surveys.

## B. CONSUMERS VARY IN THEIR UNDERSTANDING OF THE CHALLENGED "NATURAL" CLAIM AND DO *NOT* COMMONLY PERCEIVE THIS CLAIM TO MEAN THAT THE DISPUTED TOM'S PRODUCTS DO NOT CONTAIN ANY ARTIFICIAL INGREDIENTS

131. Plaintiffs allege the following:[56]

> A reasonable consumer would understand and expect that a product labeled "natural" would in fact be natural. ... Unfortunately for consumers, however, the Tom's Products in question are not actually "natural." Instead, the Products contain ingredients that are synthetic, artificial, and chemically processed. These ingredients include sodium lauryl sulfate ("SLS") and propylene glycol, which Defendants have recognized as ingredients that consumers try to avoid.

And:

> They each purchased Tom's Products at a price premium because the Products were labeled "natural," precisely as Defendants intended. Unfortunately for Plaintiffs, they were mislead [*sic*] because the Products contain synthetic ingredients.

132. According to the Plaintiffs' pleadings, the aforementioned allegations apply to the following putative nationwide Class and state-specific Subclasses, respectively:[57]

> [A]ll persons in the United States who purchased Tom's of Maine deodorant and/or toothpaste products (the 'Products' or 'Tom's Products') on or after September 24, 2015 (the 'Class'). [Footnote omitted]

And:[58]

> [A] "all members of the Class who purchased Tom's Products in California [Florida/New York] ('the California [Florida/New York] Subclass'). [References omitted]

133. Thus, the Plaintiffs accuse all (or nearly all) of Tom's toothpaste and deodorant products -- bought on or after September 24, 2015, until the present -- of being deceptive due to the "natural" claim that appears on the products' packaging. After reading the various pleadings in this case and the Plaintiffs' depositions, it is my

---

[56] *Memo ISO Motion for Class Certification*, p. 3.
[57] *Ibid*, p. 4; see also *First Amended Class Action Complaint*, ¶ 33.
[58] *Memo ISO Motion for Class Certification*, p. 4; *First Amended Class Action Complaint*, ¶¶ 34 - 36.

understanding that the Plaintiffs contend that the challenged "natural" claim misled the putative Class and Subclasses members because the "natural" claim ostensibly caused the Class and Subclasses members to believe that Tom's toothpastes and deodorants do not contain any artificial, synthetic, or chemically-processed ingredients.

134. It is my professional opinion that consumers are likely to vary in their understanding of the challenged "natural" claim and are *not* likely to *commonly* perceive this claim to mean that the disputed Tom's products do not contain any artificial, synthetic, or chemically-processed ingredients. This is because: (*i*) both the context in which the challenged "natural" claim appears, and the context in which the disputed Tom's toothpastes and deodorants are sold, are *not* likely to create common consumer perceptions that the disputed products do not contain any artificial, synthetic, or chemically-processed ingredients; (*ii*) consumers are *not* likely to make inferences about the meaning of the challenged "natural" claim; (*iii*) many consumers are skeptical about "natural" claims; (*iv*) consumers who are concerned about artificial, synthetic, or chemically-processed ingredients would *not* assume -- just based on a "natural" packaging claim -- that the Tom's toothpastes and deodorants do not contain any artificial, synthetic, or chemically-processed ingredients; and ([redacted]

B.1. <u>The Context In Which The Challenged "Natural" Claim Appears Is *Unlikely* To Create Common Perceptions That Tom's Toothpastes And Deodorants Do *Not* Contain Any Artificial, Synthetic, Or Chemically-Processed Ingredients</u>

135. The Plaintiffs allege that "[t]hey each purchased Tom's Products at a price premium because the Products were labeled "natural" … and that "they were mislead [*sic*] because the Products contain synthetic ingredients."[59] In order to examine whether consumers are likely to be misled by the aforementioned alleged deception, it is helpful

---

[59] *Memo ISO Motion for Class Certification*, p. 3.

to evaluate the context in which the challenged "natural" claim appeared. Such context includes, but is not limited to: (*i*) the disputed Tom's packages that displayed the "natural" claim; and (*ii*) the other products (from other categories) that have a "natural" claim on their packaging and are sold at the same retailers with Tom's toothpastes and deodorants.

136. Thus, this subsection discusses the impact of the above real-world context on consumer perceptions and the likelihood (or lack thereof) of any deception across the putative Class and Subclasses members. The importance of analyzing consumers' perceptions of products and advertising/packaging claims in the context in which they appear is underscored by seminal research in cognitive psychology and consumer behavior. For example, research indicates that human perception is dependent on the *general context* provided by words and/or visual stimuli, which drive people's interpretations.[60] Such processing, in which context guides perception, is called "top-down processing," because high-level general knowledge determines the interpretation of low-level perceptual units. For example, as shown in Figure 5 below, the same stimulus can be perceived differently (*i.e.*, as an "H" or an "A"), depending on the context:

Figure 5: A Demonstration of the Impact of Context on
Human Perception of an Individual Element [61]



137. Context is also critical in determining consumer perceptions of product offerings, as demonstrated in the widely-cited phenomenon of "context-effects."[62] For example, academic research[63] showed that a high-end offer of a $125 subscription to the

---

[60] E.g., J. R. Anderson (1985), *Cognitive Psychology and Its Implications*, W.H. Freeman and Company.
[61] Shown in Anderson (1985).
[62] R. Kivetz, O. Netzer, and V. Srinivasan (2004a), "Alternative Models for Capturing the Compromise Effect," *Journal of Marketing Research*, 41 (3), 237-257 (Lead article); I. Simonson and A. Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," *Journal of Marketing Research*, 29 (August), 281-295.
[63] R. Kivetz, O. Netzer, and V. Srinivasan (2004b), "Extending Compromise Effect Models to Complex Buying Situations and Other Context Effects," *Journal of Marketing Research*, 41 (3), 262-268.

Print and Web editions of the Economist magazine was seen as expensive and was chosen by only 43% of people -- when this high-end offer was presented in the context of only one alternative offer, a $59 subscription to the Web only edition of the Economist. By contrast, the same high-end offer of a $125 subscription to the Print and Web editions was perceived as a "deal" and was chosen by 72% of people (a statistically significant difference) -- when it was presented in the context of two alternative offers, the aforementioned $59 subscription to the Web only edition *and* a $125 subscription to the Print only edition of the Economist. The actual subscription page that was used by the Economist magazine at the time when the research was conducted is shown in Figure 6:

Figure 6: The "Economist" Context Effect [64]




[64] Shown in R. Kivetz, O. Netzer, and V. Srinivasan (2004b).

138. In fact, the disputed Tom's toothpaste and deodorant packages provide a context and multiple alternative interpretations for the challenged "natural" claim. For example, my understanding is that the disputed Tom's Peppermint Antiplaque & Whitening toothpaste displays the claim "fluoride-free" next to the challenged "natural" claim. Further, disputed Tom's toothpastes that displayed the challenged "natural" claim on their packaging also included multiple other claims and statements on their packaging. For example, the top panel of some of the disputed Tom's toothpastes' packages featured the sentence "**What makes a product natural and good? At Tom's, it includes how we make it**"; underneath this sentence, several claims and images were displayed, including, "**No** animal testing or animal ingredients," "We share every **ingredient**, its **purpose**, and its **source** at www.tomsofmaine.com," "**Sustainable practices** are a priority in every aspect of our business," "**No** artificial colors, flavors, fragrance, or preservatives," "**We strive to maximize recycled content** and **recyclability** of our packaging," and "**5%** (12 days) of employee time to volunteering. **10%** of profits to human and environmental goodness" [emphasis in the original packaging; see, *e.g.*, Figure 9 in Subsection D.1.1 below].

139. Relatedly, disputed Tom's deodorants that displayed the challenged "natural" claim on their packaging also included multiple other claims and statements on their packaging. For example, the top right of the front panel of some of the disputed Tom's toothpastes' packages featured the claims "**NO** Aluminum," "**NO** Parabens," and "**NO** Artificial Preservatives" [emphasis in the original packaging; see, *e.g.*, Figure 3a above]. Some disputed packages also displayed on the front panel the claim "24 HR odor protection" just below the challenged "natural" claim. Further, disputed Tom's deodorants that displayed the challenged "natural" claim on their packaging also included multiple other claims and statements on their packaging. For example, the back panel of some of the disputed Tom's deodorants' packages featured the sentence "**What makes a product natural and good? At Tom's, it includes how we make it**"; underneath this sentence, several claims and images were displayed, including, "**No** animal testing or animal ingredients," "**No** artificial colors, flavors, fragrance, or preservatives," "We share

every **ingredient**, its **purpose**, and its **source** at www.tomsofmaine.com," "**Sustainable practices** are a priority in every aspect of our business," "**We strive to maximize recycled content** and **recyclability** of our packaging," and "**5%** (12 days) of employee time to volunteering. **10%** of profits to human and environmental goodness" [emphasis in the original packaging; see, *e.g.*, Figure 3a above]. Some disputed Tom's deodorant packages also displayed on the top of their back panel the claim "No artificial fragrance or preservatives."

140. Consumers who are exposed to, and pay attention to, the challenged "natural" claim in the context of the aforementioned Tom's toothpaste and deodorant products' packaging may interpret the "natural" claim as referring (or related) to one or more of the other adjacent claims appearing on the packages. This is consistent with both common sense and academic research (discussed earlier) that demonstrates that consumers' interpretation of messages is sensitive to the context on which these messages are conveyed. That is, the context provided by the various images, claims, and textual messages shown on the disputed Tom's packages is likely to guide consumers' perceptions and understandings of the challenged "natural" claim. Further, given the myriad representations surrounding the challenged "natural" claim, consumers are likely to form varying interpretations of the "natural" claim.

141. The disputed Tom's products' form factors and application methods (*i.e.*, how the product is stored in its casing and then dispensed used) also provide context that can influence consumers' interpretations of the challenged "natural" claim. It is unlikely that consumers would *commonly* perceive toothpaste and deodorants that come in such form factors to be free of any processing and any artificial, synthetic, or chemically-processed ingredients. Instead, consumers are likely to *vary* in their expectations of "natural" products, which can include, but is not limited to, such aspects as derived from a natural element such as a plant, mineral, or water source; simplicity and few ingredients; similarity to old-fashioned or traditional products; no animal testing or ingredients; no aluminum; no parabens; fluoride-free; no artificial fragrance;

sustainability, recyclability, and environmental friendliness; and lower likelihood of provoking allergic reactions.

142. The retailers that sell the disputed Tom's toothpastes and deodorants provide another type of context for interpreting the challenged "natural" packaging claim. In particular, Tom's toothpastes and deodorants are distributed through traditional grocery chains (*e.g.*, Publix Super Market, Trader Joe's), through big-box stores (*e.g.*, Target), and through the drugstore channel (*e.g.*, CVS/pharmacy, Walgreens).[65]

143. I visited multiple stores that carry the disputed Tom's toothpastes and deodorants products. These store observations confirmed my prior experiences that there are a variety of different products that make "natural"-type claims on their packages. Such products, whose packaging displays a "natural" claim, can be found in various aisles and product categories in retailers in which the disputed Tom's products are sold, and include numerous types of edible products (*e.g.*, bacon jerky, cheese puffs, chocolate, canned beverages, corn chips and other snacks, croutons, medicine, supplements, ice-cream, cereal, sparkling water, yogurt, tea, pasta, peanut butter, and popcorn seasoning), as well as a multitude of inedible items (*e.g.*, adult and kid shampoos, air fresheners and deodorizers, all-purpose cleaners, concentrated cleaner & degreaser, cooking twine, diaper cream, dish liquid, dog shampoo, drain opener, facial moisturizer, hand sanitizer, household cleaner, insect repellant, lip gloss, men's deodorant, self-tanner, soap bars, stain & odor remover, toilet bowl cleaner, toys, and wood tweezers). Figure 7 below depicts examples of products that display on their packages a "natural" claim (or a variation, such as "Made With Natural Ingredients" or "Formulated With Natural Active Ingredients") and are sold at stores carrying Tom's toothpastes and deodorants.

---

[65] See, *e.g.*, *Memo ISO Motion for Class Certification*, p. 4; *First Amended Class Action Complaint*, ¶ 40.

Figure 7: Products with a "Natural" Packaging Claim Sold in Stores Carrying Tom's Toothpastes and Deodorants

**Shampoo**




**Ear Remedy**




**Coconut Oil**




**Dental Treatment**



Figure 7 (continued): Products with a "Natural" Packaging Claim
Sold in Stores Carrying Tom's Toothpastes and Deodorants

**Hand Cream**




**Hair Color**




**Cough Relief**




**Whey Protein Powder**



Figure 7 (Continued): Products With A "Natural" Packaging Claim
Sold In Stores Carrying Tom's Toothpastes And Deodorants

**Beef Jerky**




**Toothpaste**




*****************

144. Exposure to such products (*i.e.*, with a "natural" claim) as those shown in Figure 7 above reinforces to consumers that "natural" can mean many different things or even mean nothing at all. Thus, the fact that consumers are exposed to a myriad of products making a "natural" claim suggests that consumers would *not* take away a *common* message from this claim. Moreover, as subsequently explained in Subsection B.3, the proliferation in the marketplace of products making "natural" claims can contribute to consumer skepticism toward such claims, as well as to wide differences in consumers' understanding of such claims.

### B.2. Consumers Are *Not* Likely To Make Inferences About The Meaning Of The Challenged "Natural" Claim

145. Packaging claims like "natural" are vague and require additional inference-making in order for consumers to determine what exactly is meant by the term "natural." Academic research on consumer perception and decision-making supports the notion that consumers will *not* engage in elaborate inference-making (including inferring that the disputed Tom's toothpastes and deodorants are made without any artificial, synthetic, or chemically-processed ingredients) based on the challenged "natural" packaging claim. More specifically, prior research demonstrates that consumers often do *not* form inferences about (*e.g.*, do *not* impute a meaning for) product information that is missing or vague.[66] Further, the tendency to interpret and make inferences regarding incomplete product information varies across consumers, for example, based on individual differences in consumers' "need of cognition."[67]

146. To illustrate the type of research that demonstrates that consumers do *not* make inferences about unspecified or incomplete product information, consider the

[66] R. Kivetz and I. Simonson (2000), "The Effects of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37 (4), 427-448; J. Simmons and J. G. Lynch, JR. (1991), "Inference Effects without Inference Making? Effects of Missing Information on Discounting and Use of Presented Information," *Journal of Consumer Research*, 17 (March), 477-91.

[67] *E.g.*, R. Kivetz and I. Simonson (2000); J. T. Cacioppo and R. E. Petty (1982), "The Need For Cognition," *Journal of Personality and Social Psychology*, 42(1), 116-131; J. T. Cacioppo, R. E. Petty, J. A. Feinstein, and W. B. G. Jarvis (1996), "Dispositional Differences in Cognitive Motivation: The Life and Times of Individuals Varying in Need For Cognition," *Psychological Bulletin*, 119(2), 197-253.

following study, which was reported in an article that I co-authored.[68] This study used the three yogurts described in Figure 8 below, and participants were divided into three groups: one group chose between Yogurts A and B, a second group chose between Yogurts B and C, and a third group chose between Yogurts C and A. For each pair of yogurts, there is one ("common") attribute with full information and two ("unique") attributes where the information is specified for only one yogurt.

**Figure 8: Yogurts Described with Incomplete Information**

| | Yogurt **A** | Yogurt **B** | Yogurt **C** |
|---|---|---|---|
| Total Fat (range: 0g to 15g) | 8g | (Information Unavailable) | 1g |
| Vitamins A and C (range: 0% to 65% of RDA) | (Information Unavailable) | 50% | 20% |
| Blind Taste Rating (range: 0 to 100, where 0 is poor and 100 is exceptional) | 85 | 75 | (Information Unavailable) |

147. In the first group of participants, a majority (61%) chose Yogurt A over Yogurt B. In the second group of participants, a majority (69%) chose Yogurt B over Yogurt C. And, in the third group of participants, a majority (70%) chose Yogurt C over Yogurt A. As is clear from these results, participants exhibited intransitive preferences, that is, they preferred Yogurt A to B, Yogurt B to C, but Yogurt C to A.[69] Participants' binary choices were determined primarily by the common attributes on which information was available for both options (e.g., the attribute "Blind Taste Rating" in the binary choice set {A, B}), not by the unique attributes (e.g., the attributes "Total Fat" and "Vitamins A and C" in the binary choice set {A, B}) or by inferences regarding the unspecified attribute values. Of particular relevance to the present case, participants did

[68] See R. Kivetz and I. Simonson (2000).
[69] A preference-or-indifference relation, denoted ≥, is transitive if for any {A, B, C}, A ≥ B and B ≥ C imply A ≥ C. Preference *in*transitivity represents a clear violation of value maximization; *e.g.*, D. M. Kreps, (1990), *A Course in Microeconomic Theory*, Princeton University Press, Princeton.

*not* tend to infer or impute the value of unspecified (or unavailable) attribute values (e.g., participants did not tend to infer for Yogurt A the value of its "Vitamins A and C" attribute).

148. Importantly, the above research shows that consumers do *not* tend to make inferences about, or rely on, unspecified or incomplete product information. Other studies demonstrated that consumers are even less likely to speculate (make inferences) regarding incomplete information when they spend less cognitive effort (as is likely the case when viewing a toothpaste or deodorant package at the store).[70]

149. For consumers to infer a message of no artificial, synthetic, or chemically-processed ingredients from a "natural" claim, consumers would need to invest additional cognitive effort. As the consumer behavior literature suggests, consumers are *un*likely to expend the cognitive effort necessary to make such a specific inference.

B.3. Many Consumers Are Skeptical About "Natural" Claims

150. When consumers encounter, notice, pay attention to, and process a claim made on a product's package, they may accept the claim and incorporate it into their purchase decision-making, or instead, they may be skeptical of the claim. Academic research has documented that many consumers are skeptical of information that is provided to them by marketers.[71] For example, a review of polling data documents a long-standing belief among a majority (approximately 70%) of consumers that advertising is untruthful and attempts to persuade consumers to use products even when it is not in the consumers' interests.[72] A study of grocery store shoppers found that more than half of the consumers expressed strong doubts about advertised sale prices,

[70] *E.g.*, R. Kivetz and I. Simonson (2000); J. T. Cacioppo and R. E. Petty (1982), "The Need For Cognition," *Journal of Personality and Social Psychology*, 42(1), 116-131; J. T. Cacioppo, R. E. Petty, J. A. Feinstein, and W. B. G. Jarvis (1996), "Dispositional Differences in Cognitive Motivation: The Life and Times of Individuals Varying in Need For Cognition," *Psychological Bulletin*, 119(2), 197-253; Hoyer, W. D. (1984), "An examination of consumer decision making for a common repeat purchase product," *Journal of Consumer Research*, 822-829.
[71] Pollay, Richard W. and Banwari Mittal (1993), "Here's the beef: Factors, determinants and segments in consumer criticism of advertising," *Journal of Marketing*, 57 (3), 99-114.
[72] Calfee, John E., and Debra Jones Ringold (1994), "The 70% majority: Enduring consumer beliefs about advertising." *Journal of Public Policy & Marketing* 228-238.

incorrectly assuming that less than half of the purportedly discounted items were actually reduced in price, even though nearly all the items were reduced in price.[73] Relatedly, consumer behavior and decision-making research shows that consumers often react to marketing communications and promotions;[74] that is, consumers are often aware that marketers provide information in an attempt to influence them to make a purchase, and customers regularly counteract such influence tactics.[75]

151. Prior research has demonstrated that the highest levels of consumer skepticism occur for subjective claims that are difficult for the consumer to verify at the time of choice.[76] A "natural" claim is likely to be perceived as a subjective attribute by many consumers, given the lack of an established definition or certification process (*e.g.*, as opposed to "organic"). Furthermore, even if the consumer had their own working definition of "natural," most consumers would *not* be able to judge the accuracy of their interpretation of the claim without collecting additional information. As a result, many consumers are likely to be skeptical of the challenged "natural" claim.

152. Widespread skepticism about "natural" claims is documented in industry research, which states, based on a national survey, that: "consumers often perceive the term 'natural' simply as a marketing ploy."[77] Skepticism about food label claims in general was highest in the US.[78]

---

[73] Zaichkowsky, Judith Lynne, and Deborah Patricia Sadlowsky (1991), "Misperceptions of grocery advertising," *Journal of Consumer Affairs*, 25.1: 98-109.
[74] *E.g.*, R. Kivetz (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31 (4), March, 725-736. This article won the 2005 "Ferber Award" from the Association for Consumer Research, which is the largest association of consumer researchers in the world.
[75] M. Friestad and P. Wright (1994), "The Persuasion Knowledge Model: How People Cope with Persuasion Attempts," *Journal of Consumer Research*, 21, 1-31; P. Wright (1985), "Schemer Schema: Consumers' Intuitive Theories about Marketers' Influence Tactics," *Advances in Consumer Research*, 13, UT: Association for Consumer Research, 1-3.
[76] Ford, G. T., Smith, D. B., & Swasy, J. L. (1990), "Consumer Skepticism of Advertising Claims: Testing Hypotheses from Economics of Information," *Journal of Consumer Research*, 433-441.
[77] Hartman Group (2010) "Beyond Organic and Natural: Resolving Confusion in Marketing Food and Beverages", Hartman Group Syndicated Study, February 2010, p. 5.
[78] "Battle of the Bulge & Nutrition Labels: Healthy Eating Trends Around the World," Nielsen Report, January 2012, p. 5.

153. It is noteworthy that the proliferation in the marketplace of products with "natural" claims (as reviewed earlier in Subsection B.1) can also contribute to skepticism toward such claims, as well as to wide differences in consumers' understanding and valuation of such claims. Overall, consumers who are skeptical of natural claims are unlikely to draw any specific, common inferences about the disputed Tom's toothpaste and deodorant products.

B.4. Consumers Who Are Concerned about Artificial or Chemically-processed Ingredients Would *Not* Assume – Based on a "Natural" Packaging Claim – that Tom's Toothpastes and Deodorants Do Not Contain *Any* Artificial Ingredients

154. Consumers differ in how involved they are with a product category or product dimension, and accordingly, consumers vary in the extent to which they construe a purchase as important and worry about making a bad choice.[79] Consumers who possess the knowledge to draw distinctions between specific attributes and subcategories of products needed to form strong preferences about such product aspects as artificial ingredients, are the consumers who are most able to determine which brands best fit their needs.[80] Likewise, consumers who have strong preferences or negative opinions about a certain product characteristic, such as artificial, synthetic, or chemically-processed ingredients, and who therefore construe purchasing a product with the undesired product attribute to be risky or undesirable, are precisely those consumers who would be the most involved in the purchase decision and in the product category.[81] Highly involved consumers, in turn, engage with the category differently: they are more interested in getting additional information and comparing product characteristics,[82] spend more time

---

[79] See, *e.g.*, Laurent, G., & Kapferer, J. N. (1985). "Measuring consumer involvement profiles." *Journal of Marketing Research*, 41-53; Schrift R., O. Netzer, and R. Kivetz (2011), "Complicating Choice," *Journal of Marketing Research*.

[80] Hoyer, W. D., D. J. MacInnis, & R. Pieters, Consumer Behavior, Sixth Ed., 2013, South-Western Cengage Learning, p. 115.

[81] Hoyer, W. D., D. J. MacInnis, & R. Pieters, Consumer Behavior, Sixth Ed., 2013, South-Western Cengage Learning, p. 59.

[82] Zaichkowsky, J. L. (1985). "Measuring the involvement construct," *Journal of Consumer Research*, 341-352.

and attention on their purchase decisions, consider more product attributes, search for more product information, and keep themselves informed about the product category even when not actively making a purchase.[83] Furthermore, high involvement consumers are more likely to make their decisions based on the persuasiveness of available information and less likely to be affected by non-informative cues.[84]

155. While many consumers shopping for packaged goods spend very little time making their choice in-store,[85] highly-involved consumers would tend to spend more time and engage in more detailed product search. Those consumers who search more tend to be more intrinsically motivated and bigger spenders in the category.[86] Consumers who actively consider their product choices, take into account specific product claims, and weigh the benefits of different personal care products are exactly the consumers who will also be more likely to search for information about toothpastes and deodorants and about product claims. Thus, those consumers who are more likely to pay attention to a claim like "natural" are also those who are more likely to already have searched, or are searching, for information about the category and the specific products at issue.

156. For example, high involvement consumers would be more likely to read one or more of the other claims appearing on the disputed packages adjacent to the challenged "natural" claim. As explained earlier, such consumers may perceive the challenged "natural" claim as referring (or related) to one or more of these other claims; this would *diminish* the likelihood that such consumers would interpret the challenged "natural" claim to mean that the disputed products do *not* contain any artificial, synthetic, or chemically-processed ingredients.

---

[83] See, *e.g.*, Laurent, G., & Kapferer, J. N. (1985). "Measuring consumer involvement profiles." *Journal of Marketing Research*, 41-53.
[84] Petty, R. E., Cacioppo, J. T., & Schumann, D. (1983). "Central and peripheral routes to advertising effectiveness: The moderating role of involvement." *Journal of Consumer Research*, 10(2), 135.
[85] Dickson, P. R., & Sawyer, A. G. (1990), "The price knowledge and search of supermarket shoppers," *The Journal of Marketing*, 42-53.
[86] Bloch, P. H., Sherrell, D. L., & Ridgway, N. M. (1986), "Consumer search: an extended framework," *Journal of Consumer Research*, 119-126.

157. Further, consumers who are more involved with a product category or a product attribute are more interested in reading information from third-party sources (*i.e.*, *not* the manufacturer or marketer) about the category or attribute, and are more likely to differentiate between brands and to compare product characteristics across brands.[87] Therefore, consumers who care about product characteristics, such as artificial ingredients or "natural" claims, but do not have enough information to evaluate the product on such aspects, are more likely to search for additional sources of information beyond their initial impression of the package. Relatedly, data from a large-scale national survey, the DDB Needham Life Style Study, demonstrates that consumers who cared more about environmental packaging and environmentally-safe cleaners were more careful shoppers and were more interested in information about products.[88] Thus, highly involved consumers, who have strong preferences for personal care products without any artificial, synthetic, or chemically-processed ingredients, are the *least* likely to engage in shallow processing of an on-package "natural" claim and instead are the most likely to research the product attributes and ingredients they care about, investing time and effort to do so.

158. Consumers who have strong preferences regarding a product attribute are more motivated to find information about products and attributes, and therefore also tend to be more informed. For example, purchasers of organic products report feeling less confused about organic foods.[89] Likewise, consumers who are more concerned about perceived risks and disadvantages of artificial ingredients in personal care products should be more likely to be familiar with, and aware of, such artificial ingredients and their presence in personal care products. Thus, consumers who are trying to avoid artificial and chemically-processed ingredients are expected to be more likely to

---

[87] Zaichkowsky, J. L. (1985), "Measuring the Involvement Construct," *Journal of Consumer Research*, 341 - 352.
[88] Shrum, L. J., John A. McCarty, and Tina M. Lowrey (1995), "Buyer Characteristics of the Green Consumer and their Implications for Advertising Strategy," *Journal of Advertising*, 24 (2), 71 - 82.
[89] Finch, J. (2005), "The Impact of Personal Consumption Values and Beliefs on Organic Food Purchase Behavior," *Journal of Food Products Marketing*, 11 (4), p. 63-76.

scrutinize claims and seek out additional information. This is particularly true for claims relating to the ill-defined concept of "natural," which, as earlier, is seen skeptically by some consumers. As noted in the "Beyond Organic & Natural" report:[90]

> Consumers see 'natural' as a marketing term, meaningless alone, which may encourage them to investigate the product more, but is not enough by itself.

159. Consumers' tendency to search for information and deliberate their product choices is largely determined by how important the decision is to them and how much product information they believe they already have.[91] In particular, consumers who are *more concerned* about their purchases and who believe they do *not* have sufficient data tend to search more for product information, not only in-store, but also by talking to others as well as using media and third-party information sources.[92] Therefore, although some consumers have low, or no, knowledge about the ingredients identified in the class certification motion (sodium lauryl sulfate ["SLS"] and propylene glycol), those consumers who are sufficiently knowledgeable to have formed a strong preference for personal care products without any artificial ingredients are likely to be exactly the consumers who search for more information about the disputed products' ingredients and who realize that the disputed Tom's products contain sodium lauryl sulfate ["SLS"] or propylene glycol. Such discerning consumers are *not* likely to assume that the Tom's toothpastes and deodorants do not contain sodium lauryl sulfate and propylene glycol (respectively) just because of a "natural" packaging claim.

160. Relatedly, a relevant stream of academic research pertains to consumers' propensity to search for, and use, ingredient and nutrition information on product packages and labels. Such research indicates that considerable proportions (often more

---

[90] "Beyond Organic & Natural," p. 8.
[91] *E.g.*, Laurent, G., & Kapferer, J. N. (1985), "Measuring Consumer Involvement Profiles," *Journal of Marketing Research*, 41 - 53; Schrift, R., O. Netzer, and R. Kivetz (2011), "Complicating Choice," *Journal of Marketing Research*, 48 (2), 308 - 326; Urbany, J. E., Dickson, P. R., & Wilkie, W. L. (1989), "Buyer Uncertainty and Information Search," *Journal of Consumer Research*, 208 - 215.
[92] Beatty, S. E., & Smith, S. M. (1987), "External Search Effort: An Investigation Across Several Product Categories," *Journal of Consumer Research*, 83 - 95.

than 75%) of consumers are aware of, search for, and review, the ingredients list and the nutrition facts.[93] Because the disputed Tom's products listed the contested ingredients on their packaging, the tendency to search for, and review, the ingredients list is inconsistent with the deception alleged in this litigation. Consumers who read the ingredients list on the disputed Tom's products' packages would realize that the products contain sodium lauryl sulfate or propylene glycol.

161. Importantly, researchers have found multiple factors that lead to significant and systematic differences between consumers in the tendency to review ingredients and nutrition labels; such factors include differences in demographics (specifically age, gender, region, urbanization, education, household size, race, and income), differences in employment status, and differences in health concerns.[94] Such differences between consumers in the tendency to review ingredients and nutrition labels is diametrically opposed to Plaintiffs' contention that there is commonality across all (or most) of the proposed Class and Subclasses members with regards to the alleged deception.

---

[93] S.Y. Kim, R. M. Nayga, Jr., and O. Capps, Jr. (2001), "Food Label Use, Self-Selectivity, and Diet Quality," *The Journal of Consumer Affairs*, 35 (2), 346-363; R. M. Nayga, Jr. (1996), "Determinants of Consumers' Use of Nutritional Information on Food Packages," *Journal of Agricultural and Applied Economics,* 28 (2), 303–312; G. A. Zarkin and D. W. Anderson (1992), "Consumer and Producer Responses to Nutrition Label Changes," *American Journal of Agricultural Economics*, (74) 5, pp. 1202-1207.

[94] L. F. Feick, R. O. Herrmann, and R. H. Warland (1986), "Search for Nutrition Information: A Probit Analysis of the Use of Different Information Sources," *Journal of Consumer Affairs*, 20 (2) 173-192; S.Y. Kim, R. M. Nayga, Jr., and O. Capps, Jr. (2001); R. M. Nayga, Jr. (1996).

## C. THE CONCLUSIONS DRAWN FROM TOM'S INTERNAL RESEARCH BY PLAINTIFFS AND THEIR EXPERTS ARE NEITHER SUBSTANTIATED NOR VALID

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

---

[95] *Memo ISO Motion for Class Certification*, pp. 2 – 3.

[96] COLGATETOMS00011847, p. 2.

[97] COLGATETOMS00023391, p. 7.

[98] *Memo ISO Motion for Class Certification*, pp. 2 – 3.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[99] COLGATETOMS00011847, p. 4.
[100] *Ibid*, p. 7.
[101] *Ibid*.
[102] *Ibid*. [redacted]

[redacted]

[103] COLGATETOMS00011847, p. 8.
[104] Declaration of Colin B. Weir, pp. 3 – 4.
[105] COLGATETOMS00013657 CONFIDENTIAL.pptx, p. 17. [redacted]
[106] *Ibid.*

[redacted]

[redacted]

[redacted]

107 "COLGATETOMS00013657_CONFIDENTIAL.pptx," p. 17. [redacted]
108 Dennis Report, pp. 7 & 13.
109 COLGATETOMS00020980, p. 5; COLGATETOMS00021173, p. 5; COLGATETOMS00023391, pp. 8, 12-14.
110 Dennis Report, pp. 7 & 13.
111 COLGATETOMS00014108.
112 COLGATETOMS00005284.

[redacted]

[redacted]

---

[113] *Memo ISO Motion for Class Certification*, pp. 3 & 9.
[114] COLGATETOMS00022476, pp. 15 – 17.
[115] COLGATETOMS00022476, pp. 46 & 48.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

116 *First Amended Class Action Complaint*, ¶ 16.
117 COLGATETOMS00022476, p. 50.
118 *Memo ISO Motion for Class Certification*, p. 7.
119 COLGATETOMS00021920, p. 14.
120 COLGATETOMS00014108, p. 17.
121 *Memo ISO Motion for Class Certification*, p. 7; Weir Declaration, p. 3 ([redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

122 *Memo ISO Motion for Class Certification*, p. 7.
123 COLGATETOMS00014108, p. 51.
124 COLGATETOMS00014108, p. 17. [redacted]
125 Weir Declaration, p. 4.
126 *Ibid*, p. 3.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

127 Weir Declaration, p. 4 [Footnotes removed].

128 COLGATETOMS00013164, p. 8.

[redacted]

> [redacted]

- [redacted]
- [redacted]
- [redacted]

[redacted]

[redacted]

[redacted]

---

[129] COLGATETOMS00011738, p. 3.
[130] COLGATETOMS00013164, p. 2.
[131] COLGATETOMS00013164, p. 13.
[132] *Ibid*.

[redacted]

******************

[133] "COLGATETOMS00013657_CONFIDENTIAL.pptx," p. 17.
[134] COLGATE00013657, Slide 17.

## D. EVALUATION OF THE DENNIS SURVEY AND ITS ALLEGED "PRICE PREMIUM" ESTIMATION

### Introduction

[redacted]

135 Dennis Report, ¶ 14.
136 *Ibid*, ¶ 24.
137 *Ibid*, ¶ 25.
138 *Ibid*, ¶ 28.
139 *Ibid*, ¶ 36.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[140] Dennis Report, ¶ 28.
[141] *Ibid*, ¶¶ 34 - 36.
[142] *Ibid*, ¶ 28 & Attachment E, pp. 35 - 39.
[143] *Ibid*, ¶ 56.
[144] *Ibid*, ¶¶ 61 & 62.

[redacted]

[145] See, *e.g.*, R. Kivetz and I. Simonson (2002), "Self Control for the Righteous: Toward a Theory of Pre-Commitment to Indulgence," *Journal of Consumer Research*, 29 (2), (September), 199-217. This article was a finalist for the award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 2002 and 2005.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

146 See, *e.g.*, Dennis Report, ¶ 22; *ibid*, Attachments D & E.
147 *Ibid*, ¶ 28.
148 See Dennis Report, Attachment E.
149 Dennis Report, ¶ 28.
150 *Ibid*, ¶¶ 34 – 36; see also *ibid*, Attachment E.

[redacted]

[151] Simonson, Itamar and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S.S. & J. Swann (eds), American Bar Association. *See also* Russell Winer (1999), "Experimentation in the 21st Century: The Importance of External Validity," *Journal of the Academy of Marketing Science,* 27 (3), 349-358.
[152] *McCarthy* at §32:163.
[153] See, *e.g.*, *Simon Property Group L.P. v. MySimon, Inc*., 104 F. Supp. 2d 1033; 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, "Opinion & Order," 06 Civ. 550 (U.S. SDNY; Aug. 2007); *THOIP v. The Walt Disney Co. et al*., OPINION AND ORDER, (08 Civ. 6823; S.D. NY; Feb. 2010).

[redacted]

[154] See Simonson and Kivetz (2012) in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*.

[155] See, *e.g.*, M. Orne (1962), "On the Social Psychology of the Psychological Experiment," *American Psychologist*, 17, 776-783; W. Darley and J. Lim (1993), "Demand Artifacts in Consumer Research: An Alternative Perspective," *Journal of Consumer Research*, 20 (December), 489-95.

[156] [redacted]

[157] See Simonson and Kivetz (2012) in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*.

[158] See, *e.g.*, *Simon Property Group L.P. v. MySimon, Inc.*, 104 F. Supp. 2d 1033; 2000, U.S. Dist. S.D. Indiana; *Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, "Opinion & Order," 06 Civ. 550 (U.S. SDNY; Aug. 2007); *Government Employees Insurance Company v. Google Inc., et al.*, East. Dist. of Virginia, 2005 U.S. Dist. LEXIS 18642; 77 U.S.P.Q.2D (BNA) 1841; *THOIP v. The Walt Disney Co. et al.*, OPINION AND ORDER, (08 Civ. 6823; S.D. NY; Feb. 2010).

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

*****************

[159] See, *e.g.*, COLGATETOMS00005158, COLGATETOMS00005284, and COLGATETOMS00005503. [redacted]

[160] Dennis Report, ¶ 28.

[161] This example was copied from the Dennis Report, p. 18.

[redacted]

[redacted]

[redacted]

---

[162] Dennis Report, ¶ 16.
[163] COLGATETOMS00005158, COLGATETOMS00005284 and COLGATETOMS00005503.
[164] COLGATETOMS00005158
[165] See, *e.g.*, R. Winer and R. Dhar (2011), *Marketing Management*, 4th Edition, Prentice Hall, p. 204.
[166] Note that the Dennis Survey showed participants toothpaste brand logos.

[redacted]

[redacted] [redacted]

> [redacted]

[redacted] [redacted]

[redacted] [redacted] [redacted] [redacted]

[redacted] [redacted].

167 Dennis Report, ¶ 38 & Attachment C.

168 *Ibid*, ¶ 41.

169 See Dennis Report, Attachment F.

[redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

---

[170] Dennis Report, ¶ 30.

[171] *E.g.*, David A. Houston, Steven J. Sherman, and Sara M. Baker (1991), "Feature Matching, Unique Features, and the Dynamics of the Choice Process: Predecision Conflict and Postdecision Satisfaction," *Journal of Experimental Social Psychology*, 27, 411-430; Ravi Dhar and Steven J. Sherman (1996), "The Effect of Common and Unique Features in Consumer Choice," *Journal of Consumer Research*, 23 (3), 193-203.

[172] *E.g.*, B. A. Mellers and K. Biagini (1994), "Similarity and Choice," *Psychological Review*, 101 (3), 505-518.

[173] *E.g.*, A. Tversky (1972), "Elimination by Aspects: A Theory of Choice," *Psychological Review*, 79 (4), 281-299; D. Kahneman and A. Tversky (1979), "Prospect Theory: An Analysis of Decision Under Risk," *Econometrica*, 47 (March), 313-327.

[redacted]

174 See, *e.g.*, Schkade and Kahneman (1998); Kahneman, Daniel, Alan B. Krueger, David Schkade, Nobert Schwarz, and Arthur A. Stone (2006), "Would You Be Happier If You Were Richer? A Focusing Illusion," *Science*, 312, 1908–1910; Wilson, Timothy D., Thalia Wheatley, and Jonathan M. Meyers (2000), "Focalism: A Source of Durability Bias in Affective Forecasting," *Journal of Personality and Social Psychology*, 78 (5), 821–36.

175 Schkade and Kahneman (1998), p. 340.

176 Huber, Joel (1997), "What We Have Learned from 20 Years of Conjoint Research," *Research Paper Series*, Sequim, WA: Sawtooth Software, Inc., p. 10.

[redacted]

[redacted]

177 *McCarthy* at §32:163.

[redacted]

> [redacted]

[redacted]

*****************

---

[178] J. P. Peter and J. C. Olson (2008), *Consumer Behavior and Marketing Strategy,* 8th Edition, Mcgraw-Hill/Irwin, pp. 48-50.

[179] *Ibid*, pp. 48-50, 109-110, and 119-120.

[redacted]

[redacted]

180 Dickson, P. R., & Sawyer, A. G. (1990), "The price knowledge and search of supermarket shoppers," *The Journal of Marketing*, 42-53.; Hoyer, W. D. (1984), "An examination of consumer decision making for a common repeat purchase product," *Journal of Consumer Research*, 822-829.
181 Dickson & Sawyer (1990).
182 *Ibid*.
183 Swann, Jerre B. (2012), "Survey Critiques," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, Diamond, S.S. & J. Swann (eds), American Bar Association, pp. 373-374.
184 *Ibid*, pp. 374-375.
185 See *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 405 (D.N.J. 2011).

[redacted]

[186] Quoted in *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242 (11th Cir. 2002).
[187] See, *e.g.*, *NAD*'s decision in Case #4919 (08/28/08; pp. 1 & 15; footnote 18), which states that "NAD noted that its task in any given proceeding is limited to evaluating the challenged claims in the context of the advertising in which they appear" (p. 15).
[188] *E.g.*, Anderson (1985); Kivetz et al. (2004a & 2004b); Simonson and Tversky (1992).

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[189] See, *e.g.*, Green, Paul E. and V. Srinivasan (1990). "Conjoint Analysis in Marketing Research: New Developments and Directions." *Journal of Marketing,* 54 (October), p. 7.

[redacted]

190 [redacted]

192 See Excel filed titled "Attachment J Raw Utility Data from Price Premium Survey.xlsx."

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[193] *E.g.*, Nowlis, Stephen M. and Itamar Simonson (1996), "The Effect of New Product Features on Brand Choice," *Journal of Marketing Research*, 33 (February), 36-46.

[redacted]

[redacted]

[redacted]

[redacted]

---

194 Murdock Jr, Bennet B. (1962), "The Serial Position Effect of Free Recall," *Journal of Experimental Psychology*, 64 (5), 482; Klatzky, R. L. (1975), "Human Memory: Structures and Processes," San Francisco: W.H. Freeman & Co.

195 *E.g.*, Malhotra, N. K. (2004); Diamond (2011), pp. 395-396; *see also* Ravi Dhar and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," *Journal of Marketing Research*, 29 (November), 430-440.

196 Johnson, Richard M. (1989), "Assessing the Validity of Conjoint Analysis," *Sawtooth Software Conference Proceedings*, pp. 273 - 274, & 279.

[redacted]

[197] Chrzan, Keith. (1994), "Three Kinds of Order Effects in Choice-Based Conjoint Analysis," *Marketing Letters*, 5 (2), 165-172.

[198] See, *e.g.*, Green, Paul E., and V. Srinivasan (1978), "Conjoint Analysis in Consumer Research: Issues and Outlook," *Journal of Consumer Research*, 5 (2), 103-123.

[199] *E.g.*, Diamond (2011), 395-396.

[200] Gensler, Sonja, Hinz, Oliver, Skiera, Bernd and Theysohn, Sven (2012), "Willingness-to-pay Estimation with Choice-based Conjoint Analysis: Addressing Extreme Response Behavior with Individually Adapted Designs, *European Journal of Operational Research*, 219 (2), p. 377.

[redacted]

[redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted] [redacted]

[redacted]

[redacted] [redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted]

201 *Ibid*, p. 369.
202 See spreadsheet titled "Accumulated Data.csv".
203 See *ibid*.

[redacted]

[204] See "Attachment K Market Simulator for Price Premium Survey.xlsm".
[205] Dennis Report, ¶ 59.
[206] *Ibid*.
[207] *Ibid*, ¶ 58.

[redacted]

208 See Exhibit L, pp. 6 - 16.
209 See Dennis Report, Attachment F.
210 COLGATETOMS00005158, COLGATETOMS00005284 and COLGATETOMS00005503.

[redacted]

211 See, *e.g.*, S. Diamond (2011), p. 412; Phyllis J. Welter, *Trademark Surveys*, at §8:05; 1996; CBC.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[212] See Dennis Report, ¶¶ 53, 59 – 63.
[213] See *ibid*, ¶ 59.
[214] *Ibid*.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[215] See, *e.g.*, Orme, Bryan K. (2010), "Interpreting the Results of Conjoint Analysis," Chapter 9 in *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Second Edition, Madison, Wis.: Research Publishers LLC; see also Ofek, Elie, and V. Srinivasan (2002), "How Much Does the Market Value an Improvement in a Product Attribute?," *Marketing Science*, 21 (4), 398-411.
[216] Orme (2010), Chapter 9. This book, as well as chapters from this book, are referenced in the Dennis Report, FNs 15 & 17, and in the Weir Declaration, FNs 15 & 16. See also Orme, Bryan K. (2001), "Assessing the Monetary Value of Attribute Levels with Conjoint Analysis: Warnings and Suggestions," Sawtooth Software, Inc., p. 4.
[217] Orme (2010), p. 87.

[redacted]

[redacted]

[redacted] [redacted]
[redacted]

> [redacted]

[redacted]

> [redacted]

---

[218] Dennis Report, ¶ 17.
[219] *Ibid*, ¶ 32; see also ¶¶ 33 & 57.

[redacted]

[redacted]

[redacted]

[redacted]

---

220 Weir Declaration, ¶¶ 38 – 50.

221 Dennis Report, ¶¶ 17 & 32; Weir Declaration, ¶¶ 38 - 50.

222 Dennis Report, ¶ 32; see also Weir Declaration, ¶¶ 39 - 48.

[redacted]

[223] Weir Declaration, ¶ 41.

[redacted]

[redacted]

## Conclusion: Evaluation Of The Dennis Survey

[redacted]

[redacted]

---

[224] Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi (2014a), "Economic Valuation of Product Features," *Quantitative Marketing and Economics*,12 (4), 421-456; Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi (2014b), "Valuation of Patented Product Features," *The Journal of Law and Economics*, 57 (3), 629-663.

[225] *Ibid*.

[redacted]

[redacted]

[redacted]

[redacted]

---

226 Dennis Report, ¶ 15.
227 *Ibid*, ¶ 66.
228 *Ibid*, ¶ 45.

[redacted]

[redacted]

[229] See *ibid*, ¶¶ 38 & 66; Attachments C & F.
[230] See *ibid*, Attachment F.
[231] *Ibid*, ¶ 45.
[232] See *ibid*, Attachment F, p. 5.

[redacted]

[redacted] [redacted]

[redacted] [redacted]

*****************

## E. EVALUATION OF MR. WEIR'S "PRICE PREMIUM **DAMAGES**" ESTIMATION AND WHETHER, IN THIS CASE, IT IS POSSIBLE TO RELIABLY CALCULATE DAMAGES ON A CLASS-WIDE BASIS

### Introduction

[redacted]

[redacted]

[redacted]

[redacted]

233 Weir Declaration Report, ¶ 5.
234 *Ibid*, ¶ 15.
235 *Ibid*, ¶¶ 16, 31 – 37, & 51 – 52.
236 *Ibid*, ¶¶ 58 – 62.
237 *Ibid*, ¶¶ 61 & 63.

[redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted].

[redacted] [redacted]

238 Weir Declaration, ¶ 53.
239 *Ibid*, ¶ 15 & 61
240 Dennis Report, ¶¶ 61 - 62.
241 Weir Declaration, ¶¶ 16, 31 – 37, & 50 - 63.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

[242] *Ibid.*
[243] *Ibid.*

[redacted]

[244] See, *e.g.*, Orme, Bryan K. (2010), Chapter 9; Ofek and Srinivasan (2002).
[245] See, *e.g.*, Allenby et al. (2014a & 2014b).

[redacted]

[redacted]

[redacted]

246 *E.g.*, Gupta and Lehmann (2005); Kivetz and Simonson (2002).
247 See, *e.g.*, Aaker (1991); Hoyer and Brown (1990); Keller (2008); Kivetz et al. (2006); Pieters and Warlop (1999).

[redacted]

[redacted]

[redacted]

*****************

## F. IT IS *NOT* POSSIBLE TO IDENTIFY PUTATIVE CLASS AND SUBCLASSES MEMBERS IN A RELIABLE AND VALID MANNER BY USING EITHER CONSUMER SELF-IDENTIFICATION OR LOYALTY CARD DATA

306. Like other consumer packaged goods (CPG) manufacturers, Defendants have very little individual-level sales and consumer data, and therefore, individual notice to the putative Class and Subclasses members is *not* likely to be possible in this action. Thus, to identify and manage the putative Class and Subclass, Plaintiffs may seek to rely on consumers' ability to accurately self-identify and self-select into the putative Class and Subclass. Alternatively, Plaintiffs may argue that the putative Class and Subclasses can be ascertained by using retailer (loyalty card) data. However, as detailed in this section, academic and industry research, as well as Plaintiffs' specific definition of the Class and Subclasses in this case, indicate that it is impossible to identify members of Plaintiffs' proposed class in a reliable and valid manner using either consumer self-identification or retailer data.

### F.1. The Putative Class And Subclasses Members Cannot Self-Identify In A Reliable And Valid Manner

307. According to Plaintiffs, "[t]he Class and Subclasses consist of 'persons in the United States who purchased Tom's of Maine Toothpaste and/or Deodorant Products on or after September 24, 2015.'"[248] Thus, the putative Class and Subclasses period does not cover the entire period of sales of the disputed Tom's toothpaste and deodorant products. Instead, the class definition covers approximately only the past three years of sales of the disputed products. Thus, in order for consumers to accurately self-identify into the putative Class and Subclasses, consumers will have to remember *when* they purchased the disputed Tom's products, and specifically, whether they bought the products within the past three years or at an earlier time. They may also be required to identify which specific product they purchased, to the extent that Plaintiffs have not accused all of toothpastes and deodorants manufactured by Tom's.[249]

---

[248] *Memo ISO Motion for Class Certification*, p. 15.
[249] *Declaration of Neal J. Deckant in Support of Plaintiffs' Motion for Class Certification*, at Ex. 1.

308. As detailed in this subsection, consumers will not be able to self-identify in a valid and reliable manner into the putative Class and Subclasses. Such self-identification by the putative Class and Subclasses members will be unreliable, inaccurate, and susceptible to biases arising from memory limitations, as explained next.

309. The disputed products in this case are nondurable consumer packaged goods (CPGs). Consumers buying such products typically have no reason to retain the package after they use its content. Further, the putative Class and Subclasses members are unlikely to have proof of purchase (receipts) showing that they bought the disputed Tom's toothpaste and deodorant products during the relevant class period.

310. Given that individual identification and notice of Class and Subclasses members is highly unlikely in this litigation, ascertaining the putative Class and Subclasses will likely require its members to self-identify in response to a published notice. To do so, the putative Class and Subclasses members will need to be able to reliably recall *whether* they bought the disputed Tom's toothpaste and deodorant products and, if they remember buying the disputed products, *when* did they purchase the disputed products (*i.e.*, during the relevant class period *or* before September 24, 2015). As detailed next, considerable research on human memory, indicate that the putative Class and Subclasses members would *not* be able to accurately remember the required details and reliably self-identify.

311. Research shows that human memory is both limited and diminishing with the passage of time.[250] For example, academic research demonstrates that over half of shoppers cannot recall price and purchase-related information regarding items that they just placed in their shopping cart.[251] This finding is inconsistent with the notion that consumers will be able to remember the necessary details in order to reliably and validly self-identify into the putative class in this case.

---

[250] *E.g.*, J. R. Anderson (1985), *Cognitive Psychology and Its Implications*, W.H. Freeman and Company.
[251] P. R. Dickson and A. G. Sawyer (1990), "The Price Knowledge and Search of Supermarket Shoppers," *Journal of Marketing*, 54 (July), 42-53.

312. Academic research indicates that memory decays over time even when the event or behavior is important and distinctive. For example, while only 3% of respondents fail to recall their hospitalization when interviewed within ten weeks of the hospitalization, 42% fail to do so when interviewed after one year.[252] The behaviors and outcomes at issue in the present case (*e.g.*, purchases of toothpaste and deodorants) are *not* more important or unique relative to a hospitalization episode, and the putative class members will be asked to recall purchases that could have occurred more than three years prior to the class notice (as early as 2015). Thus, the putative Class and Subclasses members' memory regarding their purchases of the disputed Tom's toothpaste and deodorant products is expected to be less accurate and less reliable than that of people who are interviewed one year after an episode of hospitalization.

313. Research demonstrates that autobiographical memories are weak and inaccurate when the target behavior consists of recurring and similar events (*e.g.*, purchases of personal care products). In such cases, the various instances of the target behavior tend to blend into a global representation that lacks specific time markers and in which the individual episodes of the target behavior become indistinguishable and irretrievable.[253] For example, people can more accurately recall a single episode of unemployment than multiple such episodes.[254] Overall, memory not only deteriorates over time, but also the recall of events is often limited to highly important and unique behaviors and events. It is noteworthy that memory can be enhanced by restricting the recall task to a short and recent reference period. However, in the present litigation, to self-identify, the putative Class and Subclasses members will need to recruit memories from a relatively long and distant reference period. Thus, academic research on human memory suggests that the putative Class and Subclasses members would have inaccurate

---

[252] Cited in N. Schwarz and D. Oyserman (1992), "Asking Questions About Behavior: Cognition, Communication, and Questionnaire Construction," *American Journal of Evaluation*, 22 (2), 127-160.
[253] N. Schwarz and D. Oyserman (1992).
[254] Cited in N. Schwarz and D. Oyserman (1992).

and unreliable memory with regard to their purchases of toothpastes and deodorants over multiple years *and the timing* of any such purchases.

314. As discussed earlier, to reliably self-identify, the putative Class and Subclasses members have to accurately remember whether they bought a disputed Tom's product and -- if they do recall buying a disputed Tom's product -- whether they purchased that Tom's toothpaste or deodorant during the relevant class period (*i.e.*, on or after September 24, 2015). Considering the likelihood that purchasers of Tom's toothpastes and deodorants also bought these products prior to September 24, 2015, together with the limitations of human memory, my professional opinion is that the putative Class and Subclasses members will *not* be able to self-identify in a reliable and valid manner.

315. The academic research on human memory reviewed above, as well as the aforementioned conclusion, is consistent with the Plaintiffs' deposition testimonies. For example, Plaintiff Moran could not remember when she bought the Tom's deodorant products, and whether that was during the class period, as shown in the following testimony:[255]

Q. All right. For what period of time did you purchase Tom's deodorant products?
A. Don't recall offhand.
Q. Do you recall generally?
A. Looking at the picture here, and this one was expiring 1/17, so I definitely had it then.
Q. You definitely had it in -- well, this expires in 1/17.
A. Yeah.
Q. Does that give you any information about when you purchased it?
A. No. No, so I started purchasing it -- as I said, I don't recall exactly. I'm going to say sometime in the fall of 2015, winter of 2016. Sometime during that period.
Q. Okay. So what's the earliest time you think you might have purchased the Tom's deodorant product? When school started?
A. It was sometime after the start of school.

---

[255] Moran Deposition, pp. 47 – 49.

Additionally, Plaintiff Moran could *not* remember how much she paid for the Tom's product and how many times she purchased.[256]

316. Similarly, Plaintiff Wright could *not* recall where she purchased the Tom's product.[257] However, Plaintiff Wright did remember that she has been purchasing the Tom's product for at least five, if not ten, years, that is, before the class period had begun.[258] Surprisingly, Ms. Wright could *not* remember how and when she became a named Plaintiff in this litigation:[259]

> Q. Okay. Ms. Wright, can you tell me how it is that you came to be a plaintiff in this case?
> A. I don't remember. I don't remember. This has been going on for about three years that I've received paperwork and -- but I don't remember the original way I came to do this.
> Q. So you don't know how you became a plaintiff in this case?
> A. No.

F.2. In This Case, Retailer Loyalty Card Data Would *Not* Allow To Reliably Identify The Class Members

317. Plaintiffs may argue that, if consumer self-identification is unreliable, then retailer loyalty card data can ascertain the putative Class and Subclasses. However, as explained next, academic and industry research, as well as other sources, indicate that in the present matter retailer data would *not* permit to reliably identify class members.[260]

318. ***First***, in order for loyalty card data to reliably ascertain the putative Class and Subclasses, the adoption among retailers of such loyalty programs must be near universal. However, *not* all retailers operate a loyalty program.[261]

---

[256] *Ibid*, pp. 49, & 67.
[257] Wright Deposition, pp. 13 – 14.
[258] *Ibid*, p. 25.
[259] *Ibid*, p. 15, & 18 - 19.
[260] Particularly relevant to the analysis herein is my extensive academic research, teaching, business consulting, and executive education on loyalty programs and incentives, including with companies and retailers offering consumer loyalty programs and rewards. I have conducted and published (in top-tier, peer-reviewed journals) considerable research on these topics, have carefully studied and reviewed the research of other scholars, and have taught these subjects at Columbia University Business School to MBA and executive MBA students as well as to my doctoral students. I have also advised many companies on constructing, evaluating, and enhancing their consumer loyalty programs.
[261] See, *e.g.*, B. Tuttle (2013), "A Disloyalty Movement? Supermarkets and Customers Drop Loyalty Card Programs," *Time*.

319. ***Second***, many retailers use proprietary data systems that change over time and also store the retailer's data in different databases. Further, when a consumer makes a cash purchase without a loyalty card, there is no way for the retailer to record the transaction for that individual consumer. My professional opinion is that the nature of the individual-level consumer and loyalty card data systems used by retailers will make it extremely difficult, if not impossible, to reliably ascertain the putative Class and Subclasses using such data.

320. ***Third***, in order to employ loyalty card data to ascertain the putative Class and Subclasses, consumers' loyalty program enrollment and card usage must be near universal. However, academic and industry research demonstrate that consumers' enrollment and participation in loyalty programs is far from universal.[262] Such academic and industry research indicates that, across a variety of loyalty/reward programs, customer enrollment rates are significantly lower than 100%.[263] In fact, industry pundits cite limited enrollment and weak consumer interest as one the main reasons underlying the failure and discontinuation of various loyalty/reward programs.[264] Indeed, given that a major challenge facing marketing managers is to increase the rate of customer enrollment and participation in loyalty/reward programs, academic research has examined the factors that influence consumers' likelihood of joining and participating in such programs.[265]

321. ***Fourth***, considerable research indicates that consumers do *not* consistently remain engaged in loyalty (reward) programs, do not always use their reward cards, and,

---

[262] See, *e.g.*, Dowling, G.R. & M. Uncles. (1997), "Do Customer Loyalty Programs Really Work?" *Sloan Management Review*, 38 (Summer), 71-82; O'Brien, L. & C. Jones. (1995). "Do Rewards Really Create Loyalty?" *Harvard Business Review*, (May-June), 75-82; Colloquy, 1997, 5 (4), pp. 4-10; R. Kivetz (2005), "Promotion Reactance: The Role of Effort-Reward Congruity," *Journal of Consumer Research*, 31 (4), March, 725-736; R. Kivetz (2003), "The Effects of Effort and Intrinsic Motivation on Risky Choice," *Marketing Science*, 22 (4), 477-502; R. Kivetz and I. Simonson (2003), "The Idiosyncratic Fit Heuristic: Effort Advantage as a Determinant of Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40 (4), 454-467; Kivetz and Simonson (2002).

[263] See, *e.g.*, Dowling & Uncles. (1997); O'Brien & Jones (1995); Colloquy, 1997, 5 (4), pp. 4-10; Kivetz (2005); Kivetz (2003); Kivetz and Simonson (2003); Kivetz and Simonson (2002).

[264] *E.g.*, Dowling, G.R. & M. Uncles. (1997), "Do Customer Loyalty Programs Really Work?" *Sloan Management Review*, 38 (Summer), 71-82; O'Brien, L. & C. Jones. (1995). "Do Rewards Really Create Loyalty?" *Harvard Business Review*, (May-June), 75-82; Colloquy, 1997, 5 (4), pp. 4-10.

[265] See, *e.g.*, Kivetz (2005); Kivetz (2003); Kivetz and Simonson (2003); Kivetz and Simonson (2002).

in fact, cease participating in most of the loyalty programs in which they enroll.[266] For example, academic research on loyalty/reward programs demonstrates that, once enrolled in a program, customers often begin working toward a reward, but then cease their efforts before reaching the program's goal and attaining a reward.[267] Relatedly, researchers have found that: (*i*) as much as 71% of earned loyalty points are never exchanged for rewards; (*ii*) in some programs 50% to 70% of potential rewards remain unredeemed; and (*iii*) more than 41% of consumers rarely or never redeem their loyalty program rewards.[268] Moreover, the average U.S. household member remains active *in less than half* (44%) of the loyalty/reward programs in which the household enrolled.[269]

322. It is noteworthy that a variety of factors could lead consumers to avoid joining loyalty programs or to stop engaging/participating in such programs (*i.e.*, churn). Such reasons include, but are not limited to: a suboptimal program structure, unclear program goals, non-motivating rewards or incentives, lack of recognition and personalization for individual members, *in*effective program communications, program "clutter," and privacy concerns. Further, privacy concerns, which are particularly relevant in grocery and drug store loyalty (discount) card programs, can "suppress[] active loyalty-program participation," as stated in one industry research report:[270]

> Increasing wariness of use of personal data. Savvy customers understand that loyalty programs gather and utilize customer data to make marketing decisions. If programs are not crystal-clear in providing benefit to the customer in exchange for that information, and are not clear in their privacy policy, consumers can back off from participating.

---

[266] See, *e.g.*, Kivetz, Urminsky, and Zheng, (2006); Bijmolt, Tammo H. A., Matilda Dorotic, and Peter C. Verhoef (2010), "Loyalty Programs: Generalizations on Their Adoption, Effectiveness and Design," *Foundations and Trends in Marketing*, 5(4), 197–258; X. Drèze and S.J. Hoch. (1998), "Exploiting the Installed Base Using Cross-Merchandising and Category Destination Programs," *International Journal of Research in Marketing*, 15 (5), 459-471; S. Dubner and S. Levitt, "The Gift Card Economy," *The New York Times,* Jan. 7, 2007; Berry, Jeff (2013), "Bulking Up: The 2013 COLLOQUY Loyalty Census: Growth and Trends in U.S. Loyalty Program Activity," June, COLLOQUY.
[267] *E.g.*, Kivetz, Urminsky, and Zheng, (2006).
[268] Bijmolt et al. (2010); Drèze and Hoch (1998); Dubner and Levitt (2007).
[269] Berry, Jeff (2013), "Bulking Up: The 2013 COLLOQUY Loyalty Census: Growth and Trends in U.S. Loyalty Program Activity," June, COLLOQUY.
[270] *Ibid*, p. 5.

323. As I have taught my PhD, MBA, and Executive MBA students at Columbia University Business School, and consistent with the above cited research, one of the most difficult challenges for retailers launching loyalty programs is to garner sufficient consumer enrollment, engagement, and persistence in the program. In the current case, the notions that *not* all consumers would want to join a retailer's loyalty card program and that *not* all consumers would prefer to consistently use the loyalty card mean that it is impossible to reliably identify the putative Class and Subclasses members.

324. ***Fifth***, the inability to ascertain the putative Class and Subclasses using loyalty card data is also supported by academic research that demonstrates increased heterogeneity (differences) among consumers in their behaviors and responses to loyalty programs. Academic research on loyalty programs indicates that consumers vary widely in their willingness to join loyalty programs, in their engagement and persistence during the program, in their reward preferences, and in their attainment (or lack thereof) of goals and rewards.[271] For example, consumers with higher spend levels (*e.g.*, larger transactions) are more likely to earn rewards, and therefore, more likely to enroll in the loyalty program, more likely to engage in the program (*e.g.*, use a discount card), and more likely to exhibit loyalty and persistence in the program.[272]

325. Loyalty program members also differ substantially in terms of whether and how they react to program incentives and in their long-term response, if any, to the reward program. For example, in a retail setting including grocery products, academic researchers identified different kinds of consumers by their response to the introduction of a loyalty/reward program.[273] Two small segments (comprising 3.3% of card members) had high card usage and long-term increases in their spending. However, large segments of consumers had strong decreases in their program behavior over time, either continuing

---

[271] *E.g.*, Kivetz (2005); Kivetz (2003); Kivetz and Simonson (2003); Kivetz and Simonson (2002); Kivetz, Urminsky, and Zheng, (2006).
[272] *E.g.*, Lewis, M. (2004), "The Influence of Loyalty Programs and Short-Term Promotions on Customer Retention," *Journal of Marketing Research*, 41(3), 281-292.
[273] Allaway, A. W., Gooner, R. M., Berkowitz, D., & Davis, L. (2006), "Deriving and Exploring Behavior Segments within a Retail Loyalty Card Program," *European Journal of Marketing*, 40 (11/12), 1317-1339.

to use their card but spending less (36%) or largely ceasing card usage after relatively few trips (39%).[274] Additionally, research indicates that consumers vary in how much their purchases are affected by progress towards earning a reward.[275]

326. Overall, academic and industry research on loyalty (reward) programs supports the notion that many of the putative Class and Subclasses members would either forego joining retailers' loyalty programs or would fail to persist in using the loyalty program card. This, in turn, means that any attempt to ascertain the Class or Subclasses using such retailer data would be unreliable and invalid.

327. In summary, my professional opinion is that, in the present litigation, it is impossible to ascertain the putative Class and Subclasses. This is because: (*i*) most consumers would not retain any proof of purchase (*e.g.*, receipts or purchased packages); (*ii*) consumer self-identification into the class would be extremely unreliable and invalid; and (*iii*) retailer loyalty card data is highly incomplete, proprietary, and complex.

328. I redeclaration in response to any further information provided by the parties and/or in light of additional documents or testimony, which may be brought to my attention after the date of my signature below.

329. This *Expert Declaration* is to be used only for the purpose of this litigation and may not be published, distributed, or used for any other purpose without prior written consent from Dr. Ran Kivetz.

| | |
|---|---|
| September 21, 2018 | |
| Date | Dr. Ran Kivetz, Ph.D. |

---

[274] *Ibid.*

[275] *E.g.*, Kivetz, Urminsky, & Zheng (2006).