# EXHIBIT 5

Page 1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    ----------------------------------------x

5    ANNE DE LACOUR, ANDREA WRIGHT, and

6    LOREE MORAN, individually and on

7    behalf of all others similarly situated,

8                        Plaintiffs,

9              -against-

10   COLGATE-PALMOLIVE CO., and TOM'S OF

11   MAINE INC.,

12                       Defendants.

13   Case No. 1:16-cv-08364-KMW

14   ----------------------------------------x

15                       (Via Zoom Videoconference)

16                       September 9, 2022

                         9:36 a.m. Eastern

17

18

19           Video-recorded Videoconference

20     Deposition of COLIN WEIR, before Kristi Cruz,

21     a Stenographic Reporter and Notary Public of

22     the State of New York.

23

24

25

```
                                    Page 21
 1                    C. WEIR
 2        A.    Again, having not seen the
 3     plaintiffs' testimony, I can't answer the
 4     question.
 5        Q.    Well, you can answer it -- I'll
 6     repeat the question:  Sitting here today, do
 7     you know whether plaintiffs' testimony is
 8     consistent with the opinions stated in your
 9     report?
10             MS. WESTCOT:  Objection.  Asked and
11        answered.
12        A.    Having not seen that testimony, I
13     don't know the answer.
14        Q.    Let's step back a little bit.
15             What's your birthday?
16        A.    October 29th.
17        Q.    Of what year?
18        A.    1980.
19        Q.    And where did you attend high
20     school?
21        A.    The Waring School.
22        Q.    Where is that located?
23        A.    Beverly, Massachusetts.
24        Q.    What year did you graduate high
25     school?
```

```
                                        Page 22
 1                    C. WEIR
 2        A.    1999.
 3        Q.    And did you go to college straight
 4   after high school?
 5        A.    There was a brief break in between,
 6   but yes.
 7        Q.    How long was the break?
 8        A.    Two, three months.
 9        Q.    Okay.  And where did you go to
10   college?
11        A.    The College of Wooster, Wooster,
12   Ohio.
13        Q.    And when did you begin college, what
14   year?
15        A.    1999.
16        Q.    And what year did you graduate?
17        A.    2003.
18        Q.    And what was your major?
19        A.    Business economics.
20        Q.    Do you have any other majors?
21        A.    No.
22        Q.    Any minors?
23        A.    No.
24        Q.    Do you have any concentration within
25   your major of business economics?
```

Page 23

                              C. WEIR
1
2        A.      Well, business was a concentration
3    of economics more broadly.
4        Q.      I see.  So it was a degree -- okay.
5    So it was a major in economics with a focus in
6    business?
7        A.      They issue a separate degree called
8    business economics.  It is part of the
9    economics curriculum, and it's focused on
10   studying how businesses behave, what they do,
11   tools that they use, and kind of skips some of
12   the more -- sometimes say macro economy, but
13   that maybe isn't the right term.  But some of
14   the curriculum like labor economics that just
15   isn't relevant when you're going into the
16   business field.
17       Q.      When you were in undergrad, did you
18   take any classes in retail pricing?
19       A.      I don't think there was a class
20   titled "retail pricing," but how to price
21   goods was definitely part of the curriculum.
22       Q.      How so?
23       A.      We studied how businesses set
24   prices, different strategies that you might
25   employ, the consequence of various choices,

```
 1                         C. WEIR
 2      like if a product exists, it's going to be
 3      better to sell it than to refuse to sell it if
 4      you're a profit-making enterprise.
 5           Q.    Do you remember the names of the any
 6      of the classes where you learned those things?
 7           A.    Yeah, we're going back more than 20
 8      years now.  I just don't remember the class
 9      names.
10           Q.    Are you specifically relying on your
11      undergraduate education for providing the
12      opinions in your report?
13           A.    I have 19 years of professional
14      experience, and I would say that I generally
15      bring my professional experience and
16      educational experience to bear as part of what
17      I do in my work.  There's no class where I
18      would say, aha, for Tom's of Maine I'm going
19      to go back to Econ 203 and rely on what I was
20      taught in that class.
21                 But to the extent that my experience
22      has been formed by attending those classes and
23      then subsequently using those skills for 19
24      years professionally, I suppose that there's
25      probably some foundation that started in
```

```
                                      Page 25
 1                      C. WEIR
 2    undergraduate.
 3         Q.    Okay.  Now, after undergraduate, did
 4    you go straight to graduate school?
 5         A.    No.
 6         Q.    What did you -- do you recall how
 7    long it was between undergraduate and graduate
 8    school?
 9         A.    About four years.
10         Q.    And what did you do during those
11    four years?
12         A.    I concluded my work at Stop & Shop
13    Supermarkets and began my work at Economics
14    and Technology, Inc.
15         Q.    So let's back up for a second.
16               Did you work at Stop & Shop while
17    you were in undergraduate?
18         A.    Yes.
19         Q.    Okay.  What year did you begin
20    working at Stop & Shop?
21         A.    1996.
22         Q.    So you were in high school when you
23    began working at Stop & Shop?
24         A.    That's correct.
25         Q.    Okay.  What year of high school did
```

```
                                          Page 26
 1                      C. WEIR
 2    you begin working at Stop & Shop?
 3         A.    That probably would have been my
 4    sophomore year.
 5         Q.    And did you continue working at
 6    Stop & Shop while you were in undergraduate?
 7         A.    Yes.
 8         Q.    So your high school was in
 9    Massachusetts and your college was in Ohio,
10    correct?
11         A.    Yes.
12         Q.    Did you work at the same store
13    during that time period, or did you change
14    stores?
15         A.    I worked at different stores
16    throughout my tenure at Stop & Shop.
17         Q.    When you were in high school, did
18    you work in multiple Stop & Shop stores?
19         A.    Yes.
20         Q.    Which was the first Stop & Shop
21    store you worked at?
22         A.    My home base was Store 32 on Enon
23    Street in Beverly.
24         Q.    That's Beverly, Massachusetts?
25         A.    Yes.
```

```
                                     Page 27
 1                     C. WEIR
 2        Q.    From what year to what year did you
 3    work at Store 32?
 4        A.    I worked on and off at Store 32
 5    throughout the entire time I was employed at
 6    Stop & Shop.
 7        Q.    I'm just trying to understand how
 8    this all fits together.  So you graduated high
 9    school in 1999, correct?
10        A.    Yup.
11        Q.    Okay.  And you began college in Ohio
12    also in 1999, correct?
13        A.    That's right.
14        Q.    And you graduated college in 2003,
15    correct?
16        A.    Yes.
17        Q.    And what year did you begin your
18    graduate studies?
19        A.    2007.
20        Q.    And I apologize, I know you just
21    said this, it's just hard for me to keep years
22    straight:  What year did you begin working at
23    Stop & Shop?
24        A.    1996.
25        Q.    And that would have been your
```

```
                                          Page 28
 1                         C. WEIR
 2      sophomore year of high school?
 3           A.     I think so.
 4           Q.     And you worked at Store 32 from 1996
 5      through 1999 while you were in high school,
 6      correct?
 7           A.     I didn't stop working at Store 32 in
 8      1999, but I did work there through that date
 9      range, yes.
10           Q.     So while you were a full time high
11      school student, you were -- well, let me step
12      back.  I don't want to assume.
13                  Were you a full time high school
14      student from 1996 to 1999?
15           A.     Unlike for college or graduate
16      studies, I'm not aware of there being
17      part-time high school.  So I guess I would
18      describe that I went to what I understand to
19      be a normal high school.
20           Q.     Okay.  That's fine.  You'd be
21      surprised at the accommodations that they make
22      sometimes today.
23           A.     Different era.
24           Q.     Yeah.
25                  Okay.  So you were a full time high
```

```
                                        Page 29

 1                    C. WEIR
 2      school student and you were working at Stop &
 3      Shop Store 32 from 1996 to 1999, correct?
 4           A.    Subject to the caveat that I gave
 5      you before, yes.
 6           Q.    I'm not saying you stopped working
 7      in 1999 at that store, I'm saying during those
 8      years, that's where you worked and you were a
 9      high school student, correct?
10           A.    Yes.
11           Q.    And then when you moved to Ohio for
12      college, did you continue working at Store 32?
13           A.    Sometimes.
14           Q.    When?
15           A.    I worked at Store 32 on and off
16      through the remainder of my career with Stop &
17      Shop.
18           Q.    So you were in college in Ohio, but
19      Store 32 is in Massachusetts.  Do you mean you
20      worked when you were back on breaks, summer
21      break, winter break, things like that?
22           A.    I'd work at Store 32 over the
23      summer, holiday breaks, occasionally I would
24      go home, I would work.
25           Q.    Were you a full time college student
```

```
                                         Page 30
 1                    C. WEIR
 2     from 1999 to 2003?
 3         A.    Yes.
 4         Q.    So you worked at Store 32 when you
 5     were home from college.  Which store did you
 6     work in when you were in Ohio as a college
 7     student?
 8         A.    So I was not working at a store when
 9     I was in Ohio.
10         Q.    I see.  So your only work for Stop &
11     Shop from 1999, when you began college,
12     through 2003, when you finished college, was
13     part-time work at Store 32 when you were home
14     for weekends and holidays and breaks?
15         A.    I would also do remote work for the
16     store.
17         Q.    For Store 32?
18         A.    I can't guarantee that it was
19     exclusively for Store 32, but generally, yes.
20         Q.    Okay.  What was the nature of the
21     remote work you performed while you were in
22     college?
23         A.    Some of it related to pricing at the
24     store, and some of it related to sales
25     forecasting at the store.
```

```
 1                       C. WEIR
 2       Q.    What title did you hold at the time
 3  you performed this remote work?
 4       A.    That's a good question.  I think at
 5  the time I was the price-file maintenance
 6  head, but I wouldn't swear my life on that.
 7       Q.    Well, there are three titles that
 8  you list in your report as positions you held
 9  at Stop & Shop.  Grocery/receiving clerk, cash
10  department head, and price-file maintenance
11  head.
12            Does that refresh your recollection
13  as to what title you held while performing
14  this remote work in college for Stop & Shop?
15       A.    That does not give me a better sense
16  than the answer I've already given.
17       Q.    I mean, do you have any expectation
18  as to whether a grocery and receiving clerk
19  performs remote work and sales forecasting?
20       A.    The title that I held was not always
21  related to the work that I would do.  I had, I
22  guess I would say, unusual merit at the store
23  and unusual drive to succeed, and so I was
24  given tasks that were sometimes beyond my
25  role, which is why I can't remember whether at
```

```
                                              Page 32
 1                        C. WEIR
 2      the time I had been given the title of
 3      price-file maintenance head yet or not.
 4           Q.    Have you ever discussed the nature
 5      of your work as a grocery/receiving clerk and
 6      a cash department head and a price-file
 7      maintenance head during depositions in other
 8      cases?
 9           A.    Probably.
10           Q.    And during any of those depositions,
11      have you ever mentioned this remote work for
12      sales forecasting and pricing at the store
13      during college?
14           A.    Going back to depositions starting
15      in 2007, I don't recall.
16           Q.    So for this -- you said remote work.
17      Can you just explain what you mean by the,
18      quote, "remote work" that you performed while
19      you were in college?
20           A.    My capstone research project in
21      college dealt with sales forecasting at
22      supermarkets, which is something that I had
23      begun to experience at my job.  And so I did
24      some work with the store and the store manager
25      to help with the forecasting and to get a
```

```
                                         Page 33
 1                      C. WEIR
 2    better understanding of it.  And then as part
 3    of my research at school, I was integrating my
 4    work at the job with academic research as to
 5    whether or not there were better methods to
 6    conduct the sales forecasts that are required
 7    of store managers at Stop & Shop supermarkets.
 8         Q.    What was the store manager's name?
 9         A.    Dominique Gabriel.
10         Q.    Do you have Mr. Gabriel's contact
11    information on you?
12         A.    It's a she.  I have not been in
13    touch with her in many years.  I understand
14    that she still works for the company, but no
15    longer at Store 32, but I don't have a contact
16    information.
17         Q.    And this capstone research project,
18    was that supervised by a professor?
19         A.    Yes.
20         Q.    What was the professor's name?
21         A.    Allison Wellington and John Sell.
22         Q.    How do you spell their names?
23         A.    Allison, I think with two Ls and an
24    I.  I think there's only one Wellington.
25         Q.    Yeah.
```

```
 1                      C. WEIR
 2        A.    And John as you would expect, and
 3   Sell is S-E-L-L, to the best of my memory.
 4        Q.    Did you receive a grade on this
 5   capstone research project?
 6        A.    It wasn't graded in the traditional
 7   sense.  It was a mandatory project for which
 8   you needed to pass in order to graduate, which
 9   I did.
10        Q.    Was it high pass, low pass, or just
11   pass/fail?
12        A.    To the best of my memory, you either
13   got satisfactory or unsatisfactory, and mine
14   was deemed satisfactory.
15        Q.    Okay.  When you were performing this
16   remote work, what was your means of
17   communication with the store?  Was this -- I
18   mean, this was pre-Zoom.
19        A.    Again, we're going back 20-plus
20   years.  My recollection would have been we
21   were speaking by landline telephone.
22        Q.    You sent letters back and forth, or
23   just on the phone?
24        A.    I think on the phone.
25        Q.    What specifically did you discuss
```

```
                                              Page 35
 1                        C. WEIR
 2       with the store manager from Stop & Shop
 3       Store 32 as part of your capstone research
 4       project?
 5            A.    I don't have the specifics of the
 6       conversation 20-plus years later.  I can tell
 7       you generally, like I already have, that I was
 8       understanding the requirement that store
 9       managers had to produce weekly forecasts of
10       what they expected the business to be like at
11       the store, and they -- the store managers were
12       not given training in how to do that, nor were
13       they given any real economic tools to make
14       those forecasts.  And it occurred to me that
15       there were actually good tools to do forecasts
16       and better ways to be accurate, and since the
17       managers could be penalized for being
18       inaccurate, I thought it would be interesting
19       to study the method that they used and whether
20       or not there were better methods to apply to
21       the data from the store to try and more
22       accurately predict the weekly sales.
23            Q.    Were you compensated by Stop & Shop
24       for your work with the store manager, or were
25       you just helping this person out?
```

```
 1                        C. WEIR
 2        A.     I was not compensated for my
 3   academic research.  But part of what I was
 4   doing was assisting the manager with
 5   forecasting when I was discrete work that was
 6   for Stop & Shop and not for my academics, I
 7   was paid the normal hourly rate for my work.
 8        Q.     And do you recall what the normal
 9   hourly rate for your work was at that time?
10        A.     I think it was embarrassingly low,
11   but I don't know the exact rate.  Let's just
12   say that I'm lucky I didn't end up with a
13   lifetime career of working at Stop & Shop.
14        Q.     Okay.  You said it occurred to you
15   that there were actually good tools to do the
16   forecasts and better ways to be accurate.  Do
17   you recall what tools you suggested that the
18   store manager use?
19        A.     The primary tool that I thought
20   would be helpful would be regression analysis.
21        Q.     What do you mean by regression
22   analysis?
23        A.     Like an ordinary leased squares
24   regression that looks at the relationship
25   between one dependent variable and one or more
```

```
                                           Page 37
 1                      C. WEIR
 2     independent variables.
 3          Q.    What year of college was this that
 4     you were working on this capstone project?
 5          A.    It would have begun probably 2002,
 6     would be my best guess.
 7          Q.    So junior year of college?
 8          A.    I think the end of the junior year,
 9     and then all throughout senior year.
10          Q.    Okay.  I hate to poke on this point,
11     but you say your salary at the time,
12     compensation from Stop & Shop was
13     embarrassingly low.  Do you recall if it was
14     above or below $10 an hour?
15          A.    I think it was above $10 an hour.
16          Q.    Above or below $20 an hour?
17          A.    I don't recall.
18          Q.    But you're not sure whether it was,
19     you know, $9.50 or $12, you don't recall
20     specifically?
21          A.    It's been so long, I just don't
22     remember.
23          Q.    So what information did you -- you
24     said you help with pricing at the store as
25     part of your remote work, right?
```

```
                              C. WEIR
1
2      the high school time, that could be true, too.
3          Q.    Do you have any understanding as to
4      the approximate number of times you were asked
5      to fill in at other Stop & Shop stores?
6          A.    I don't have a memory.
7          Q.    So other than the remote work you
8      performed for Stop & Shop while in college, is
9      it fair to say that your other work experience
10     at Stop & Shop was in store?
11         A.    I'm sorry, I lost track of the
12     question.  Would you ask it again, please?
13         Q.    Sure.  So other than the remote work
14     you performed for Stop & Shop while in
15     college, is it fair to say that your remaining
16     work experience at Stop & Shop was in-store
17     work?
18         A.    As a lawyer, you should probably be
19     aware that asking whether things are fair is a
20     subjective analysis and you may be better off
21     asking whether something is accurate or true
22     and correct.  But it is correct that the vast
23     majority of my work for Stop & Shop was
24     conducted in one of their retail stores.
25         Q.    That's not quite my question,
```

```
                          C. WEIR
 1
 2     though.  So you previously discussed the
 3     remote work you performed for Stop & Shop
 4     while in college, correct?
 5          A.     Yes.
 6          Q.     Other than that work, did you do any
 7     work for Stop & Shop that was not in-store
 8     work?
 9          A.     I don't have a perfect memory of
10     that, but the vast majority of the work that I
11     did was conducted in a retail store.
12          Q.     As you sit here today, other than
13     the remote work from college that we
14     previously discussed, do you recall any work
15     you did for Stop & Shop that was not conducted
16     in a retail store of Stop & Shop?
17          A.     Going back 20-plus years, I don't
18     have a memory one way or the other.
19          Q.     Do you recall the store numbers or
20     locations of any of the other stores you
21     worked in as part of this fill-in work that we
22     were discussing?
23          A.     As I testified just a moment ago,
24     no, I do not.
25          Q.     Okay.  In paragraph 1 of your
```

```
                                        Page 58
 1                       C. WEIR
 2      report, it notes that you worked as a cash
 3      department head and grocery/receiving clerk
 4      and price-file maintenance head.  Did you hold
 5      any other positions at Stop & Shop?
 6           A.    Those are the official titles that I
 7      held, but as I indicated, I was basically
 8      willing to help out however the store needed,
 9      and I was interested in both learning and
10      proving myself as a capable person.  So there
11      are definitely other tasks that I performed
12      that would fall outside of those titles.
13           Q.    Okay.  Now, while you were at Stop &
14      Shop, did you move sequentially from title to
15      title, or did you ever hold multiple titles at
16      once?
17           A.    I think I only ever held one title.
18      But like I said, the title didn't dictate that
19      I would only work in the one category.
20           Q.    Well, in paragraph 1 of your report
21      you list three titles; cash department head,
22      grocery/receiving clerk, and price-file
23      maintenance head, correct?
24           A.    Yes.
25           Q.    So are the only titles you held
```

```
                              C. WEIR
 1
 2      while working at Stop & Shop, correct?
 3           A.     To the best of my recollection, yes.
 4           Q.     And do you recall at any point
 5      holding more than one of those three titles at
 6      the same time?
 7           A.     I don't have a memory, but I don't
 8      believe so.
 9           Q.     Do you recall which title you held
10      first?
11           A.     Cash department head.
12           Q.     So you began work as a cash
13      department head in 1996, sophomore year of
14      high school?
15           A.     To the best of my recollection, yes.
16           Q.     And which title did you hold second?
17           A.     Grocery/receiving clerk.
18           Q.     And do you recall approximately when
19      you took on that title?
20           A.     No, I do not.
21           Q.     Do you recall whether you were still
22      in high school when you acquired that title?
23           A.     I don't have a memory one way or the
24      other.
25           Q.     To the best of your recollection, at
```

```
                                    Page 60
 1                    C. WEIR
 2    some point in high school or college maybe,
 3    you transitioned from cash department head to
 4    grocery/receiving clerk?
 5         A.    Yup, sometime between 1996 and 2003
 6    I made that transition.
 7         Q.    And do you recall approximately when
 8    you transitioned to price-file maintenance
 9    head?
10         A.    No, I do not.
11         Q.    So as you sit here today, you
12    have -- let me back up.
13              Did you consider the move from cash
14    department head to grocery/receiving clerk to
15    be a promotion at the time?
16         A.    I don't know.  I mean, they were all
17    jobs within the store, and I wasn't going to
18    be the store manager, so maybe you could view
19    it as a lateral move.  It had different types
20    of responsibilities.  Instead of being
21    responsibility for the money at the front, I
22    was responsible for the goods coming in in the
23    back.
24         Q.    Was there a difference in salary
25    from cash department head to grocery/receiving
```

```
                                    Page 61
  1                     C. WEIR
  2    clerk?
  3         A.    I was never on salary at Stop &
  4    Shop.
  5         Q.    How were you compensated?
  6         A.    Hourly.
  7         Q.    Was there a change in your hourly
  8    compensate rate when you transitioned from
  9    cash department head to grocery/receiving
 10    clerk?
 11         A.    I don't remember.
 12         Q.    And what about when you transitioned
 13    from grocery/receiving clerk to price-file
 14    maintenance head, was there a change in your
 15    hourly compensation then?
 16         A.    I don't remember.
 17         Q.    Do you recall at any point what your
 18    hourly compensation rate was when you worked
 19    at Stop & Shop?
 20              MS. WESTCOT:  Objection.  Asked and
 21         answered.
 22         A.    I mean, at some point it was going
 23    to be in the high single digit dollars per
 24    hour, and then at some point that grew into
 25    the double digit dollars per hour.  But beyond
```

Page 62

C. WEIR

1
2      that, I don't have a precise recollection.

3          Q.    Do you have any understanding as to

4      why your hourly compensation increased during

5      your time at Stop & Shop?

6          A.    I don't have a perfect memory, but I

7      believe that I continued to prove that I had

8      merit within the store, and so within the

9      boundaries of what they were allowed to do, I

10     was continually given raises over the course

11     of time.

12         Q.    So you previously described the cash

13     department head as having responsibility for

14     the money in the front.  What did you mean by

15     that?

16         A.    The cash department head generally

17     is in charge of the register area and

18     monitoring cashiers, the customer experience,

19     and then literally collecting -- I mean, I

20     don't know how much people pay cash for

21     groceries anymore, but back then, a lot of the

22     business was cash, so you'd go around and

23     you'd make sure that you collected cash from

24     the registers and turned it in to the cash

25     office for counting and processing, and then

Page 63

```
 1                           C. WEIR
 2     monitoring and auditing cashier cash drawers
 3     to make sure that they weren't stealing and
 4     were conducting transactions accurately.  I
 5     think there could be more nuance to your
 6     deposition about Tom's of Maine, but now we're
 7     talking about cash drawers at Stop & Shop.
 8     You tell me what you want to hear about.
 9          Q.    I take it you feel that your cash
10     department head experience is not particularly
11     relevant to your opinion in this case?
12          A.    Never say never, but I don't think
13     I'm relying on, you know, auditing of
14     cashier's drawers for my opinions in this
15     case.
16          Q.    And you also described your time as
17     a grocery/receiving clerk as being responsible
18     for the goods coming in the back.  What did
19     you mean by that?
20          A.    As a receiving clerk, products come
21     into the store at the highest level in two
22     broad categories.  The we would order things
23     from Stop & Shop, and then Stop & Shop would
24     deliver a tractor-trailer full of products.
25     And so I would be responsible for ordering,
```

Page 64

1                          C. WEIR

2      tracking inventory, and then either literally

3      bringing the products into the store or

4      supervising somebody else doing that.

5                The other category is that products

6      are brought in by vendors.  Like Coca-Cola

7      sits on the same shelf as Stop & Shop soda,

8      but we are responsible for putting the store

9      brand soda up on the shelf, a guy from Coke

10     brings their own product into the store and

11     puts the product on the shelf.  But you need

12     to be careful to track the products that they

13     bring in, anything that's damaged or things

14     that you need credit for.  And so those were

15     all parts of the things that I would do, as

16     well.

17          Q.    In terms of ordering inventory, as a

18     grocery/receiving clerk, how did you know how

19     much inventory to order?

20          A.    That's something you learn while

21     you're on the job.  And as I was there, the

22     technology was improving, so we would have

23     what to a layperson would probably be

24     described as a scan gun.  I think the

25     technical term was like a Telxon or something

Page 65

1                        C. WEIR
2     like that.  So I would scan a product or a
3     barcode or the shelf tag, and it would say you
4     should see four units on the shelf and you
5     should have a case in the back, and typically
6     you use about a case per week, and then based
7     on that information you decide, okay, I'll
8     order another case or I'll wait until next
9     week and then bring in another case.
10         Q.    I see.  So the technology and the
11    scan gun tracked your inventory and let you
12    know when it was time to reorder inventory?
13         A.    I don't think it said please
14    reorder.  It would provide information that
15    would be the basis of somebody making a
16    decision to reorder.
17         Q.    I see.  So it would tell you how
18    much you had in inventory, and you would then
19    make a subjective determination whether the
20    inventory was low and you needed more?
21         A.    It would tell us the expected
22    inventory, and it would give some statistics
23    about the estimated velocity or throughput of
24    the inventory.
25         Q.    I see.  And so based on that

```
                                  Page 66
 1                       C. WEIR
 2      information, you would deduce when to order
 3      more product?
 4          A.    Right.  And you'd have to bring some
 5      amount of -- some amount of your expertise to
 6      bear on that.  I remember there was a product
 7      that people want all the time I think around
 8      Thanksgiving.  I remember people asking for
 9      Major Grey's Chutney.  In that week, you might
10      sell a whole case, and then for the entire
11      rest of the year, you might sell three bottles.
12          Q.    Okay.
13          A.    So you had to kind of understand the
14      products within the store.
15          Q.    Got it.
16                Do you know whether Stop & Shop
17      still uses a similar inventory management
18      process system?
19          A.    Today?
20          Q.    Yeah.
21          A.    I don't have any idea.
22          Q.    Okay.  Out of the seven years you
23      spent working at Stop & Shop, do you have any
24      understanding as to approximately how many of
25      them were spent as a cash department head?
```

Page 67

C. WEIR

1

2      A.    Again, I don't have a precise

3  recollection of how the times worked.  If I

4  had to guesstimate, I would say it was roughly

5  thirds.  But again, even when my title

6  shifted, the roles and responsibilities, you

7  know, while I was doing the pricing at the

8  store, they might say, hey, the receiving

9  clerk is out sick this week, can you work the

10  receiving desk, and I would say of course I

11  can do that.

12      Q.    When you were a grocery/receiving

13  clerk, did anyone report directly to you?

14      A.    Several grocery clerks, yes.

15      Q.    Other grocery clerks reported to

16  you?

17      A.    Yes.

18      Q.    Approximately how many?

19      A.    A handful, but I don't have a

20  precise recollection.

21      Q.    Do you recall their names?

22      A.    At this point, no.

23      Q.    Did you report to anyone when you

24  were a grocery/receiving clerk?

25      A.    I reported both to the grocery

```
1                        C. WEIR
2       department head and to the store manager.
3           Q.    When you were grocery/receiving
4       clerk, do you recall approximately how many
5       other grocery receiving clerks worked in that
6       store?
7           A.    There were usually at least two, so
8       that you would have full coverage over the
9       whole day and the whole week.  But at any
10      given time, I don't know that I can tell you
11      that maybe there were three; I don't know.
12          Q.    Okay.  And in your understanding,
13      was that a typical number of grocery receiving
14      clerks for a Stop & Shop shore?
15          A.    Yeah, there was usually, like, one
16      or two people, I think, at most stores.  Not
17      going to say that you couldn't have a store
18      that had a different setup.  But I think you
19      asked if that was typical; I think that would
20      be typical.
21                  I can't hear you, I'm sorry.
22                  MS. WESTCOT:  I can't hear you
23          either.  It looks like your audio is
24          reconnecting.
25                  THE VIDEOGRAPHER:  Would you like to
```

                          C. WEIR
1
2         go off while we fix this, counsel?
3                 MR. WEISBERG:  Okay.  Can you hear
4         me now?
5                 THE WITNESS:  Now you're back.
6                 MR. WEISBERG:  I have no idea why
7         the audio dropped out.
8                 THE WITNESS:  It's okay.
9    BY MR. WEISBERG:
10        Q.    Let me just ask the question again
11   because I didn't hear your answer:
12              In your understanding, was that a
13   typical number of grocery receiving clerks for
14   a Stop & Shop store?
15        A.    What I had said is, I think it would
16   be regular to have one or two clerks.  There
17   could be stores that had a different setup,
18   but yes, I think that would be typical, at
19   least in the era when I was there.
20        Q.    Okay.  And in the era that you
21   worked at Stop & Shop, do you have any
22   understanding as to how many Stop & Shop
23   locations there were in the United States?
24        A.    Dozens and dozens, if not hundreds.
25        Q.    Okay.  And when you were a cash

```
 1                        C. WEIR
 2     department head, how many cash department
 3     heads were there at your Stop & Shop store?
 4          A.    That I don't have a precise
 5     recollection of, but it would be a bigger
 6     number.
 7          Q.    Five cash department heads?  Ten?
 8          A.    I don't know, I don't know.
 9          Q.    But more than two per store?
10          A.    Oh, yeah, because the register area
11     has to be covered at all times.  So you might
12     have two people on staff for any given shift.
13          Q.    I see.  In your understanding, it
14     was a regular number of cash department heads
15     for a typical Stop & Shop store to have at the
16     time?
17          A.    Well, you say that was the number.
18     I haven't given you a number because I don't
19     recall, but I think our store was typical in
20     terms of given the size of the store.  Where
21     at a bigger store you might have more and a
22     smaller store you might have less, we had a
23     typical stable of cash department heads.
24          Q.    Now, as a price-file maintenance
25     head, do you have any understanding as to
```

```
                                           Page 71
 1                    C. WEIR
 2     whether you ever held that title, price-file
 3     maintenance head, while you were working in a
 4     physical Stop & Shop store?
 5         A.    I'm positive that I was working
 6     physically in the store while I had that
 7     title.
 8         Q.    What were your responsibilities as a
 9     price-file maintenance head?
10         A.    I was responsible, generally, either
11     myself or through other folks, for changing
12     and setting prices within the store.
13         Q.    What do you mean by "changing and
14     setting prices within the store"?
15         A.    So we're going to increase the price
16     of tomatoes for whatever reason.  I would
17     print out a list of price changes that would
18     happen in the produce department, and I would
19     deliver them to the produce people and say,
20     you know, within the next two days I need you
21     to adjust the prices and your signage and
22     everything like that.  And then I would have
23     responsibility for the computer system that
24     would correlate either a UPC or PLU or other
25     product identifier with the price that would
```

```
 1                        C. WEIR
 2     ring up when somebody scanned it at the
 3     register, and also matching those things with
 4     discounts or sales or promotions.  So it might
 5     ring up 2.99 if you just scan the item, and if
 6     you have a loyalty card, it might ring up
 7     2.49, something like that.
 8          Q.   So as the price-file maintenance
 9     head, how did you come to learn that, for
10     instance, the price of tomatoes was going to
11     be decreased?
12          A.   Sometimes that's a decision that we
13     would make in the store, sometimes we would be
14     told that there's going to be a promotion, so
15     that kind of information would come by
16     computer.
17          Q.   And was it your understanding that
18     the promotion information coming by computer
19     was sent from Stop & Shop corporate?
20          A.    I think there are varying degrees.
21     I think sometimes there would be a store-wide
22     promotion, so that would probably come from
23     corporate.  I had discretion to adjust prices.
24     Sometimes the store manager would make
25     promotional decisions that I don't think were
```

Page 73

```
 1                          C. WEIR
 2      tied to corporate.
 3           Q.    So what instances did you have
 4      discretion to adjust prices?
 5           A.    I'll give you just one example.
 6      Technically, I think I could have adjusted any
 7      price within the store.  But if we had
 8      inventory that was going to perish or expire,
 9      I could adjust the price downward in order to
10      try and move the product before the product
11      would go to waste.  At the grocery store,
12      there's a principle that you want to get
13      literally any money you can for a product
14      rather than zero money for the product, even
15      if you wind up taking a loss on the sale.  So
16      I think that's one category.
17           Q.    So you said you could have adjusted
18      any price within the store.  I understand that
19      functionally if you're the person in charge of
20      the barcode system, you could put in whatever
21      price you want.  But I just want to be clear:
22      Is it your testimony that you had unfettered
23      discretion to reduce any price of any product
24      in the store however you saw fit?
25           A.    So I would say that in order to get
```

Page 74

```
 1                        C. WEIR
 2     the position, you have to prove that you have
 3     the discretion to do that appropriately.  So
 4     yes, I think that I could have adjusted any
 5     price in the store, but I would not just do
 6     that willy-nilly, and that part of the
 7     responsibility of the position was only
 8     adjusting prices as necessary or in
 9     consultation with a manager or within
10     circumstances that were generally understood
11     to be prudent, like this pile of steaks is
12     going to expire tomorrow, we want to make sure
13     that we sell them and get some money rather
14     than have to throw them away.
15         Q.    Okay.  So other than the instance
16     of, you know, soon-to-expire food, were there
17     other particular instances in which you were
18     permitted to lower prices in the store?
19         A.    Yeah, we would occasionally have an
20     offer from, like, Coke, if you buy an entire
21     trailer of product, we'll give it to you at an
22     enormous discount, and that would then permit
23     us to sell, like, two liters for below the
24     regular price while we would maintain that
25     inventory.  So in concert with other people in
```

Page 75

```
 1                          C. WEIR
 2      the store, there would be times like that
 3      where there would be pricing adjustments that
 4      would be made based on ordering and inventory
 5      and other factors like that.
 6          Q.    You said that would be in concert
 7      with other people in the store.  That wasn't a
 8      decision that you had the authority to
 9      personally make on your own, to just order an
10      entire trailer of Coke and then reduce the
11      price?
12          A.    Well, when I was the
13      grocery/receiving clerk, I could decide to
14      bring in a trailer of Coke.  But at the time,
15      then, I wouldn't have been the person who
16      would have been responsible for the other
17      portion of it, which was, let's just the
18      pricing, as well.
19          Q.    So is it your testimony that as a
20      grocery/receiving clerk, you had unfettered
21      discretion to order whatever product you saw
22      fit?
23          A.    Again --
24              MS. WESTCOT:  Objection.  Asked and
25          answered.
```

1                    C. WEIR

2        A.     There's a level of responsibility

3    that you must prove to have before you take

4    that type of job.  So I think I could have

5    ordered anything that I wanted to, but there

6    were just sort of general parameters.  Like,

7    you don't want to be the guy that orders the

8    trailer of product this then rots away.

9    Again, are you saying, like, did I technically

10   have the ability to buy a whole trailer of

11   product?  Yeah, I think so.  But that would be

12   a rare thing that we would actually do that

13   because there aren't that many things that you

14   could sell that kind of volume so quickly.

15       Q.     When you were grocery/receiving

16   clerk, was there a limit on the amount of

17   money you could spend ordering product without

18   permission from a manager or someone superior

19   to you?

20       A.     I don't recall having a fiscal limit

21   on what I could order.

22       Q.     In terms of, I want to go back to

23   this pricing.  So you said one instance is

24   perishable food going bad and you had

25   discretion to lower the price.  And then you

```
 1                        C. WEIR
 2      said another is that in concert with others in
 3      the store, you could order a large quantity
 4      from a vendor and then discount it based on
 5      the price you got from the vendor.
 6                 Are there any other instances where
 7      you had discretion to set prices in the store?
 8           A.   Like I told you, even though I don't
 9      think I would have done it willy-nilly, I
10      could just any price that I saw fit.  There
11      are other types of circumstances where that
12      might be common, such as, we're not doing any
13      business this week because everybody's
14      anything to the next door grocery store
15      because they have steak real cheap, so why
16      don't we respond and make sure that we don't
17      lose our entire business for the week because,
18      you know, the loss leader item is taking
19      people to the competitor.
20           Q.   Other than perishing goods, are
21      there any other instances where you personally
22      recall reducing a price in your capacity as
23      price-file maintenance head?
24           A.   I mean, again, this is 20 years ago,
25      so I don't remember every UPC that I made an
```

1                          C. WEIR

2       adjustment to, and it would happen hundreds of

3       times a week; this one's going up, this one's

4       going down.  We would print sheets and sheets

5       and sheets of them because as a practical

6       matter, at least in Massachusetts, you have to

7       label every unit of product with its selling

8       price.  So if you're going to take the

9       toothpaste up 20 cents or take the toothpaste

10      down 20 cents, that means somebody's got to go

11      into the aisle, scrape off the old price, mark

12      it again, change the label that's on the

13      shelf.  But we would do that with sheets that

14      would be hundreds of products per week.

15                 So do I remember the particulars of

16      that?  No.  But it wasn't just because it was

17      perishable food.  There are many categories of

18      things that could cause that to happen; like I

19      said, what the competitors are doing at the

20      store down the street, whether there's a

21      promotion, whether we were able to get

22      favorable terms from the vendor, seasonal

23      things, where we just want to make a

24      particular product -- like you can always find

25      one bottle of eggnog in the store, but at

Page 79

```
 1                      C. WEIR
 2     Christmastime, there's a whole section of
 3     eggnog, so you adjust the pricing seasonally,
 4     that sort of thing.
 5         Q.    Is it your testimony that you
 6     personally decided how to price hundreds of
 7     products every single week as a price-file
 8     maintenance head?
 9         A.    I had the ability to change prices.
10     The store manager could ask me to change
11     prices.  There were things that would come
12     from corporate that would cause prices to
13     change.  I think all of those categories.
14         Q.    Okay.  So in your experience working
15     at Stop & Shop, were the majority of those
16     price changes dictated by corporate, by you,
17     or the manager?
18         A.    It was a mix.
19         Q.    It was a mix.  But in your
20     experience, were a majority of the price
21     changes, these hundreds of price changes every
22     week, dictated by corporate, right?
23         A.    I don't have a precise recollection
24     other than that they could come from a variety
25     of sources, myself included.
```

```
 1                        C. WEIR
 2        Q.    So as you sit here today, it's your
 3   understanding that it's equally likely that
 4   out of 100 price changes in a given week, you
 5   were making 50 of them and corporate was
 6   making 50 of them, or you were making 80 of
 7   them and corporate was making 20 of them?  You
 8   have no concept as to how that breakdown
 9   occurred?
10             MS. WESTCOT:  Objection to form.
11        A.    Part of the problem was it would be
12   different by week.  There might be a week that
13   has a huge slate that comes in as things were
14   updated in the store, and then there might be
15   a week where, you know, everything is at the
16   store's discretion depending upon what's going
17   on.  Or more likely, that there was a mix.
18        Q.    Sitting here today, do you recall
19   any week where you personally set a majority
20   of the price changes implemented in your
21   store?
22        A.    I don't have a perfect memory of
23   that, but I do recall that there were weeks
24   where I was making dozens, if not hundreds of
25   manual entries into our system.
```

```
 1                        C. WEIR
 2        Q.    I'm not asking about who entered the
 3    prices, Mr. Weir.  I'm asking about who
 4    decided what the prices would be.
 5        A.    Right, I understand that.  The
 6    corporate changes were -- they were automatic
 7    in the sense that the computer would update it
 8    when you said we're ready, because we've done
 9    the work in the store.  But when they're
10    manual, it's a store-level change.
11        Q.    Who set -- I know we talked about
12    price changes.  But in terms of the normal
13    list price as it were, is that set by
14    corporate or the store?
15        A.    I'm not a hundred percent sure how
16    to answer that question.  When I inherited the
17    job, I inherited prices that were what they
18    were, and I couldn't tell you, per se, who had
19    been responsible for setting them.  From that
20    point on, it was a combination of corporate
21    and store-level changes that would increase or
22    decrease either permanently or temporarily the
23    price of an item.
24        Q.    So you worked at Stop & Shop for
25    seven years.  Did Stop & Shop ever begin
```

                                                  Page 82

                                C. WEIR
 1
 2       running any new items during that time?
 3           A.    Possibly.  I don't have a
 4       recollection of a specific new item.
 5           Q.    Do you have any understanding as to
 6       how the price of new items is set?
 7           A.    Again, I think there's some amount
 8       of discretion.  The store might be told where
 9       to put the price.  The store could also choose
10       a price.
11           Q.    So, just taking a random product, a
12       bottle of shampoo, nonperishable product, the
13       regular price of a bottle of shampoo on a
14       shelf in a store, is that set by corporate or
15       is that set by you?
16           A.    Again, as I take over the job, the
17       price is what it is.  Whether or not it
18       changes as a result of something that I do or
19       that is asked of the store, I don't have a
20       memory on a product-by-product basis.
21           Q.    But just generally, with regard to
22       all the products in the store, is the regular
23       price of those products generally set by
24       corporate or generally set by the store?
25                 MS. WESTCOT:  Objection.  Asked and

```
                                            Page 83
 1                        C. WEIR
 2       answered.
 3       A.     The prices are set by a mix of
 4   corporate action and by people at the store
 5   level.
 6       Q.     So as you sit here today, you have
 7   no understanding as to the breakdown between
 8   when a corporate sets retail price, like the
 9   normal non-sale price, versus the store, for a
10   given product?
11            MS. WESTCOT:  Objection.  Asked and
12       answered.  Misstates the witness' prior
13       testimony.
14       A.     It is a mix, and in any given week,
15   it could be more of one and less than the
16   other.
17       Q.     Did you ever receive price lists
18   from corporate when you worked at Stop & Shop?
19       A.     I don't know what you mean by a
20   price list.
21       Q.     Did you receive any instructions
22   from corporate listing the items in your store
23   and the prices that should be charged for
24   them?
25       A.     I would sometimes get price changes
```

```
1                        C. WEIR
2      that were recommended by corporate.
3          Q.    And were you expected to implement
4      those price changes?
5          A.    Unless, in concert with the manager,
6      we decided against, I would, yes, make the
7      changes that were asked of me.
8          Q.    Can you recall any specific
9      instances in which you decided to ignore a
10     price change recommended by corporate?
11         A.    My recollection is that there were
12     times when we would note that the traffic in
13     the store was unusually low, and somebody
14     would scoot down the street to the competitor
15     grocery store and find out that they had some
16     unbeatable deal on something that was causing
17     the foot traffic to go there, because
18     everybody wants to get their paper towels for
19     cheap, and then they do the rest of the
20     grocery shopping at the place they're buying
21     the paper towels.  So occasionally we would
22     override whatever the price was and say we
23     don't want to lose our entire business for the
24     week, let's match the loss leader item from
25     down the street.
```

```
                                      Page 85
 1                    C. WEIR
 2        Q.    Do you recall specifically reducing
 3    the price of paper towels in such a scenario?
 4        A.    I don't have specific memory of
 5    whether it's paper towels or something else.
 6    That was a common one that was a loss leader
 7    at the store, so I picked that as an example.
 8        Q.    But you don't recall any specific
 9    products where, when you worked at Stop &
10    Shop, corporate said charge price X, and you
11    elected to charge a different price, correct?
12        A.    I'm positive that that happened.
13    But if you're asking me to remember from
14    20-plus years ago the UPCs of the specific
15    products where that happened, I just don't
16    have that in my memory bank.
17        Q.    I'm not sure what you mean by the
18    UPCs.  A designation like paper towels would
19    be sufficient or steak would be sufficient.
20             Do you recall any specific products
21    where Stop & Shop corporate said charge one
22    price and you elected to charge a different
23    price?
24             MS. WESTCOT:  Objection.  Asked and
25        answered.
```

                          C. WEIR

1

2        A.     20-plus years on, I just don't have

3    a memory of the precise products where that

4    happened, other than the fact that it did.

5        Q.     And do you have any recollection of

6    the specific number of times that that

7    happened, or is that also too far back?

8        A.     I don't have a count.  And again, we

9    were changing prices hundreds of times a week,

10   so the details of that, it's just hard to

11   remember.

12       Q.     Do you recall any specific instances

13   in which you unilaterally decided to lower the

14   price for a given item in your store and

15   discount it?

16       A.     I am positive that I did that in my

17   capacity of being in charge of pricing.  But

18   if you're going to ask, again, about the

19   specific products, I just don't remember from

20   20 years ago.

21       Q.     Okay.  I mean, do you remember

22   discounting -- applying unilateral -- let me

23   back up.

24              Do you recall unilaterally deciding

25   to apply a price discount to perishable goods,

```
                                   Page 103
 1                    C. WEIR
 2        Q.    But you don't recall the last time
 3    you did that or the name of the person you
 4    spoke with when you did so?
 5        A.    No.  I mean, with the pandemic,
 6    we're probably going back several years.
 7        Q.    Before joining Stop & Shop, had you
 8    had any direct experience with setting
 9    wholesale prices for consumer packaged goods?
10        A.    Before joining Stop & Shop?  I don't
11    think so.
12        Q.    Okay.  I think you would have been
13    in middle school, right?
14        A.    Yeah.  It seems absurd.
15        Q.    Yeah.
16        A.    But I wanted to make sure I had the
17    question right.
18        Q.    Okay.  And similarly, before joining
19    Stop & Shop, had you had any direct experience
20    with setting retail prices for consumer
21    packaged goods?
22        A.    I don't believe so.
23        Q.    After leaving Stop & Shop, have you
24    had any direct experience with setting
25    wholesale prices for consumer packaged goods?
```

```
 1                    C. WEIR
 2        A.    I mean, that is a frequent topic of
 3   study.  Whether you call that direct
 4   experience or not, I don't know.
 5        Q.    Well, have you been involved in
 6   setting of prices for -- wholesale prices of
 7   consumer packaged goods after leaving Stop &
 8   Shop?
 9        A.    I have consulted with other
10   businesses on that matter, yes.
11        Q.    So you left Stop & Shop in 2003.
12   During what years did you work with businesses
13   on setting wholesale prices for consumer
14   packaged goods?
15        A.    A large chunk of my 19-year
16   experience at Economics and Technology.
17        Q.    What businesses have you worked
18   with?
19        A.    We sign nondisclosure agreements
20   with our private clients, so I'm not at
21   liberty to say.
22        Q.    I'm going to ask the question again.
23   Unless your lawyer instructs you not to answer
24   on the grounds of privilege, I'm going to ask
25   that you address the question:  What
```

Page 105

```
 1                    C. WEIR
 2    businesses have you worked with in setting
 3    wholesale prices for consumer packaged goods?
 4        A.    Due to the nondisclosure agreements
 5    that I have, I'm not going to answer that
 6    question.
 7        Q.    I'd like the record to reflect that
 8    your attorney is not advising you --
 9    instructing you not to answer.  You are just
10    personally refusing to answer.
11        A.    I don't have an attorney here.  No
12    one is representing me.
13        Q.    Ms. Westcot is not?  She's been
14    objecting.
15        A.    She is an attorney.  She is
16    representing the class, the plaintiffs.  She
17    is not representing me.
18        Q.    We may have to come back and have
19    this conversation another time, Mr. Weir.
20              What types of consumer packaged
21    goods have you been involved with setting
22    wholesale prices for since 2003?
23        A.    I'm not even sure I want to get into
24    that, given that it's potentially deducible
25    who I'm working for.  But I would say at the
```

```
 1                    C. WEIR
 2    highest level, it involves things like grocery
 3    store products and things that you could buy
 4    at CVS and drugstores, as well as at sort of
 5    big box stores that sell a variety of both
 6    grocery and non-grocery consumer packaged
 7    goods.
 8        Q.    Have you been involved in setting
 9    wholesale prices for perishable goods?
10        A.    Perishable goods?
11        Q.    Yeah.
12        A.    I don't recall if any of the
13    products were perishable or not.  Possibly.
14        Q.    So I assume, then, that the products
15    that you are referring to that you've been
16    involved in setting wholesale prices for are
17    nonperishable consumer goods?
18        A.    I guess maybe we should get a
19    definition out.  I mean, even a tube of
20    toothpaste is perishable, right?  It expires
21    at some point.  So I guess it depends on how
22    you're using the term.
23        Q.    What was your role in the setting of
24    wholesale prices for these goods sold at
25    grocery stores and CVS and big box stores?
```

```
 1                    C. WEIR
 2        A.    I've provided analytical frameworks
 3    and models and analyses that were produced to
 4    clients to help them make decisions, including
 5    sometimes express advise about the decisions
 6    to make, and other times just providing
 7    information that the team could use to make
 8    their decision about how to price their own
 9    products.
10        Q.    But you won't tell us any of the
11    businesses that you worked with in that
12    capacity, correct?
13        A.    Due not fact that I have
14    nondisclosure agreements that expressly
15    prescribe that, that is correct, I'm not going
16    to give those names away.
17        Q.    And you're also not going to testify
18    to the names of the products that you were
19    involved in setting the wholesale prices for,
20    correct?
21        A.    I've given you some high level
22    categories.  I felt comfortable with that.
23    I'm not comfortable with giving you granular,
24    specific products.
25        Q.    And I disagree with your refusal to
```

```
 1                       C. WEIR
 2    answer the question, and we may have to come
 3    back here and address these, particularly as
 4    your counsel has not instructed you not to
 5    answer.
 6              After leaving Stop & Shop, have you
 7    had any direct experience with setting retail
 8    prices for consumer packaged goods?
 9        A.    Again, that's a frequent point of
10    study for me.  I am, you know, any week I'm
11    not on vacation, studying the retail price of
12    consumer products.
13        Q.    I'm not asking about studying.
14    Before -- I just want to make sure I'm clear:
15    Are you relying on this experience setting
16    wholesale prices for consumer packaged goods
17    for your opinions in this case?
18        A.    I don't think I would point to any
19    one consulting engagement that I'd had in the
20    past and say that informs my opinion for Tom's
21    of Maine, no.  But I generally am in the
22    business of understanding the setting of
23    prices of consumer products, and I study it, I
24    read literature about it, I consult with
25    private companies about it, and I work in
```

Page 109

```
 1                      C. WEIR
 2      proceedings such as this, where we estimate
 3      how the market would respond and how consumers
 4      would behave and how consumers are impacted by
 5      the setting of prices.
 6           Q.    But you are relying on your work
 7      with these unnamed companies in wholesale
 8      price setting as part of your basis for
 9      expertise on which you're offering your
10      opinion in this case?
11                MS. WESTCOT:   Objection.   Misstates
12           the testimony.
13           A.    I think I said I'm not relying on
14      any particular consulting engagement, but I
15      have expertise in these matters, and part of
16      that includes the fact that I have done
17      consulting with companies about their own
18      product development, including how to price
19      it.
20           Q.    And even though you believe that
21      your work with those companies informs and
22      supports your expertise, you won't tell us any
23      of their names or any of the products you
24      worked on?
25           A.    I am happy --
```

1                          C. WEIR

2              MS. WESTCOT:  Objection.  Misstates

3        the testimony.

4        A.    I am happy to disclaim every one of

5    those consulting projects and say that my

6    opinions stand based on other areas of

7    expertise, and that none of my opinions would

8    change without that knowledge.

9        Q.    Okay.  Have you also worked with

10   companies in setting the retail prices of

11   consumer packaged goods after you left Stop &

12   Shop?

13       A.    As I said, both, yes, and as a

14   frequent point of study for me, how retail

15   prices are set and how the market will respond

16   to various factors.

17       Q.    I just -- taking steady aside, I

18   just want to focus on your work with companies

19   setting retail prices.  Can you name any of

20   the companies that you have worked with to

21   help set retail prices?

22             MS. WESTCOT:  Objection.  Asked and

23        answered.

24       A.    No, I cannot.

25       Q.    You cannot because there are none,

Page 111

```
 1                      C. WEIR
 2      you don't know them, or you're bound by NDAs?
 3          A.    I'm bound by nondisclosure
 4      agreements with our private consulting clients
 5      to not disclose our relationship with them or
 6      the nature of the work.
 7          Q.    So, on the same grounds, are you
 8      unwilling to disclose the specific products or
 9      specific types of products that you worked
10      with those companies on to set retail prices
11      for?
12              MS. WESTCOT:  Mr. Weisberg, Mr. Weir
13          has already testified that he has
14          confidentiality agreements that are in
15          place that he cannot breach in the
16          deposition today.  So the repeated
17          questions about these topics, you've
18          already gotten your answers and you've
19          gotten Mr. Weir's explanation that he's
20          bound by these confidentiality agreements.
21              If you have any further questions
22          about it, I think you need to take it up
23          with the judge and file a motion if you're
24          going to keep pressing on this.  I think
25          he's answered your questions today.
```

Page 112

```
 1                        C. WEIR
 2              MR. WEISBERG:  This is the last
 3         question on that point.  I just want to
 4         foreclose and be clear that we talked
 5         about wholesale pricing and now we're
 6         talking about retail pricing, and I just
 7         want to a clear record that Mr. Weir is
 8         refusing to specify the product that he's
 9         worked on with these companies for retail
10         price setting and the companies that he's
11         worked on -- worked with for this retail
12         price setting, on the basis of his
13         nondisclosure agreements.  If he says
14         that, we can move on.  That was my last
15         question on this.
16         A.    Yes, due to the NDAs that have been
17    signed, I cannot give you the specifics of
18    those consulting projects.
19         Q.    Okay.  And just like with the
20    wholesale projects that you couldn't discuss,
21    are you willing to disclaim your experience
22    and expertise gained from those retail price
23    setting projects?
24         A.    I don't know why where this is
25    going.  What I will say is, I have enormous
```

```
 1                    C. WEIR
 2     knowledge and expertise and background in
 3     price setting both at the wholesale and retail
 4     level.  If you're asking would my opinions
 5     change if I hadn't done those consulting
 6     projects, I don't think my opinions would be
 7     different.  Is that part and parcel of the
 8     expertise that I bring to the case?  I don't
 9     know how I can walk away from that.  Yes, I
10     have that experience; I bring it to bear.  My
11     opinions in Tom's of Maine is not going to
12     change whether or not I had worked for any one
13     particular one of those companies.  And I
14     don't say, based on one particular consulting
15     project, my opinion in Tom's of Maine is this.
16          Q.   I'm not going to argue with you.
17     I'm just going to -- should I ask the question
18     again or are you aware of the question?
19          A.   I don't know that there's a pending
20     question.  I just gave an answer.
21          Q.   You previously said when we were
22     discussing your experience working with
23     companies to set wholesale prices, quote, "I'm
24     happy to disclaim every one of those
25     consulting projects and say that my opinions
```

Page 114

```
 1                        C. WEIR
 2     stand based on other areas of expertise and
 3     none of my opinions would change without that
 4     knowledge."
 5               Are you willing to make the same
 6     statement with regard to your retail price
 7     setting project?  I would imagine you are.
 8               MS. WESTCOT:  Objection to form.
 9        Asked and answered.
10        A.    If somebody asks me in front of the
11     jury what experience do you have, I'm going to
12     mention those things because they are
13     experiences that I've had.  But as I just said
14     in my last answer, none of my opinions in
15     Tom's of Maine are driven by any one of those
16     consulting projects.  I have general
17     expertise, educational background, and
18     professional training that allow me to give
19     these opinions independent of the consulting
20     projects that I have done, though I believe
21     those consulting projects would be supportive
22     of the opinions that I have in this case.
23        Q.    So you're not relying on that
24     consulting experience for your opinions in
25     this case?
```

Page 115

                              C. WEIR
1
2       A.    I'm relying on my experience
3   generally in this case.  That includes those
4   consulting projects.  But I didn't say I'm
5   taking a page out of that consulting project
6   to form my opinion in Tom's of Maine.
7       Q.    So you are relying on them,
8   generally, for your opinions in this case?
9       A.    I'm not relying on the consulting
10  projects.  I'm relying on the fact that I have
11  19 years of experience analyzing retail and
12  wholesale pricing.
13      Q.    Let me put it a different way:  You
14  contend -- are you standing on that consulting
15  experience as part of the basis for your
16  claimed expertise in this case?
17            MS. WESTCOT:  Objection to form.
18      Asked and answered.
19      A.    If a judge says what's his basis for
20  expertise, I would list everything that I've
21  done.  But if you say what's the basis for an
22  opinion, I'm not relying on those consulting
23  projects as a basis for an opinion in this
24  case.
25      Q.    So even though you're relying on

Page 116

1                      C. WEIR

2      those consulting projects as a basis for your

3      expertise, your claimed expertise, you are

4      unwilling to discuss the specifics of them or

5      disclaim them, correct?

6           A.    I thought that's --

7                MS. WESTCOT:  Objection to form.

8           Asked and answered.

9           A.    You broke your promise about the

10     last question on that topic.  Again, I can't

11     walk away from the fact that I've had these

12     experiences, but I am not relying on any of

13     those consulting projects, per se, for any

14     opinion that I've issued here in Tom's of

15     Maine.  I'm not willing to disclose the

16     details of those consulting projects pursuant

17     to the NDAs that prohibit that, as we've

18     talked about several times now.

19          Q.    Okay.  That's your choice.  We may

20     have to be back.

21               MR. WEISBERG:  But let's take a

22          break.  Madam court reporter, how long of

23          a break would you like?  I know it's noon

24          on the East Coast -- sorry.  Let's go off

25          the record.

```
 1                      C. WEIR
 2       trustworthiness as a witness.  I'm not
 3       casting aspersions, but it is relevant.
 4       There's a large -- large scope of what is
 5       relevant here, and I think we're entitled
 6       to it.  You obviously disagree, and I
 7       don't intend to argue the point here.  We
 8       can discuss it before the judge.
 9            MS. WESTCOT:  Well, if you have any
10       questions specifically about his
11       compensation in this engagement, I'm sure
12       Mr. Weir would be happy to answer those
13       today.  So if you have questions about
14       that, please ask him today so we don't
15       have to come back another day for the
16       relevant portion of your questioning.
17            MR. WEISBERG:  Okay.
18  BY MR. WEISBERG:
19       Q.   Mr. Weir, your report states you
20    also have an MBA in the High Technology
21    program from Northeastern University, correct?
22       A.   Yes.
23       Q.   When did you begin your studies in
24    that MBA program?  When did the program
25    commence?
```

                              C. WEIR

1

2        A.      We talked about that earlier today,

3   as well.   That was in the summer of 2007.

4        Q.      And do you stop working at ETI while

5   enrolled in the MBA program, or did you do

6   them simultaneously?

7        A.      It was a requirement of the MBA

8   program that the students in the cohort be

9   employed full time while earning their degree.

10   So I maintained my employment at ETI full time

11   during that span of, I guess, two-ish years

12   that I was doing the MBA.

13        Q.      So you probably mentioned this, this

14   morning, and I apologize if I forgot the date,

15   but you completed your MBA in 2009?

16        A.      Correct.

17        Q.      All right.   What is the High

18   Technology program, specifically?

19        A.      It's defunct now; I don't think it

20   exists anymore.   But it was an MBA program

21   that was designed -- there were sort of two

22   salient things.   One is that it requires that

23   you have employment.   In other words, they

24   wanted people who were already in business.

25   And then the case studies that we were using

```
 1                          C. WEIR
 2      tended to be maybe more modern, like studying
 3      Apple Computer instead of General Motors in
 4      the mid century.
 5          Q.    So from digging at -- digging around
 6      online, I was able to find a description of
 7      the program, and it's described as follows:
 8      "Designed for both techies and managers alike,
 9      an online MBA and High Technology Management
10      is offered by Northeastern University.
11      Whether you are an IT architecture specialist
12      who wants to acquire leadership skills, or you
13      are a manager who wants to strengthen your
14      technical knowledge, this graduate degree will
15      put your career in prime position for
16      advancement."
17              Do you agree with that description
18      of the program?
19          A.    That is not --
20              MS. WESTCOT:  Objection to form.
21          A.    That is not an accurate description
22      of the program that I took.  I can tell in
23      part because it says it's an online program,
24      and 100 percent of my classes were in person,
25      and it was not focused on IT managers at all.
```

```
 1                        C. WEIR
 2        Q.    As part of your MBA program, did you
 3     take any classes in retail pricing?
 4        A.    I would give you the same answer as
 5     to my under graduate degree.  I don't think
 6     there was any one class titled retail pricing,
 7     but there were many classes that touched on
 8     pricing and strategies and that sort of thing.
 9        Q.    Do you recall the names of any of
10     those classes?
11        A.    I think the classes had boring
12     names, like Economics 1 and Economics 2, but I
13     wouldn't swear my life on it.
14        Q.    So you don't recall any specific
15     names of classes that you recall touched on
16     retail pricing topics?
17        A.    For example, I remember that there
18     were classes where the key subject was
19     economics, that touched on pricing.  But as to
20     the precise name of the class, again, I
21     thought they had boring names like Economics 1
22     or Economics 2, but I could be wrong about
23     that.
24        Q.    So as part of your MBA, you took
25     classes, kind of general economics classes
```

1                        C. WEIR

2       that touched on retail pricing as one of many

3       topics within the class.  Is that accurate?

4            A.    I think there are many classes, both

5       focused on economics and other categories,

6       that included studies of pricing and retail

7       pricing.  Economics is one that I remember

8       specifically.  They did also teach other

9       topics.

10           Q.    But you don't recall any of those

11      classes being specifically focused on retail

12      economics or retail pricing, correct?

13           A.    Yeah, I think that could be

14      misleading to somebody reading the transcript.

15      The classes taught those topics, but that

16      wasn't the singular focus of the class.

17           Q.    In any of the classes you took as

18      part of your MBA, was retail pricing or retail

19      economics a main focus of the class?

20                MS. WESTCOT:  Objection to form.

21           A.    I certainly walked away feeling like

22      I had more experience and expertise in retail

23      pricing after taking those classes, so to me,

24      I would say yes.

25           Q.    But just objectively, from the

1                    C. WEIR

2        perspective of a course syllabus, for

3        instance, in any of the classes you took as

4        part of your MBA, was retail pricing or retail

5        economics a main focus of the class?

6                MS. WESTCOT:  Objection.  Asked and

7            answered.

8            A.    To the best of my ability to answer

9        that question, I would say yes.

10           Q.    Which classes?

11           A.    I already told you that I can't

12       remember the titles of the classes, but some

13       of them included economics courses that I

14       think had boring names like Economics 1 or

15       Economics 2.

16           Q.    But you can remember the nature of

17       the syllabus for those courses and the fact

18       that a majority of it was dedicated to retail

19       pricing and retail economics, and you can't

20       remember the name of the course?

21               MS. WESTCOT:  Objection.

22           Argumentative.  Misstates the witness'

23           prior testimony.

24           A.    I can recall that there were many

25       classes that touched on retail pricing,

Page 133

                              C. WEIR
1
2    including in such a manner that I would
3    describe it as having been a, quote, main
4    focus of the class.  I don't know that I have
5    an ability to break down a syllabus into
6    majority and minority.  I don't even know how
7    you would define or measure that.  But I do
8    specifically remember doing things like retail
9    pricing, pricing strategy, analysis of
10   profitability that results, and
11   decision-making that relates under various
12   different scenarios about whether you
13   increase, decrease, or hold prices steady.
14        Q.    For those classes that you were just
15   describing, do you have any understanding as
16   to the approximate number of days, course days
17   spent discussing those topics?
18        A.    I don't have a precise memory of
19   that.  Many days, but I couldn't quantify.
20        Q.    So it's your testimony that as you
21   sit here today, although you can't remember
22   the names of those specific classes, you do
23   recall taking classes that touched on retail
24   economics and retail pricing in your MBA, and
25   you also can't remember approximately how many

```
                                    Page 134

 1                   C. WEIR
 2    days were spent discussing those topics in the
 3    courses?
 4              MS. WESTCOT:  Objection to form.
 5         A.    Retail pricing was one element of
 6    the MBA.  Anybody who's going into business is
 7    eventually going to have to sell a product.
 8    Many of them are going to get sold at retail.
 9    There were many classes that worked on that
10    subject.  You are correct that I don't
11    remember the precise name, and nor do I have
12    memorized the number of days when that subject
13    was on the docket in any particular class that
14    did touch on that topic.
15         Q.    Just to be clear, I'm not asking do
16    you know the precise number of days that those
17    topics were discussed.  Do you have any
18    understanding of the approximate proportion of
19    days of the class when those topics were
20    discussed?
21         A.    I couldn't tell you the proportion
22    because I can't remember the number of days.
23         Q.    Did you take any classes as part of
24    your MBA focused on conjoint analysis?
25         A.    Yes.
```

Page 135

                              C. WEIR

1
2        Q.    Okay.  Which class?
3        A.    There was one class that was
4   dedicated solely to conjoint, and another
5   class that involved the practical use of
6   conjoint in various applications, as well as
7   some other marketing issues.
8        Q.    What was the name of the class that
9   was dedicated solely to conjoint?
10       A.    I don't recall, specifically.
11       Q.    What was the name of the professor
12   who taught that class?
13       A.    Rosanna Garcia.
14       Q.    And what was the name of the class
15   that involved the practical use of conjoint?
16       A.    That I don't recall.
17       Q.    What was the name of the professor
18   who taught that class?
19       A.    I could be wrong, but my best
20   recollection is that it was co-taught by
21   Dr. Garcia and Marc Meyer.
22       Q.    Do you recall what grade you got in
23   the conjoint class that Professor Garcia
24   taught?
25       A.    I believe I had the highest GPA of

```
 1                    C. WEIR
 2    my class.  Or if not, I was in the highest
 3    echelon.  So it couldn't have been a low
 4    grade, but I do not have that transcript
 5    memorized.
 6         Q.    You're talking about the highest
 7    overall GPA in your class?
 8         A.    Or very close to it.
 9         Q.    How long was the class that you were
10    referring to that was focused on conjoint?
11    Was it a semester?
12         A.    Each class was a semester, yes.
13         Q.    Have you received any post-MBA
14    training or education on which you're relying
15    for your opinions in this case?
16         A.    Yes.
17         Q.    Okay.  What?
18         A.    Well, in one category, which I
19    believe I mentioned in the report, I take
20    postgraduate training in conjoint analysis.  I
21    don't know that there's any one class I would
22    point to, but again, generally as to my
23    expertise, I believe that bolsters my
24    credentials as a conjoint practitioner.  And I
25    have 19 years of on-the-job experience
```

```
                             C. WEIR
 1
 2     that's due at the end of the training.
 3         Q.    I see.  But there's no half-sale
 4     type of determination at end of the training?
 5     If you're there and you complete it, you've
 6     completed it?
 7         A.    That's right.
 8         Q.    Now, Exhibit 1 to your report, which
 9     was marked as Exhibit 2, that was your
10     publications, correct?
11         A.    Exhibit 1 to the report is my
12     Statement of Qualifications.  Part of that
13     Statement of Qualifications includes a list of
14     publications.
15         Q.    And Exhibit 1 says, "Mr. Weir has
16     co-authored the following," and then lists a
17     number of publications.  Do you see that?
18         A.    Again, that's a subsection of the
19     document, but I do see to where you are
20     referring.
21         Q.    Okay.  And on which, if any, of
22     these publications are you the lead author?
23         A.    All of these are publications that
24     were done within the purview of the firm, and
25     I don't think we've ever used a designation
```

```
 1                      C. WEIR
 2      such as the "lead author" like you might in an
 3      academic setting.
 4           Q.    But have you ever authored any
 5      publications outside of your work for ETI?
 6           A.    No.  Well, it depends on how you
 7      define that.  You could talk about my senior
 8      capstone project at college, for example.  But
 9      if you're talking about, you know,
10      post-undergrad and publications, what you see
11      is what you get on the list.
12           Q.    But your capstone report was never
13      published, was it?
14           A.    People have different feelings about
15      what that term means, so I would rather be
16      overinclusive than underinclusive and accused
17      of withholding something.
18           Q.    That's fine.
19                 Now, each publication in the
20      description, it has phrasing, "prepared on
21      behalf of," and then it lists an entity.  What
22      does that phrasing mean?
23           A.    It indicates that we were hired by
24      the client to conduct some independent
25      research and to publish our findings.
```

```
 1                      C. WEIR
 2        Q.    So none of the publications listed
 3   here in Exhibit 1 have been peer reviewed?
 4        A.    I don't believe so.  At least not
 5   within my understanding of what that means in
 6   academia.
 7        Q.    And to your knowledge, has any work
 8   by you, whether listed in this Exhibit 1 or
 9   otherwise, ever been subject to peer review?
10        A.    "Any work"?  I mean, I feel like --
11        Q.    A publication, written product,
12   analysis.
13        A.    Yeah, I feel like these contested
14   proceedings, somebody's always reviewing your
15   work.  But outside of that sort of
16   adversarial, somebody else is critiquing your
17   work, I'm not an academic, I'm a consultant,
18   so I'm not regularly submitting things for
19   peer review (indicating).
20        Q.    So outside of a litigation context,
21   none of your work has been subject to peer
22   review?
23             MS. WESTCOT:  Objection to form.
24        A.    Not that I'm aware of.  Again, I'm
25   not in an industry where we submit work for
```

```
                                      Page 142
1                    C. WEIR
2    peer review.
3         Q.    Now, a couple of times today you've
4    referred to that you base your expertise in
5    this case on 19 years of experience, right?
6         A.    Yes.
7         Q.    Okay.  And I just want to make sure
8    I'm clear about what comprises that experience
9    on which you rely in claiming your expertise.
10              So does your claimed expertise rely
11   on your work with Stop & Shop?
12        A.    That's not part of the 19 years that
13   I'm mentioning, but I do believe that there
14   are small elements of my time at Stop & Shop
15   that could be informative in this case.  I've
16   already put on the record I think maybe the
17   most important conclusion, which is that if
18   there's a product in existence, a grocery
19   store's going to want to sell it for some
20   money, rather than no money.
21        Q.    And then another basis of your
22   claimed expertise in this case is the
23   consulting work that you previously declined
24   to get into specifics about based on your NDA,
25   correct?
```

```
                              C. WEIR
 1
 2              MS. WESTCOT:  Objection to form.
 3       A.    That's part of the 19-year career
 4    that I've had at ETI.
 5       Q.    And that's part of the basis for
 6    your claimed expertise in this case, correct?
 7       A.    I don't think I would need that
 8    consulting experience to have the credentials
 9    to give the opinions I have, but it's
10    experience that I have had.
11       Q.    What other experience are you
12    relying on in claiming your expertise in this
13    case?
14       A.    Well, there's my undergraduate
15    degree, my graduate degree, my postgraduate
16    education, my time at ETI, and I guess the
17    time at Stop & Shop.
18       Q.    So undergraduate degree, that's the
19    time at college in Ohio, right?
20       A.    Yes.
21       Q.    Graduate degree is the MBA from
22    Northeastern?
23       A.    Yes.
24       Q.    And the postgraduate education
25    you're referring to the Sawtooth training we
```

Page 144

```
1                      C. WEIR
2      were discussing?
3           A.    Yes.
4           Q.    Okay.  And your time at ETI, that
5      reflects the consulting work that is subject
6      to the NDA.  Does it include anything else?
7           A.    Yes.
8                 MS. WESTCOT:  Objection to form.
9           Misstates the witness' prior testimony.
10          A.    I've done consulting work for
11     private clients, but we also do consulting
12     work for government agencies, various
13     different groups, and many, many cases that
14     are similar to this one.  So the next part of
15     the Statement of Qualifications has a list of
16     cases I've worked on in the last four years.
17     I've now been involved in, it's got to be,
18     hundreds of cases at this point that would
19     provide guidance and expertise upon which I
20     draw in submitting opinions in this case.
21          Q.    Which government entities have you
22     consulted with that you are relying on as part
23     of your experience for your expertise in this
24     case?
25          A.    I'm having a real hard time with the
```

C. WEIR

1

2    Q.    So other than CPUC and the

3    Department of Justice, are there any other

4    government entities for which you've done

5    consulting projects involving retail economics

6    or retail pricing?

7    A.    Pennsylvania Department of Revenue

8    is one of the ones for which I had suggested

9    that there was at least one project.  I'm

10   fairly certain the Illinois Office of the

11   Attorney General would be the same.

12   Q.    And what about, you said other

13   groups you also do consulting work for

14   involving retail pricing and retail economics.

15   What groups were you referring to?

16   A.    These are older projects that go

17   back some time, but there are groups that

18   monitor retail pricing and participate in

19   proceedings before regulators.  I'm trying to

20   think -- they're all acronyms.  I'm trying to

21   remember what they stand for.  But, you know,

22   groups of telephone regulators, for example,

23   would hire us, and we would do work for them.

24   Q.    Can you think of an example?

25   A.    Yeah.  One of them is called NASUCA.

Page 149

```
 1                     C. WEIR
 2     I don't remember what the acronym stands for,
 3     but it's an acronym.
 4          Q.    Do you remember how to spell that
 5     acronym?
 6          A.    I think it's as you would do it
 7     phonetically; N-A-S-U-C-A.
 8          Q.    I would have spelled it differently,
 9     so I'm glad you said that.
10          A.    Okay.
11          Q.    So in terms of litigation, you said
12     you've worked in hundreds of litigation
13     matters involving retail pricing and retail
14     economics; is that right?
15          A.    I think I was speaking more broadly,
16     that we were talking about my experience, that
17     that involved hundreds of contested
18     proceedings that don't always necessarily
19     involve litigation.  But of those hundreds,
20     there are dozens, if not more than a hundred
21     cases, that involve analysis in one way or
22     another of what consumers pay in the
23     marketplace and the impact that some at-issue
24     behavior has on what consumers pay in the
25     marketplace.
```

Page 150

                    C. WEIR

1

2       Q.    Have you ever taught a class in

3    retail pricing or retail economics?

4       A.    I don't believe so, no.

5       Q.    Have you ever taught a class in

6    conjoint analysis?

7       A.    I teach people here at the company

8    how to use the technique, but I'm not a

9    professor, so I'm not regularly in a position

10   to teach classes.

11      Q.    Outside of teaching other people at

12   ETI about conjoint analysis, have you ever

13   taught a class about conjoint analysis?

14           MS. WESTCOT:  Objection.  Asked and

15       answered.

16      A.    No.

17      Q.    Have you ever personally overseen a

18   conjoint analysis?

19      A.    Many times, yes.

20      Q.    Approximately how many times?

21      A.    Dozens; more.

22      Q.    Under what circumstances?

23      A.    I do them in cases such as these,

24   when my client hires me to do the full

25   conjoint work.  We also do them for our

```
                                            Page 151
 1                      C. WEIR
 2      private clients.
 3           Q.    Just to be clear, have you ever
 4      personally designed and ran a conjoint
 5      analysis --
 6           A.    Yes.
 7           Q.    -- a conjoint survey?
 8           A.    Yes.
 9                 (Discussion held off the written
10      record.)
11           Q.    Have you ever personally designed
12      and conducted a conjoint survey that has been
13      accepted and relied on in court?
14           A.    I believe so.
15           Q.    Do you know which court?
16           A.    I would need to go look that up, but
17      various federal courts.
18           Q.    Do you recall when?
19           A.    Over the last half a dozen years,
20      probably.
21           Q.    Can you name a single court that has
22      accepted a conjoint survey that you personally
23      designed and conducted?
24           A.    There was one that I designed that
25      was accepted by the -- one of the New York
```

```
                                    Page 152
 1                    C. WEIR
 2      districts.  We didn't get to the point where
 3      it was run.  I don't remember the court, but I
 4      did a case about New Balance sneakers.  I
 5      believe that result was accepted.  That was
 6      years ago.  Maybe there was a case in
 7      Connecticut where I had another design that
 8      was submitted.  That case was scuttled for
 9      other reasons other than the conjoint.
10          Q.    Okay.  So I just want to be clear.
11      So have you ever designed and conducted, so,
12      you know, run the survey, taken it to
13      fruition, gotten results and analyzed them,
14      that was accepted by a court?
15          A.    I just told you the New Balance case
16      was one.  There are a couple of others.
17      There's one pending right now.  That one I
18      know is out in California.
19          Q.    What court was the New Balance
20      survey before?
21          A.    I don't remember, off the top of my
22      head.
23          Q.    Do you remember whether it was the
24      state or federal court?
25          A.    I believe it's federal court.
```

```
 1                        C. WEIR
 2        Q.    Do you recall what state the federal
 3   court was located in?
 4        A.    I don't.
 5        Q.    Do you recall what year your
 6   conjoint was accepted by the Court?
 7        A.    My recollection is -- well, it was
 8   definitely before the pandemic and maybe a
 9   couple years, so 2017, 2018 maybe.  But again,
10   I don't have the dates memorized.
11        Q.    Other than New Balance -- was New
12   Balance a party to that case?
13        A.    They were the defendant in the case,
14   yes.
15        Q.    Do you recall the name of the
16   plaintiff in that case?
17        A.    I think the plaintiff's last name
18   was Dashnaw, but again, I'm not a hundred
19   percent on that.
20        Q.    Do you recall the nature of the
21   claims in that case?
22        A.    The case centered on New Balance's
23   practice of labelling some of its sneakers as
24   being made in the USA, and the allegations
25   were that the sneakers definitely would not
```

```
 1                    C. WEIR
 2    meet the requirements to use that phrase, and
 3    we were testing the impact on the market price
 4    of the removal of the "Made in the USA" claim
 5    from the New Balance packaging.
 6         Q.    So you were testing a price premium
 7    in that case?
 8         A.    Yeah.  I mean, the facts and
 9    circumstances are obviously different, but
10    conceptually, it's very similar to what
11    happened in this case.  There's a statement
12    that's made on the packaging, we want to find
13    out whether or not there's a market impact due
14    to the use of the claim at issue.  In that
15    case, it happened to be "Made in the USA."
16         Q.    And you also mentioned an ongoing
17    California case.  What's the name of the
18    plaintiff in that case?
19         A.    That's a good question.  I can tell
20    you the defendant for sure, but I would have
21    to think for a minute on the plaintiff's name.
22         Q.    What's the defendant's name?
23         A.    R.C. Bigelow.
24         Q.    And what is the nature of the claims
25    in that case?
```

Page 155

C. WEIR

1

2      A.    Actually, fairly similar to the New
3    Balance project.  They put on their tea --
4    Bigelow sells tea bags.  They put on some of
5    their boxes of tea bags a statement that says,
6    and I may be -- I'm just going to paraphrase,
7    but something like manufactured in the USA,
8    100 percent American family owned.  And the
9    legal claim is that, again, that would mislead
10   a consumer into believing that the product was
11   made in the USA.  There's no way that the teas
12   would qualify for the use of that type of
13   statement, and the question is, what would
14   happen if you remove the offending statement
15   from the packaging.
16      Q.    And is that in federal or state
17   court in California?
18      A.    Pretty certain it's federal court.
19      Q.    Do you recall what district?
20      A.    This one I can do by looking at the
21   Statement of Qualifications.  It's the second
22   case down on page 3 of Exhibit 1 to Depo
23   Exhibit 2.
24      Q.    So I see Kimberly Banks, etcetera,
25   versus R.C. Bigelow?

Page 156

                          C. WEIR

1

2       A.      Yes.

3       Q.      And did your conjoint analysis in

4    that case -- again, this is a conjoint

5    analysis that you designed and oversaw to

6    completion?

7       A.      Correct.

8       Q.      And has your conjoint analysis in

9    that case, the Bigelow case, been accepted by

10   the Court?

11      A.      It certainly hasn't been rejected,

12   that I'm aware of, but I don't know if

13   their -- what the posture of the case is at

14   the moment.

15      Q.      And is the New Balance case you were

16   referring to listed on your Statement of

17   Qualifications?

18      A.      If it was within the last four

19   years, then yes.  If not, it may have fallen

20   off of the list.

21      Q.      Okay.  Other than the New Balance

22   case that we've discussed and the California

23   Bigelow case that we've discussed, are there

24   any other instances where a conjoint that you

25   have designed and overseen has been accepted

Page 157

```
 1                      C. WEIR
 2     by a court?
 3         A.    So you're creating the restriction
 4     that it has also been done, designed and done?
 5         Q.    Yes.
 6         A.    Is that part of the question?
 7         Q.    Yes.  Designed, run the survey, you
 8     have data, and you analyze it.
 9         A.    It's possible that there's one or
10     two other cases.  There are many cases where I
11     have designed a survey and that's all that I
12     have been asked to do, and the courts have
13     accepted the design of the survey.
14         Q.    And are those cases listed on your
15     Statement of Qualification?
16         A.    If they happened within the last
17     four years, then yes.  One of them is the in
18     re Fisher-Price, it's a case out of
19     Connecticut involving -- gosh, I'm sorry --
20     Craftsman Tools, I think.  I would have to jog
21     my memory.  There are more than those, but
22     those are some examples that I can think of
23     for sure.
24         Q.    From reading your Statement of
25     Qualifications, I take it you've also applied
```

```
 1                        C. WEIR
 2     conjoint analyses that other people performed?
 3          A.    Yeah, there were 30-plus cases that
 4     have involved me working in the capacity that
 5     I am in this case, which is that I helped with
 6     the design of the conjoint survey and have
 7     brought to bear my mixed experience both with
 8     conjoint and economics to help the team with
 9     those issues.  And then ultimately, after
10     reviewing the results and finding them to be
11     economically reasonable, apply the results to
12     calculate damages.
13          Q.    Have you ever applied a conjoint
14     analysis, either designed by yourself or
15     someone else, outside of a litigation context,
16     such as a commercial or academic setting?
17          A.    Yes.  Like I mentioned earlier
18     today, we do conjoint analyses for our private
19     clients.
20          Q.    And can you name those private
21     clients, or is that subject to the NDA, as
22     well?
23          A.    I'm happy to give you some
24     high-level information about the nature of the
25     studies, but I cannot disclose the particular
```

Page 159

1                      C. WEIR
2     clients.
3          Q.    Yeah, please provide the extent of
4     the information that you feel comfortable.
5          A.    We recently have done some studies
6     involving food products and pricing related to
7     food products.  We've done another one
8     recently that involved shampoos and actually
9     maybe deodorant, now that I'm thinking about
10    it, and how those products are priced within
11    the marketplace.
12         Q.    What --
13         A.    There are others.  I'm just trying
14    to recall.  Sometimes the litigation and the
15    consulting work kind of blends together in my
16    mind as to which is which.
17         Q.    When did you conduct this food
18    product conjoint analysis?
19         A.    That's actually work that's ongoing.
20    The shampoo and deodorant studies I think were
21    done earlier this year, maybe.  Might have
22    begun at the tail end of last year.
23         Q.    And was the food product conjoint
24    study done on behalf of a manufacturer or a
25    retailer?

```
                                        Page 160
 1                    C. WEIR
 2        A.    That, I'm not comfortable
 3   disclosing.
 4        Q.    Same question with regard to the
 5   shampoo study.
 6        A.    Same answer.
 7        Q.    And same question with regard to the
 8   deodorant study.
 9        A.    The shampoo and deodorant were the
10   same group.
11        Q.    Oh.
12        A.    But I cannot reveal the party.
13        Q.    Okay.  Again, just for the record, I
14   disagree with your refusal to answer the
15   question.  You have not been instructed by
16   counsel not to answer.  And it is relevant to
17   your expertise in this case and your testimony
18   that you seek to give.  So I reserve my right
19   to revisit that issue at a later date.
20           MS. WESTCOT:  And, Mr. Weisberg,
21        just for the record, as you probably know,
22        most NDAs and confidentiality agreements
23        require the party to give advanced notice
24        before making a disclosure publicly.  So
25        it's something that Mr. Weir would have to
```

Page 161

```
 1                        C. WEIR
 2         consult with parties to the NDAs.  It's
 3         not something that he can just disclose
 4         today.
 5              MR. WEISBERG:  I mean, I haven't
 6         seen the NDA, so I don't know.
 7              MS. WESTCOT:  I'm sure you've seen
 8         an NDA, maybe.
 9              THE WITNESS:  And I'm doing my best
10         to be as helpful as I can about giving as
11         much detail as I feel comfortable.
12              MR. WEISBERG:  No, and I understand,
13         Mr. Weir, yeah.  I'm not trying to beat up
14         on you here.  It's just, yeah, I just
15         disagree.
16    BY MR. WEISBERG:
17         Q.    So do you feel at liberty to share
18      the nature of the attribute you were measuring
19      in the conjoint analyses for the food product
20      or the shampoo and deodorant?
21         A.    There were many attributes and
22      levels within the conjoint.  But as to the
23      specifics, I don't think it would be
24      appropriate for me to discuss those.
25              MR. WEISBERG:  I want to reserve the
```

Page 162

1                         C. WEIR
2          same rights.
3          A.    Actually, I'll -- there's detail
4     that I think I can give.  We use brand,
5     there's price, and then there are information
6     that are specific to the specific foods that
7     are being studied.
8          Q.    And the specific information about
9     the foods being studied you feel you cannot
10    disclose at this time?
11         A.    Without going beyond saying that
12    it's information that's on the packaging of
13    existing products.
14         Q.    Do the opinions in your report rely
15    on any education or training that we have not
16    discussed today?
17         A.    So I put in the Statement of
18    Qualifications some other things that I do,
19    including serving on the board of trustees at
20    a school and serving as the comptroller of a
21    partnership that manages investments for the
22    education and benefit of the partners.  I
23    don't think that there are, per se, specific
24    things where I would say, again, like, ah, I
25    learned this as the comptroller and I'm

```
 1                      C. WEIR
 2      applying it to Tom's of Maine, but they do
 3      comprise part of my experience.
 4         Q.    I actually had just asked about your
 5      education or training rather than experience
 6      at large.  So just, are there any opinions in
 7      your report that rely on education or training
 8      that we have not discussed today?
 9         A.    We've talked about undergraduate,
10      graduate, postgraduate, and my time at ETI.  I
11      think those are probably the things that I'm
12      relying on.
13         Q.    Okay.  And I think you already
14      answered this one inadvertently, but did the
15      opinions in your report rely on any personal
16      experience that we have not yet discussed
17      today?
18         A.    Yeah, I think my prior answer gets
19      to that, which is that I have experience
20      involving data analytics and other accounting
21      things that arguably make me, I guess I would
22      say, more qualified to do the work that I've
23      done here.  But I don't think specific
24      experiences on the board of trustees or as the
25      comptroller of the investment partnership lead
```

```
                                        Page 164
 1                    C. WEIR
 2      to opinions that I've issued here in Tom's of
 3      Maine.
 4           Q.    And you previously said that you are
 5      relying on your experience conducting projects
 6      for private clients at ETI as informing your
 7      expertise in this report?
 8                 MS. WESTCOT:   Objection.   Misstates
 9           the witness' prior testimony.   Asked and
10           answered.
11           A.    There's nothing in the report that
12      derives from a consulting project that I've
13      done.   But, I mean, it literally is part of my
14      past, so I have that experience.   I don't know
15      that I would be required to have that
16      experience to, for example, qualify as an
17      expert, but I do have those credentials.
18           Q.    Do you consider yourself to be an
19      expert in statistical analysis?
20           A.    Statistics is a broad field.   I
21      wouldn't want to take credit for being an
22      expert in the entirety of the field, but there
23      are areas of statistics where, yes, I would
24      hold myself out as an expert.
25           Q.    And which areas of statistics would
```

1                      C. WEIR

2      difference between the calculation of MWTP in

3      this article and the calculation of a market

4      price?

5          A.     The willingness to pay of the

6      marginal consumer is definitionally the same

7      as the market price.  So if the authors have

8      faithfully reported a calculation of the

9      willingness to pay of the marginal consumer,

10     then yes, it is calculating a change in market

11     price under specific conditions.

12         Q.     And do you know whether the authors

13     to this study used marginal willingness to pay

14     in the same way that you do?

15         A.     That is my read of the article, as a

16     professional in the field.

17             MR. WEISBERG:  Let's, Julian, let's

18         go back to -- let's mark, excuse me, tab 8

19         as Exhibit 5.

20             MR. BUFF:  Yes, will do.

21             (Weir Exhibit 5, Testing Consumer

22         Perception of Nutrient Content Claims

23         Using Conjoint Analysis, marked for

24         identification, as of this date.)

25         Q.    Mr. Weir, let me know when you have

Page 215

```
                            C. WEIR
 1
 2      the article in front of you.
 3          A.    Okay.  I have Exhibit 5 up.
 4          Q.    Do you recognize this as the
 5      healthfulness survey that you refer to in
 6      paragraph 26 of your report?
 7          A.    Testing Consumer Perception of
 8      Nutrient Content Claims.
 9          Q.    So this is the article --
10          A.    I cite that in footnote 17 of
11      paragraph 26.
12          Q.    Okay.  Now, your report doesn't
13      claim that this survey calculates a price
14      premium or a market price, correct?
15          A.    I don't believe that it does.  This
16      is just an exemplar of conjoint being
17      scientific and peer reviewed, well-accepted.
18          Q.    But it's not an example of conjoint
19      being used to measure a market price or price
20      premium, correct?
21          A.    Not to the best of my recollection.
22                MR. WEISBERG:  Julian, let's go
23           ahead and mark tab 9 as Exhibit 6.
24                (Weir Exhibit 6, Evaluation of
25           Packing Attributes of Orange Juice on
```

```
 1                     C. WEIR
 2        Consumers' Intention to Purchase by
 3        Conjoint Analysis and Consumer Attitudes
 4        Expectation, marked for identification, as
 5        of this date.)
 6             MR. BUFF:  The exhibit has been
 7        introduced.
 8        Q.    Let me know when you have it in
 9     front of you, Mr. Weir.
10        A.    Okay.  I have it.
11        Q.    Okay.  Do you recognize this as the
12     orange juice survey referred to in paragraph
13     27 of your report?
14        A.    Sorry, I've got enough things open
15     now that it takes me a minute to get back and
16     forth.
17        Q.    Just to be clear, the only things
18     open on your computer are the Veritext Zoom
19     and the Exhibit Share and the exhibits to this
20     deposition, correct?
21        A.    Yes, but I had the complaint, I had
22     two other articles.  I only have two displays.
23     So normally I can toggle back and forth pretty
24     easily, and so when I toggled, I got the Zoom
25     screen back, and not the report.
```

                              C. WEIR
1
2       Q.    That's fine.  I just wanted to make
3    sure that you didn't have anything else open.
4          You have Exhibit 6 in front of you?
5       A.    I was back at the report to confirm.
6    I've lost -- to be honest, I've lot track of
7    the pending question.  Why don't you start
8    again, and I'm happy to go to the article, if
9    that's what you want.
10      Q.    That's fine.  So in paragraph 27 of
11   your report, you discuss an orange juice
12   survey.  Do you see that?
13      A.    Yes.
14      Q.    Okay.  And do you recognize
15   Exhibit 6 as the orange juice survey referred
16   to in or cited to in paragraph 27 of your
17   report?
18      A.    It's been a while since I've looked
19   at this paper, but the title and the authors
20   match.
21      Q.    So you have no reason to doubt that
22   it's the same article you cite in paragraph 27?
23      A.    Not that I'm aware of at this very
24   moment, no.
25      Q.    Your report in paragraph 27 says

```
                              C. WEIR
 1
 2     that this study, quote, "showed that vitamin C
 3     content was the most important purchase driver
 4     besides price," right?
 5          A.     Sorry, I'm toggling back.
 6                 Yes, I do say that it was the most
 7     important purchase driver.
 8          Q.    But isn't it true that in this
 9     study, Vitamin C was just the second most
10     important purchase driver out of the four
11     drivers studied in the survey; not the second
12     most important driver overall?
13          A.    I'll be honest, I put this article
14     into the current report because I had
15     basically used my old report as a -- as a
16     template for that.  I haven't read this in
17     some time.  If you have particular things you
18     want to point me to that can speed things
19     along; otherwise, I'm going to have to read
20     the paper to get to an answer to that question.
21          Q.    I mean, do you have any
22     understanding as to whether this article
23     measures four purchase drivers or all purchase
24     drivers?
25          A.    Oh, I mean, a conjoint is almost
```

1                      C. WEIR
2       never going to have every element of a product
3       put into it.  That would be -- you would need
4       to be dealing with a very simple product.
5       Conjoint, the best practices say,
6       purposefully, please do not put everything
7       into the survey; you know, limit yourself to,
8       say -- I mean, there's no exactly hard and
9       fast rule -- eight attributes.  I know more
10      complicated products can use 20 attributes.
11      But yes, it would be -- it would be unusual to
12      see every attribute of a product measured in a
13      conjoint survey, especially for a more complex
14      product.
15          Q.    So, just to clarify, do you have any
16      reason to claim that this survey speaks to all
17      purchase driver -- or this article states that
18      Vitamin C content is the second most important
19      purchase driver for all drivers of the orange
20      juice product?
21          A.    I don't think that's what I say in
22      my report.
23          Q.    Your report says that, (as read)
24      "the studies show that vitamin C content was
25      the most important purchase driver besides

```
                                            Page 220
 1                      C. WEIR
 2     price."
 3         A.    And of the things studied in the
 4     survey, I believe that statement is true.
 5         Q.    Your report also says that this
 6     study showed that "the minimum price premium
 7     for vitamin C was approximately 17 percent,"
 8     right?
 9         A.    Yes.
10         Q.    And please show me where in the
11     study you're relying on to support that
12     statement.
13         A.    Again, I don't know that I'm going
14     to be able to do that without rereading the
15     whole paper here.  It's been a while since
16     I've looked at this.
17         Q.    I'll direct you to page 64 of table
18     7, which lists -- the only place I could find
19     17 percent mentioned in this study is under
20     Cluster 3, under Relative Importance.  There
21     there's a 17 percent listed and then there's
22     an 18 percent and a 34 percent.  But that's
23     under Relative Importance.
24         A.    I see where it says that.  I'm not
25     sure where the 17 percent premium comes from.
```

1                      C. WEIR

2        Q.     Is it your testimony that this

3    article does show or calculate a 17 percent

4    price premium for Vitamin C?

5        A.     I can go back and read the paper and

6    see if I can confirm that, or I can say that

7    that was my memory from years ago when I cited

8    this.

9        Q.     But you would accept that that might

10   not be a correct understanding of the survey?

11       A.     Without reading it, again, I would

12   say it could be right, it could not be right.

13   Either way, the point still stands that people

14   are using conjoint within a peer reviewed

15   context, which is part of the point of citing

16   the paper, and I am 100 percent behind that

17   opinion.  I don't rely on the 17 percent price

18   premium for determining the damages in the

19   case or something like that.

20       Q.     Well, but are you holding up -- I

21   guess my fundamental question here is:  Are

22   you holding up this article as support for the

23   general principle that conjoint, as an

24   analytical methodology, is used in the peer

25   reviewed literature, or are you holding it up

```
                                    Page 222
 1                    C. WEIR
 2     as support for the narrower principle that
 3     conjoint, as an analytical methodology for
 4     studying but-for market prices is supported in
 5     the peer reviewed academic literature?
 6          A.    The former.
 7          Q.    Okay.  And with the second article
 8     that we were just looking at, Exhibit 5, which
 9     is the healthfulness study, the Drewnowski
10     article, which point are you holding that up
11     for, the general principle about conjoint
12     being academically peer reviewed as a general
13     analytical method, or the narrower point?
14          A.    I'm using that article for the
15     principle that conjoint is peer reviewed,
16     widely accepted, scientific.  Just that
17     general principle.
18          Q.    Okay.  The same with the first
19     article, as well?
20          A.    The first article is more broad.  It
21     is also the general point that conjoint is
22     peer reviewed, published, academic, reliable,
23     accepted in the community, and calculates a
24     price premium for a labelling attribute under
25     specific sets of circumstances.
```

Page 223

```
 1                    C. WEIR
 2       Q.    Now, paragraph 28 of your report,
 3   Exhibit 2, says that, quote, "The use of
 4   conjoint analysis in similar applications is
 5   too extensive to document exhaustively here."
 6   As you sit here today, are you aware of any
 7   additional academic or industry study that you
 8   rely on in your report that uses conjoint
 9   specifically as a means of measuring but-for
10   market pricing?
11       A.    Well, again, I have 30-odd court
12   cases where federal judges have approved of
13   conjoint to estimate a market price in the
14   damages context.  I have an article, there are
15   textbooks that are cited.  Beyond that, my
16   point in this paragraph is, I didn't go cite
17   every possible support for the premise that
18   conjoint can be used in the manner in which I
19   suggest that it can.
20       Q.    So excluding litigation, because my
21   question was specifically an additional
22   academic or industry study, so excluding the
23   litigation, other than the Hirogaki article,
24   are you aware of any additional studies,
25   academic or industry studies, that you relied
```

1                        C. WEIR
2    on in your report that used conjoint to
3    measure a but-for market price?
4         A.    Well, the exclusion, the way that
5    you're doing it is a fiction in terms of my
6    process.  I'm aware that conjoint has been
7    used this way and accepted by many courts.  I
8    have an academic article, I have a textbook
9    that talks about it, and I don't go further
10   because I have all of that stuff together.
11        Q.    And the textbook you're referring to
12   is the Orme textbook; O-R-M-E?
13        A.    Yes.
14        Q.    And what specific part of that
15   textbook are you referring to?
16        A.    There's a section that, if my memory
17   serves, talks about the market simulation that
18   is the one used by Dr. Dennis.
19        Q.    And in your recollection, does the
20   Orme textbook specifically endorse the use of
21   conjoint to determine but-for market prices?
22        A.    Yes.  Well, he doesn't use but-for,
23   which is a legal term, but there's a premise.
24   If you're going to hold everything else
25   constant and you want to determine the value

1                        C. WEIR

2      of a particular attribute, here's how to do

3      it, and the set of circumstances matches the

4      but-for.  It's everything else held constant,

5      you're only changing the one attribute or

6      level.

7           Q.    So you have the academic article,

8      you have the Orme textbook.  Are you relying

9      on any other academic or industry study in

10     support of this claim that conjoint can be

11     used to measure but-for market prices?

12          A.    I mean, this seems so self-evident

13     to me, and again, the point of the paragraph

14     that you raised is that I purposely didn't go

15     try to get every potential source.  So no,

16     those are the things that I have relied upon,

17     plus my experience.

18          Q.    Now, we talked a lot about conjoint

19     generally.  But specifically with regard to

20     this case, just to be clear, you did not

21     personally conduct and complete the conjoint

22     analyses that your report relies on, right?

23     Dennis did those, Dr. Dennis did those?

24          A.    Dr. Dennis and I worked in tandem on

25     the conjoint design.  I believe -- I mean,

C. WEIR

1

2    "executing the conjoint" is kind of a curious

3    term and I'm guilty of using it, but it's

4    pushing a button and then panelists do all the

5    work at that point, and then I would have to

6    go back and think about whether I also

7    reconstructed Dennis' results as to

8    toothpaste, but I believe I did do that with

9    the modern deodorant study that he has put

10   into the current report.

11       Q.   So you said just now and you say

12   also in paragraph 33 of your report that you

13   worked with Dr. Dennis to develop parts of the

14   conjoint surveys in this case.  Specifically,

15   which parts of the survey did you work with

16   Dr. Dennis to develop?

17       A.   I'm also going to admit to being

18   guilty about using "survey" when maybe

19   "analysis" would also be an appropriate term

20   to put in there.  In terms of the survey

21   instrument itself, I assisted Dr. Dennis by

22   providing information about real world

23   market-based prices that serve as the basis

24   for the range of prices used in the survey.

25   That's one of the ways in which supply is

Page 227

                        C. WEIR

1   incorporated into the analysis.  Dr. Dennis

2   and I discussed the use of hierarchical bayes

3   regression analysis to process the conjoint

4   data, which is a way of getting more market

5   realistic results from conjoint information.

6           We discussed the particulars of the

7   market simulation that he was going to use,

8   including holding supply fixed as a matter of

9   history, and holding everything else fixed in

10  the but-for world as it existed in the real

11  world, with the exception of the challenged

12  claim.  We discussed structuring the

13  attributes and levels such that he could model

14  the challenged claim, both being present and

15  absent, holding everything else constant.

16          I think those are probably good

17  high-level descriptions.  There might be more

18  nuance if we were to talk about it at greater

19  length.

20      Q.    How many times did you discuss the

21  design of the conjoint survey with Dr. Dennis?

22      A.    That's a good question.  We had

23  spoken about the design however many years ago

24  that it was that he conducted the first

Page 228

1                         C. WEIR
2       conjoint study about toothpaste, and then
3       again this year as we talked about taking that
4       similar design, but applying it to the facts
5       and circumstances of deodorant.  My guess is
6       there would be many conversations if you
7       include both of those time periods; maybe ten
8       or more.
9            Q.    Okay.  How many conversations did
10      you have for the older study?
11           A.    That's where I'm just a little hazy
12      on the memory because it's so many years ago
13      now, but it had to have been several,
14      including the original design, going back and
15      forth on pricing, reviewing the theory of
16      liability, and making sure there was an
17      attribute and level that could test that.  I
18      don't have a precise recollection, but just
19      back of the envelope, has to be several, half
20      a dozen calls to cover those topics the first
21      time we did this.
22           Q.    And approximately how many times did
23      you discuss the newer conjoint survey with
24      Dr. Dennis?
25           A.    Also several times.  We reviewed

```
 1                   C. WEIR
 2     pricing for deodorant.  There was updated
 3     sales data.  We talked about attributes and
 4     levels.  Yeah, another handful of
 5     conversations.
 6          Q.   So you've reviewed -- you said you
 7     spoke with Dennis about sales data.  Are you
 8     talking about units sold or the prices they
 9     were sold for --
10          A.   Both.
11          Q.   -- or both?
12          A.   Both.
13          Q.   And what sales data specifically did
14     you review before having that conversation
15     with Dr. Dennis?
16          A.   So I had looked at IRI sales data.
17     I'm trying to remember if there was anything
18     more that I looked at.  And I know that
19     Dr. Dennis went further with his pricing
20     review, at least to the best of my memory.  So
21     IRI, it's possible that there was other
22     pricing information in the Bates numbered
23     documents that I don't remember, but I think
24     that's the primary source of pricing that I
25     had at my availability.
```

Page 249

1              C. WEIR
2       Q.     Now, in this case, it is your
3    opinion that there is no need to determine a
4    but-for quantity of sales, correct?
5       A.     You need a but-for quantity of
6    sales.  It's just going to be the same as the
7    sales in the real world, because just
8    logically, the price premium here concedes
9    that people do receive some amount of value
10   from the Tom's product, and if you logically
11   say, in the but-for world, a person got value
12   from Tom's deodorant, then they had to have
13   had the Tom's product to derive that value,
14   that means they had to buy the product at
15   retail, assuming they obtained the product
16   lawfully.  And if they bought it lawfully,
17   then it turns out they must have had that
18   product at the store that they bought it from.
19   They had the product at the store, that means
20   that Tom's made the product.
21            And so if we go down that logical
22   chain, you realize that in order to measure
23   the value that the class members received or
24   didn't receive, you'd have to deal with all of
25   the transactions, no more, no less.  And if

```
 1                    C. WEIR
 2      you run a model that says let's estimate
 3      value, but only across half of the
 4      transactions, and we're going to assume that
 5      half of them didn't take place, I suppose you
 6      could do that, but you would then need to
 7      account for the value of the unsold products,
 8      because those would have a zero value, and
 9      that would -- that would cause the damages to
10      be higher in that set of circumstances, if you
11      appropriately considered the products that
12      would not have been sold.
13           Q.   And is that why in your report, you
14      refer to Dr. Dennis' price premium analysis as
15      an inherently conservative measure?  It's in
16      paragraph 40.
17           A.   Yes, that's exactly right.  If you
18      were to engage in the arguendo debate over
19      let's figure out a different quantity, you
20      would need to go another step and say, okay,
21      when you don't sell units of the product,
22      people don't get any value, and you have to
23      control for that in the calculus, too.  And in
24      all instances when you have unsold product,
25      the price premium is going to produce a
```

```
 1                    C. WEIR
 2     measure of damages that is less than the full
 3     refund that you would owe people if you were
 4     to model a but-for world where you allowed
 5     them to undo their transaction with Tom's and
 6     get a full refund.
 7             To be clear, I'm not proposing that
 8     people get a full refund, but that's the
 9     benchmark by which I'm saying the price
10     premium is conservative, as opposed to if you
11     were to adopt a method that said, let's change
12     the quantity supplies to be less, you'd wind
13     up owing some people a full refund if they
14     can't make their purchase.
15        Q.   I see.  So it is possible -- so,
16     like, you could have done that analysis and
17     determined how many sales just would not have
18     occurred, but you intentionally chose not to
19     do so and used the assumptions that you did
20     because you felt that doing so was a
21     conservative measure of damages?
22        A.   You kind of strung a couple things
23     together there, and I --
24        Q.   I'll break it up.  It was a
25     complicated question.  I'll break it up.
```

Page 252

                            C. WEIR

1

2        A.     Yeah.

3        Q.     So I'll just say -- so, just to

4    confirm, you could have done the analysis you

5    were just describing, where you see, you know,

6    if the price, you know, would have stayed the

7    same, how many sales just wouldn't have

8    happened.  That's also a way that you could

9    have looked at the impact of this claim,

10   correct?

11       A.     As a technical matter, we could have

12   done a number of different things in the

13   model, one of which would be to say, imagine

14   the defendant is able to say the price is

15   going to be this, and no matter what, you're

16   stuck with that.  And first of all, there are

17   lots of reasons not to do that.  But as a

18   technical matter, you could do it.

19            One of the reasons you don't do it

20   is that we're trying to figure out the value

21   that people obtain from actually making a

22   purchase of the product, and so you've got to

23   model them making the purchase.  Another

24   reason that you don't want to do it is that a

25   product can be worth less than, for example, a

Page 253

1                          C. WEIR

2     manufacturer might be willing to sell the

3     product for if they were given a choice.  But

4     since these products have already been sold,

5     the willingness to sell can't impact the

6     damages calculus by artificially limiting the

7     price of the product.

8               You know, you could have a guy that

9     lies about the efficacy of the product.  Were

10    talking about the sleeping pill.  Imagine it

11    doesn't do anything at all, and the guy has to

12    put money into selling the products and

13    manufacturing them, so he might say, yeah, the

14    price has got to be at least this, but the

15    product is -- you don't need an economic

16    analysis to know that if the only thing the

17    product is advertised to do is help you sleep

18    and it doesn't do that, then it's worth zero.

19    And you can use that as a logical way to know

20    that you really should not be limiting the

21    price in the manner you described in order to

22    artificially depress sales.

23    Q.    So in your analysis, aren't you

24    assuming that Tom's would have sold the same

25    number of units just for a uniformly lower

Page 254

C. WEIR

1
2   price; 12 percent less for toothpaste, and

3   21 percent less for deodorant?

4       A.   I don't think I get to making that

5   assumption.  I don't know.  I've heard people

6   disagree with crazier things, but I don't

7   think we can dispute that class members bought

8   these products.  They were sold, and we're

9   trying to figure how much value did those

10  people receive, and how much value did those

11  people not receive.  We are not going back in

12  time and letting Tom's say, you know what, we

13  just won't sell the products at all, or we'll

14  sell them, but only at a price that we get to

15  dictate.  The analysis here is asking, people

16  bought these products, how much value did they

17  get versus how much value that they didn't

18  get.

19      Q.   But looking at just economic

20  realities, are you aware of whether removing

21  the "natural" claim would have had any impact

22  on Tom's cost of manufacturing the product?

23      A.   I gave that some thought, and

24  whether they write "natural" on the label or

25  not doesn't change the cost of ingredients for

                    C. WEIR

 1

 2    toothpaste, it doesn't change the cost of the

 3    tube for the toothpaste, it doesn't change the

 4    cost of shipping that toothpaste to the

 5    grocery store, it doesn't change the salary

 6    that's paid to the cashier that swipes the

 7    tube through the cash register.  The change in

 8    the labelling would not in any way

 9    fundamentally alter the supply factors at

10    Tom's or the retailer, which is why we hold

11    those supply factors constant as between the

12    real world and the but-for world.

13        Q.   So the cost to Tom's in

14    manufacturing it would stay the same if the

15    "natural" claim was removed.  Are you

16    familiar -- have you reviewed Tom's profit

17    margins on the class items at issue, the

18    products at issue?

19        A.    Perhaps; not recently.

20        Q.    Okay.  Are you relying on Tom's

21    profit margins for the products at issue as

22    part of your opinions in your report?

23        A.    Decidedly not, for the reasons that

24    I just explained to you.  A product can be

25    worth nothing even though the product cost

Page 256

```
 1                        C. WEIR
 2    money to manufacture and the manufacturer
 3    would like the product to sell to cover those
 4    costs.  But it's routine that once products
 5    are in existence, this is where we were
 6    talking about the key point from the Stop &
 7    Shop days, if the product exists, a retailer's
 8    going to sell it for anything rather than
 9    nothing.  Nobody is going to let tubes of
10    Tom's expire on the shelf purposefully when
11    they could reduce the price and clear them
12    from the inventory.
13              And since we're dealing with
14    products that have already been made, already
15    been sold, and by definition had to have been
16    in class members' procession for them to
17    derive value, you have to model the fact that
18    the products are out there, and you can't let
19    there be a decision that says I would rather
20    make more money on this by trying to sell
21    fewer units or something like that, let's
22    pretend that some of the units didn't get
23    sold.
24         Q.   Well, it's not even pretending,
25    though.  I mean, are you familiar with the
```

Page 271

                            C. WEIR

1

2          video record.

3                    (Recess was taken.)

4                    THE VIDEOGRAPHER:  The time is

5          approximately 4:14.  We are back on video

6          record.

7     BY MR. WEISBERG:

8          Q.    All right, Mr. Weir.  In paragraph

9     33 of your report, as we talked about, you say

10    you worked with Dr. Dennis to develop parts of

11    the conjoint surveys in this case, right?

12         A.    And the modeling as we discussed

13    earlier today, but yes.

14         Q.    And did you work with Dr. Dennis to

15    determine the specific attributes and levels

16    that were used in the conjoint survey?

17         A.    Yes, as to price, and to ensure that

18    the challenged claims were in the survey.  No,

19    as to the other elements.

20         Q.    Okay.  So attributes such as product

21    benefits and the different levels within

22    product benefits, you didn't have a role in

23    that?

24         A.    I think his product benefits

25    includes the challenge claim.  So yes, as to

Page 272

                        C. WEIR

1

2      that element; no, as to the others.

3          Q.    I mean, like Deep Clean or Advanced

4      Whitening for toothpaste, that was not --

5          A.    That were Dr. Dennis' choices.  I

6      don't have a beef with them, but those were

7      his choices.

8          Q.    Why do you say you don't have a beef

9      with them?

10         A.    Oh, I always imagine what a person

11     who isn't hearing it this live, what they

12     might think, and it's like, oh, Mr. Weir's

13     disclaiming the attributes, and I'm just

14     trying to tell you it was Dr. Dennis' choice;

15     not like I think he did a poor job or have a

16     negative connotation about the choices that he

17     made.

18         Q.    I see.  And have you critically

19     assessed the choices that he made and

20     thoroughly agree with them, or do you just, as

21     you sit here, have no reason to object to

22     them?

23         A.    The latter.  I was not asked to, you

24     know, look over his shoulder and approve of

25     the design.  But there's nothing that I've

```
                                      Page 273
 1                    C. WEIR
 2      seen in the design in reviewing his
 3      declarations in this case that caused me to
 4      worry about the design.
 5           Q.    I see.  So in paragraph 34, your
 6      report states that the respondents in the
 7      toothpaste and deodorant conjoint surveys,
 8      quote, "are representative of the Class, the
 9      results of the survey are projectable to the
10      class, and the results of the survey provide a
11      reliable and accurate measurement of the
12      market price premium solely attributable to
13      the challenged Claim used by Tom's of Maine on
14      their Toothpaste Products."
15                 Is that assertion based on any
16      analysis you performed, besides reviewing
17      Dr. Dennis' report?
18           A.    I don't think I'm making the
19      assertion so much is that it's a recitation of
20      what Dr. Dennis has said.  If you look at that
21      paragraph, all of the sentences are tied back
22      to citations to the Dennis report.  And all
23      I'm trying to do here is, if somebody's
24      reading my report but hasn't read Dr. Dennis',
25      they're getting a flavor of what came from
```

1                         C. WEIR

2    Dr. Dennis that is leading me to the

3    conclusions that I make later on.

4         Q.    I see.  So you're just reiterating

5    Dr. Dennis' assertions; you're not personally

6    endorsing them?

7         A.    Yeah.  In the same way that I just

8    mentioned, I don't want to come in and make it

9    sound like I have a disagreement with

10   Dr. Dennis.  I have no reason to disagree with

11   him.  But that's his statement, and I'm just

12   citing to him making that statement.

13        Q.    Okay.  Paragraph 42 of your report

14   says that you, quote, "worked closely with

15   Dr. Dennis to ensure that his surveys were

16   appropriately designed to measure the true

17   market value of the price premiums

18   attributable to the Claim."

19             How specifically did you do so?

20        A.    I think we've covered that in our

21   conversations to date about real world

22   market-based prices, HB regression model,

23   market simulation, holding supply -- quantity

24   supply fixed as a matter of history, etcetera,

25   etcetera.

```
 1                         C. WEIR
 2     going to do the percentage price premium that
 3     we have discussed at length in other cases
 4     when it was the first time and we had to think
 5     about that, and the facts and circumstances
 6     seemed like they mirror those other efforts
 7     and, therefore, we're going to adopt that
 8     method; yeah, sounds good; okay.
 9          Q.   And what specific application issues
10     did you discuss with Mr. Dennis?
11          A.   Can you point to where you're
12     looking just so I can read what you're talking
13     about, please?
14          Q.   Oh, sure.  Back to paragraph 43, you
15     say you had several discussions with
16     Dr. Dennis "concerning the results of his
17     surveys and how they should be interpreted and
18     applied."
19          A.   Okay.  And now would you give me the
20     question one more time?
21          Q.   Sure.  What specific issues of
22     application or applying did you discuss with
23     Dr. Dennis?
24          A.   Primarily that the percentage would
25     be applied back to the actual sales
```

1                        C. WEIR

2      transactions so that we could account for what

3      I describe as the price of the pizza

4      difference.  Namely, that some people pay

5      different amounts for these products, but if

6      they didn't get 10 percent of the pizza, it

7      doesn't matter whether you paid $20 for the

8      pizza or $12 for the pizza, you didn't get 10

9      percent of the value.  And so the application

10     of that percentage to the price correctly

11     calculates damages and controls for and

12     obviates any issues that might arise from

13     variations in purchase prices.

14          Q.    I see.  So are you assuming that

15     even if someone in the class bought a product

16     that was already, say, 20 percent on sale,

17     just for some, you know, reason, manager's

18     special, it's your assumption that even under

19     that sales price, it would have been

20     12 percent to 21 percent less?

21          A.    I've heard this argument before, and

22     I find it quite puzzling.  Imagine there's a

23     20 percent sale, like your hypothetical.  Why

24     on earth would that conceptually apply first

25     to a contested premium in a litigation and

```
                                            Page 280
 1                          C. WEIR
 2      only then to other elements of the product?
 3      The answer is:  That wouldn't make any sense.
 4      Instead, what you say is, here's the, like,
 5      starting value of the product, we're going to
 6      reduce it because we're putting it on sale,
 7      you're still getting the same product, you're
 8      still missing, in my pizza example, one slice
 9      out of the ten, it's just that now the price
10      is lower.  And so we account for those
11      transactions where people still didn't get 10
12      percent of the pizza, they still didn't get 12
13      or 21 percent of their toothpaste and
14      deodorant, but we would give fair credit to
15      Tom for the fact that -- Tom's for the fact
16      that the retailer did have a discount that
17      applied to the totality of the product.
18          Q.   Is it your understanding that the
19      product -- or the market for toothpaste is an
20      ordinary market?
21          A.   The way that I use that term, yes, I
22      would characterize the marketplace as
23      ordinary.
24          Q.   And how do you characterize the term
25      "ordinary market"?
```

Page 281

                              C. WEIR

1          A.    I usually try and describe instead a

2   non-ordinary market to kind of illustrate.

3   But the classic example is prescription drugs.

4   If you're trying to figure out the price of

5   prescription drugs, that can be very

6   complicated because you could go into a store

7   and pay nothing because you have insurance

8   that covers the whole thing, or you might have

9   a co-pay, and each insurer is working in a

10  smoke-filled backroom to negotiate how those

11  payments will work.  And if you -- I usually

12  try and avoid cases that would involve

13  something like that.

14          But the grocery store presents what

15  I would refer to as an ordinary market, and

16  it's sort of a take it or leave it.  People

17  aren't going in, they're not negotiating the

18  price of Tom's toothpaste.  The price is what

19  it is, and they buy or they don't buy.  We all

20  know how the prices at the grocery store work.

21  To me, that makes it an ordinary market and

22  subject to the typical economic models of

23  price.

24          Q.    And would you describe the market

```
 1                         C. WEIR
 2     for deodorant in the same way?
 3          A.    Yes.
 4          Q.    And would you describe the market
 5     for toothpaste and deodorant as efficient
 6     market?
 7          A.    That sounds like you're talking
 8     about like -- oh, yeah, so you're thinking
 9     about fraud on the market and the cause of a
10     price premium.  No, the price premium does not
11     rely on a fraud-on-the-market price principle
12     in an efficient market.  It relies on the
13     principle of product differentiation, which is
14     that products that are literally different,
15     which implies that there can be competition,
16     but not perfect competition, that those
17     products can sell for different prices
18     precisely because of the differentiation.  So
19     the price premium here does not rely on market
20     efficiency.  It relies on the fact that
21     products are differentiated, and that allows
22     for different products to sell for more and
23     less.
24          Q.    So paragraph 38 of your report
25     states that Dr. Dennis considered supply-side
```

```
 1                    C. WEIR
 2        Q.    And are you aware -- well, let me
 3     ask:  Are there any other macroeconomic
 4     factors that you're referring to besides
 5     inflation?
 6        A.    I mean, it could be anything.
 7     Consumer sentiment could change, GDP could
 8     change, all those things.  If you're going to
 9     be something that is temporally apples to
10     oranges, must be controlled for, unlike in the
11     situation where Dr. Dennis and I are running a
12     comparison that is temporally apple to apples
13     where I can hold those factors constant.
14        Q.    Did you hold them constant, or did
15     you just assume that they would remain
16     constant?
17        A.    I have held them constant.  It's the
18     but-for construct again.  If you want to
19     answer the question of what is the effect of
20     removing the "natural" label, you couldn't run
21     a but-for world where you introduce inflation.
22     It wouldn't make sense.  You'd have a result
23     that's a blend of those two impacts.  So
24     again, we use the economy exactly as it
25     existed and as it impacted things in the real
```

```
 1                   C. WEIR
 2     world, and we hold that constant in the
 3     but-for world.
 4         Q.    Are you aware of the inflation rate
 5     that was prevailing in the national economy at
 6     the time that the label changes occurred?
 7         A.    I don't have the inflation rates in
 8     any given month memorized.  I'm aware that
 9     recently inflation has gone up, and I use that
10     as an example when you asked me, could you
11     conceive of a macroeconomic factor that would
12     need to be controlled for.
13              But even imagine that it wasn't as
14     big of a change as it is now.  It was 2.3
15     instead of 2.6 in the particular time period.
16     You still have to control for that, because we
17     would expect, all else equal, that if the
18     inflation went up even by .3 percent, that the
19     price of Tom's would go up .3 percent.  So
20     when it stays the same, that's the same as
21     being able to say, if you controlled for
22     inflation pushing the price up, then the label
23     claim going away has a downward impact on the
24     price in order to hold the price constant.
25     But if you don't do the analysis and control
```

```
 1                       C. WEIR
 2      for those things, which, by the way, is very,
 3      very challenging to do correctly, which is why
 4      it's not a method that I would recommend, you
 5      can't get a result that isolates the impact of
 6      the harmful conduct from everything else.
 7           Q.    Well, your damages model posits that
 8      without the "natural" claim, holding
 9      everything else constant, Tom's would have
10      received 21 percent -- actually, slightly more
11      than 21 percent less for the deodorant product
12      at issue, correct?
13           A.    I'm not talking really about what
14      Tom's would obtain so much as that consumers
15      did not receive 21 percent of the value they
16      were promised, when we're talking about
17      deodorant.
18           Q.    Your report says that the market
19      price for the deodorant product at issue would
20      have been 21.25 percent less had Tom's not
21      included the "natural" claim on the product,
22      correct?
23           A.    That's the retail price of the
24      product, yes.
25           Q.    Okay.  And if the market price,
```

Page 313

1                         C. WEIR
2       after the label is -- the "natural" claim is
3       removed, actually stays the same and you have
4       2 percent maybe you attribute to inflation,
5       where is the other 18.5 percent coming from?
6       Where is the rest?
7            A.    You can't ask me to do what would
8       otherwise be weeks worth of analysis in the
9       last hour of this deposition.  But what I can
10      tell you is that there are many, many, many
11      potential factors, including other changes to
12      the label and all the things that you've been
13      quizzing me about when you're thinking about a
14      forward analysis, such as the behavior of
15      competition, the behavior of competitors.  All
16      of these other things, when you're not
17      comparing time period A to the same time
18      period like Dr. Dennis and I are, you now have
19      additional requirements for what you must
20      control for in the analysis.
21           Q.    So is it your testimony that it
22      doesn't change your confidence in the price
23      premium of 21.25 percent for deodorant and
24      12.33 percent for toothpaste, that after the
25      "natural" claim was removed, the prices -- the

Page 314

1                    C. WEIR

2     retail prices for those products did not fall

3     at all, let alone to the extent predicted

4     under your conjoint analysis?

5          A.    Because of all of those confounding

6     factors, it does not bother me one bit.  That

7     analysis, that before and after, is junk.  It

8     cannot tell you or inform as to the

9     reliability of the real price premium in this

10    case, if all you do is compare the price

11    before and after without any of the controls

12    for confounding factors.

13         Q.    Other than inflation, what

14    confounding factors are you aware of that you

15    believe undermine the validity of that before

16    and after analysis?

17         A.    I haven't done all of the work

18    required to figure that out, but I've already

19    given you some examples.  Competition could

20    change, products could be added or subtracted

21    from the marketplace, retailers could change,

22    other behaviors, GDP or other macroeconomic

23    events could take place or change.  All of

24    those things have to be controlled for when

25    you do a time period A to time period B

```
                                        Page 315
 1                         C. WEIR
 2      analysis, as that before and after is trying
 3      to do, unlike when you do time period A versus
 4      time period A the way Dr. Dennis and I do,
 5      which allows us to hold those factors constant
 6      across the analysis.
 7           Q.    Are you aware of any changes in
 8      competition involving the Tom's product at
 9      issue in this case that occurred at the time
10      of the labelling change?
11           A.    I haven't sought to analyze that
12      because the method that you're quizzing me
13      about, I would never, in a million years,
14      sponsor for this.
15           Q.    And so I take it you also haven't
16      looked into whether any products were added or
17      subtracted for the marketplace at the time of
18      the Tom's labelling change?
19           A.    What I can tell you is that your
20      team that came up with this comparison haven't
21      investigated that at all, and they have made
22      no controls, big or small, for any factor such
23      as that.
24           Q.    I see.  So you're saying that our
25      team should have looked into all of these to
```

Page 334

```
 1                          C. WEIR
 2      retail prices for the Tom's products at issue
 3      in this case changed before and after the
 4      labelling changes occurred?
 5           A.    Because that is of no probative
 6      value to the price premium that people paid as
 7      a result of the challenged conduct in this
 8      case, I did not look into that.
 9           Q.    Okay.  Now, in section 7 of your
10      report paragraph -- I'm almost done, I just
11      want to make sure I understand this last
12      section.  So in paragraph 54 to 56 and tables
13      1 and 2, those summarize data produced in this
14      litigation, right?
15           A.    Section 6 is a summary of the sales
16      data that has been produced in the case, yes,
17      for the class products and class period.
18           Q.    Okay.  And then in section 7, can
19      you please explain to me what you're doing in
20      paragraphs 57 to 61 and tables 3 and 4 of your
21      report?
22           A.    I am calculating price premium
23      damages that I believe should be awarded to
24      plaintiffs, should plaintiffs prevail on the
25      merits of their case.
```

1                    C. WEIR

2        Q.    So to calculate those damages,

3    you're taking the dollar sales figures that

4    were produced in this litigation and you're

5    multiplying them by the price premium from

6    Dr. Dennis' report?

7        A.    There's a lot of work that we do

8    before we get to section 7, including

9    evaluating the theory of liability,

10   determining the correct framework for the

11   calculation of damages, designing and

12   conducting the conjoint analysis, reviewing

13   and analyzing voluminous sales data to

14   correctly estimate the sales at issue that are

15   used as an input in the calculation,

16   determining that the price premium factor and

17   those sales are the correct inputs to the

18   calculation.

19            But you are correct that the final

20   analysis is the product of the dollar sales

21   and the price premium.

22       Q.    And it's that final analysis, the

23   product of the dollar sales and the price

24   premium, that's what's happening in paragraphs

25   57 to 61 and table 3 and 4, correct?

                              C. WEIR
1
2         A.     The calculations happened in a
3    spreadsheet someplace.  Section 7 does present
4    the results after having done all the work
5    that I just described in my prior answer that
6    gets us to the results in tables 3 and 4.
7         Q.     And then can you explain to me what
8    you're doing in paragraphs 62 to 64 and table 5?
9         A.     That presents the understanding that
10   I have derived from conversations with counsel
11   about New York GBL statutory damages, and
12   based upon that understanding that has been
13   provided to me, I set forth the calculation of
14   those damages in table 5.
15        Q.     So you take the number of units sold
16   based on the figures produced in this
17   litigation, and then you multiply them by 50
18   or $500 per unit, and then you add up your
19   total statutory damages?
20        A.     I don't know that there's addition
21   going on in the calculation, but -- and again,
22   I'm going to affirm that I'm not a lawyer, nor
23   opining as to the propriety one way or the
24   other of the calculation, but I've been led to
25   believe that statutory damages are the product

Page 337

C. WEIR

1  
2     of the violations, where violation would

3     constitute a unit of product sold, and the

4     statutory remedy of either 50, 500, or both,

5     in terms of the statutory damage amount.

6              MR. WEISBERG:  Okay.  I have no

7          further questions for the witness.

8              MS. WESTCOT:  I don't have any

9          questions for you, Mr. Weir.  Thank you

10         for your time today.

11             THE WITNESS:  I'd like to take a

12         moment to thank Kristi and Mike for their

13         service today.  We couldn't do it without

14         you.

15             I'm going to reserve my right to

16         read and sign the transcript.

17             THE VIDEOGRAPHER:  I appreciate

18         that.  Thank you so much.

19             Counsel, would you like me to sign

20         off?

21             MR. WEISBERG:  Yeah, we'll go off

22         the record.

23             THE VIDEOGRAPHER:  Okay.  The time

24         is 5:39, we're going off the video record.

25             (Time noted:  5:39 p.m. Eastern.)

Page 340

1

2                    C E R T I F I C A T E

3

STATE OF NEW YORK        )

4

                         ) SS.:

5

COUNTY OF SUFFOLK        )

6

7              I, KRISTI CRUZ, a Notary Public

8         within and for the State of New York, do

9         hereby certify:

10             That the witness whose deposition

11        is hereinbefore set forth, was duly

12        sworn by me and that such deposition is

13        a true record of the testimony given by

14        such witness.

15             I further certify that I am not

16        related to any of the parties to this

17        action by blood or marriage; and that I

18        am in no way interested in the outcome

19        of this matter.

20             IN WITNESS WHEREOF, I have

21        hereunto set my hand this 16th day of

22        September 2022.

23             *Kristi Cruz*

24

25        KRISTI CRUZ