# EXHIBIT 9

**Confidential: Under Protective Order**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNE DE LACOUR, ANDREA WRIGHT, and LOREE MORAN, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 1:16-cv-08364-KMW |
| COLGATE-PALMOLIVE CO., and TOM'S OF MAINE INC., | |
| Defendants. | |

**EXPERT REPORT OF EDWARD J. FOX**

**August 23, 2022**

**TABLE OF CONTENTS**

**Page**

I.   Introduction .................................................................................................................. 1

    A.   Qualifications ........................................................................................................ 1

    B.   Case Background .................................................................................................. 2

        1.   Parties ......................................................................................................... 2

        2.   Allegations ................................................................................................. 2

    C.   Assignment .......................................................................................................... 3

II.   Summary of Opinions .................................................................................................. 4

III.   Plaintiffs' Experts' Price Premia and Damages Calculations Are Unreliable Because they
Ignore Basic Retailing Concepts and Principles of Branding and Differentiation ......................... 5

    A.   Mr. Weir's Price Premium Damages Methodology Is Not Supported by His
Qualifications or by Academic Literature .................................................................. 6

    B.   Mr. Weir Fails to Account for How Prices Are Actually Set in the Consumer
Packaged Goods Market ............................................................................................ 9

        1.   Mr. Weir Does Not Adequately Consider Wholesale Prices in his
Damages Calculations ............................................................................... 9

        2.   Mr. Weir Does Not Adequately Consider Different Retail Pricing
Strategies in his Damages Calculations ................................................. 10

        3.   Mr. Weir Does Not Adequately Consider Temporary Price Reductions or
Trade Promotions in his Damages Calculations ................................... 11

        4.   Mr. Weir's Fixed Quantity Assumption Is Fundamentally Flawed .................... 14

    C.   Mr. Weir and Dr. Dennis Ignore Key Principles of Branding and Differentiation .......... 15

IV.   Actual Pricing Data For Tom's of Maine's Products Contradicts Mr. Weir's Assumptions
And Resulting Damages Calculations ........................................................................ 21

    A.   Consistent Pricing Before and After Major Packaging Changes Contradicts Mr.
Weir's Assumption That Tom's of Maine's Packaging Has a Material Impact on
Prices ..................................................................................................................... 22

    B.   Line Pricing Practices Contradict Mr. Weir's Assumptions Regarding How
Prices Are Set in the Marketplace ........................................................................ 29

**Confidential: Under Protective Order**

## I.   INTRODUCTION

### A.  Qualifications

1.   I am the Professor of Marketing and Marketing Department Chairman at the Cox School of Business at Southern Methodist University ("SMU"). I also hold the endowed positions of Marilyn & Leo F. Corrigan Faculty Research Professor and W.R. & Judy Howell Endowed Director of the JCPenney Center for Retail Excellence at SMU's Edwin L. Cox School of Business. I have been a professor at SMU's Cox School of Business since 1999. In this position, my duties have included teaching graduate students, undergraduate students, and executives, conducting scholarly research, and engaging with retail and marketing practitioners. As a professor, I teach Marketing, Retailing, and Analytics courses. My research focuses on decisions facing retail managers, including pricing, promotion, product assortment, and store location decisions. My research also involves the modeling of consumer shopping behavior. Along with many scholarly articles, I recently coauthored a book chapter in the Handbook of the Economics of Marketing detailing the process by which retailers set prices. I have also served on multiple occasions as an expert in retail pricing, retail competition, and market structure. I hold a Ph.D. and M.A. in Marketing from the Wharton School at the University of Pennsylvania, along with an M.B.A. in Marketing from the Kellogg School of Management and an M.S. in Marketing Communications from the Medill School of Journalism, both at Northwestern University.

2.   I have consulted on marketing and retailing issues with a number of companies including Booz Allen Hamilton, Radio Shack, ACME Markets, Genuardi Family Markets, VHA, Reliant Rehabilitation, Ben E. Keith, Softspikes, ARCIS Golf, Aegon Direct, and others. Topics on which I have been asked to consult include consumer shopping behavior, marketing strategy, retail management, pricing, and promotion, as well as data analysis.

3.   My professional qualifications are described further in my curriculum vitae, which is attached as **Appendix A**. The cases in which I have testified in the past four years are included in **Appendix B**. I am being compensated at $800 per hour for time spent preparing this report. In addition, I receive compensation based on the professional fees of Analysis Group, Inc., an economic and litigation consulting firm headquartered in Boston, Massachusetts, which has provided research support under my direction and supervision. Neither my compensation for this assignment nor that of Analysis Group is in any way contingent upon the outcome of this research or of the case.

**Confidential: Under Protective Order**

### B. Case Background

#### 1. Parties

4. Based on my review of Plaintiffs' Complaint, I understand that Named Plaintiffs in this matter are three individuals residing in Florida, California, and New York ("Plaintiffs").[1] Plaintiffs bring suit against Defendants individually and on behalf of classes "consisting of all persons who purchased Tom's of Maine deodorant and/or toothpaste products…on or after September 24, 2015" in the states of New York, California, and Florida.[2]

5. Defendants in this matter are Colgate-Palmolive, Co. ("Colgate-Palmolive") and Tom's of Maine Inc. ("Tom's of Maine").[3] Colgate-Palmolive was founded in 1928 when Colgate merged with Palmolive-Peet to become the Colgate-Palmolive-Peet Company and was later renamed to Colgate-Palmolive, Co. in 1953.[4] Colgate-Palmolive is a global, publicly traded company and is headquartered in New York, NY. Colgate-Palmolive is the parent company of brand subsidiaries in categories including oral care, home care, personal care and pet care, including Colgate toothpaste.[5] Tom's of Maine was founded in 1970, was acquired by Colgate-Palmolive in 2006, and is a wholly-owned subsidiary of Colgate-Palmolive.[6] Tom's of Maine Inc. provides personal care products such as toothpaste, deodorant, mouthwash, soap, and lotion.[7]

#### 2. Allegations

6. Plaintiffs in this matter allege that "Defendants' representations that their Products are 'natural' are false and misleading because each of the Products contains at least one, and in most instances, several,

---

[1]   First Amended Class Action Complaint, *Anne De LaCour, Andrea Wright and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Civil Action No. 1:16-cv-08364-KMW, United States District Court Southern District of New York, December 9, 2016 ("First Amended Complaint"), ¶¶ 6-8.

[2]   Opinion & Order, *Anne De LaCour, Andrea Wright and Loree Moran individually and on behalf of all others similarly situated, against Colgate-Palmolive Co., and Tom's of Maine Inc.*, Civil Action No. 1:16-cv-08364-KMW, United States District Court Southern District of New York, April 23, 2021, p. 32.

[3]   First Amended Complaint, ¶ 1.

[4]   "Our History," *Colgate-Palmolive Co.,* available at https://www.colgatepalmolive.com/en-us/who-we-are/history, accessed August 16, 2022.

[5]   "Our Brands," *Colgate-Palmolive Co.,* available at https://www.colgatepalmolive.com/en-us/brands, accessed August 16, 2022.

[6]   "Our Story - The Tom's of Maine Origin Story," *Tom's of Maine, Inc.,* available at https://www.tomsofmaine.com/the-backstory, accessed August 18, 2022. See also, "Colgate Purchasing Tom's of Maine," *Tom's of Maine, Inc.,* March 21, 2006, available at https://www.tomsofmaine.com/news/colgate-purchasing-toms-of-maine, accessed August 16, 2022.

[7]   First Amended Complaint, ¶¶ 15, 17, 19.

**Confidential: Under Protective Order**

ingredients that are synthetic or highly chemically processed."[8] Plaintiffs contend that they and class members "(a) would not have purchased the Tom's Products if they had known the true facts; (b) they paid for the Tom's Products due to the mislabeling; and (c) the Tom's Products did not have the quality, or value as promised."[9] As a result, Plaintiffs allege that "Plaintiffs and the Class have been damaged by the difference in value between the Tom's Products as advertised and the Tom's Products as actually sold."[10]

### C. Assignment

7. I have been asked by O'Melveny & Myers LLP, counsel for Tom's of Maine, to review and respond to the Declaration of Colin B. Weir ("Weir Declaration"), submitted in this matter on July 22, 2022. Mr. Weir was asked to "provide a framework for the calculation of, and a preliminary estimate of, damages suffered by the proposed class of consumers as a result of the allegedly false and misleading Claim."[11] Specifically, I was asked to assess Mr. Weir's opinion that prices for the Tom's of Maine toothpaste and deodorant products at issue in this case ("at-issue products") are driven primarily, even solely, by consumer demand such that a decreased willingness to pay would be met with lower and lower prices until a "market clearing" price is reached. My failure to address any specific sentence or opinion in the Weir Declaration or the Declaration of Dr. J. Michael Dennis ("Dennis Declaration")—which Mr. Weir's analysis relies upon in part—does not mean I agree with it, and no such agreement should be inferred.

8. In formulating my opinions, I considered the materials cited in this report, including in the footnotes, as well as other materials listed in **Appendix C**. I also have relied upon my professional judgment and expertise gathered from over three decades of experience as a marketing scholar and teacher. My expertise includes a focus on retail, particularly consumer packaged goods, shopping behavior, and retail data analysis. That focus has given me an in-depth knowledge of the retail environment, particularly in food, drug, mass, club, and convenience stores.

---

[8]   First Amended Complaint, ¶ 23.

[9]   First Amended Complaint, ¶ 51.

[10]   First Amended Complaint, ¶ 51.

[11]   Declaration of Colin B. Weir, *Anne De LaCour, Andrea Wright and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Civil Action No. 1:16-cv-08364-KMW, United States District Court Southern District of New York, July 22, 2022 ("Weir Declaration"), ¶ 5. I have also reviewed the expert report of Dr. J. Michael Dennis. *See,* Declaration and Expert Report of J. Michael Dennis, Ph.D., *Anne De LaCour, Andrea Wright and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Civil Action No. 1:16-cv-08364-KMW, United States District Court Southern District of New York, July 8, 2022 ("Dennis Declaration").

**Confidential: Under Protective Order**

9. I reserve the right to supplement the opinions expressed in this report in response to any new information provided by the parties after the date of my signature below.

## II.   SUMMARY OF OPINIONS

10. Based on my review of relevant materials and my experience as a marketing scholar, I conclude that there is no basis for the Price Premium Damages methodology described in the Weir Declaration or for his reliance on the price premia calculated by Dr. Dennis. As a result, Mr. Weir's damages calculations are unreliable and would not reasonably be relied upon in the fields of quantitative marketing and retailing.

11. Mr. Weir purports to base his Price Premium Damages methodology approach on his own demonstrated expertise, and he relies on three academic studies to benchmark the price premia he uses. However, neither his experience nor the three studies he cites support his Price Premium Damages methodology; none of the studies use conjoint analysis to determine the impact of any health claim on the price, despite Mr. Weir's assertion that two of them do. (See **Section III.A**).

12. Additionally, Mr. Weir misunderstands how manufacturers and retailers set prices for several reasons:

- Manufacturers of consumer packaged goods products do not adjust wholesale prices in response to differences in consumer preferences in the manner suggested by Mr. Weir. Instead, manufacturers set wholesale prices using strategies that actually *ignore* differences in preferences and demand, such as by setting the same price for horizontally differentiated goods ("line pricing"), and often involving specific pricing considerations and concessions for retailers with market power. (See **Section III.B.1**).

- Retailers employ different pricing strategies, with some offering everyday low prices while others use periodic (e.g., weekly) sales and promotions to drive demand. Retailers with different pricing strategies would behave differently when contemplating or implementing pricing or packaging changes—a fact Mr. Weir's analysis ignores. (See **Section III.B.2**).

- Sales and promotions in retail stores result from negotiations and deals between retail stores and manufacturers. These trade promotions can take many forms and can vary by retailer. These allow retailers to respond to changes in demand in various ways that are not limited to simply reducing prices. (See **Section III.B.3**).

- Quantity and price are fundamentally interrelated concepts in economics, and order quantities and frequency depend on the price that retailers intend to offer, which are often contractually required by trade promotion agreements. (See **Section III.B.4**).

**Confidential: Under Protective Order**

13. Mr. Weir further mischaracterizes the at-issue "natural" labelling as a primary differentiator of the Tom's of Maine toothpaste and deodorant products. In fact, the evidence suggests a key differentiator for these products is the Tom's of Maine brand itself, not elements of its individual products in isolation. As a result, Dr. Dennis' conjoint studies, and Mr. Weir's reliance on those studies, fail to consider important attributes and benefits of the Tom's of Maine brand aside from the "natural" claim. Furthermore, many brands that compete with Tom's of Maine make "natural" claims, and the at-issue "natural" claim does not differentiate Tom's of Maine from these brands. (See **Section III.C**).

14. An analysis of the actual sales data for Tom's of Maine toothpaste and deodorant provide evidence that the pricing process and principles of branding and differentiation are not properly accounted for by Mr. Weir. Packaging changes relating to the "natural" claim in 2014-2015 did not lead to wholesale or retail price changes, and there is no evidence of changes in wholesale or retail price from 2020-2021 when additional packaging changes to one of Tom's most popular deodorants were made to remove the word "natural" from the front label . Line pricing strategies employed by Tom's of Maine demonstrate that products that differ only by flavor/scent typically have the same wholesale and retail price, despite having differing demand, offering empirical evidence that the retail price is not directly tied to consumer demand for specific attributes or claims. (See **Section IV**).

## III.   PLAINTIFFS' EXPERTS' PRICE PREMIA AND DAMAGES CALCULATIONS ARE UNRELIABLE BECAUSE THEY IGNORE BASIC RETAILING CONCEPTS AND PRINCIPLES OF BRANDING AND DIFFERENTIATION

15. In his declaration, Mr. Weir claims to "ascertain whether it would be possible to determine damages on a class-wide basis using common evidence" and attempts to "provide a framework for the calculation of, and a preliminary estimate of, damages suffered by the proposed class of consumers" as a result of Tom's of Maine labelling certain toothpaste and deodorant products as "natural."[12] Mr. Weir claims that his Price Premium Damages methodology estimates damages, defined as "the value of the price premium" consumers paid "as a result" of the at-issue "natural" labelling.[13]

16. First, Mr. Weir's approach is not supported by his demonstrated expertise or the academic research he cites in his declaration. Second, although both Mr. Weir and Dr. Dennis acknowledge the importance of "supply-side considerations" in addition to consumer demand when estimating price premia and damages, their analysis of supposed price changes that could result from the removal of the at-issue "natural" claim from the Tom's of Maine fails to account for how prices are actually set in the retail

---

[12]   Weir Declaration, ¶ 5.

[13]   Weir Declaration, ¶ 16.

environment and the factors that affect retail pricing.[14] Third, Mr. Weir further ignores the principles of branding and differentiation. These decisions result in the calculation of unreliable price premia and unreliable damages. I discuss each of these areas in-turn below.

### A. Mr. Weir's Price Premium Damages Methodology Is Not Supported by His Qualifications or by Academic Literature

17. In the "qualifications, background and experience" section of his Declaration, Mr. Weir states that he worked at Stop and Shop Supermarkets "as a cash department head, grocery/receiving clerk, and price-file maintenance head."[15] A "clerk" in a grocery store is generally responsible for tasks like stocking shelves, cleaning, and assisting customers, and a "cash department head" would oversee other cashiers, assist customers, and ensure registers have the correct amount of cash. "Price-file maintenance" involves updating the in-store information technology systems so that the prices scanned at checkout reflect current pricing. These are in-store roles, not corporate roles, and Mr. Weir provides no explanation about how these roles inform his opinions in this case. Mr. Weir's employment at Stop and Shop is the only experience that he lists prior to his current position, implying that it is a relevant qualification. However, this experience does not appear to have provided sufficient knowledge of retail pricing, as demonstrated by Mr. Weir's misapplication of economic concepts like "market clearing price." That concept is more relevant for commodity markets with uniform products than for differentiated consumer products like the ones at issue in this case.

18. Beyond his own qualifications, Mr. Weir cites three academic studies to justify his use of conjoint analysis in determining the impact of Tom's of Maine's "natural" claim on product prices.[16] But none of those studies uses conjoint analysis to determine the impact of any health claim on the price, despite Mr. Weir's assertion that two of them do.[17]

19. The first study Mr. Weir cites uses a choice-based conjoint to determine "whether health claims (claims of health-promoting effects) of food products positively influence product price."[18] The paper uses

---

[14] *See,* Dennis Declaration, ¶ 38; Weir Declaration, ¶¶ 38-39. Mr. Weir claims that he has made sufficient "supply-side considerations" because [i] "the at-issue transactions occurred at prices that *already* reflect the supply-side factors then extant in the marketplace," [ii] he kept quantity supplied fixed, [iii] the "Defendant and retailers varied their wholesale and retail prices (respectively) in response to their own business needs and changing market conditions," and [iv] because the toothpaste and deodorant markets are considered "ordinary" markets. *See,* Weir Declaration, ¶¶ 44-47.

[15] Weir Declaration, ¶ 1.

[16] Weir Declaration, ¶¶ 25-27.

[17] Weir Declaration, ¶¶ 25-27.

[18] Hirogaki, Mitsunori, "Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis," *International Journal of Innovation, Management and Technology,* Vol. 4, No. 6, December 2013, pp. 541-546 ("Hirogaki (2013)"), at p. 541.

**Confidential: Under Protective Order**

conjoint model estimates to test multiple hypotheses, none of which involve computing a price premium.[19] Instead, the paper computes MWTP (marginal willingness to pay) estimates for three product attributes.[20] Stated simply, MWTP is not a price premium, nor can it be interpreted as one. MWTP represents the dollar amount at which a consumer values the product attribute; however this consumer-specific attribute valuation does not imply that the presence or absence of that attribute would cause retailers to adjust their prices by that amount, as Mr. Weir's price premium misrepresentation suggests. Even though this first paper does not involve the computation of a price premium, Mr. Weir incorrectly claims that it does. He asserts that it finds "a price premium of approximately 20%" for the focal green tea health claim;[21] there is no support for a price premium calculation based on the MWTP estimates from the study. The study's conclusion, "that health claims affirmatively affect the purchase of functional food and that consumers' marginal willingness to pay (WTP) for health claims is high,"[22] is similarly insufficient to support Mr. Weir's claim that the study computes a price premium, let alone one of 20%.

20. The second study that Mr. Weir cites focuses on nutritional content labeling on product packaging.[23] The paper's objective was to assess the relative effects of different types of nutritional labels on consumer perceptions of product healthfulness. The nutritional content labels included both nutrients "to encourage," such as protein, fiber, vitamins and minerals; and other nutrients "to limit," such as fat, cholesterol, sugar, and sodium. The researchers' conjoint design did not require study participants to choose a product instead requiring them to rate their perception of a product's healthfulness. Those healthfulness ratings were not linked to product preference or choice, not did the study design even include price as an attribute (as noted by Mr. Weir).[24] In fact, the paper never mentions the words "price" or "pricing." Further, the paper offers no conclusions about any specific nutritional content label, in part because the conjoint study was insufficiently powered to draw relevant statistical conclusions.

21. Perhaps most concerning is Mr. Weir's claim that the third study "showed that vitamin C content was the most important purchase driver besides price, and the minimum price premium for vitamin C was

---

[19]   Hirogaki (2013), p. 542.

[20]   Hirogaki (2013), pp. 542, 544.

[21]   Weir Declaration, ¶ 25.

[22]   Hirogaki (2013), p. 541.

[23]   Drewnowski, Adam et al., "Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis," *Public Health Nutrition*, Vol. 13, No. 5, January 15, 2010, pp. 688-694.

[24]   Weir Declaration, ¶ 26.

approximately 17%."[25] Both of those claims are false and represent a misreading of the results reported in the third study. The 17% statistic *is not* a "minimum price premium for vitamin C"—it *is* a measure of the RI (relative importance) of nutritional information about vitamin C for one of three shopper segments identified by the authors.[26] Like MWTP, RI cannot be interpreted as a price premium; rather, RI measures the relative impact of an attribute on total utility of the product, assuming the maximum difference between levels of that attribute.[27] The importance scores of attributed considered (there are only four in this study) by definition sum to 100%, so the RI of a single attribute can be interpreted as the percentage describing how much that attribute affects product choice.[28] RI is inflated or deflated depending on the number of attributes (for example, color, size, brand, and price, among others) and the number of levels of a given attribute (such as three colors versus seven).[29] Furthermore, the 17% RI calculated was for only a single consumer segment—it is therefore not applicable to the entire population.[30] As to Mr. Weir's claim that "vitamin C content was the most important purchase driver besides price," the only conceivable basis for Mr. Weir's claim is the study's conclusory comment that "nutritional information on vitamin C was an important factor for most evaluators."[31] Yet this comment does not justify his claim.

22. Mr. Weir's misunderstanding of conjoint applications in the very literature he cites not only calls his relevant knowledge into question, but it also undermines Mr. Weir's premise that academic literature supports the price premia he uses in this matter. His misrepresentation of the cited literature as including 20% and 17% price premia for health-related product claims make the unreliable price premia that he calculates in his Declaration appear to be consistent with the literature, when there are no price premia in the literature he cites. The price premia—and the damages calculations—that Mr. Weir calculates are entirely unsupported.

---

[25]   Weir Declaration, ¶ 27; Gadioli, Izabel L. et al., "Evaluation of Packing Attributes of Orange Juice on Consumers' Intention to Purchase by Conjoint Analysis and Consumer Attitudes Expectation," *Journal of Sensory Studies, Vol.* 28, 2013, pp. 57-65 ("Gadioli et al. (2013)"), at pp. 63-64.

[26]   Gadioli et al. (2013), pp. 63-64.

[27]   "The Basics of Interpreting Conjoint Utilities," *Sawtooth Software*, available at https://sawtoothsoftware.com/the-basics-of-interpreting-conjoint-utilities, accessed August 22, 2022.

[28]   "Importances," *Sawtooth Software*, available at https://sawtoothsoftware.com/help/discover/manual/index html?importances.html, accessed August 23, 2022.

[29]   "Importances," *Sawtooth Software*, available at https://sawtoothsoftware.com/help/discover/manual/index html?importances.html, accessed August 23, 2022.

[30]   Gadioli et al. (2013), pp. 63-64.

[31]   Weir Declaration, ¶ 27; Gadioli et al. (2013), p. 64.

**Confidential: Under Protective Order**

**B. Mr. Weir Fails to Account for How Prices Are Actually Set in the Consumer Packaged Goods Market**

23. The prices set for consumer packaged goods (CPGs) depend on decisions made by at least two firms – manufacturer and retailer. In this case, the manufacturer (Tom's of Maine) produces toothpaste and deodorant,[32] and then it sells the product to the retailer, sometimes through an intermediary distributor. Retailers, in turn, make product sales directly to consumers.[33] Accordingly, manufacturers and retailers *each* set prices for the same products. Therefore, accurate estimates of expected and observed prices of the at-issue products require consideration of how prices are actually set in practice.

24. The damages approach presented in the Weir Declaration does not reflect how prices are actually set in CPG markets, notwithstanding the assertion that pricing was "one of the most important and frequent topics of discussion" in the development of both the Weir Declaration and Dennis Declaration.[34] In this section, I describe how manufacturers set wholesale prices, how retailers set prices paid by consumers, the impact of temporary price reductions and trade promotions on the retail price, how quantities and prices are related, and how manufacturers and retailers engage throughout this process. Each of these elements is either handled inappropriately or simply ignored in Mr. Weir's "supply-side considerations."

*1. Mr. Weir Does Not Adequately Consider Wholesale Prices in his Damages Calculations*

25. **Wholesale Pricing.** The manufacturer sets a pricing schedule for its retail customers, known as wholesale prices. Any "but for" analysis must incorporate the wholesale price and consider how changes in price would affect manufacturer and retailer margins. The acknowledgement that "…both Defendants and retailers varied their wholesale and retail prices (respectively) in response to their own business needs and changing market conditions" oversimplifies marketplace realities.[35] For example, Mr. Weir claims that in the absence of "natural" product claims, the retail price of the at-issue products would have been lower by subtracting the ▮▮▮ premium for toothpaste and ▮▮▮ premium for deodorant, as calculated by Dr. Dennis.[36] Yet the cost of producing the at-issue products would not have changed. Reducing the retail price but not the production cost would have resulted in a dollar-for-dollar decrease in the available contribution margin. Retailers would never bear the full cost of such a

---

[32] "Fact Sheet," *Tom's of Maine*, available at https://www.tomsofmaine.com/fact-sheet, accessed August 22, 2022.

[33] For simplicity and clarity, this report will focus on the roles of the manufacturer and retailer, not the wholesaler.

[34] Weir Declaration, ¶ 44.

[35] Weir Declaration, ¶ 46.

[36] Weir Declaration, ¶ 52.

**Confidential: Under Protective Order**

retail price reduction—especially large, powerful retailers like Walmart, Kroger, Safeway, and Publix, CVS, and Walgreens—meaning that the manufacturer would have to share that burden. Yet Mr. Weir claims that "many major grocery retailers identify a willingness to adjust prices in response to changing economic conditions and consumer preferences."[37] It is highly unlikely that retailers would fully absorb the claimed "but for" price reductions, which would profoundly affect their profit margins for the at-issue products.

26. **Line Pricing.** Mr. Weir similarly does not account for other practices in wholesale price setting. For example, the practice of setting the same price for horizontally differentiated products (e.g., same brand, same size, but different flavor) is a tenet of "line pricing." This line pricing practice is pervasive, despite differences in demand and consumer preference for one flavor over another.[38] Within the conjoint setting, such preferences might lead to a large hypothetical price premium for strawberry over kiwi-banana yogurt, for example. However, in actual practice, the manufacturer would generally apply the same pricing schedule to all flavors for the same brand / size combination, as would the retailers of those products.[39]

> 2. *Mr. Weir Does Not Adequately Consider Different Retail Pricing Strategies in his Damages Calculations*

27. The retail price—the price paid by the consumer—is determined by the retailer, and sometimes by the retailer's individual stores. The retailer's most common price for a product is called the regular price or shelf price. For products like Tom's of Maine toothpaste and deodorant, the retailer sets a regular price that is offered during most weeks. Mr. Weir acknowledges this fundamental fact, then dismisses its importance by saying that "Defendants and retailers varied their wholesale and retail prices (respectively) in response to their own business needs and changing market conditions."[40] Acknowledging that retailers set their own prices in response to their specific needs and market conditions, Mr. Weir nevertheless assumes that the retail price of Tom's of Maine products will be set at the "market clearing price" and, by implication, will be the same for all retailers in the market.[41] This assumption is entirely inconsistent with retailers' acknowledged pricing autonomy and motives, as well as the price variation observed in virtually every retail market. Mr. Weir's assumptions are simply not

---

[37] Weir Declaration, ¶ 48.

[38] Draganska, Michaela and Dipak C. Jain, "Consumer Preferences and Product-Line Pricing Strategies: An Empirical Analysis," *Marketing Science*, Vol. 25, No. 2, Mar/Apr 2006, pp. 164-174.

[39] Evidence that Tom's of Maine sets wholesale prices in this manner, and that retailers extend this in the case of Tom's of Maine toothpaste and deodorant is discussed in **Section IV**.

[40] Weir Declaration, ¶ 46.

[41] Weir Declaration, ¶ 40.

sufficient to develop "a reliable and accurate measurement of the market price premium solely attributable to the challenged Claim used by Tom's of Maine on their Toothpaste Products," as he purports to have done.[42]

28. **Hi-Lo and EDLP Pricing.** Each retailer in a market sets prices based, in part, on a pricing strategy. Most retailers are promotional (or "Hi-Lo"), attracting shoppers by offering temporary price discounts. Some retailers offer everyday low prices (or "EDLP") instead of temporary discounts.[43] For example, Walmart is commonly considered to be an EDLP retailer, while CVS employs a Hi-Lo strategy. Tom's of Maine products are sold by retailers that employ both strategies.[44] Mr. Weir's price premia, and hence his damages calculations, ignore the effects of retailers' pricing strategies on retail prices. Instead, they are premised on his assumption that all retailers set the same "market clearing price," which ignores price variation between retailers.

29. **Key Value Items.** Another dimension of variation among retailers is a decision to price products deemed to be particularly important at lower margins than other products. Such important individual products are called "key value items," and product categories of particular importance are called "destination categories."[45] The reasons for pricing key value items and destination categories at lower margins are to reinforce the retailer's image for offering low prices and to influence shoppers to continue to shop at the retailer. Mr. Weir's damages calculations do not attempt to account for the role of Tom's of Maine products for different retailers, whether or not any Tom's of Maine products are considered to be key value items, and the resulting gross margin targets that retailers set that guide their pricing decisions.

> *3. Mr. Weir Does Not Adequately Consider Temporary Price Reductions or Trade Promotions in his Damages Calculations*

30. Mr. Weir's analyses and conclusions are premised on his asserted understanding of retail pricing, but his declaration shows a superficial understanding that is ill suited to analysis of CPG retail prices. He claims that these "…prices are set by the market, by the aggregate effects of all of the factors affecting supply and demand,"[46] and that "many major grocery retailers identify a willingness to adjust prices in

---

[42] Weir Declaration, ¶ 34.

[43] *See, e.g.*, Ellickson, Paul B. and Sanjog Misra, "Supermarket Pricing Strategies," *Marketing Science,* Vol. 27, No. 5, September – October 2008, pp. 811-828, at p. 7.

[44] COLGATETOMS00004908, at tab "Nielsen - All Accounts."

[45] Briesch, Richard A., William R. Dillon, and Edward J. Fox, "Category Positioning and Store Choice: The Role of Destination Categories," *Marketing Science,* Vol. 32, No. 3, May – June 2013, pp. 488-509.

[46] Weir Declaration, ¶ 53.

**Confidential: Under Protective Order**

response to changing economic conditions and consumer preferences."[47] He summarizes his superficial understanding of the pricing process by saying that "…both Defendants and retailers varied their wholesale and retail prices (respectively) in response to their own business needs and changing market conditions."[48] However, this explanation fails to take into account how price changes and price reductions are implemented in practice, as documented in the literature.[49]

31. **Temporary Price Reductions.** Promotional retailers sometimes offer temporary discounts from the regular price (called temporary price reductions, or TPRs). These price changes are implemented weekly, requiring changes to shelf tags in every store and to electronic price files for checkout scanners. TPRs have a minimum duration of one week but can last up to six weeks or more. These temporary discounts from regular price are the primary driver of retail price variation and are actually co-determined by manufacturer and retailer through trade promotions.

32. **Trade Promotions.** Trade promotions are financial incentives that a manufacturer offers for a retailer to make decisions that favor the manufacturer's products. Trade promotions incentivize retailers to [i] offer temporary price discounts on the manufacturer's products, [ii] include the manufacturer's products in the retailer's weekly ad [iii] display the manufacturer's products prominently in-store or to place them in advantageous positions on the shelf, or [iv] integrate the retailer's logistics and supply chain with the manufacturer's in order to reduce overall system costs. Trade promotions often obligate the retailer to offer a TPR—discounting to an agreed-upon retail price—sometimes together with placement in the retailer's weekly ad and/or an in-store display. When a TPR is accompanied by a retail ad and/or display, the discount from regular price is usually deeper. As incentives, the manufacturer can offer fees, allowances, and/or rebates that reduce the retailer's cost of goods. It is important to note that the retailer often receives these fees, allowances, and rebates after paying the manufacturer's invoice, making it difficult to link trade promotions payments to specific products during specific time periods.

33. Manufacturers allocate trade promotions in two stages.[50] In the first stage, a fixed dollar amount for a brand or product is budgeted to the retailer. This amount is normally accrued based on the retailer's

---

[47] Weir Declaration, ¶ 48.

[48] Weir Declaration, ¶ 46.

[49] *See*, *e.g.*, Blattberg, Robert C., Richard Briesch, and Edward J. Fox, "How Promotions Work," *Marketing Science*, Vol. 14, No. 3, 1995, G122-G132; Anderson, Eric T. and Edward J. Fox, "How Price Promotions Work: A Review of Practice and Theory," H*andbook of the Economics of Marketing*, Dube, Jean-Pierre, and Peter Rossi eds., Elsevier: Amsterdam, 2019.

[50] Gómez, Miguel I., Vithala R. Rao, and Edward W. McLaughlin, "Empirical Analysis of Budget and Allocation of Trade Promotions in the U.S. Supermarket Industry," *Journal of Marketing Research,* Vol. 44, No. 3, August 2007, pp. 410-424 ("Gómez, Rao, and McLaughlin. (2007)").

**Confidential: Under Protective Order**

purchase volume, though it may also be budgeted as a lump sum. In the second stage, the budgeted amount is spent over the course of a year (in some cases, over a month or a quarter) on individual promotional events. Before each event, the manufacturer's incentive payment(s) and the retailer's performance requirement(s) are negotiated. The manufacturer can offer the retailer fees, allowances, rebates, or buy-back agreements (for unsold product); the retailer's performance requirements typically include a specific price point and duration of the TPR but often also include product placement in the retailer's ad, an in-store display, a minimum purchase quantity for the event, etc. After the promotional event, the manufacturer's incentive payments are deducted from its accrual account for that retailer, reducing the funds available for subsequent events.

34. During the past 30 years, retail pricing has changed fundamentally in large part due to a dramatic increase in manufacturer spending on trade promotions. For example, trade promotion spending by CPG manufacturers increased by eight times between 1996 and 2004,[51] and it currently represents approximately 20% of these manufacturers' total annual revenues.[52] More recently, information technology has enabled retailers to use shopper loyalty card programs to offer more effective, targeted price promotions. Omnichannel retailing has also enabled tracking of shoppers purchasing online and in-store.[53] These loyalty programs allow retailers to offer deeper discounts or discounts on specific products to individual consumers or consumer segments depending on their recorded purchase histories. Together, the increase in CPG manufacturers' trade promotion spending and retailers' data-driven consumer targeting have fundamentally changed retail pricing.

35. Despite TPRs representing the vast majority of price changes for most retailers, Mr. Weir only claims that retailers act in a competitive environment and fails to acknowledge any interaction between a price change in his "but-for" scenario, TPRs offered by retailers, and trade promotions that Tom's of Maine negotiates with retailers. Evidence also shows that Tom's of Maine considers pricing to be more complex than simply matching the "market price" that Mr. Weir asserts, including by accounting for promotions. For example, a 2018 Tom's of Maine internal presentation contains a slide outlining "7 Levers of Pricing."[54] These levers include: Non-Promo Shelf Price, Promo Shelf Price, Price Flow,

---

[51]  Gómez, Rao, and McLaughlin (2007), p. 410.

[52]  Huang, Minha, Ryan Murphy, and Abdul Wahab Shaikh, "How Analytics Can Drive Growth in Consumer Packaged-Goods Trade Promotions," *McKinsey & Company*, October 23, 2019, available at https://www.mckinsey.com/business-functions/growth-marketing-and-sales/our-insights/how-analytics-can-drive-growth-in-consumer-packaged-goods-trade-promotions/.

[53]  Indeed Editorial Team, "What is Omnichannel in Retail (Definition and How it Works)," *Indeed*¸ April 9, 2021, available at https://www.indeed.com/career-advice/career-development/omnichannel.

[54]  COLGATETOMS00152482, at slide 4.

**Confidential: Under Protective Order**

Mix, Pack/ Size, New Products, and Cross Border.[55] Such strategic pricing considerations show that retail prices are not simply a mechanical response to supply and demand. Mr. Weir's analysis, discussion, and conclusions ignore common strategic pricing considerations altogether and therefore fail to control for how price changes and price reductions are implemented in practice.

### 4. Mr. Weir's Fixed Quantity Assumption Is Fundamentally Flawed

36. Mr. Weir's damages assessment adopts the fundamentally flawed assumption that, but-for Tom's of Maine's "natural" product claim, demand would change but supply would not. He claims that "the quantity of the Products supplied is a known quantity, and fixed as a matter of history."[56] The apparent yet indefensible logic in this statement is that consumers would be willing to pay less for a product without the claim which would cause retailers to reduce the price, yet Tom's of Maine would not respond to the resulting change in demand by adjusting supply—rather, he argues that it would produce exactly the same amount of toothpaste or deodorant without regard to demand, price, or profit margin. A well-known foundational principle of economics is that demand and supply are best represented as curves which help determine price—suppliers (in this case, Tom's of Maine) would be willing to supply more if it could be sold at a higher price but less if it could only be sold at a lower price. Mr. Weir's assertion that supply is fixed implies that the markets at issue have a vertical supply curve and so are completely price inelastic. This, in turn, violates his own assertion that the toothpaste and deodorant markets are "ordinary."[57]

37. Underlying Mr. Weir's price premia and fixed supply logic is the assumption that quantity (a so called "supply-side factor") is allocated to the retailer, which then sets the retail price to sell the allocated quantity. This assumption misrepresents how retailers manage supply and ignores the fact that the quantity on hand is not a significant consideration in retail pricing.[58] The quantity ordered by the retailer actually depends on the price it intends to offer, a price that may be contractually required by a trade promotion agreement. The retailer's approach to ordering product from the manufacturer depends on whether or not a promotion will be offered. If no promotion will be offered, the retailer's approach is called replenishment buying, also known as rebuying. When the retailer's distribution center runs its inventory down below a minimum threshold, an order is placed to the manufacturer to replenish the

---

[55]   COLGATETOMS00152482, at slide 4.

[56]   Weir Declaration, ¶ 45.

[57]   Weir Declaration, ¶ 47.

[58]   Seasonal products (e.g., Halloween candy, Christmas cards, turkeys for Thanksgiving) and perishable products with short shelf lives are exceptions in which quantity on hand can affect pricing. Because Tom's of Maine products have relatively long shelf lives, quantity on hand would not be a consideration in retail pricing for its products.

**Confidential: Under Protective Order**

product at that distribution center. The retailer usually buys a standard quantity (for example, a full pallet) in what is often a partially or fully automated process.[59] This replenishment buying process prevents the retailer from holding so much inventory that the product must be marked down to clear it out.

38. If the retailer schedules a TPR or advertised price reduction, then product is ordered in anticipation of that promotional event using a more proactive approach. First, the parameters of that promotional event are negotiated between manufacturer and retailer, including the recommended discounted retail price. The retail price agreed to by the retailer is then used to forecast product sales for the event. Based on that sales forecast, the retailer orders enough product so that its distribution centers have sufficient inventory to meet anticipated demand. It is important to note that: [i] retailers are responding to anticipated consumer demand when buying product for promotions, not accepting a "supply-side" product allocation as Mr. Weir argues, and [ii] the retail prices during promotional events are based largely on negotiated fees from the manufacturer, an aspect that Mr. Weir ignores entirely.

### C.  Mr. Weir and Dr. Dennis Ignore Key Principles of Branding and Differentiation

39. The American Marketing Association defines a brand as a "name, term, sign, symbol, or design, or a combination of them, intended to identify the goods and services of one seller or group of sellers and to differentiate them from those of competition."[60] In a competitive marketplace, consumers have myriad options, so many that choosing among them would be unreasonably cumbersome without simplifying cues. Brands serve as a simplifying cue that enable consumers to streamline their information search, preventing cognitive overload.[61] From the seller's perspective, "the appeal and attraction of brands … can yield higher price margins, increased sales volumes and greater profits."[62]

40. Marketing scholars recognize the concept of customer-based brand equity as "the differential effect that brand knowledge has on consumer response to the marketing of that brand."[63] Brand knowledge has two primary components: brand awareness—the "consumer's ability to identify the brand under

---

[59]  In some cases, the retailer buys enough of several products from the same manufacturer to reach a full truckload—manufacturers offer incentives for doing this.

[60]  Keller, Kevin Lane and Vanitha Swaminathan, *Strategic Brand Management*, Fifth Edition, Pearson, 2020 ("Keller and Swaminathan (2020)"), p. 2.

[61]  Jacoby, Jacob, "Information Load and Decision Quality: Some Contested Issues," *Journal of Marketing Research*, Vol. 14, November 1977, pp. 569-573; Iyengar, Sheena S. and Mark R. Lepper, "When Choice is Demotivating: Can One Desire Too Much of a Good Thing?" *Journal of Personality and Social Psychology*, Vol. 79, No. 6, 2000, pp. 995-1006.

[62]  Keller and Swaminathan (2020), p. 14.

[63]  Keller and Swaminathan (2020), p. 39.

**Confidential: Under Protective Order**

different conditions"—and brand image—"consumers' perception about a brand."[64] The more familiarity and favorability a brand carries in the marketplace, the more positive its customer-based brand equity. There are different levels of brand awareness, including recall (top-of-mind awareness) and recognition (aided awareness).[65] The higher the level of awareness, the greater the effect of brand knowledge on consumer response. [66] Brand image depends on consumers' associations with the brand along with their perceptions of the brand's quality.

41. Sellers seek to differentiate their brands from those of other sellers in order to provide "compelling and credible reasons for choosing it over the other options."[67] It is important to note that differentiation occurs at the *brand*, rather than the individual *product* level. For example, Hyundai branded automobiles are differentiated from competitors, in part, because they offer a longer, more comprehensive warranty.[68] This feature applies to all Hyundai vehicles throughout the product line. If it applied to only one or two products but not others in the product line, consumers would not associate the benefits of lower operating costs and peace of mind with Hyundai, so the brand would not be differentiated.

42. Brands are differentiated by attributes that are common to products across their product lines and the consumer benefits that those attributes provide. For example, Apple's products are differentiated from competing brands' products by the ease-of-use in their operating systems across its phone, computer, and tablet offerings. Apple's products are also differentiated from competing brands' products by the level of aesthetic appeal in design and form factor. Apple's products are further differentiated from competing brands' products by the level of customer support provided by the brand's network of Apple stores. The Apple brand is therefore differentiated from competitors based on multiple attributes, each providing different consumer benefits. Consumers' associations with the Apple brand incorporate these elements of differentiation and others which, together with brand awareness, form the consumer-based brand equity on which Apple consumers' preferences are founded.

43. Mr. Weir's assertion that attributes are *added* to products to differentiate them from other products misunderstands the mechanism of differentiation and trivializes the capabilities and competitive advantages that firms and brands must develop in order to differentiate effectively.[69] Mr. Weir's

---

[64]   Keller and Swaminathan (2020), p. 41.

[65]   Keller and Swaminathan (2020), pp. 346-347.

[66]   Keller and Swaminathan (2020), p. 347.

[67]   Keller and Swaminathan (2020), p. 55.

[68]   Keller and Swaminathan (2020), p. 163.

[69]   Weir Declaration, ¶ 9.

**Confidential: Under Protective Order**

assertion ignores that brand image and consumers' brand associations depend on both attributes and the benefits they provide for consumers. Brand attributes are "descriptive features that characterize a product," whereas benefits "are the personal value and meaning that consumers attach to the product."[70] In this way, Mr. Weir's overly-simplistic definition of product differentiation as "the introduction of product attributes that allows the consumer to differentiate between otherwise similar products, with the goal of increasing sales and profits"[71] misses the critical context of brand image and brand associations for the of product attributes and the benefits they provide.

44. Mr. Weir's disregard for the mechanisms used to differentiate brands incorrectly reduces Tom's of Maine's differentiation efforts to the presence or absence of one product-specific claim. The Tom's of Maine brand carries meaning and importance far beyond a single claim or attribute.[72] Moreover, a number of Tom's of Maine's products (outside of the products at issue in this case) do *not* contain any claim of "natural." Tom's of Maine's packaging for the products at issue, which represent its external branding communications to consumers, list many other claims during the time period at issue.

45. **Figure 1** below shows the current packaging for a representative Tom's of Maine toothpaste product. It displays a "WITH FLOURIDE" claim in the same panel in the same size font as the "NATURAL" claim. The packaging (shown below) includes several other claims, many in larger font sizes than the "natural" claim.[73] The apparent objective of including all of these claims on the packaging is to develop positive brand associations in order to strengthen the brand's image and build its brand equity. As discussed in the paragraphs that follow, internal documents produced by Tom's of Maine in this matter confirm consumers' multi-faceted associations with the brand.

---

[70] Keller and Swaminathan (2020), p. 46.

[71] Weir Declaration, ¶ 9.

[72] Results from Dr. Dennis' own cognitive interviews back this up. For example, Dr. Dennis notes that cognitive interview respondent number 4 described that she "knows Tom's doesn't do animal testing" so she "relied on the brand name to know that the brand did not test on animals." *See,* Dennis Declaration, Attachment C5.

[73] This current packaging was introduced in 2021. *See,* Declaration of John Kindness In Support of Expert Report of Edward J. Fox, *Anne De LaCour, Andrea Wright and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Civil Action No. 1:16-cv-08364-KMW, United States District Court Southern District of New York, August 22, 2022 ("Kindness Declaration"), ¶ 9.

**Confidential: Under Protective Order**

**Figure 1**
**Tom's of Maine Whole Care Cinnamon Clove Toothpaste Packaging, August 3, 2022**





46. The claims featured in the above packaging are listed below:[74]

   o   "BENEFITS FOR HEALTHY TEETH"
   o   "BRIGHT SMILES"
   o   "FRESH"
   o   "NOT TESTED ON ANIMALS"
   o   "HOW WE DO GOOD EVERYDAY AT TOM'S"
   o   "WE SHARE EVERY INGREDIENT'S PURPOSE AND SOURCE AT
       TOMSOFMAINE.COM"
   o   "10% PROFITS TO CHARITY"
   o   "SUSTAINABLE BUSINESS PRACTICES'
   o   "CERTIFIED GOOD GUYS"
   o   "5% EMPLOYEE TIME VOLUNTEERING"
   o   "CRUELTY FREE"
   o   "CERTIFIED B CORPORATION"
   o   "THOUGHTFULLY BLENDED AND PACKAGED IN THE USA"

47. Dr. Dennis' conjoint design does not include any of these actual product claims, including the animal
    testing claim that was highlighted in his cognitive interviews.[75] Failing to include the majority of Tom's
    of Maine's actual product claims in his conjoint design would have the effect of artificially increasing
    the importance of claims that Dr. Dennis does include—in particular, the "natural" product claim.[76]

48. The packaging shown above also lists additional consumer benefits:[77]

---

[74]   *See*, **Figure 1.**

[75]   Dennis Declaration, p. 15. Again, Dr. Dennis notes that cognitive interview respondent number 4 described that
       she "knows Tom's doesn't do animal testing" so she "relied on the brand name to know that the brand did not
       test on animals." *See,* Dennis Declaration, Attachment C5.

[76]   Dennis Declaration, p. 15.

[77]   *See*, **Figure 1.**

**Confidential: Under Protective Order**

- o  "fights cavities"
- o  "whitens teeth"
- o  "fights tartar buildup"
- o  "freshens breath"
- o  "strengthens enamel"
- o  "promotes remineralization"

49. A review of Tom's of Maine product packaging confirms that Tom's of Maine consistently listed numerous claims and benefits on product packaging in addition to the at-issue "natural" claim. For example, a schematic of Tom's of Maine 2019 packaging for a peppermint anticavity toothpaste similarly displays a "with fluoride" claim in the same panel in the same size font as the "natural" claim.[78] The 2019 packaging also includes claims about animal testing, sustainable practices, maximizing recycled content, and donating 10% of profits to "human and environmental goodness."[79]

50. Beyond the messages conveyed on its product packaging, Tom's of Maine's website has emphasized core brand associations in addition to the "natural" claim. For example, the July 2016 Tom's of Maine homepage conveyed to consumers its mission of "Giving back" alongside the claim that "10% of our profits are donated to human and environmental goodness.[80] Currently, Tom's of Maine's website emphasizes this same mission.[81] Similarly, the November 2015 toothpaste category webpage on Tom's of Maine's website presents several claims aside from a variation of the at-issue "natural" claim, such as Tom's commitment to "non-animal-testing models" and a lack of "artificial colors."[82]

51. A review of Tom's of Maine's internal, qualitative branding studies and marketing materials further supports the notion that the Tom's of Maine brand is differentiated holistically, not by a single attribute, but by the combination of many elements. For example, a 2018 internal marketing deck titled "Introduction to Tom's of Maine" emphasizes Tom's of Maine's vision to "be an unstoppable force for good" and highlights "giving back" as a core value of the Tom's of Maine brand since 1970.[83] The deck also notes that "'10% Profits' & '5% Paid Employee Volunteer Time' on nearly every pack we sell as is both <u>unique</u> and <u>driver of brand choice</u>."[84] Additionally, a 2014 study of Amazon.com consumers

---

[78]   COLGATETOMS00188983.

[79]   COLGATETOMS00188983.

[80]   Toms of Maine Website Homepage as of July 4, 2016, *Wayback Machine,* available at https://web.archive.org/web/20160704190726/http://www.tomsofmaine.com/home.

[81]   "Our Mission," *Tom's of Maine,* available at https://www.tomsofmaine.com/our-promise/our-mission, accessed August 16, 2022.

[82]   Tom's of Maine Toothpaste Webpage as of November 28, 2015, *Wayback Machine,* available at https://web.archive.org/web/20151128151147/http://www.tomsofmaine.com/oral-care/toothpaste.

[83]   COLGATETOMS00183474, at slides 7, 10.

[84]   COLGATETOMS00183474, at slide 25.

**Confidential: Under Protective Order**

who had purchased a Tom's of Maine product in the last six months illuminates various "brand evaluation differentials" for Tom's of Maine versus other brands.[85] The study found that, compared to other natural and non-natural brands, the Tom's of Maine brand elicited higher rankings of agreement with the following statements: "Does not contain certain ingredients I'm looking to avoid," "Is made with natural/organic ingredients," "Is not tested on animals," "Is environmentally friendly," "Is made by a company that shares the same values as me," and "Is suitable for the whole family."[86]

52. Any association that Tom's of Maine consumers may have of "natural" with the brand is not sufficient to differentiate Tom's of Maine from competing brands. Depending upon which retailer consumers shop for personal care products from, they encounter several brands of toothpaste and deodorant when making purchase decisions, a number of which make "natural" claims for at least some of their products. Obviously, the "natural" product claim alone does not differentiate Tom's of Maine from these brands. However, Tom's of Maine products have higher sales than many other competing brands in the natural toothpaste and/or deodorant categories.[87] Thus, Tom's of Maine's differentiation—the reason that consumers prefer its products to other brands' products—is not adequately explained by the "natural" product claim alone.

53. Furthermore, a natural product association does not necessarily lead to a price premium over a product that is not considered natural. In fact, Dr. Ran Kivetz's 2018 empirical surveys conducted for this litigation show that displaying the "natural" claim on Tom's toothpaste packaging actually *decreased* participants' intent to buy the toothpaste.[88] Additionally, a dataset with 2017, 2019, and 2021 average prices for "mainstream" and "natural" brands in the toothpaste and the deodorant/antiperspirant categories show that mainstream brands frequently have higher prices than natural brands, including Tom's of Maine.[89]

---

[85]   COLGATETOMS00162587.

[86]   COLGATETOMS00162587, at slide 40.

[87]   *See, e.g.*, COLGATETOMS00132206, at tabs "Competitive – TOOTHPASTE" and "Competitive – DEODORANT." *See also*, COLGATETOMS00050207, at tabs "Target Weekly Tracking" and "Walmart Weekly Tracking."

[88]   Declaration of Dr. Ran Kivetz, *Anne De LaCour, Andrea Wright and Loree Moran individually and on behalf of all others similarly situated, v. Colgate-Palmolive Co., and Tom's of Maine Inc.*, Civil Action No. 1:16-cv-08364-(RA)(AJP), United States District Court Southern District of New York, September 21, 2018, Section A.1.3.

[89]   COLGATETOMS00225061.

**Confidential: Under Protective Order**

## IV. ACTUAL PRICING DATA FOR TOM'S OF MAINE'S PRODUCTS CONTRADICTS MR. WEIR'S ASSUMPTIONS AND RESULTING DAMAGES CALCULATIONS

54. While Mr. Weir claims that conjoint analyses which address applications similar to the impact of "natural" product claims are "too extensive to document exhaustively here," he has not actually cited any academic research discussing his damages calculation methodology. Academic research finds that conjoint survey results can be very sensitive to design decisions, and thus should be tested for external validity.[90] As described in **Section III.A**, Mr. Weir fails to validate his results with support from academic studies. Furthermore, Mr. Weir does not attempt to validate his results using real-world data on wholesale and retail prices of the at-issue Tom's of Maine deodorant and toothpaste products. Indeed, the stable pattern of *actual* prices over time observed in the Nielsen market-level retail price data and Tom's wholesale price data produced in discovery supports the pricing process that I describe in **Section III.B** and contradicts Mr. Weir's assumptions.[91]

55. As part of my analysis of available evidence in this matter, I reviewed actual pricing data prior to and during the proposed class period to assess whether there was any observable shift in Tom's of Maine's retail or wholesale prices following packaging changes to the at-issue Tom's of Maine products. Because many of these packaging changes modify how natural-associated claims are communicated to consumers, such changes would be expected to affect pricing if Mr. Weir's assertion about the "natural" product claim is correct. Yet despite these packaging changes, the available pricing data do not show evidence of a trend or any other material change in pricing over time..

56. Underlying the price premia used by Mr. Weir in his damages calculations is the assumption that a packaging change removing the "natural" label from Tom's of Maine packaging would result in a decrease in price. I understand that Tom's of Maine has made several packaging changes since 2014. Packaging reflecting that consumers could "[l]earn more about [Tom's of Maine's] Stewardship Model and what 'natural' means for Tom's of Maine ingredients and their processing" was shipped to retailers by the end of 2014, and most toothpastes and deodorants bought by consumers from the first quarter of 2016 would include this language.[92] I also understand that certain deodorant products had the "natural" claim removed from the packaging in 2020 and 2021.[93] Specifically, the "natural" claim was removed from the front packaging of five deodorant scents in Tom's of Maine's Long-Lasting deodorant line,

---

[90] Hauser, John R., Felix Eggers and Matthew Selove, "The Strategic Implications of Scale in Choice-Based Conjoint Analysis," *Marketing Science*, Vol. 36, No. 6, 2019, pp. 1059-1081.

[91] COLGATETOMS00027698; COLGATETOMS00027702; COLGATETOMS00027703; COLGATETOMS00226559; COLGATETOMS00226560.

[92] Kindness Declaration, ¶¶ 4-7.

[93] Kindness Declaration, ¶ 8.

**Confidential: Under Protective Order**

and that inventory of these product with "natural" labelling was no longer available in stores by the first quarter of 2021.[94] In addition, the "natural" claim was removed from the front packaging of the remaining Long-Lasting deodorants in the Tom's of Maine Long-Lasting line in 2021, and iinventory of these products with "natural" labelling was no longer available in stores beginning in the third quarter of 2021.[95]

**A. Consistent Pricing Before and After Major Packaging Changes Contradicts Mr. Weir's Assumption That Tom's of Maine's Packaging Has a Material Impact on Prices**

57. I begin this analysis with wholesale prices. Based on the evidence I reviewed, despite the package changes related to the "natural" claim discussed above during the at-issue period, Tom's of Maine

---

[94]   Kindness Declaration, ¶ 8.

[95]   Kindness Declaration, ¶ 9.

[96]   This price change does appear to correspond to packaging changes. *See,* Kindness Declaration.

**Figure 2**
**Wholesale Unit Prices of Tom's of Maine Toothpaste Products from 2011 to 2021**



**Sources:**
[1] 2011-2017 Data: COLGATETOMS00094949_CONFIDENTIAL;
COLGATETOMS00036854_CONFIDENTIAL.
[2] 2018 Data: COLGATETOMS00150507_CONFIDENTIAL.
[3] 2019 Data: COLGATETOMS00053047_CONFIDENTIAL.
[4] 2020 Data: COLGATETOMS00084145_CONFIDENTIAL.
[5] 2021 Data: Telephone Interview with Patrick Casey, Marketing Director, Colgate-Palmolive Co. (Aug. 23, 2022) ("Interview with Patrick Casey").

**Notes:**
[1] This table includes the set of Tom's of Maine toothpaste products for which wholesale data are available for the same UPC across 2011-2021.
[2] April 2017 wholesale prices for Tom's of Maine toothpaste products were consistent with prices listed in the prior period.2021 wholesale prices for Tom's of Maine toothpaste products were consistent with prices listed in the 2020 data (Interview with Patrick Casey).

**Confidential: Under Protective Order**

**Figure 3**
**Wholesale Unit Prices of Tom's of Maine Deodorant Products from 2011 to 2021**



**Sources:**
[1] 2011-2017 Data: COLGATETOMS00094949_CONFIDENTIAL.;
COLGATETOMS00036854_CONFIDENTIAL.
[2] 2018 Data: COLGATETOMS00150507_CONFIDENTIAL.
[3] 2019 Data: COLGATETOMS00053047_CONFIDENTIAL.
[4] 2020 Data: COLGATETOMS00084145_CONFIDENTIAL.
[5] 2021 Data: Interview with Patrick Casey.

**Notes:**
[1] This table includes the set of Tom's of Maine deodorant products, excluding antiperspirants, for which wholesale data are available for the same UPC across 2011-2021.
[2] April 2017 wholesale prices for Tom's of Maine deodorant products were consistent with prices listed in the prior period.2021 wholesale prices for Tom's of Maine deodorant products were consistent with prices listed in the 2020 data (Interview with Patrick Casey).

58. I now turn to my analysis of retail prices.



[98] Price-per-ounce is the most appropriate measure for making price comparisons and analyzing trends because it accommodates not

---

[97] Collectively, that time period covers the packaging change reflecting that consumers could "[l]earn more about [Tom's of Maine's] Stewardship Model and what 'natural' means for Tom's of Maine ingredients and their processing" (2014-2016), as well as the two packaging changes removing the "natural" claim from Long Lasting deodorant scents (2020-2021). *See,* Kindness Declaration.

[98] As discussed above, the 2014-2016 time period is when Tom's toothpaste packaging was changed to add that consumers could "[l]earn more about [Tom's of Maine's] Stewardship Model and what 'natural' means for Tom's of Maine ingredients and their processing," and even though no further toothpaste packaging changes occurred in the 2017-2021 time period, the pricing data provides helpful context. *See,* Kindness Declaration. Produced data did not include annual sales information for Tom's of Maine toothpaste products in the U.S. market from 2014-2021.

only week-to-week price variation due to temporary retail price promotions, but also changes in product mix over time as a result of new products being introduced and other products being discontinued.

**Figure 4**
**Tom's of Maine Deodorant Products**
**Retail Price Per Ounce**
**Florida and the U.S., 2014 - 2021**



**Sources:** COLGATETOMS00027702; COLGATETOMS00027703; COLGATETOMS00226560.

**Notes:**
[1] Prices represent the average annual retail price per ounce for Nielsen's Florida and U.S. market categories (the "Florida xAOC" and "Total U.S. xAOC" markets).
[2] Price per ounce is calculated on a per-stick basis rather than on a per-UPC basis to account for multipacks (e.g., 2-packs of deodorant).
[3] Antiperspirants and UPCs with negative sales dollars or unit volume were excluded from this analysis. Antiperspirants were identified as the UPCs in produced wholesale data from 2011-2021 for which the listed product name included "antiperspirant."

                    **Confidential: Under Protective Order**

**Figure 5**
**Tom's of Maine Toothpaste Products**
**Retail Price Per Ounce**
**Florida, 2014 – 2021**



**Sources:** COLGATETOMS00027702; COLGATETOMS00027698; COLGATETOMS00226559.

**Notes:**
[1] Prices represent the average annual retail price per ounce for Nielsen's Florida market category (the "Florida xAOC" market).
[2] Price per ounce is calculated on a per-tube basis rather than on a per-UPC basis to account for multipacks (e.g., 2-packs of toothpaste).
[3] UPCs with negative sales dollars or unit volume were excluded from this analysis.
[4] Produced data did not include annual sales information for Tom's of Maine toothpaste products in the U.S. market from 2017-2021.

59.

**Confidential: Under Protective Order**



**Figure 6**
**Tom's of Maine Long-Lasting Deodorant Products**
**Retail Price Per Ounce**
**U.S., 2017 - 2021**



**Sources**: COLGATETOMS00027703; COLGATETOMS00226560; Kindness Declaration.

**Note:**
[1] Prices represent the average annual retail price per ounce for Nielsen's U.S. market category (the "Total U.S. xAOC" market) for the five "Long-Lasting" deodorants for which the "natural" claim was removed from the front packaging in late 2020 / early 2021, as described in paragraph 8 of the Kindness Declaration.

62. 

---

99   *See, e.g.*, COLGATETOMS00027702; COLGATETOMS00027698; COLGATETOMS00226559.

100   Kindness Declaration, ¶ 8.

101   COLGATETOMS00027702; COLGATETOMS00027698; COLGATETOMS00226559.



**Figure 7**
**Tom's of Maine Long-Lasting Deodorant Products with Packaging Change**
**Retail Unit Sales**
**U.S., 2017 - 2021**

**Sources:** COLGATETOMS00027703; COLGATETOMS00226560; Kindness Declaration.

**Notes:**
[1] Graph includes the five "Long-Lasting" deodorants for which the "natural" claim was removed from the front packaging in late 2020 / early 2021, as described in paragraph 8 of the Kindness Declaration. Line showing removal date is for illustration purposes and does not reflect an exact date.
[2] Units represent the total number of deodorant sticks sold for Nielsen's U.S. market category (the "Total U.S. xAOC" market).

63. The degree of consistency observed in actual wholesale prices, together with the consistency of actual retail prices (on a per ounce basis) stand in stark contrast to Mr. Weir's flawed model of prices moving "in concert with demand"[102] based on a misreading of the empirical data as showing "that variability in pricing both at the wholesale and retail level showed that Defendants' and retailers' pricing was responsive to changing market forces."[103] It also shows that Mr. Weir's assertion that a packaging change that removes the natural product claim would lead to a reduction in the "market price" is unfounded.

---

[102]   Weir Declaration, ¶ 40.

[103]   Weir Declaration, ¶ 44.

**Confidential: Under Protective Order**

**B.   Line Pricing Practices Contradict Mr. Weir's Assumptions Regarding How Prices Are Set in the Marketplace**

64. Evidence of the practice of line pricing for Tom's of Maine products at retail is also clear when simply looking at the store shelves. For example, in **Figure 8** below, different scents of Tom's of Maine men's deodorant are all priced at ▬▬ In **Figure 9** below, Tom's of Maine toothpastes of the same size and product line with different flavors are all priced consistently.

**Figure 8[104]**
**Example of Line Pricing of Tom's of Maine Deodorant at Kroger on August 15, 2022**



---

[104]   Edward Fox, Photograph of Line Pricing of Tom's of Maine Deodorant Products at Kroger on August 15, 2022.

**Confidential: Under Protective Order**

**Figure 9**[105]
**Example of Line Pricing for Tom's of Maine Toothpaste at CVS on August 3, 2022**



65. While the evidence of line pricing is clear in Tom's of Maine's wholesale price data and the retail price examples, demand for different flavors or scents is not the same.  These differences in demand between products are not reflected in wholesale price differences, as there are no wholesale price differences. This contradicts Mr. Weir's assertion that prices "change in concert with demand" in order to maintain a predetermined production quantity.[108] Neither Tom's of Maine, the brand manufacturer, nor retailers of its products

---

[105] Edward Fox, Photograph of Line Pricing of Tom's of Maine Toothpaste Products at CVS on August 3, 2022.

[106] *See, e.g.,* COLGATETOMS00027703.

[107] Total U.S. xAOC (or extended all outlets combined) is the Nielsen geographical term for the total U.S. market including all retail channels.

[108] Weir Declaration, ¶¶ 39-40.

**Confidential: Under Protective Order**

"lower [*or raise*] prices in concert with demand" for particular attributes, as Mr. Weir argues that they will. [109]

Edward J. Fox
August 23, 2022

---

[109]   Weir Declaration, ¶ 40.

**Confidential: Under Protective Order**