# EXHIBIT 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANNE DE LACOUR, ANDREA WRIGHT,
and LOREE MORAN individually and on
behalf of all others similarly situated,

                                  Plaintiffs,          Case 1:16-cv-08364-KA

v.

COLGATE-PALMOLIVE CO., and TOM'S
OF MAINE INC.,

                                  Defendants.

Declaration

of

**COLIN B. WEIR**

July 22, 2022

MAY REFERENCE MATERIALS DESIGNATED "CONFIDENTIAL" OR "HIGHLY

CONFIDENTIAL -- ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am President at Economics and Technology, Inc. ("ETI"), 100 Franklin Street, 6th Floor, Boston, Massachusetts 02110.  ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.    I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts.  I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio.  I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels.  I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, furniture, and computers.  My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is attached hereto as Exhibit 1.  This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition.  Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.

2.    Contained in Exhibit 1 is a list of numerous litigations in which I have participated in the design, execution and/or determination of the economic suitability of conjoint surveys, or have been found by the court to have expertise in conjoint analysis.  These cases include, but are not limited to *Jones v. Nutiva; Hunter v. Nature's Way; Looper v. FCA; Sanchez-Knutson v.*



Declaration of Colin B. Weir
July 22, 2022
Page 2 of 21

*Ford Motor Company; Belfiore v. Procter and Gamble; Kurtz v. Kimberly Clark; In re Scotts EZ Seed Litigation; In re: ConAgra Foods; Dzielak v. Whirlpool.*

3.    I received graduate level training in conjoint analysis as part of my MBA.  I take continuing education in advanced conjoint design, execution, and analysis through Sawtooth Software, a leading provider of conjoint analysis software.

## II.  ENGAGEMENT

4.    I provide this declaration in connection with the case filed by Anne de Lacour, Andrea Wright, and Loree Moran ("Plaintiffs") in the above-captioned action against Colgate-Palmolive Co. and Tom's of Maine Inc. ("Defendants").  I make this declaration based upon my own personal knowledge and, if called as a witness in this action, I would be able to competently testify as to the facts and opinions set forth herein.

5.    I have been advised by Counsel for Plaintiffs that individuals purchased certain Tom's of Maine brand Products[1] that were labeled as "natural" ("the Claim").[2]  I  have been further advised that Plaintiffs allege that this Claim is false and misleading to reasonable consumers and therefore should not have been made.  I have been asked by Counsel for Plaintiffs to ascertain whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of, and a preliminary estimate of, damages suffered by the proposed class of consumers as a result of the allegedly false and misleading Claim.

6.    ETI is being compensated at the rate of $600 per hour for my work on this case.  The opinions expressed in this declaration are my own, and my compensation is not dependent upon the substance of these opinions or the outcome of the litigation.

---

[1] Tom's of Maine toothpastes and deodorants of various sizes, pack sizes, and flavors.

[2] *See, generally,* First Amended Complaint, filed December 9, 2016 ("Complaint").



Declaration of Colin B. Weir
July 22, 2022
Page 3 of 21

7.   The documents, data and other materials that I relied upon in forming my opinions are identified throughout my report and in Exhibit 2, attached hereto.  In addition, I have relied upon my educational background and more than 18 years of experience.

### III.  THE ALLEGED MISREPRESENTATION

8.   Plaintiffs' allegations center on Defendants' labeling of their Products as being "natural."  Plaintiffs allege that this Claim is misleading and deceptive, and therefore should not have been made.

**Product Differentiation**

9.   In economics, the concept of product differentiation can be summarized as the introduction of product attributes that allows the consumer to differentiate between otherwise similar products, with the goal of increasing sales and profits.[3]

10.   Defendants appear to understand the concept of product differentiation. Defendants also appear to understand that the "natural" Claim is a product attribute that will differentiate their Products from competitors, allowing Defendants to charge a premium for this attribute and derive higher revenues and profits therefrom.

11.   Defendants have undertaken substantial research to understand what drives consumer demand for Tom's of Maine Products.  For example, ███████████████████

███████████████████████████████████████ ██ ███████████████

███████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████

---

[3] Case, Fair & Oster, Principles of Microeconomics, 9th Edition, 2009, at 305-316, 449.

[4] COLGATETOMS00013657_CONFIDENTIAL.pptx

[5] COLGATETOMS00013657_CONFIDENTIAL.pptx



Declaration of Colin B. Weir
July 22, 2022
Page 4 of 21

████████████████████████████████████████████████████████████ ▪

████████████ [7]

12. ████████████████████████████████████████████████████

████████████████████████████████████████ ▪

████████████████████████████████████████████████

████████████████████████████████████
████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
███████████

████████████████████████████████████
████████████████████████████ ▪

13. ██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ ▪

14. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

---

[6] COLGATETOMS00013657_CONFIDENTIAL.pptx

[7] COLGATETOMS00013657_CONFIDENTIAL.pptx

[8] COLGATETOMS00013164_CONFIDENTIAL.pptx

[9] COLGATETOMS00013164_CONFIDENTIAL.pptx

[10] COLGATETOMS00011738_CONFIDENTIAL.pptx


ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
July 22, 2022
Page 5 of 21

## IV.  FRAMEWORK FOR DAMAGES

15.   As a threshold matter, it is my opinion that it is possible to determine class-wide damages in this case using Defendants' own available business records, third-party records, and industry resources.

16.   Below, I propose the use of conjoint analysis to calculate Price Premium Damages (wherein consumers would receive the value of the price premium they paid solely as a result of Defendants' conduct of labeling their Products with the Claim).  This methodology can determine the damages for any given claim or set of claims, across any prescribed time period, and across geographic regions, given any of the possible liability scenarios that may arise in this litigation.

## V.  CALCULATION OF THE PRICE PREMIUM:
## CONJOINT ANALYSIS

17.   In this litigation, price premium damages for the Class are the portion of the market price of the Products solely attributable to Defendants' misrepresentations.

18.   Conjoint analysis is a representative survey technique that permits an economist to analyze the value of various product attributes.[11]

19.   Conjoint analysis was initially developed in the 1960s as part of the marketing discipline, and continues to evolve as an economic tool.  Conjoint analysis is used to determine consumer preferences and price/attribute information for a given product.

20.   Conjoint analysis is founded on rigorous statistical and economic principles.[12] Indeed, conjoint analysis has been used in litigation contexts to calculate damages for years.[13]

---

[11] Conjoint analysis as a discipline is quite broad, and can be used to facilitate many other sorts of research beyond the specific application that I discuss here.

[12] *See, e.g.*, Sawtooth Software technical papers, available online at http://www.sawtoothsoftware.com/support/technical-papers; *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013) https://www.analysisgroup.com/Insights/ag-feature/analysis-group-forum/winter-2013-forum/when-all-natural-may-not-be/ (last accessed March 9, 2022).



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
July 22, 2022
Page 6 of 21

21.   In a typical conjoint analysis, survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof.

22.   Through conjoint analysis, by systematically varying the attributes of the product and observing how respondents react to the resulting product profiles, one can statistically gather information about a product's various attributes.

23.   Statistical methods (including regression analysis) are then applied to the survey responses to calculate attribute value.[14]

24.   Conjoint analysis has a long history of use in industry and is widely accepted and relied upon by enterprises such as Procter & Gamble, Microsoft, General Motors, Ford, and Google.[15]   Conjoint is also widely respected by academics and is a regular part of the curriculum

---

[13] *Applying Conjoint Analysis to Legal Disputes: A Case Study*, Wind, Yoram, *et al.*; *See, e.g.*, *Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *In re: Lenovo Adware Litigation*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014);  *Microsoft v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 2018 WL 3126385 (N.D. Cal. June 26, 2018);  *In Re Arris Cable Modem Consumer Litig.*, 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018); *Hadley v. Kellogg Sales Co.*, 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018); *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019); *Krommenhock v. Post Foods, LLC*, 2020 U.S. Dist. LEXIS 40463 (N.D. Cal. Mar. 9, 2020); *Hudock v. LG Elecs. USA, Inc.*, 2020 U.S. Dist. LEXIS 54994 (D. Minn. Mar. 30, 2020); *Koenig v. Vizio, Inc.*, Los Angeles Superior Court Case No. BC702266 (L.A. Super. Ct. Aug. 24, 2020); *Banh v. American Honda Motor Co.*, Inc., 2020 WL 4390371 (C.D. Cal. July 28, 2020); *Kaupelis v. Harbor Freight Tools, Inc.*, 2020 WL 5901116 (C.D. Cal. Sep. 23, 2020); *McMorrow v. Mondelez*, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021); *de Lacour v. Colgate-Palmolive Co.*, 2021 WL 1590208 (S.D.N.Y. Apr. 23, 2021); *Bailey v. Rite Aid Corp.*, 2021 WL 1668003 (N.D. Cal. Apr. 28, 2021); *Prescod v. Celsius Holdings, Inc.*, Case No. 19STCV09321 (Cal. Super. Ct. Cnty. L.A. Aug. 2, 2021); *Cardenas v. Toyota Motor Corp.*, Case No.: 18-cv-22798, 2021 U.S. Dist. LEXIS 152920, at *21-*23, *52-*65 (S.D. Fla. Aug. 12, 2021); *Bechtel v. Fitness Equipment Svcs., LLC*, No. 1:19-CV-726, 2021 WL 4147766, at *2, *16-*17 (S.D. Ohio Sep. 12, 2021); *Milan v. Clif Bar & Co.*, Case No. 18-cv-02354-JD, 2021 WL 4427427, at *6-*7 (N.D. Cal. Sep. 27, 2021); *Testone v. Barlean's Organic Oils*, Case No. 19-cv-169-JLS (BGS), 2021 WL 4438391, at *5-*6, *15-*17 (S.D. Cal. Sep. 28, 2021).

[14] *See, e.g.*, *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2020 ("Getting Started With Conjoint").

[15] *Id.*



Declaration of Colin B. Weir
July 22, 2022
Page 7 of 21

at universities world-wide, such as Duke, Ohio State, Northeastern, the University of South

Australia, NYU, and the University of California.  Defendant Colgate itself relies upon conjoint

analysis.

25.   Conjoint analysis can, and indeed has, been used to analyze the value and

importance of product claims, such as the "natural" Claim.  One recent study used conjoint

analysis to determine "whether health claims (claims of health-promoting effects) of food

products positively influence product price and consumer choices."[16]  Prior to conducting the

conjoint survey, the study finds that "[i]n general, consumers consider health and wholesomeness

as important aspects of food quality."  The study then uses choice-based conjoint analysis to

measure the effects of various product attributes on the price of a single product, green tea.  The

study examines only four product attributes: health claim, country of origin, the size of the

product, and price.  The study finds that the health claim on green tea is a positive, statistically

significant purchase driver, and results in a price premium of approximately 20%.

26.   In light of proposed FDA standardized front-of-pack nutrition labeling standards,

another study sought "to estimate the relative contribution of declared amounts of different

nutrients to the perception of the overall 'healthfulness' of foods by the consumer."[17]  The study

determined that claims such as "this product has no saturated fat," "this product is fat free," and

"this product is low in total fat" were among the 22 most important nutrient content claims.  The

study concludes that "Conjoint analysis can lead to a better understanding of how consumers

process information about the full nutrition profile of a product, and is a powerful tool for the

testing of nutrient content claims."

---

[16] *Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis*, Mitsunori Hirogaki, International Journal of Innovation, Management and Technology, Vol. 4, No. 6, December 2013.

[17] *Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis*, Drewnowski, Adam *et al.*, Public Health Nutrition: 13(5), 688–694.



Declaration of Colin B. Weir
July 22, 2022
Page 8 of 21

27. An application of conjoint analysis to orange juice was used to evaluate which attributes of orange juice consumers value most. Results of the study showed that vitamin C content was the most important purchase driver besides price, and the minimum price premium for vitamin C was approximately 17%.[18]

28. The use of conjoint analysis in similar applications is too extensive to document exhaustively here.

29. Conjoint analysis, as a survey tool, does not rely on an existing data set for its analysis because it relies on data generated through the survey process. Common conjoint analysis software would permit the administration of a representative sample survey, and the analysis of the results therefrom.

30. No individualized analyses, or Class-Member-specific inquiry will be required. All relevant data needed to complete the conjoint analysis will be Class-wide, common evidence.

**Price Premium: The Dennis Conjoint Survey**

31. I have been provided with, and have reviewed, a copy of the Declaration and Expert Report of J. Michael Dennis, Ph.D. dated July 8, 2022 ("Dennis Declaration"). Dr. Dennis is Senior Vice President at NORC in Chicago, IL and is a recognized expert in the design and implementation of online consumer statistical surveys with more than 20 years experience conducting such surveys at leading institutions.[19]

32. Among other things, the Dennis Report discusses the process by which Dr. Dennis conducted two conjoint analyses and market simulations of Tom's of Maine Products with the Claim ("Dennis Surveys"). I have also been provided with the results of those conjoint surveys, which generally indicate that purchasers overwhelmingly prefer Tom's of Maine Products with

---

[18] *Evaluation of Packing Attributes of Orange Juice on Consumers' Intention to Purchase by Conjoint Analysis and Consumer Attitudes Expectation*, Gadioli, I. L. et al., Journal of Sensory Studies 28 (2013):57-65.

[19] Dennis Declaration, at 2-5.



Declaration of Colin B. Weir
July 22, 2022
Page 9 of 21

the Claim as opposed to the Products without the Claim, and that units of Tom's of Maine

Products labeled with the Claim carry a price premium stemming solely from the labeling and

sale of those units with the Claim.

33.   I worked with Dr. Dennis to develop parts of the surveys.

34.   The survey data contain the results of 1,000 and 849 completed responses to the

toothpaste and deodorant surveys, respectively.[20]  These respondents are representative of the

Class, the results of the survey are projectable to the class, and the results of the survey provide a

reliable and accurate measurement of the market price premium solely attributable to the

challenged Claim used by Tom's of Maine on their Toothpaste Products.[21]

35.   The Dennis Report concludes that Tom's of Maine purchasers paid a price premium

for the Products as a result of the Claim.[22]  Dr. Dennis sets forth this price premium in his

Report.[23]

36.   As discussed below, the results of these surveys may be used as an input in my Price

Premium Damages calculation.

37.   I have relied on conjoint surveys, and the work of Dr. Dennis, to determine damages

in other litigations.[24]

---

[20] *Id*., at 23, 29.

[21] *Id*., at 8, 23-24, and 30.

[22] *Id*., at 29-30.

[23] *Id*.

[24] *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *Dei Rossi v. Whirlpool Corp.*, No. 2:12-cv-00125-TLN-CKD, 2015 U.S. Dist. LEXIS 55574 (E.D. Cal. Apr. 27, 2015); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 2018 WL 3126385 (N.D. Cal. June 26, 2018); *Martinelli v. Johnson & Johnson, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019); McMorrow v. Mondelez*, 2021 WL 859137 (S.D. Cal. Mar. 8, 2021).



Declaration of Colin B. Weir
July 22, 2022
Page 10 of 21

**Supply-Side Considerations**

38.   I understand that Dr. Dennis considered and accounted for supply-side factors in the determination of the price premiums.[25]

39.   I have also considered supply-side factors in my determination of damages.  First, unlike in a Lanham Act or intellectual property litigation where a but-for quantity of sales may need to be determined, in this litigation, the historic number of units sold is a fact and, in this litigation, it would be antithetical to the concept of class definition to suggest that the quantity supplied be anything other than the actual number of units sold by Defendants.

40.   Furthermore, as is borne out in the Dennis Surveys, if one were to assume, *arguendo*, that Defendants would not have lowered their price in concert with demand (indicating that Defendants priced above the market clearing price), then the economic outcome would be that many or all of the purchases would not have take place at all.  As such, the price premiums developed by Dr. Dennis are inherently conservative measures.

41.   It is also an economic perversion for a defendant engaged in a litigation (with an obvious conflict of interest) to simply state that it would never have adjusted its prices or would not have adjusted them enough so as to meet demand, and therefore damages should be set at zero or something less than actual economic damages.  If that were permitted, any defendant could simply postulate its way out of economic damages.

42.   I worked closely with Dr. Dennis to ensure that his surveys were appropriately designed to measure the true market value of the price premiums attributable to the Claim.

43.   Dr. Dennis and I had several discussions concerning the design of his surveys where I provided input based upon economic concepts, and real-world retail sales and market data.  We also had several discussions concerning the results of his surveys and how they should be interpreted and applied.

---

[25] Dennis Declaration, at 7, 13-14, and 27.

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
July 22, 2022
Page 11 of 21

44.   One of the most important and most frequent topics of discussion between Dr.
Dennis and myself was the data on actual sales of the Products in the real-world marketplace.
These real-world transactions occurred at prices that *already* reflect the supply-side factors then
extant in the marketplace.  I understand that Dr. Dennis relied upon these historical data in
setting the prices used in his conjoint survey.  We also discussed that variability in pricing both
at the wholesale and retail level showed that Defendants' and retailers' pricing was responsive to
changing market forces.

45.   Another important supply-side factor that Dr. Dennis and I discussed was the fact
that the quantity of the Products supplied is a known quantity, and fixed as a matter of history.

46.   Another important supply-side factor that Dr. Dennis and I discussed was the fact
that, as I have discussed above, both Defendants and retailers varied their wholesale and retail
prices (respectively) in response to their own business needs and changing market conditions.
We discussed that Defendants do not control the retail price paid by consumers.

47.   Another important supply-side factor that Dr. Dennis and I discussed was the fact
that, as I discuss below, the market for the Products was an "ordinary" market, subject to
competitive pressures that both Defendants and retailers identified as risks to their business.

48.   Many major grocery retailers identify a willingness to adjust prices in response to
changing economic conditions and consumer preferences.

- Kroger:

**COMPETITIVE ENVIRONMENT**

The operating environment for the food retailing industry continues to be
characterized by intense price competition, aggressive expansion, increasing
fragmentation of retail and online formats, entry of non-traditional competitors
and market consolidation.  We have developed a strategic plan that we believe
provides a balanced approach that will enable us to meet the wide-ranging
needs and expectations of our customers in this challenging economic
environment.  However, the nature and extent to which our competitors
implement various pricing and promotional activities in response to increasing
competition, including our execution of our strategic plan, and our response to



Declaration of Colin B. Weir
July 22, 2022
Page 12 of 21

these competitive actions, can adversely affect our profitability.  Our
profitability and growth have been, and could continue to be, adversely
affected by changes in the overall economic environment that affect consumer
spending, including discretionary spending.[26]

- Publix:

***Increased competition and low profit margins could adversely affect the
Company.***

The retail food industry in which the Company operates is highly competitive
with low profit margins.  The Company's competitors include national and
regional supermarket chains, independent supermarkets, supercenters,
membership warehouse clubs, mass merchandisers, dollar stores, drug stores,
specialty food stores, restaurants, convenience stores and online retailers.  The
Company's ability to attract and retain customers is based primarily on quality
of goods and service, price, convenience, product mix and store location.

As a result of the highly competitive environment, traditional supermarkets,
including the Company, face business challenges.  There has been a trend in
recent years for traditional supermarkets to lose market share to nontraditional
competitors.  The Company's ability to retain its customers depends on its
ability to meet the business challenges created by this highly competitive
environment.  There can be no assurance that the Company will be able to
meet these challenges.  In addition, the Company believes it will face increased
competition in the future from existing and potentially new competitors and its
financial condition and results of operations could be impacted by the pricing,
purchasing, advertising or promotional decisions made by its competitors as
well as competitor format innovation and location additions.[27]

- Safeway:

***Competitive Industry Conditions***

We face strong competition from traditional grocery retailers, non-traditional
competitors such as supercenters and club stores, as well as from specialty and
niche supermarkets, drug stores, dollar stores, convenience stores and
restaurants.  Increased competition may have an adverse effect on profitability
as the result of lower sales, lower gross profits and/or greater operating costs.

---

[26] The Kroger Co. 2016 10-K Annual Report filed with the US Securities and Exchange Commission.

[27] Publix Super Markets, Inc. 2016 10-K Annual Report filed with the US Securities and Exchange Commission.



Declaration of Colin B. Weir
July 22, 2022
Page 13 of 21

Our ability to attract customers is dependent, in large part, upon a combination of location, quality, price, service, selection and condition of assets. In each of these areas, traditional and non-traditional competitors compete with us and may successfully attract our customers to their stores by aggressively matching or exceeding what we offer.  In recent years, many of our competitors have increased their presence in our markets.  Our responses to competitive pressure, such as additional promotions and increased advertising, could adversely affect our profitability.  We cannot guarantee that our actions will succeed in gaining or maintaining market share.  Additionally, we cannot predict how our customers will react to the entrance of certain non-traditional competitors into the grocery retailing business.

Because we face intense competition, we need to anticipate and respond to changing consumer demands more effectively than our competitors.  We strive to achieve and maintain favorable recognition of our unique private-label brands, effectively market our products to consumers, competitively price our products and maintain and enhance a perception of value for consumers.  Finally, we need to source and market our merchandise efficiently and creatively.  Failure to accomplish these objectives could impair our ability to compete successfully and adversely affect our growth and profitability.[28]

- SuperValu:

**Competition**

Wholesale and Retail each operate in a highly competitive environment.

Wholesale competes directly with a number of traditional and specialty grocery wholesalers and retailers that maintain or develop self-distribution systems. Supervalu believes it competes in this business on the basis of price, quality, assortment, schedule and reliability of deliveries and services, service fees and distribution facility locations.

Principal competition for Supervalu's Retail segment comes from traditional grocery retailers, including regional and national chains and independent grocery store operators, and non-traditional retailers, such as supercenters, membership warehouse clubs, specialty supermarkets, hard discount stores, dollar stores, online retailers, convenience stores, drug stores and restaurants. Supervalu's ability to differentiate itself from its competitors and create an attractive value proposition for its customers is dependent upon a combination of price, quality, customer service, convenience, e-commerce offerings,

---

[28] Safeway Inc. 2015 10-K Annual Report filed with the US Securities and Exchange Commission.



Declaration of Colin B. Weir
July 22, 2022
Page 14 of 21

assortment, in-stock levels, brand perception, store location and conditions, in-store marketing and merchandising and promotional strategies.

Supervalu believes that the success of its Wholesale and Retail segments is dependent upon the ability of its own stores, as well as the stores of wholesale customers it supplies, to compete successfully.  Supervalu also competes to attract and maintain licensed and franchised operators to operate stores to which it provides wholesale distribution and services. This competition generally takes the form of alternative investment formats, such as a potential or existing licensee's investment in fast food restaurants, dollar stores, specialty supermarkets, drug stores and other potential investments.

Recent and ongoing consolidation within the grocery industry has resulted in, and is expected to continue to result in, increased competition, including from some competitors that have greater financial, marketing and other resources than Supervalu.[...]

**Supervalu faces intense competition.**

The grocery business is intensely competitive, and the recent and ongoing consolidation within the grocery industry is expected to result in increased competition, including from some competitors that have greater financial, marketing and other resources than Supervalu.  The grocery industry is characterized by relatively small operating margins, and as competition in certain areas intensifies and as the industry continues to consolidate, Supervalu's results of operations may be negatively impacted through a loss of sales and reductions in gross margins.  See "Business—Competition" for a discussion of the competitive environment.

If Supervalu is unable to appropriately respond to competition and execute on its initiatives to improve the competitive position or profitability of Supervalu, and differentiate Supervalu's offerings, Supervalu's sales, financial condition and results of operations may be adversely affected.[...]

**Competitive Environment**

The United States grocery business is highly competitive and management expects operating results will continue to be impacted by the effects of operating in a highly competitive and price-sensitive marketplace.  In fiscal 2017, Supervalu's Retail segment was impacted to a greater degree than anticipated by price competition, competitive store openings and a challenging sales and operating environment.  This environment contributed to lower sales from identical retail stores, which impacted gross profit and operating



Declaration of Colin B. Weir
July 22, 2022
Page 15 of 21

earnings.  These factors affecting the Retail segment are expected to impact fiscal 2018 as well.[29]

- Ahold Delhaize (Stop & Shop):

  **Competitive environment and economic conditions (S)**

  Changes to the competitive landscape and a weak macroeconomic climate without appropriate response could threaten Ahold Delhaize's ability to achieve its strategic objectives

  Key risk Drivers

  • Consumer value perception (price, assortment, quality)

  • Changing customer behavior (e.g., online shopping) and competition

  • Lack of distinctiveness

  • Consumer purchasing power under pressure

  • Inflationary forces impacting cost of goods sold

  • Pressure on margin[30]

49.  In addition to these factors that influenced Dr. Dennis' survey design, after the completion of the surveys, the results were calculated using Hierarchical Bayes regression.[31]  The use of Hierarchical Bayes regression provides for, amongst other factors, the ability to estimate better market-level results from a conjoint survey.

50.  The proper use of supply-side factors, individually or in combination, as I have discussed above, permits the Dennis Surveys to estimate a marketplace outcome -- the price premiums that prevailed due to Defendants' use of the "natural" Claim.

---

[29] SuperValu Inc. 2016 10-K Annual Report filed with the US Securities and Exchange Commission.

[30] Ahold Delhaize Annual Report 2016.

[31] Dennis Declaration, at 26.



Declaration of Colin B. Weir
July 22, 2022
Page 16 of 21

**Dennis Survey Results**

51.  Based upon my observation that retail pricing of the Products fluctuated during the relevant time period, I advised Dr. Dennis that the price premiums solely attributable to the Claim should be calculated as a percentage of the total price of the Products to be applicable to the various retail price points in the marketplace.  Dr. Dennis did so using conjoint surveys that took into account actual marketplace prices and other supply-side considerations and therefore are able to measure marketplace outcomes, and calculated the following price premiums.

52.  Dr. Dennis calculated the price premiums arising from the Claim in this litigation The results of these calculations are shown below.

**Price Premium Solely Attributable to the "Natural" Claim on Tom's of Maine Toothpastes**

| No. Respondents | Price Premium / Product Price | Price Premium Percent |
|---|---|---|
| 1,000 | ▮▮▮ / $6.00 | ▮▮▮ |

**Price Premium Solely Attributable to the "Natural" Claim on Tom's of Maine Deodorants**

| No. Respondents | Price Premium / Product Price | Price Premium Percent |
|---|---|---|
| 849 | ▮▮▮ / $7.99 | ▮▮▮22 |

53.  As noted above, Dr. Dennis concludes that these price premium factors apply to every sale of the Products, to every Class Member, and the class period, respectively. Consumers do not negotiate the price of the Products in one-off transactions.  The prices are set by the market, by the aggregate effects of all of the factors affecting supply and demand.  Just as



Declaration of Colin B. Weir
July 22, 2022
Page 17 of 21

a rising tide lifts all boats, a reduction in demand reduces prices market-wide. This is why the price premium percentages calculated by Dr. Dennis apply to all Class Members market-wide regardless of the absolute price they paid, and regardless of any individual Class Member's subjective valuation of the Products.

## VI.  TOTAL SALES OF THE PRODUCTS

54.  I have been provided with myriad sales data, as described below.

55.  I have been provided with retail sales of the Products from Nielsen for the period October, 2015 to February, 2020.[32] This data includes dollar and unit sales measures for the Tom's of Maine Products both for the following states: California, Florida, and New York.

56.  I have summarized the existing data on unit and dollar sales of the Products below in Tables 1 and 2. I anticipate supplementing these data should additional sales data become available.

| TABLE 1.<br>Total Sales by Class: Toothpaste Products<br>October, 2015 – February, 2020 | | |
|---|---|---|
| **State** | **Unit Sales** | **Dollar Sales** |
| California Class | ███████ | ███████ |
| Florida Class | ███████ | ███████ |
| New York Class | ███████ | ███████ |
| Sources: COLGATETOMS00004908, COLGATETOMS00027698. | | |

---

[32] COLGATETOMS00004908, COLGATETOMS00027698, COLGATETOMS00027703. The data production spans a longer time period, but I have restricted my analysis to Class period -- September 24, 2015 to February 21, 2020. For brevity, I refer to this period as October 2015 - February 2020.



Declaration of Colin B. Weir
July 22, 2022
Page 18 of 21

| TABLE 2.<br>Total Sales by Class: Deodorant Products<br>October, 2015 – February, 2020 | | |
|---|---|---|
| **State** | **Unit Sales** | **Dollar Sales** |
| California Class | ███████ | ███████ |
| Florida Class | ███████ | ███████ |
| New York Class | ███████ | ███████ |
| Sources: COLGATETOMS00004908, COLGATETOMS00027703. | | |

## VII.  CALCULATION OF PRICE PREMIUM

## DAMAGES

57.  This litigation calls for a Price Premium damages calculation:

- Price Premium Damages -- wherein consumers would receive the difference between the market value (purchase price) of the Products (with the Claim) and the market value of the Products (without the Claim), at the time and point of sale

**Price Premium Damages**

58.  After completing all of the work as discussed above, the final calculation of total price premium damages in this litigation will be as follows.

59.  With the price difference due to the Claim determined on a percentage basis, the calculation of class-wide damages for any Product will be:

$$\%Price\ Premium\ Factor\text{:}\ Claim \times \$Units\ Sold\ = Damages$$

60.  This calculation can be performed on a class-wide basis, Nationwide or across different geographies, and for any defined time period, including the proposed Class Period(s) in this litigation.



Declaration of Colin B. Weir
July 22, 2022
Page 19 of 21

61.  I have summarized the results of these preliminary calculations for Toothpaste

Products in Table 3 below.  I would anticipate supplementing this analysis as additional sales

data becomes available.

| TABLE 3.<br>Price Premium Damages by Class<br>Toothpaste Products | | | |
|---|---|---|---|
| **Nielsen Sales Channel** | **Dollar Sales** | **Price Premium Factor** | **Price Premium Damages** |
| California Class | ███████ | ███ | █████ |
| Florida Class | ███████ | ███ | █████ |
| New York Class | ███████ | ███ | █████ |
| Total | | | █████ |
| Sources: COLGATETOMS00004908, COLGATETOMS00027698. | | | |

| TABLE 4.<br>Price Premium Damages by Class<br>Deodorant Products | | | |
|---|---|---|---|
| **Nielsen Sales Channel** | **Dollar Sales** | **Price Premium Factor** | **Price Premium Damages** |
| California Class | ██████ | ███ | █████ |
| Florida Class | ██████ | ███ | █████ |
| New York Class | ███████ | ███ | █████ |
| Total | | | █████ |
| Sources: COLGATETOMS00004908, COLGATETOMS00027703. | | | |

ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
July 22, 2022
Page 20 of 21

## VIII.  STATUTORY DAMAGES

62.   In addition to the above damage calculations for the Class, I have been advised by Counsel for Plaintiffs that several statutory nuances must be considered for New York consumers.  I have been advised that New York GBL § 349 provides for statutory damages of $50 per violation.  I have been advised that New York GBL § 350 provides for statutory damages of $500 per violation.

63.   Using Defendants' sales records, I have determined that approximately ███████ units of the Products were sold in New York during the relevant period (a combination of both the toothpaste and deodorant products from Tables 1-2 above).

64.   Table 5 below sets forth the calculations of Statutory Damages.

| TABLE 5. New York Statutory Damages Toothpaste & Deodorant Products | | | |
|---|---|---|---|
| **Statute** | **Number of Units** | **Damages per Violation** | **Total Statutory Damages** |
| GBL § 349 | ████ | $50 | ████ |
| GBL § 350 | ████ | $500 | ████ |
| GBL §§ 349 & 350 | ████ | $50 + $500 = $550 | ████ |
| Sources: COLGATETOMS00004908, COLGATETOMS00027698, COLGATETOMS00027703. | | | |

## IX.  RESERVATION OF RIGHTS

65.   My testimony is based upon the information and data presently available to me.  Additional, different and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.



Declaration of Colin B. Weir
July 22, 2022
Page 21 of 21


VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief, and that this declaration was executed at Boston,

Massachusetts, this 22nd day of July, 2022.


Colin B. Weir


ECONOMICS AND
TECHNOLOGY, INC.