**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNE DE LACOUR, ANDREA WRIGHT, and LOREE MORAN, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Civil Action No. 1:16-cv-08364-KMW |
| COLGATE-PALMOLIVE CO., and TOM'S OF MAINE INC., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY AND OPINIONS OF**
**PLAINTIFFS' PROFFERED CONSUMER SURVEY EXPERT, BRIAN M. SOWERS**

O'MELVENY & MYERS LLP
7 Times Square
New York, New York 10036
(212) 326-2000

*Attorneys for Defendants Colgate-Palmolive Co. and Tom's of Maine, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................... 4

I.     Plaintiffs Contend that the "Natural" Representation on the Front of Tom's Packaging Misleads Reasonable Consumers. ........................................... 4

II.    Class Counsel Hired Sowers to Conduct a Survey, But Told Him Not to Ask What "Natural" on Toothpaste and Deodorant Labels Means to Survey Participants. ................................................................................. 5

III.   Sowers Designed a Survey Asking Whether Consumers Would Check a Box When Presented with the Definition of "Natural" Plaintiffs Advance in This Case ........................................................................................... 6

IV.   Sowers Artificially Inflated His Results by Asking Control Group Participants to Play a Matching Game. ............................................... 10

LEGAL STANDARD ...................................................................................... 10

ARGUMENT .................................................................................................. 11

I.     Sowers' Opinions Are Not Relevant Because He Did Not Ask Consumers Their Understanding of "Natural" and Failed to Test Plaintiffs' Theory of Deception. ...................................................................................... 12

II.    The Court Should Exclude Sowers' Opinions Because His Control Test Was So Circular and Biased that Survey Respondents Wondered If It Was a "Joke." ........................................................................................... 13

III.   Sowers' Opinion Relies on Leading, Closed-Ended Questions and Ignores Respondents' Unprompted Answers to Open-Ended Questions. ........................ 17

       A.    Sowers Designed His Surveys to Get Respondents to Validate Plaintiffs' Theories—Not to Discern How Reasonable Consumers Understand "Natural." .................................................................. 18

       B.    Sowers Did Not Define Key Terms in His Surveys, Leading Survey Participants to Guess about the Questions They Were Answering. ...................................................................................... 21

       C.    Sowers' Closed-Ended Question Did Not Give Participants "All Possible" Answer Choices and Forced Participants to Accept His Hypothesis .................................................................................. 22

CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Footwear Corp. v. Gen. Footwear Co., Ltd.*,
  76-civ-3594, 1978 WL 21442 (S.D.N.Y. Oct. 26, 1978) .................................................. 15

*Choi v. Tower Research Capital LLC*,
  2 F.4th 10 (2d Cir. 2021) ............................................................................................. 12

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)................................................................................................ 11, 12

*Edmondson v. RCI Hosp. Holdings, Inc.*,
  16-cv-2242, 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020)........................................ passim

*Franklin Res. Inc. v. Franklin Credit Mgt. Corp.*,
  988 F. Supp. 322 (S.D.N.Y. 1997) .................................................................................. 17

*Hughes v. Ester C Co.*,
  330 F. Supp. 3d 862 (E.D.N.Y. 2018) ............................................................................ 11

*J.T. Colby & Co., Inc. v. Apple Inc.*,
  11-civ-4060, 2013 WL 1903883 (S.D.N.Y. May 8, 2013)................................................ 13

*Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*,
  04-civ-7203, 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006)............................................. 13

*Kargo Global, Inc. v. Advance Mag. Publishers, Inc.*,
  06-civ-550, 2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ................................................ 16

*In re KIND "Healthy and All Natural" Litigation* ("*KIND*"),
  15-md-2645, 2022 WL 4125065 (S.D.N.Y. Sept. 9, 2022)........................................ passim

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)................................................................ 13, 15, 16, 21

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* ("*In re Mirena*"),
  982 F.3d 113 (2d Cir. 2020).......................................................................................... 11

*Podell v. Citicorp Diners Club*,
  112 F.3d 98 (2d Cir. 1997)................................................................................................ 7

*Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*,
  06-civ-0034, 2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006) ........................................ 20, 23

*Scotts Co. v. United Indus. Corp.*,
  315 F.3d 264 (4th Cir. 2002) ......................................................................................... 17

*THOIP v. Walt Disney Co.* ("*THOIP I*"),
  690 F. Supp. 2d 218 (S.D.N.Y. 2010).............................................................................. 15

*THOIP v. Walt Disney Co.* ("*THOIP II*"),
  788 F. Supp. 2d 168 (S.D.N.Y. 2011)................................................................ 13, 14, 15, 16

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
  800 F. Supp. 2d 515 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).......... 13, 14, 15

**TABLE OF AUTHORITIES (Cont'd)**

**Page(s)**

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007)..................................................................... 10

*Universal City Studios, Inc. v. Nintendo Co., Ltd.*,
  746 F.2d 112 (2d Cir. 1984)........................................................... 17, 19, 20

*Valador, Inc. v. HTC Corp.*,
  242 F. Supp. 3d 448 (E.D. Va. 2017) ........................................................ 17

**Rules**

Fed. R. Evid. 702(a)–(d) ............................................................................. 11

## PRELIMINARY STATEMENT[1]

The Court should exclude the opinions of Plaintiffs' proffered consumer survey expert, Brian M. Sowers.  His surveys are biased and leading on their face, violate basic principles of survey design and accepted legal standards governing the use of survey evidence, and at bottom, are designed to avoid the key issue in this false advertising case—whether the word "natural" on Tom's toothpaste and deodorant labels deceives reasonable consumers—making them ultimately irrelevant.  Plaintiffs' core contention is that reasonable consumers would not think the ingredients in Tom's toothpaste and deodorant are "natural," because the plant and vegetable starting points for those ingredients, *e.g.*, birch, corn, coconut, palm nut, become "unnatural" on the way to becoming safe and effective toothpaste and deodorant ingredients.  To prove that theory, Plaintiffs must present extrinsic evidence, typically a consumer survey, showing how the objectively reasonable consumer would understand the word "natural" on Tom's toothpaste and deodorant packaging.  That in turn raises questions about consumer expectations for how "natural" ingredients are sourced and derived, and how much processing is too much.

Plaintiffs offer Sowers' opinions to try to meet their initial burden to show what reasonable consumers would expect from "natural" toothpaste and deodorant.  But his surveys show nothing of the sort.  On the contrary, as he revealed at his deposition, his assignment "***wasn't*** to ask consumers what they think 'natural' means." Ex. 1 (Sowers Tr.) 70:20–71:5.  His surveys therefore do not establish how reasonable consumers understand the term "natural."

Instead, Sowers' job was to try to get survey participants to endorse Plaintiffs' theory that consumers think "natural" means "no artificial ingredients," by asking a closed-ended, multiple-

---

[1] Unless otherwise indicated, defined terms have the same meaning as in the October 24, 2022 declaration of Hannah Y. Chanoine in support of Defendants' Motion to Exclude the Testimony and Opinions of Plaintiffs' Proffered Consumer Survey Expert, Brian M. Sowers, all exhibits are to that declaration, and all emphasis is added and internal quotation marks omitted.

choice question that literally led them to that answer.  His surveys presented respondents with the

"natural" claim on the product packaging, and then made them select from three *closed-ended*

options as to what they thought was in the product: "Contains <u>only</u> natural ingredients (*i.e.*, no

artificial ingredients)," "Contains <u>some</u> natural ingredients and <u>some</u> artificial ingredients," and

"Contains <u>no</u> natural ingredients (*i.e.*, only artificial ingredients)"—in addition to a "No opinion"

and a "Don't know/Unsure" option.  Ex. 2 (Sowers Report) at ¶ 39.  As it was designed to do, the

survey led a significant number of survey respondents (net 26.3% in the toothpaste survey and

24% in the deodorant survey) to select the first choice, matching Plaintiffs' theory of "natural."

*Id.* at ¶¶ 46, 78.  But the answer to this question does not shed any light on what survey

respondents (much less reasonable consumers) believe "natural" means.  Sowers did not ask

what "natural" or "artificial" meant to survey respondents when those words appear on

toothpaste or deodorant labels.  And, in fact, he brushed aside participants' verbatim responses to

open-ended questions showing that they had different understandings of "natural" and "artificial"

than the one Plaintiffs posited.  *See* Ex. 1 (Sowers Tr.) 70:20–71:5, 72:9–21, 195:2-23.

Sowers' survey was all the more unilluminating because the one and only definition of

"natural" that he offered survey respondents, namely, one matching Plaintiffs' theory that

"natural" means made with "no artificial ingredients," is entirely circular.  As Sowers explained,

"artificial ingredients" just means "not natural ingredients." *Id.* at 66:23–67:5.  So his key

survey question effectively asks nothing more than whether respondents believe products labeled

"natural" contain ingredients that are "natural."  And his results say nothing more than that some

participants stated (after being shown the word "natural" on a package) that Tom's products

contain natural ingredients, which is to say, they do not have ingredients that are "not natural."

This is not helpful to the trier of fact because it does not answer the questions at the heart of

Plaintiffs' theory, for example, what do reasonable consumers understand "natural" to mean on a

tube of toothpaste or a stick of deodorant, and how much ingredient processing would make

them "not natural."  Sowers certainly did not ask whether reasonable consumers would agree that

the ingredients that Tom's uses to make toothpaste and deodorant would flunk their expectations

for toothpaste and deodorant labeled "natural."  *Id.* at 70:20–71:5.

That is not all.  Sowers inflated his results by failing to conduct a proper control for his

survey design, instead presenting control group respondents with a simple matching game that at

least one participant thought was a "joke."  Ex. 3 (Verbatims) at G-3, ID 40.  For his "control,"

Sowers showed survey participants an ordinary Tom's package, but he added a commercially

unrealistic bolded red disclaimer: **<span style="color:red">CONTAINS SOME NATURAL INGREDIENTS\*</span>**

**<span style="color:red">\*contains one or more artificial ingredients</span>** to the front of the packaging.  Ex. 2 (Sowers

Report) at ¶ 22.  Participants needed only to match this language with the "correct" answer

choice in the surveys, which conveniently included the identical language:  "Contains <u>some</u>

natural ingredients and <u>some</u> artificial ingredients."

Judge Buchwald recently excluded a similar consumer survey in a similar "natural"

labeling case over the words "All Natural" on KIND bar labels.  *See In re KIND "Healthy and

All Natural" Litigation*, 2022 WL 4125065 (S.D.N.Y. Sept. 9, 2022) ("*KIND*")*.*  The *KIND*

plaintiffs offered the opinions of Dr. J. Michael Dennis —Plaintiffs' proffered conjoint expert

here—who submitted a consumer survey purporting to demonstrate that consumers understood

"All Natural" to mean no synthetic or artificial ingredients.  *Id.* at \*9-10.  Like Sowers, Dennis

did not ask his survey participants how ***they*** understood the packaging, but instead gave them a

limited set of answer choices that only sought to "validate" plaintiffs' theory, namely that the

product "Will <u>NOT</u> contain artificial and synthetic ingredients," "Will contain artificial and

synthetic ingredients" or "Not sure/No expectation."  *Id.* at \*10.  Judge Buchwald found that the

survey was biased, leading, and unreliable because, among other reasons, it failed to (1) ask

participants how they understood the "All Natural" representation, but led them to plaintiffs' theory, and (2) define for participants the terms "contains" or "artificial." *Id.* at *11-12.

The Court should exclude Sowers' opinions for the same reasons. His surveys are not designed (or intended) to address the key questions in this case, but instead simply posed the understanding of "natural" that "Plaintiffs' counsel constructed for this litigation," to see if participants would "click a check box saying that they agree to it." *Id.* at *13. This says nothing about how reasonable consumers would understand the term "natural."

## BACKGROUND

I.   **Plaintiffs Contend that the "Natural" Representation on the Front of Tom's Packaging Misleads Reasonable Consumers.**

Plaintiffs filed this case in 2016, alleging that the word "natural" on the front of Tom's toothpaste and deodorant packaging is "false and misleading," because the products contain "synthetic and highly chemically processed" ingredients. Ex. 4 (FAC) at ¶ 13. Plaintiffs further allege that: (1) "[t]he term natural means existing in nature and not made or caused by people; coming from nature or not having any extra substances or chemicals added; not containing anything artificial," *id.* at ¶ 24; and (2) "[i]ndustry and regulatory definitions of natural are also instructive in defining a reasonable consumer standard," *id.* They quote several of those regulatory definitions, including informal FDA guidance that focuses on added ingredients in food "that would not normally be expected to be in the food" and one from the USDA that refers to "severe processes, e.g. solvent extraction, acid hydrolysis, and chemical bleaching." *Id.* at ¶¶ 24–26. Tom's sources the challenged ingredients from natural vegetable sources (like corn, birch, coconut, or palm nuts)—and not from petroleum or animal sources. *See* Ex. 5 (Zhou Report) at ¶¶ 29, 37, 46, 52, 68, 75. But Plaintiffs contend that a reasonable consumer would find that the way the final ingredients are processed or derived and then subsequently used by

Tom's to create safe and effective toothpaste and deodorants makes them "artificial." *See id.* at ¶ 89.

## II.    Class Counsel Hired Sowers to Conduct a Survey, But Told Him Not to Ask What "Natural" on Toothpaste and Deodorant Labels Means to Survey Participants.

Plaintiffs engaged Brian M. Sowers to design and conduct two consumer surveys to test whether the "natural" representation on Tom's toothpaste and deodorant packaging is "likely to deceive reasonable consumers into believing that the Tom's products are natural." Ex. 2 (Sowers Report) at ¶¶ 6–7.  Sowers holds an MBA and works as a litigation consultant at Applied Marketing Science, Inc.; his sole income comes from his work designing and implementing consumer surveys used in litigation.  Ex. 6 (Sowers CV); Ex. 1 (Sowers Tr.) 33:23–34:11.  He has never published a peer-reviewed paper concerning consumer survey design or implementation, he has designed only one consumer survey as part of his MBA studies, and he says he "only read[s]" peer-reviewed academic publications "that are most relevant to litigation." Ex. 1 (Sowers Tr.) 36:20–37:2, 42:5–43:20, 51:17–52:4.

Sowers admitted that his assignment in this case "wasn't to ask consumers what they think 'natural' means." *Id.* at 70:20–71:5.  Rather, he was asked to "test whether consumers take away [Plaintiffs'] belief that the products contain only natural ingredients, that is, no artificial ingredients." *Id.*; *see also* Ex. 4 (FAC) at ¶ 23.  He conducted two separate internet surveys:  one for prospective "natural" toothpaste purchasers and another for prospective "natural" deodorant purchasers.  Ex. 2 (Sowers Report) at ¶¶ 16, 48.  He did not consider any published research on how consumers respond to natural claims on consumer packaged goods in designing his surveys, or on the market for natural personal and oral care products.  Ex. 1 (Sowers Tr.) 113:9–15.

### III.   Sowers Designed a Survey Asking Whether Consumers Would Check a Box When Presented with the Definition of "Natural" Plaintiffs Advance in This Case.

*1. Sowers' Test and Control Design.*   After screening out any purchasers who did not indicate they would buy "natural" oral or personal care products in the next six months, Sowers split remaining participants into test and control groups.  Ex. 2 (Sowers Report) at ¶¶ 27, 31.  He showed test group participants an unaltered image of the Tom's toothpaste or deodorant products at issue with the word "natural" on the front panel.  *Id.* at ¶¶ 23, 55.




By contrast, he showed his control group participants an altered image of the Tom's toothpaste or deodorant product.  He replaced the word "natural" in the upper righthand corner (which is presented in smaller font and in a shade to match the green and blue color scheme of the packaging) with bolded, red, all capitalized, underlined text followed by an asterisk: "**CONTAINS <u>SOME</u> NATURAL INGREDIENTS***."  *Id.* at ¶¶ 22, 54.  He then added a disclaimer to the bottom of the packaging (again in bold red font): "**\*contains one or more artificial ingredients**."  *Id.*  The color red does not appear on the original packaging at all.




At his deposition, Sowers agreed that a control product's packaging design should simulate real world market conditions.  Ex. 1 (Sowers Tr.) 226:5–14.  But he admitted he did not attempt to design a commercially viable package, *see id.* at 232:11–12,[2] and could not identify any steps he took to ensure that his control packaging was commercially viable, *see id.* at 231:5–12.  Instead, he testified that he "splashed" the disclaimer *Plaintiffs* think should be on the front packaging "in a way so that it's clearly communicated *as Plaintiffs allege*."  *Id.* at 188:18–24.  One control group participant remarked that Sowers' control packaging **"openly communicated that it's 'mostly' natural, kind of as a joke?"**  Ex. 3 (Verbatims) at G-3, ID 40.

*2. Sowers Ignored Answers to His Open-Ended Question.*  Open-ended questions Q1 and Q2 asked all participants what the "main message" and what "other messages, if any" the packaging images communicated to them.  Ex. 2 (Sowers Report) at ¶ 35.  But Sowers had no

_____

[2] Sowers submitted an errata on September 30—just eleven days after his deposition—attempting to delete the words "not commercially viable" from his deposition testimony.  *See* Ex. 7 (Sowers Errata).  But the deposition footage clearly shows that the transcript accurately reflects his testimony.  The law in this Circuit is clear that a deponent's "original answer to [] deposition questions will remain part of the record and can be read at trial."  *Podell v. Citicorp Diners Club*, 112 F.3d 98, 103 (2d Cir. 1997).

interest in those answers.  He admitted that he brushed aside all of the verbatim answers, and looked only for whether the answers mentioned the word "natural"—an analysis he did not use in his ultimate opinion.  Ex. 1 (Sowers Tr.) 194:14–25.  He did not look at any other aspect of the verbatims or attempt to determine how respondents understood the "natural" representation on the packaging or other claims on the packaging.  As Sowers put it, "it really doesn't matter what they say in Question 1 or 2, as long as it's not gibberish, which I removed from the data set."  *Id.* at 195:2–23.

  *3. Sowers Again Ignores Answers*.  Open-ended question Q4 then asked participants "What <u>did</u> the product packaging communicate about whether or not the [toothpaste/deodorant] is natural?"  *Id.* at ¶ 38.  But Sowers *again* ignored the answers.  As with questions 1 and 2, Sowers neither analyzed nor coded the Q4 responses, except to "simply . . . eliminate anyone who answered 'Don't Know/Unsure' in response" and to "filter [participants] into question 5." Ex. 1 (Sowers Tr.) 212:25–213:16.

  The Q4 verbatim responses that Sowers ignored are revealing.  They show that—when unprompted by Plaintiffs' theory—survey participants took away varied messages about what "natural" means, including "No animal testing, recyclable," "No aluminum," and just "natural." Ex. 3 (Verbatims) at G-12, ID 266; H-17, ID 333; H-6, ID 83.  Only 8 of 415 participants in the toothpaste survey and 8 of 408 participants in the deodorant survey said that the products "contained no artificial ingredients"—the understanding that Sowers was attempting to validate. *See* Ex. 8 (Kivetz Rebuttal) at 79–82 tbls.4a–b.  None mentioned the "minimally processed" standard that Plaintiffs' materials expert, Dr. Zhaohui Zhou, proposed.  *See id.*; *see also* Ex. 5 (Zhou Report) at ¶ 23.

*4. Sowers bases his opinion on a circular and leading question.*  Q5 asked participants whether they thought the product packaging "(a) Contains <u>only</u> natural ingredients (i.e., no



artificial ingredients); (b) Contains <u>some</u> natural ingredients and <u>some</u> artificial ingredients; or (c) Contains <u>no</u> natural ingredients (i.e., only artificial ingredients)."

Sowers based his entire opinion on the responses to this one question.  But as he admitted, Q5 was nothing more than a tautology.  Sowers testified that "natural" means "not artificial," and that "artificial" means "synthetic," which means … "not natural."  Ex. 1 (Sowers Tr.) 66:7–67:5.  The linchpin of Sowers' "analysis" asks nothing more than whether a "natural" product contains "no not-natural ingredients"—a completely circular exercise.  Sowers did not ask participants what *they* think "artificial" means, and he asked no further questions to try to understand what consumers think would make an ingredient "artificial" or "not natural."  *Id.* at 70:20–71:5, 72:9–21.  Sowers did not test any other understanding of "natural," either, including the definitions cited in Plaintiffs' complaint.  *Id.* at 70:20–71:5.  Participants who did not understand the "natural" representation to refer to one of the three options Sowers provided had no option to express their disagreement.  They could only select "No opinion" or "Don't know/Unsure," Ex. 2 (Sowers Report) at ¶ 39, which would not be accurate in the case of respondents who had contrary views.

IV.     **Sowers Artificially Inflated His Results by Asking Control Group Participants to Play a Matching Game.**

Question 5 posed control group respondents with little more than a word matching game. The control packaging highlighted in red the words "**CONTAINS <u>SOME</u> NATURAL INGREDIENTS**," which is the exact language from one of the answer choices. Professor Ran Kivetz, the Philip H. Geier, Jr., Professor of Marketing at Columbia University Business School, explained how this affects Sowers' results. As Professor Kivetz explains, among other errors in Sowers' methodology, the matching game skewed Sowers' survey results because it made it more likely that control group respondents would select the "some natural" ingredients answer. Ex 8 (Kivetz Rebuttal) at 43 fig.6.[3]

*6. Sowers' Opinions.* Relying exclusively on the results of Q5, Sowers calculated an alleged "net deception" percentage by subtracting the number of control group participants who selected the "Only natural ingredients" answer choice from the test group participants who selected the same answer. Ex. 1 (Sowers Tr.) 97:23–98:9. From this, Sowers concluded that the "net deception" created by Tom's use of "natural" on its toothpaste and deodorant products was 26.3% and 24% respectively, which he understood to be "above the threshold courts have found to support a finding of deception." Ex. 2 (Sowers Report) at ¶ 10.

**LEGAL STANDARD**

Plaintiffs bear the burden of establishing that their proffered expert's testimony is admissible. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Expert testimony

---

[3] Professor Kivetz holds a PhD in Business from Stanford University, a Master's degree in Psychology from Stanford University, and a Bachelor's degree in Economics and Psychology from Tel Aviv University. Ex. 8 (Kivetz Rebuttal) at ¶¶ 3–4. He has conducted more than one thousand marketing research surveys over the course of his career and has been published in thirty peer-reviewed publications since 2009, with two additional publications currently pending. *Id.* at ¶ 5; Ex. 9 (Kivetz CV).

is inadmissible unless it is helpful to the trier of fact, "based on sufficient facts or data," and "the product of reliable principles and methods" that the expert has "reliably applied . . . to the facts of the case." FED. R. EVID. 702(a)–(d); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) (expert testimony must be "not only relevant, but reliable"). District courts must "undertake a rigorous examination" of the expert's methods and opinions to ensure they are sufficiently reliable and helpful, *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.* ("*In re Mirena*"), 982 F.3d 113, 123 (2d Cir. 2020), including expert opinions based on survey results, which must "be properly designed, executed, and described," and comply "with generally accepted survey principles," *Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020). In the case of consumer survey experts, courts must "look at the cumulative effect of all of the flaws in a survey" in determining its admissibility. *Id.* (excluding survey expert opinions).

## ARGUMENT

The Court should exclude Sowers' opinions because they come nowhere close to withstanding "rigorous examination." *In re Mirena*, 982 F.3d at 123. To prevail on their deception theory, Plaintiffs must submit (1) extrinsic evidence, *i.e.*, a survey, demonstrating reasonable consumers' understanding of the word "natural" on Tom's toothpaste and deodorant, and (2) evidence from which a factfinder could conclude that Tom's toothpaste and deodorant did not comport with ***that*** understanding. *See KIND*, 2022 WL 4125065, at *7, 16; *see also Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 872 (E.D.N.Y. 2018) ("To satisfy the reasonable consumer standard, a plaintiff must adduce extrinsic evidence—ordinarily in the form of a survey—to show how reasonable consumers interpret the challenged claim."). Plaintiffs proffer Sowers' opinions to satisfy the first requirement, but as in *KIND*, Sowers' surveys were not only biased and misleading, but irrelevant.

**I.      Sowers' Opinions Are Not Relevant Because He Did Not Ask Consumers Their Understanding of "Natural" and Failed to Test Plaintiffs' Theory of Deception.**

The Court should exclude Sowers' opinions because they are irrelevant.  *See Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."); *Choi v. Tower Research Capital LLC*, 2 F.4th 10, 20 (2d Cir. 2021) ("It is well established that expert testimony admitted under Rule 702 must be relevant, meaning it must help the trier of fact to understand the evidence or to determine a fact in issue.").  *KIND* is directly on point.  There, the court found that Dennis's surveys "provide[d] no useful information about how a reasonable consumer understands 'All Natural,'" because the surveys did not address three key issues for the trier of fact:

- "What processing, if any, does a reasonable consumer believe can occur to an ingredient or product before that ingredient or product is considered artificial or synthetic?

- Are ingredients that do occur naturally, such as Vitamin A or C, but potentially manmade in the specific form that appears in KIND products, artificial or synthetic?

- Are trace or residual amounts of chemicals that were used in processing ingredients in KIND bars enough to cause the KIND products to contain 'artificial or synthetic ingredients?'"

*KIND*, 2022 WL 4125065, at *12-14.  Similar questions are at issue here, as Plaintiff Moran acknowledged:  "So it's a fine line, the question you're asking, the role of people in the creation of a product.  Short of going outside and grabbing a leaf off a tree and rubbing it under your arms, people have to be involved somewhere.  So the degree that people are involved is the question."  Ex. 10 (Moran Tr.) 138:3–11.  Defendants agree.  But Sowers did not attempt in any way to answer those questions.

Indeed, Sowers did not even ask what respondents understood by the terms "natural," or "artificial," and could only provide a circular definition when asked his own understanding.  *See*

Ex. 1 (Sowers Tr.) 66:7–67:5, 70:20–71:5, 72:9–21.  Nor did he attempt to test whether consumers thought particular Tom's ingredients were natural or synthetic—one of the key issues that Plaintiffs' theory of deception raises.  *Id.* at 240:12–241:12; *see KIND*, 2022 WL 4125065, at *12–14; *see also Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*, 2006 WL 1012939, at *24 (S.D.N.Y. Apr. 19, 2006) ("To be probative a survey must be directed to the relevant issues."). Sowers' surveys do not address the relevant issues.  The Court should exclude his opinions.

## II.     The Court Should Exclude Sowers' Opinions Because His Control Test Was So Circular and Biased that Survey Respondents Wondered If It Was a "Joke."

"[T]o offer sound results," consumer "surveys must employ an adequate control" to (i) "rule out confusion caused by [other] factors," *J.T. Colby & Co., Inc. v. Apple Inc.*, 2013 WL 1903883, at *22 (S.D.N.Y. May 8, 2013), and (ii) establish a "benchmark for determining whether" the results of the test group reflect actual consumer deception or merely reflect "flaws in the survey methodology," *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 534 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).  To fulfill this function, "a control should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."  *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168, 181 (S.D.N.Y. 2011) ("*THOIP II*").  That means at a minimum (i) eliminating the "very elements being assessed," *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 534, (ii) retaining the "overall look and feel" of the test stimulus, including keeping "the font, typeface, [and] layout" as in the test stimulus, *THOIP II*, 788 F. Supp. 2d at 181, and (iii) approximating market conditions, *see Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007).  As Judge Caproni held in a recent decision excluding a similar consumer survey, the "failure to include an adequate control" requires exclusion because it "undermines the reliability of the results."  *Edmondson*, 2020 WL 1503452, at *7.

Sowers' control design does none of the things a control is supposed to do.  It is instead circular and biased, causing one participant to wonder if it was a "joke," because it employed a red warning that so altered the Tom's packaging it no longer resembled a commercially viable product: "**CONTAINS <u>SOME</u> NATURAL INGREDIENTS\***" and "**\*contains one or more artificial ingredients**." *See* Ex. 3 (Verbatims) at G-3, ID 40.

| **In-Market Product** | **Control Product** |
|:---:|:---:|
|  |  |

As Professor Kivetz explains, survey participants could too easily match the red warning language that Sowers added to the control packaging—which consumers would not usually encounter on an actual product package—to the "correct" answer choice in Sowers' survey, "contains <u>some</u> natural ingredients."  Ex. 8 (Kivetz Rebuttal) at ¶ 78.  As Judge Scheindlin found when rejecting a similar survey, a control like Sowers' that is too dissimilar from the original "improperly inflat[es]" the results of a survey, requiring exclusion.  *THOIP II*, 788 F. Supp. 2d at 181.  The Court should reach the same result here.

**First**, Sowers failed to eliminate "the very element being assessed," *i.e.*, the word "natural" on the front packaging.  *Polo Ass'n, Inc.*, 800 F. Supp. 2d at 534–35 (excluding survey

for failure to include adequate control).  Worse, he ***highlighted*** that element.  He featured the

word "natural" in a color different from the packaging's palette (red), bolded it, enlarged it,

capitalized it, put an asterisk next to it, and underlined one of the words next to it.  Sowers

admitted that ***he was trying*** to draw attention to his "**CONTAINS <u>SOME</u> NATURAL**

**INGREDIENTS***" language by "splashing" it on the packaging.  Ex. 1 (Sowers Tr.) 188:5–24.

Because the control stimulus included the "very element being assessed," Sowers' control cannot

serve its essential role of filtering out noise and serving as a "benchmark" to gauge whether the

test group results merely reflect "flaws in the survey methodology."  *U.S. Polo Ass'n, Inc.*, 800

F. Supp. 2d at 534 (excluding consumer survey).

    ***Second***, Sowers changed the "overall look and feel of the packaging" by altering the font,

typeface, and color scheme (by adding a clashing color), as the side-by-side comparison above

shows.  *THOIP II*, 788 F. Supp. 2d at 181.  As Judge Scheindlin observed in *THOIP II*, when

designing a control, "the font, typeface, [and] layout" should mirror the original.  *Id.*  By

changing the "overall look and feel" of the packaging, Sowers' control is improper.  *Id.*

    ***Third***, Sowers' control stimulus does not resemble a commercially viable product.  A

control experiment "must use the proper stimulus, one that tests for confusion by replicating

market conditions."  *Malletier*, 525 F. Supp. 2d at 591; *see also THOIP v. Walt Disney Co.*, 690

F. Supp. 2d 218, 231 (S.D.N.Y. 2010) ("*THOIP I*") ("The failure of a survey to approximate

actual marketplace conditions can provide grounds for inadmissibility."); *Am. Footwear Corp. v.

Gen. Footwear Co., Ltd.*, 1978 WL 21442, at *6 (S.D.N.Y. Oct. 26, 1978) (excluding consumer

survey that failed to replicate market conditions by showing the challenged claim out of context).

Sowers admitted that a survey must replicate market conditions, Ex. 1 (Sowers Tr.) 226:5–14,

but he made no effort to design his control packaging to look like a commercially viable product,

because he said it was "not up to [him]" to do so.  *Id.* at 227:21–228:18.  Sowers could not

identify any toothpaste or deodorant products with packaging that resembled the one he designed, *i.e.*, one with a red all-capitalized disclaimer "splashed" on the front label.   *Id.* at 231:5–232:12.   Even the survey respondents called Sowers out on the packaging, which left one participant asking whether the whole exercise was a "joke" in the verbatim responses.   *See* Ex. 3 (Verbatims) at G-3, ID 40; *see also Malletier*, 525 F. Supp. 2d at 595 (excluding survey when stimulus "did not even come close" to replicating market conditions).

The error is not just a question of poor design.   As Judge Scheindlin held in *THOIP II*, a control survey that leads participants to select one answer choice over another, "improperly inflat[es] the results."   788 F. Supp. 2d at 181.   Professor Kivetz describes the circular and inflationary effect of Sowers' control experiment in his rebuttal report.   Ex. 8 (Kivetz Rebuttal) at ¶ 78.   Focusing control group respondents on the highlighted language "**<span style="color:red">CONTAINS <u>SOME</u></span>** **<span style="color:red"><u>NATURAL INGREDIENTS</u>*</span>**"—as Sowers *intentionally* did—turned Sowers' key question 5 into an elementary matching game.   *Id.*   Respondents only had to read the highlighted language on the control package to find the "correct" answer choice provided in question 5, "contains <u>some </u>natural ingredients and <u>some</u> artificial ingredients."   *Id.*

This circular matching test skewed Sowers' net deception opinion upwards, because it ensured that more control participants would select the "Contains <u>some</u> natural ingredients" answer choice in question 5, leaving fewer control participants to select a different answer choice, as Professor Kivetz explains.   *Id.* at ¶¶ 89–90.   It is no surprise that Sowers designed his control experiment as a matching test that would inflate his results—his assignment was to try to validate Plaintiffs' theory of the case.   *See* Ex. 1 (Sowers Tr.) 70:4–12.   But Courts routinely exclude surveys on exactly these grounds.   *See THOIP II*, 788 F. Supp. 2d at 181; *Kargo Global, Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688, at *9–10, 12 (S.D.N.Y. Aug. 6, 2007) (excluding survey because the "control group's responses" to multiple choice questions was

"strong, if not dispositive proof that the survey was designed to lead respondents to conclude that the parties' products were related"); *Franklin Res. Inc. v. Franklin Credit Mgt. Corp.*, 988 F. Supp. 322, 335 (S.D.N.Y. 1997) ("Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of [] consumer confusion."); *see also Edmondson*, 2020 WL 1503452, at *7 (excluding survey where control stimulus was improperly less attractive than the test stimulus).

### III.  Sowers' Opinion Relies on Leading, Closed-Ended Questions and Ignores Respondents' Unprompted Answers to Open-Ended Questions.

A survey cannot assist the trier of fact where it poses a leading question because the question "suggest[s] its own answer."  *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey); *KIND*, 2022 WL 4125065, at *10 (excluding survey); *see also Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002) (leading and suggestive survey questions "weaken the relevance and credibility of the survey evidence to the point that it sheds no light on the critical question [in the] case"); *Valador, Inc. v. HTC Corp.*, 242 F. Supp. 3d 448, 465–66 (E.D. Va. 2017) (excluding survey as "unreliable" because it included "improperly suggestive" questions from which respondents could "infer the purpose of the survey and identify the 'correct' answers").

*KIND* is again on point.  There, the plaintiffs proffered Dennis as an expert to show how reasonable consumers would understand the "All Natural" claim on KIND bars.[4]  His survey asked participants, "because of this [All Natural] descriptor, what is your expectation for this product?"  *KIND*, 2022 WL 4125065, at *10.  Like Sowers, Dennis limited his participants' answers choices.  They could select only one of three pre-coded answers centered on the

---

[4] Dr. Dennis also offers a different opinion (on injury and damages) in this case that is the subject of a separate *Daubert* motion.

undefined terms "artificial" and "synthetic": (a) "The product will <u>not</u> contain artificial and synthetic ingredients"; (b) "The product will contain artificial and synthetic ingredients"; or (c) "Not sure/No expectation." *Id.* Judge Buchwald excluded Dennis's opinions as leading and biased, because he (1) suggested plaintiffs' preferred definition to survey participants in a closed-ended question, (2) failed to define, or gave circular definitions of, key terms in the answer choices, and (3) constrained participants' answer choices and failed to give them an exhaustive list of potential answers by, for example, providing other alternative definitions of the term "all natural." *Id.* at *10–13. More fundamentally, Judge Buchwald found that the entire exercise was a litigation tactic. "Rather than determining how reasonable consumers understand the 'All Natural' claim," Judge Buchwald explained, plaintiffs used Dennis to supply the standard to survey participants and asked them to "validate plaintiffs' theory." *Id.* at *13. Sowers' surveys suffer from all these same defects.

### A. Sowers Designed His Surveys to Get Respondents to Validate Plaintiffs' Theories—Not to Discern How Reasonable Consumers Understand "Natural."

Like Dennis's biased survey in *KIND*, the whole point of Sowers' surveys was to get participants to rubberstamp Plaintiffs' theories, without ever asking them for their understanding of the term "natural." Sowers practically admitted as much. "My assignment wasn't to ask consumers what they think 'natural' means." Ex. 1 (Sowers Tr.) 70:20–71:5.[5] Instead, he was hired to construct surveys to see if consumers "will click a check box saying that they agree to" the definition of natural "that plaintiffs' counsel constructed for this litigation." *KIND*, 2022 WL

---

[5] Dennis made the exact same admission in almost the exact same words in *KIND*: "My exercise was not a general one of measuring consumers' opinions of the 'All Natural' claim in a vacuum. I was asked to test the plaintiffs' theory of liability." *KIND*, 2022 WL 4125065, at *11.

4125065, at *13.  Fittingly, his entire analysis hinges on one question that—as shown below—does nothing more than ask whether participants would check the box that Plaintiffs want.



This is a classic example of a leading question, as the Second Circuit explained in *Nintendo*.  There, participants were asked:  "[W]as the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?"  *Nintendo*, 746 F.2d at 118.  The Second Circuit found this was an "obvious leading question" because the participants "were presented with the Donkey Kong-King Kong connection rather than permitted to make their own associations."  *Id.*  This was especially so because, when unprompted, none of the participants could say who makes Donkey Kong.  *Id.*  Sowers did the same thing.  He made the natural-artificial connection, presented it to participants with no other comparisons, and then asked participants to ratify it without permitting participants to answer with their own associations.  *See id.*

As in *Nintendo*, the results of Sowers' open-ended questions also undercut this theory.  When unprompted, only 1.9% of participants mentioned the natural-artificial connection (16 out of 823).  Without Sowers' prompting, survey participants had different views about Tom's packaging.  But rather than analyze the many differing views that consumers expressed, Sowers forced them to engage *only* with Plaintiffs' "no artificial ingredients" formulation, *see* Ex. 1

(Sowers Tr.) 166:21–167:7, and based his entire opinion on the results of that one leading question, which requires exclusion, *see Nintendo*, 746 F.2d at 118; *KIND*, 2022 WL 4125065, at *14.

In fact, Sowers swept *all* of the verbatim answers aside.  "[I]t ***really doesn't matter what they say***," Sowers testified.  Ex. 1 (Sowers Tr.) 195:18–23.  The verbatim responses were—in Sowers' view—"not relevant."  *Id.* at 197:9–12.  And the three questions that elicited these "not relevant" responses?  They are listed below.

1. "What was the main message communicated to you by the product packaging?"

2. "What other messages, if any, were communicated to you by the product packaging?"

3. "What <u>did</u> the product packaging communicate about whether or not the toothpaste [or deodorant] is natural?"  Ex. 2 (Sowers Report) at ¶¶ 35, 38.

Had Sowers analyzed these verbatim responses, he would have seen that consumers had many different understandings of the "natural" representation on Tom's packaging.  The verbatims indicated that respondents valued the characteristics found in Tom's Stewardship Model.  *See* Ex. 3 (Verbatims) at G-65, ID 1501 ("Tom's doesn't test product on animals, is sustainable, uses natural fluoride, and uses recycled materials."); G-59, ID 1389 ("Not tested on animals, 12 days of employee time given to volunteering and 10% of profit goes to charity."); H-5, ID 68 ("Tom's natural deodorant is concerned with letting consumers know that they control every aspect of the manufacturing process of their product to ensure that it is done sustainably and with care for customers who are serious about a really natural, sustainable deodorant product.").  But there were passing few responses that matched Plaintiffs' theories.  *See KIND*, 2022 WL 4125065, at *11 (criticizing expert for failing to ask open-ended questions); *Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*, 2006 WL 2588002, at *22 (S.D.N.Y. Sept. 6,

2006) (criticizing proffered survey expert who "did not bother analyzing the responses to the open-ended questions").

### B.     Sowers Did Not Define Key Terms in His Surveys, Leading Survey Participants to Guess about the Questions They Were Answering.

The Court should also exclude Sowers' opinions because his surveys failed to define key terms.  This warrants exclusion because failing to define key terms in a closed-ended question leads to guessing among survey participants, undermining the reliability of their responses.  *See Edmondson*, 2020 WL 1503452, at *8 ("The use of undefined terms such as 'lifestyle' and 'events' without providing any further description or definition renders [the survey's] questions ambiguous and . . . undermines the reliability of the responses."); *Malletier*, 525 F. Supp. 2d at 604 ("If the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey." (citing Diamond, S., Manual of Scientific Evidence, *Reference Guide on Survey Research*)).  It also leaves the factfinder guessing about the responses, because there is no way to know how participants understood the term.  *See KIND* 2022 WL 4125065, at *12.

*KIND* is again on point.  There, Dennis failed to define three key terms that he used in his pre-coded answers:  "artificial," "synthetic," and "contain."  *Id.*  Judge Buchwald excluded the opinion, in part because the failure to define the key terms rendered the survey unhelpful to the jury, which would be left guessing about how the participants understood those terms.  *Id.*  Sure enough, Sowers also failed to define the words "artificial" and "contain" in his surveys (he did not use synthetic), and failed to ask survey participants how they understood those terms.  *See* Ex. 1 (Sowers Tr.) 70:20–71:5, 72:9–21; Ex. 2 (Sowers Report) at ¶ 39.  There is also no way to know whether the participants were guessing when they answered the survey questions, as Judge Caproni found in a similar case excluding a survey that failed to define the terms "lifestyle" and "events."  *Edmondson*, 2020 WL 1503452, at *8.

The failure to define "artificial," or probe survey participants' understanding of the concept is even more problematic here, because Sowers' own understanding of those terms was circular.  When asked at his deposition, Sowers said "natural" means "not artificial" and "artificial" means "synthetic," which in turn means "not natural."  Ex. 1 (Sowers Tr.) 66:7–67:5.  Plugging this understanding of "natural" and "artificial" into Sowers' key question 5 yields a completely circular response:  "Based on the product packaging, do you believe the [toothpaste / deodorant] shown …. Contains only natural ingredients (*i.e.* no ~~artificial~~ not-natural ingredients)."  Given that Sowers was only attempting to validate Plaintiffs' theory of the case, it is not surprising that he sought to manipulate survey participants into agreeing to such circular logic.  But a question like that tells the trier of fact nothing helpful about what reasonable consumers think "natural" means, or whether they are deceived by Tom's "natural" representation.  *See KIND* 2022 WL 4125065 at *12.  The Court should also exclude Sowers' opinion for this reason.

> **C.   Sowers' Closed-Ended Question Did Not Give Participants "All Possible" Answer Choices and Forced Participants to Accept His Hypothesis.**

The Court should also exclude Sowers' opinions because he did not give participants a complete set of answer choices to his closed-ended question.  Case law and treatises on litigation survey design (cited by Sowers on page B-1 of his report) require that a comprehensive, exhaustive list of answers be provided to survey respondents when closed-ended questions are used to prevent the survey designer from suppressing meaningful answers and dictating the results.  *See* Ex. 11, Diamond, S., Reference Manual on Scientific Evidence, *Reference Guide on Survey Research* at 393 ("If the respondent is asked to choose one response from among several choices, the response chosen will be meaningful only if the list of choices is exhaustive."); *see also* Ex. 12 (Sowers Report, Appendix B).  Thus, a closed-ended question will be considered

"leading and suggestive" unless it "provide[s] respondents with *all possible options* to any question." *Proctor Gamble Pharms.*, 2006 WL 2588002, at *23 (excluding survey as biased and leading); *KIND*, 2022 WL 4125065, at *11 (finding that survey presenting "only one potential definition of 'All Natural'" and limiting participants to "finite choices" about its meaning was "insufficient to determine in any meaningful sense" how reasonable consumers understood the claim).

All of the answer choices to Sowers' key closed-ended question associated "natural" with some quantum of "artificial" ingredients (*i.e.*, no, some, or only "artificial ingredients"). He did not provide any other conceptions of "natural"—such as the one on Tom's website—as comparisons. Dennis did the same thing in his *KIND* survey. There, Dennis focused exclusively on whether consumers understood the phrase "All Natural" to mean that the product contained no "artificial or synthetic ingredients." *KIND*, 2022 WL 4125065, at *10–11. Judge Buchwald rightly rejected this approach, because there are many competing understandings of "natural," such as "preservative free," or "no added flavors" that Dennis should have shown to participants. *Id.* at *11. As the record in this case reflects, Plaintiffs, their experts, the government, industry groups, and the verbatim responses to Sowers' own surveys show that people have many different expectations for products labeled as "natural." *See* Tom's Summary Judgment Motion at 13–16. Worse, Sowers did not even leave space for respondents to disagree with the limited answer choices provided in Question 5. If a participant did not share the same ingredient-focused definition as Sowers', the only option would be for that person to select "No opinion" or "Don't know/Unsure"—even if that participant *did* know or *did* have an opinion—because there was no space for respondents to write in their own answers. Ex. 1 (Sowers Tr.) 166:21–167:7; 219:7–24.

\*     \*     \*

Like Dennis's survey in *KIND*, Sowers' surveys "do[] not assist the trier of fact" because they are "biased, leading, and to the extent [they] provide[] any insight, cannot provide the objective standard necessary to answer the key question in this case." *KIND*, 2022 WL 4125065, at *14.  Each of those flaws would alone be enough to warrant exclusion.  But taken together, "the cumulative effect of all of the flaws in [his] survey" is insurmountable. *Edmondson*, 2020 WL 1503452, at *6.

## CONCLUSION

For the foregoing reasons, the Court should exclude the opinions of Brian M. Sowers.


Dated: October 24, 2022

O'MELVENY & MYERS LLP

BY: */s/ Hannah Y. Chanoine*

Hannah Y. Chanoine
Gerard A. Savaresse
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524
Telephone: (212) 326-2128
Facsimile: (212) 326-2061
Email: hchanoine@omm.com
Email: gsavaresse@omm.com

Richard B. Goetz (pro hac vice)
Carlos M. Lazatin (pro hac vice)
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Telephone: (213) 430-6655
Facsimile: (213) 430-6407
Email: rgoetz@omm.com
Email: clazatin@omm.com

*Attorneys for Defendants Colgate-Palmolive
Co., and Tom's of Maine, Inc.*