# EXHIBIT 1

Page 1

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    Civil Case No. 1:16-CV-08364

     - - - - - - - - - - - - - - - - - - - - -x

4    ANNE DE LACOUR, ANDREA WRIGHT, AND LOREE

     MORAN individually and on behalf of all

5    others similarly situated,

6                     Plaintiffs,

7               -against-

8    COLGATE-PALMOLIVE CO. and TOM'S OF MAINE,

     INC.,

9

                      Defendants.

10   - - - - - - - - - - - - - - - - - - - - -x

11

12      VIDEOTAPED REMOTE DEPOSITION of

13   BRIAN SOWERS, an Expert Witness, located

14   in Acton, Massachusetts, commencing at

15   9:56 a.m., on Tuesday, September 13,

16   2022, taken before Dawn Matera, a

17   Shorthand Reporter and Notary Public of

18   the State of New York.

19

20

21

22

23

24

25

```
 1            BRIAN SOWERS
 2   take in marketing?                    10:27:11
 3      A.    There was a marketing        10:27:11
 4   communication class.  I think the market   10:27:15
 5   research course may have been part of my   10:27:22
 6   marketing concentration.  I don't     10:27:23
 7   remember.  It's been a while.  Those two   10:27:30
 8   for sure I remember.  But there were a   10:27:32
 9   number of others I had to complete for   10:27:34
10   the concentration.                    10:27:35
11      Q.    And why did you decide to get   10:27:40
12   an MBA?                               10:27:41
13      A.    I wanted to go back to school.   10:27:43
14   I wasn't quite sure what I wanted to do   10:27:46
15   at the time, but I knew that an MBA would   10:27:51
16   open more doors than simply having a   10:27:55
17   bachelor's degree.                    10:27:58
18      Q.    And then how did you get into   10:27:58
19   the world of litigation consulting?   10:27:59
20      A.    When I started at Applied    10:28:02
21   Marketing Science.                    10:28:06
22            So AMS is a full service market   10:28:06
23   research firm and they have two lines of   10:28:10
24   business.  One is the more traditional   10:28:14
25   market research, which is the experience   10:28:16
```

```
                                            Page 32

 1              BRIAN SOWERS

 2   I had previously, and they also have a      10:28:18

 3   practice in litigation support which I      10:28:20

 4   was not familiar with until I started at    10:28:23

 5   AMS.  And I started doing that and found    10:28:27

 6   that I really enjoyed that more than        10:28:28

 7   traditional market research and focused     10:28:30

 8   on that side of the business and have       10:28:32

 9   since then.                                 10:28:34

10       Q.    Understood.  So when you          10:28:35

11   started at AMS was the plan to work on      10:28:36

12   the marketing research side of business     10:28:42

13   and then you kind of segued into            10:28:46

14   litigation consulting or do I have that     10:28:49

15   wrong?                                      10:28:52

16       A.    I should clarify, they are both   10:28:52

17   market research.  Just what we call the     10:28:53

18   innovation does more traditional market     10:28:57

19   research.  The litigation side does         10:29:00

20   market research for litigation.  At the     10:29:01

21   time I started, people would work on both   10:29:03

22   sides of the business.  Since then it       10:29:06

23   shifted to where people work exclusively    10:29:09

24   on one side or the other.  And I think I    10:29:11

25   was part of that trend.                     10:29:16
```

```
                                            Page 33
 1            BRIAN SOWERS
 2            When I came over, I said I        10:29:17
 3   really want to focus on litigation.  So I  10:29:18
 4   think maybe, maybe for the first six       10:29:22
 5   months I was at AMS I kind of did both,    10:29:23
 6   but since then I have been working         10:29:25
 7   exclusively on the litigation side.        10:29:27
 8        Q.   You may have said this before,   10:29:34
 9   is there a reason why you wanted to focus  10:29:36
10   on the litigation side?                    10:29:37
11        A.   I think in a lot of traditional  10:29:43
12   market research you conduct research and   10:29:45
13   nothing really happens with it.  It just   10:29:47
14   sits on someone's shelf.  So I was drawn   10:29:49
15   to the litigation side because it's more,  10:29:53
16   I don't know, actionable, I guess.  The    10:29:58
17   results are being used for something.      10:29:59
18            And I also, really, kind of the   10:30:01
19   level of exactitude that the Courts        10:30:03
20   require for surveys for litigation just    10:30:07
21   suited my working style and my             10:30:10
22   preferences more.                          10:30:11
23        Q.   So at what point or in what      10:30:22
24   year did you start working exclusively on  10:30:24
25   litigation matters?                        10:30:28
```

```
                                          Page 34

 1                  BRIAN SOWERS
 2      A.    I started in November of 2011,      10:30:28
 3  so it would have been early 2012 where I      10:30:36
 4  started working exclusively for              10:30:38
 5  litigation.                                  10:30:40
 6      Q.    Okay.  So would it be fair to       10:30:42
 7  say, sir, that since 2012, litigation        10:30:43
 8  consulting has been your primary source      10:30:49
 9  of income?                                   10:30:54
10      A.    Yes.  I mean, working on that       10:30:55
11  side of the business, yes.                   10:30:58
12      Q.    Okay.  Do you have an estimate      10:30:58
13  of what percentage of your income is         10:31:00
14  derived from litigation consulting?          10:31:03
15      A.    Well, I mean, you know, I work      10:31:05
16  for AMS.  AMS pays me, not the litigation    10:31:08
17  practice.  But I am also a member of the     10:31:12
18  executive team at AMS.                       10:31:15
19           So I would say probably 80 to       10:31:17
20  85 percent of my time is spent on expert     10:31:20
21  work and 15 or 20 percent is spent on        10:31:22
22  kind of general firm management issues.      10:31:27
23  So I am also paid for that work as part      10:31:29
24  of my role.                                  10:31:34
25      Q.    Okay.  Is it two different         10:31:34
```

```
                                    Page 35
 1            BRIAN SOWERS
 2    paychecks?                        10:31:38
 3        A.    No, no.                 10:31:38
 4        Q.    Do you have any other source of   10:31:42
 5    income, other than your work at AMS?   10:31:44
 6        A.    No, I don't.            10:31:46
 7        Q.    Okay.  Do you have any other   10:31:46
 8    postgraduate degrees, sir?        10:31:52
 9        A.    No, I don't.            10:31:54
10        Q.    Have you considered going back   10:31:55
11    to school to obtain another degree?   10:31:59
12        A.    I don't think at this point in   10:32:02
13    my career it's necessary.  I have a   10:32:06
14    daughter about to go into college.  So   10:32:08
15    that expense consideration has shifted.   10:32:10
16        Q.    Okay.  Well, I guess do you   10:32:12
17    have any interest in it, sort of   10:32:16
18    academically?                     10:32:18
19        A.    I don't think so.  I think I   10:32:18
20    keep busy enough with my work and I enjoy   10:32:20
21    it, there is no need for me        10:32:24
22    professionally or I don't think I would   10:32:26
23    have the time to take on another degree,   10:32:27
24    either.                           10:32:30
25        Q.    Have you published -- have you   10:32:30
```

Page 36

1              BRIAN SOWERS
2   published any work, sir?                    10:32:37
3        A.    Just one.  I think on my CV      10:32:39
4   page A9, it's an article called "Surveys    10:32:51
5   in Lanham Act Matters."                     10:32:54
6        Q.    And that was in the IP           10:33:01
7   Litigator?                                  10:33:03
8        A.    That's correct.                  10:33:03
9        Q.    How did that article sort of     10:33:08
10  come about?                                 10:33:10
11       A.    I think I have taught a CLE      10:33:12
12  accredited course for many years on         10:33:15
13  surveys and litigation.  And somehow        10:33:18
14  someone from IP Litigator had heard about   10:33:20
15  it and reached out to me and some of my     10:33:23
16  colleagues to see if we would be            10:33:25
17  interested writing an article kind of       10:33:28
18  around similar topics we discussed in the   10:33:30
19  CLE course.                                 10:33:34
20       Q.    Have you published or            10:33:40
21  considered publishing in any academic       10:33:41
22  publications?                               10:33:43
23       A.    No.  I am a practitioner, not    10:33:44
24  an academic.  So my focus is more on        10:33:48
25  performing the research rather than         10:33:51

Page 37

```
 1              BRIAN SOWERS
 2  writing about it.                        10:33:53
 3      Q.    Do you keep abreast of academic   10:33:55
 4  literature on marketing research?        10:33:58
 5      A.    Yes, I do.                      10:34:02
 6      Q.    I guess which journals do you    10:34:03
 7  follow?                                  10:34:05
 8      A.    I think it's more, if you look   10:34:05
 9  at my affiliations, a lot of the best    10:34:11
10  practices from market research come      10:34:13
11  through them.                            10:34:15
12           So, for example, the American   10:34:17
13  Association for Public Opinion Research,  10:34:18
14  they publish a monthly journal with      10:34:22
15  articles and best practices for research. 10:34:23
16  And those tend to be academic articles.   10:34:26
17           The Insights Association also    10:34:31
18  publishes often on best practices for    10:34:34
19  research.                                10:34:37
20           And then again my involvement    10:34:37
21  with the International Trademark          10:34:38
22  Association, there are lots of -- they    10:34:40
23  publish a journal called the Trademark   10:34:46
24  Reporter which provides a lot of academic 10:34:48
25  research related to surveys for          10:34:50
```

```
                                        Page 38

  1              BRIAN SOWERS

  2   litigation.  Those are my primary        10:34:53

  3   sources.                                  10:34:55

  4          There are others that I see in     10:34:55

  5   courts, that sort of thing.  They will    10:34:58

  6   have the American Marketing Association   10:35:00

  7   will often publish papers.  It's a        10:35:03

  8   variety of sources.                       10:35:05

  9      Q.    And these professional           10:35:10

 10   affiliations, I see you're a member of   10:35:11

 11   two committees at INTA?                   10:35:17

 12      A.    That's correct.                  10:35:21

 13      Q.    And then you're also a chair of  10:35:22

 14   one of those two committees or that's a   10:35:25

 15   separate --                               10:35:28

 16      A.    I'm sorry, I should clarify.  I  10:35:28

 17   was a former member of the impact studies 10:35:30

 18   committee.  I am currently a member of    10:35:34

 19   the famous and well-known marks committee 10:35:36

 20   and as part of that committee I chair the 10:35:39

 21   dilution subcommittee.                    10:35:41

 22      Q.    Got it.  And then what sort of   10:35:42

 23   work do you do as chair of the dilution   10:35:44

 24   subcommittee?                             10:35:48

 25      A.    INTA is a global organization.   10:35:49
```

Page 39

                    BRIAN SOWERS

1

2   So within of the things that they try to        10:35:54

3   do is provide guidance to brand owners          10:35:56

4   globally.  And as part of the dilution          10:35:59

5   subcommittee, there is a lot of, I would        10:36:04

6   say maybe misunderstanding globally about       10:36:08

7   what dilution is and how it can be              10:36:11

8   applied.  The laws are different from           10:36:13

9   region to region and country to country.       10:36:14

10          So in this current term what we        10:36:17

11  are tying to do is come up with some            10:36:19

12  general recommendations where INTA              10:36:22

13  advocate for brand owners in certain            10:36:27

14  countries to clarify laws around dilution       10:36:30

15  or in some countries advocate for               10:36:32

16  establishing dilution as a legal                10:36:37

17  strategy.  So it's a lot of kind of             10:36:39

18  coordinating globally in trying to get a        10:36:41

19  consensus on what the law should be.            10:36:46

20     Q.    Okay.  And then do you issue           10:36:48

21  any papers or recommendations as part of        10:36:52

22  your work on the dilution subcommittee?         10:36:56

23     A.    Yes.  Right now there are five         10:36:59

24  working groups that I manage in the             10:37:05

25  subcommittee.  The output from each of          10:37:07

Page 40

BRIAN SOWERS

1

2   those committees, some will be a paper.          10:37:08

3   Some will be an article.  Some will            10:37:11

4   simply be recommendations into leadership      10:37:13

5   about strategies they might do.  But I         10:37:15

6   think for at least one of the working          10:37:19

7   groups, the output is expected to be an        10:37:21

8   article in the Trademark Reporter              10:37:23

9   magazine.                                      10:37:25

10      Q.    And what's the Insights              10:37:32

11  Association?                                   10:37:34

12      A.    It's a group of market research      10:37:34

13  professionals and across the spectrum of       10:37:41

14  market research professionals.  So it          10:37:42

15  could be people doing research for             10:37:46

16  litigation.  People doing general market       10:37:47

17  research.  Political polling, that sort        10:37:49

18  of thing.  They establish kinds of best        10:37:52

19  practices for the way research is              10:37:54

20  conducted.                                     10:37:57

21          They establish, for example,           10:37:58

22  the protocol for maintaining respondent        10:37:59

23  confidentiality, that sort of thing.           10:38:03

24  It's kind of a self-regulating industry,       10:38:06

25  so that everyone knows the rules and they      10:38:10

```
                                        Page 41
 1               BRIAN SOWERS
 2   update them constantly, so that everyone        10:38:11
 3   is really following best practices when         10:38:13
 4   conducting research regardless of the,          10:38:17
 5   you know, of the venue.                         10:38:20
 6       Q.    Okay.  And I guess what is your       10:38:22
 7   affiliation with the Insights                   10:38:25
 8   Association?                                    10:38:27
 9       A.    The Insights, I am a member.  I       10:38:27
10   simply read the materials they put out.         10:38:32
11   Occasionally I will go to some of their         10:38:35
12   conferences.  That sort of thing.               10:38:37
13       Q.    Okay.  And as a member you pay        10:38:39
14   dues?                                           10:38:41
15       A.    Yes, that's correct.                  10:38:41
16       Q.    Then what about the AAPOR, what       10:38:46
17   is your affiliation with that                   10:38:49
18   organization?                                   10:38:51
19       A.    Similar to the Insights              10:38:51
20   Association.  I think unlike the Insights       10:38:54
21   Association, the AAPOR is more academic.        10:38:57
22            Like I said, they publish a            10:39:04
23   monthly journal where they will, mostly         10:39:05
24   peer-reviewed articles related to new           10:39:09
25   developments in market research.  So it's       10:39:11
```

```
                                       Page 42
 1              BRIAN SOWERS
 2   a way to keep on top of kind of what's        10:39:13
 3   happening in the academic world, I would      10:39:19
 4   say.                                           10:39:21
 5        Q.    Okay.  And other than these         10:39:21
 6   professional affiliations, do you keep         10:39:22
 7   abreast of other academic journals or          10:39:25
 8   peer-reviewed publications on marketing        10:39:30
 9   research or consumer psychology?               10:39:32
10        A.    Again, you know, the American       10:39:34
11   Marketing Association will often publish       10:39:39
12   articles or journals and I often see           10:39:46
13   those.                                          10:39:47
14              For purposes of what I do,          10:39:48
15   there are a series of treatises and books      10:39:50
16   and articles specifically about survey         10:39:52
17   for litigation.  I tend to keep more up        10:39:55
18   to date with that because it's more            10:40:03
19   relevant for the type of work I am doing.      10:40:05
20        Q.    Okay.  And some of those you        10:40:07
21   cited in your report in this case; is          10:40:09
22   that right?                                     10:40:11
23        A.    That's correct.                     10:40:11
24        Q.    Are you familiar with the           10:40:11
25   Journal of Marketing Research?                 10:40:22
```

```
                                        Page 43
 1              BRIAN SOWERS
 2      A.    I am, yes.                    10:40:22
 3      Q.    What do you understand that   10:40:23
 4   publication to be?                     10:40:25
 5      A.    It's a journal of peer-reviewed 10:40:25
 6   research that's published.  I read     10:40:30
 7   articles from that before.             10:40:32
 8      Q.    And do you have a view on the 10:40:34
 9   articles in the Journal of Marketing   10:40:37
10   Research?                              10:40:39
11      A.    I think they are peer-reviewed 10:40:39
12   so that lends to it certain credibility. 10:40:45
13   They are not always relevant for surveys 10:40:48
14   for litigation.                        10:40:50
15           So, you know, I read the ones  10:40:50
16   that are most relevant to litigation.  10:40:52
17   Others are more kind of hypothetical and 10:40:55
18   don't really apply to what I do.  So I 10:41:01
19   only read really the articles that apply 10:41:03
20   to what I do.                          10:41:05
21      Q.    And can you think of an article 10:41:06
22   that you read from the Journal of      10:41:09
23   Marketing Research that was relevant to 10:41:11
24   what you do?                           10:41:12
25      A.    Not recently.  Again, most of 10:41:13
```

Page 44

1                    BRIAN SOWERS

2     the literature I rely on is literature        10:41:19

3     specifically used for surveys in             10:41:22

4     litigation.  It's been a while.              10:41:24

5         Q.    Okay.  And are you familiar         10:41:25

6     with the Journal of Consumer Psychology?     10:41:26

7         A.    I may have heard of it.  Not        10:41:30

8     something that I read.                        10:41:33

9         Q.    Okay.  What about the Journal       10:41:34

10     of Consumer Research?                         10:41:37

11         A.    Again, I heard of it.  But it's    10:41:37

12     less relevant to surveys used for            10:41:42

13     litigations and not something I pay a lot    10:41:44

14     of attention to unless something pops up.    10:41:48

15         Q.    And when you say it's not          10:41:50

16     relevant to surveys used for litigations,    10:41:52

17     what do you mean by that?                     10:42:01

18         A.    I mean sometimes these articles    10:42:03

19     can be about research that just doesn't      10:42:05

20     apply to litigation research.  It might      10:42:08

21     be about best practices for concept         10:42:10

22     testing, or what purchase intents scale     10:42:13

23     to use when you're doing a multicountry     10:42:19

24     survey.  None of that is really            10:42:22

25     applicable to a deceptive advertising       10:42:24

Page 45

```
 1              BRIAN SOWERS
 2    survey, for example.                    10:42:28
 3       Q.    And I guess, how do you know    10:42:42
 4    whether an article is relevant for      10:42:43
 5    litigation surveys?                     10:42:48
 6       A.    Typically, if I see something I 10:42:49
 7    will look at that and it will, you      10:42:54
 8    know -- again, for litigation surveys, I 10:42:56
 9    don't conduct litigation surveys in Asia, 10:43:01
10    for example, I just don't.  So if it's an 10:43:04
11    article about emerging research issues in 10:43:06
12    Asia, that is not something that I am    10:43:08
13    going to pay attention to.              10:43:10
14            It's really if an article comes  10:43:11
15    about that could potentially apply to   10:43:13
16    what I do for litigation surveys.  Then I 10:43:15
17    would probably read it.                 10:43:18
18       Q.    What about the Journal of the   10:43:24
19    Association For Consumer Research, are   10:43:30
20    you familiar with that publication?     10:43:31
21       A.    I am not sure I heard of that   10:43:34
22    one before, no.                         10:43:35
23       Q.    Have you, I guess, on your --   10:43:36
24    let me start the question over, sorry   10:43:41
25    about that.                             10:43:42
```

```
                                      Page 46
 1              BRIAN SOWERS
 2      A.    Sure.                        10:43:43
 3      Q.    On your CV, you have listed a  10:43:44
 4  presentation here "Emerging issues       10:43:46
 5  related to the use of surveys in IP       10:43:49
 6  matters"?                                 10:43:53
 7      A.    Yes.                            10:43:53
 8      Q.    Other than that presentation,  10:43:53
 9  have you conducted any other              10:43:56
10  presentations on survey issues?          10:43:58
11      A.    Yeah.  As I mentioned before -- 10:44:02
12  we didn't do it this year but typically  10:44:10
13  AMS puts on a yearly webinar that is a    10:44:13
14  CLE-accredited webinar on the topic of    10:44:16
15  surveys for IP matters.                   10:44:20
16          So in the past maybe, five or     10:44:22
17  six years we've typically put that on     10:44:23
18  annually.                                 10:44:26
19      Q.    And the CLE is for lawyers?     10:44:29
20      A.    Yes.                            10:44:30
21      Q.    So you've listed sort of, you   10:44:39
22  know, a significant number of matters     10:44:41
23  here for which you either provided an     10:44:51
24  expert report or testimony in the last    10:44:53
25  five years.  And then, you know, the      10:44:54
```

```
                                      Page 47
 1              BRIAN SOWERS
 2   eight that we discussed, sort of at the      10:44:58
 3   beginning of your deposition.  Are there     10:45:00
 4   any other expert opinions or testimony       10:45:02
 5   that you provided in the last five years     10:45:07
 6   that aren't listed in this appendix to       10:45:09
 7   your report in this case?                    10:45:13
 8       A.    No.  Other than those eight        10:45:15
 9   that we discussed already, everything        10:45:20
10   else is accurate.                            10:45:22
11       Q.    And then you provided sort of      10:45:26
12   descriptors here for each of these cases;    10:45:30
13   false advertising, secondary meaning,        10:45:33
14   trademark confusion.  Is there a reason      10:45:37
15   that you provided that?                      10:45:41
16       A.    Some of that is for my own         10:45:45
17   reference when I am asked about it.  Some    10:45:46
18   is, you know, is the trier of fact or        10:45:50
19   whoever may want to see my experience may    10:45:56
20   see the types of cases that I worked on      10:45:58
21   in the past.                                 10:46:01
22       Q.    Are there differences in the       10:46:07
23   kind of surveys or opinions or testimony     10:46:10
24   that you would provide in a trademark        10:46:11
25   confusion case than you would in a false     10:46:13
```

```
                                      Page 48

 1              BRIAN SOWERS

 2   advertising case?                        10:46:15

 3      A.    The surveys themselves follow   10:46:16

 4   generally best practices of survey       10:46:23

 5   research.  The setup of the surveys, the 10:46:25

 6   way that the survey is constructed       10:46:27

 7   between a confusion survey, for example, 10:46:31

 8   and a false advertising are different.   10:46:34

 9      Q.    And what sort of case or how    10:46:36

10   would you characterize this case, the de 10:46:40

11   Lacour case?                             10:46:43

12      A.    False advertising case.         10:46:43

13      Q.    In the last five years, how     10:46:50

14   many false advertising cases did you     10:46:52

15   provide expert opinion or testimony in?  10:46:56

16      A.    On my CV 15 and then obviously  10:47:49

17   this case and the two additional cases,  10:47:52

18   so 18 in the last five years.            10:47:54

19      Q.    And in those 18 cases, has a    10:47:56

20   Court ever excluded or declined to       10:48:00

21   consider one of your opinions?           10:48:02

22      A.    No, they have not.              10:48:04

23      Q.    And has that ever happened to   10:48:12

24   you historically?                        10:48:14

25      A.    There was one case where I had  10:48:14
```

```
                                        Page 49

 1              BRIAN SOWERS
 2    a portion of my testimony excluded but      10:48:17
 3    not the full opinion.                       10:48:19
 4        Q.    What case was that?               10:48:20
 5        A.    It's Hilsinger versus Kleen       10:48:22
 6    Concepts.                                   10:48:25
 7        Q.    And what sort of case was that?   10:48:25
 8        A.    It was a trademark confusion,     10:48:27
 9    likelihood of confusion survey.  And in     10:48:31
10    this particular case I had added a          10:48:33
11    question at the end of the confusion        10:48:35
12    survey that really wasn't relevant to the   10:48:37
13    issue of likelihood of confusion.  And I    10:48:40
14    testified truthfully in deposition that I   10:48:42
15    had not used that type of test to test      10:48:47
16    for confusion and it was irrelevant for     10:48:50
17    purposes of my opinion.                     10:48:52
18           So the Court said I could not        10:48:54
19    testify on that one question but allowed    10:48:55
20    my likelihood of confusion report in.       10:48:58
21        Q.    Are there any other cases where   10:49:02
22    a Court has excluded or declined to         10:49:04
23    consider one of your opinions?              10:49:06
24        A.    Not that I am aware of, no.       10:49:06
25        Q.    Does the Lodestar Anstalt case    10:49:09
```

```
                                        Page 50

 1                BRIAN SOWERS
 2   ring a bell with you?                    10:49:18
 3       A.    It does, yes.                  10:49:19
 4       Q.    So did the Court in that case  10:49:21
 5   decline to consider your opinion?        10:49:26
 6       A.    I have always been unclear on  10:49:28
 7   this one.  It's my understanding that    10:49:32
 8   they didn't.                             10:49:33
 9            There was a procedural issue on 10:49:34
10   what the discovery period was and they   10:49:36
11   were -- the other side was saying that my 10:49:42
12   report was submitted, I think after      10:49:44
13   discovery closed.  Lodestar was saying   10:49:46
14   that it wasn't because of some           10:49:49
15   stipulation that I am not sure of.       10:49:51
16            I think they settled before     10:49:52
17   that was ever resolved.  But to the      10:49:53
18   extent it was, it was more of a          10:49:57
19   procedural issue and nothing to do with  10:49:59
20   my survey itself.                        10:50:02
21       Q.    Got it.  So wasn't sort of the 10:50:04
22   merit or methodology that was challenged 10:50:05
23   there.  It was just a procedural issue   10:50:08
24   that the lawyers sorted out?             10:50:11
25       A.    That's correct.  And my        10:50:14
```

```
                                        Page 51
 1                   BRIAN SOWERS
 2   understanding is that the case settled      10:50:17
 3   before it ever got resolved.                10:50:19
 4       Q.    Okay.  And sir, I guess, how      10:50:21
 5   would you describe your field of            10:50:24
 6   expertise?  What are you an expert in?      10:50:28
 7       A.    I am a survey expert, and         10:50:29
 8   particularly when it comes to consumer      10:50:33
 9   perceptions, behaviors and opinions.        10:50:35
10       Q.    And how did you develop that      10:50:38
11   expertise?                                  10:50:44
12       A.    Through the almost 30 years of    10:50:45
13   market research experience that I have.     10:50:48
14   The last 10 working on surveys             10:50:52
15   exclusively for litigation and some of my  10:50:53
16   graduate level course work.                10:50:59
17       Q.    As part of your graduate level    10:51:03
18   course work, did you -- did you design or   10:51:08
19   execute any consumer research surveys?      10:51:14
20       A.    I did.  There was one course, a   10:51:17
21   market research methods course, and we      10:51:21
22   developed a survey as part of the course    10:51:23
23   itself.                                     10:51:29
24       Q.    So just the one survey?           10:51:29
25       A.    Yes.  It was like a semester-     10:51:31
```

Page 52

```
 1              BRIAN SOWERS
 2   long project to develop a survey; execute    10:51:36
 3   it, analyze it and provide the reporting     10:51:40
 4   to the professor.                            10:51:41
 5       Q.   Are you a marketing expert,         10:51:44
 6   sir?                                         10:51:52
 7       A.   I am a survey expert, not a         10:51:52
 8   marketing expert.                            10:51:55
 9       Q.   Okay.                               10:51:55
10            MR. SAVARESSE:  So we have been     10:52:15
11       going about an hour here, maybe a        10:52:16
12       little bit less.  You know, we'll try    10:52:19
13       to take breaks every hour or so if       10:52:20
14       that works for you.  Now is a good       10:52:23
15       time for me to break.  I am about to     10:52:27
16       start a new topic.  But if you would     10:52:29
17       like to keep going, I am happy to stay   10:52:31
18       on.                                      10:52:33
19            THE WITNESS:  No, that's fine.      10:52:33
20       If we can do a five or 10-minute         10:52:35
21       break, that's great.                     10:52:37
22            MR. SAVARESSE:  Let's go off the    10:52:38
23       record.                                  10:52:39
24            THE VIDEOGRAPHER:  Now going off    10:52:39
25       the record at approximately 10:52 a.m.   10:52:40
```

Page 53

```
 1            BRIAN SOWERS
 2            (Off the record.)                    11:00:44
 3            THE VIDEOGRAPHER:  This is the       11:00:44
 4      beginning of media two, we are going      11:00:46
 5      back on the record at approximately 11     11:00:47
 6      a.m.  Go ahead, Counsel.                   11:00:49
 7            MR. SAVARESSE:  All right.           11:00:52
 8      Thank you, Kevin.  And welcome back        11:00:52
 9      everyone.  Welcome back, Mr. Sowers.       11:00:55
10   BY MR. SAVARESSE:
11      Q.    I know I mentioned that we were      11:00:57
12   going to be moving on to a new topic.         11:00:59
13   But just a quick follow-up question.          11:01:01
14            I think you mentioned you had        11:01:04
15   testified about or offered opinions in 15     11:01:07
16   false advertising cases in the last five      11:01:12
17   years?                                        11:01:16
18      A.    Yes, that was my count.              11:01:16
19      Q.    Do you know how many of those        11:01:20
20   cases involved consumer packaged goods?       11:01:22
21      A.    Hang on one second.                  11:01:26
22            Two of those.                        11:02:26
23      Q.    And does that include this           11:02:27
24   case?                                         11:02:31
25      A.    No, not including this case,         11:02:31
```

```
 1              BRIAN SOWERS
 2   too.  Two others.                        11:02:34
 3      Q.    So three total in the last five  11:02:35
 4   years.  Are there any others that you can 11:02:37
 5   think of that aren't on your CV here?     11:02:43
 6      A.    Not as I sit here.  I think      11:02:45
 7   those are the only two others that I am   11:02:54
 8   aware of.                                 11:02:56
 9      Q.    All right.  So I marked the      11:02:57
10   next exhibit to your deposition, sir.    11:03:02
11   It's Sowers Exhibit 3.  It should look   11:03:05
12   familiar to you, but I will give you a   11:03:10
13   second to pull it up.  It's a big        11:03:11
14   document.                                11:03:13
15            (Sowers Exhibit 3, Expert
16       report, was so marked for
17       identification, as of this date.)   11:03:14
18      A.    Yes, I have now.                 11:03:22
19      Q.    Do you recognize Exhibit 3 to    11:03:24
20   your deposition, sir?                    11:03:26
21      A.    It appears to be my expert      11:03:27
22   report.                                  11:03:28
23      Q.    Just for the record, do you     11:03:33
24   want to take a quick spin through it and 11:03:34
25   make sure your initial impression is     11:03:39
```

```
                                        Page 55
1            BRIAN SOWERS
2   correct?                              11:03:42
3      A.    Sure.                        11:03:43
4            (Witness reviews document.)  11:03:43
5      A.    Yes, it appears to be.       11:04:13
6      Q.    So I understand you have a   11:04:15
7   printed copy of this report in front of  11:04:16
8   you as well.  You're welcome to refer to  11:04:18
9   that.  It's not a memory test today.  11:04:21
10           I'll just ask you before we get  11:04:28
11  into it, when were you retained in this  11:04:29
12  matter?                               11:04:32
13     A.    May of 2022.                 11:04:33
14     Q.    And what was the scope of your  11:04:37
15  assignment?                           11:04:39
16     A.    I was asked to conduct two   11:04:40
17  surveys.                              11:04:42
18     Q.    And what specifically were you  11:04:47
19  asked to survey?                      11:04:49
20     A.    Let me just go to the report.  11:04:50
21  As I state in paragraph 7, to design and  11:05:03
22  conduct two consumer surveys.  The first  11:05:05
23  to test whether the "natural"         11:05:09
24  representation on the Tom's toothpaste  11:05:10
25  packaging communicates to relevant    11:05:16
```

```
                                        Page 62
 1              BRIAN SOWERS
 2   purchase any toothpaste or any deodorant,    11:12:08
 3   I would asking people's perceptions about    11:12:10
 4   products that they may never consider        11:12:12
 5   purchasing, which would be inappropriate     11:12:14
 6   from the survey perspective.                 11:12:16
 7       Q.    So you excluded from your          11:12:18
 8   toothpaste survey individuals who would      11:12:24
 9   not consider purchasing natural              11:12:31
10   toothpaste within the next six months?       11:12:34
11       A.    An individual who did not          11:12:36
12   indicate that they would be willing to       11:12:39
13   purchase natural toothpaste or deodorant     11:12:40
14   in the past six months would not qualify,    11:12:42
15   that's correct.                              11:12:45
16       Q.    Okay.  Is it possible that your    11:12:46
17   survey excluded consumers of Tom's           11:12:51
18   toothpaste or deodorants?                    11:12:57
19       A.    Again, as I said before, had I     11:12:58
20   screened broadly like that, the bigger       11:13:04
21   issue would have been that I would have      11:13:06
22   likely included people in the survey who     11:13:07
23   would never purchase Tom's products and      11:13:10
24   then I am asking questions and asked them    11:13:13
25   their perceptions on a product they might    11:13:14
```

```
                                    Page 63

 1              BRIAN SOWERS
 2   never purchase.                          11:13:17
 3           So I don't know if "excluded"    11:13:18
 4   is the right word.  I think I accurately 11:13:22
 5   defined the universe to get those most   11:13:23
 6   likely to purchase the products at issue.11:13:26
 7      Q.   Okay.  Let me try to ask the     11:13:30
 8   question again because I am not sure      11:13:32
 9   you've answered it.                       11:13:35
10      A.   Sure.                            11:13:36
11      Q.   I am asking is it possible that  11:13:36
12   your survey excluded consumers of Tom's  11:13:39
13   toothpastes or deodorants?               11:13:44
14      A.   I think there is a slight        11:13:46
15   chance that there may be people who would 11:13:52
16   purchase.  But -- and the important part  11:13:54
17   here is that the bigger issue is had I    11:13:59
18   done that, I would have gone overbroad in 11:14:02
19   my definition and I would have included   11:14:04
20   people who wouldn't have qualified.       11:14:06
21           Based on the way that I screen   11:14:08
22   for my survey, which is appropriate, I    11:14:10
23   can be confident that the people I am     11:14:11
24   interviewing are the types of consumers   11:14:13
25   who would be likely to consider           11:14:15
```

```
                                        Page 64
 1              BRIAN SOWERS
 2   purchasing Tom's, whereas what you were        11:14:17
 3   suggesting would not, which would have         11:14:20
 4   been a significant flaw.                       11:14:22
 5       Q.    So I think you started              11:14:23
 6   answering the question and then it sort        11:14:31
 7   of broke off.  So I will try one more          11:14:34
 8   time.                                          11:14:37
 9            Sir, is it possible that your         11:14:38
10   survey screening questions excluded            11:14:46
11   consumers who were likely to purchase          11:14:48
12   Tom's toothpaste or deodorant in the next      11:14:53
13   six months?                                    11:14:56
14            MS. WESTCOT:  Objection.  Asked       11:14:57
15       and answered.                              11:14:58
16       A.    I think maybe -- I will try to      11:14:59
17   rephrase it a different way.                   11:15:01
18            If I had excluded anyone it was       11:15:05
19   only in an effort to avoid having an           11:15:08
20   overbroad survey universe which would          11:15:10
21   have certainly included people who were        11:15:12
22   not relevant consumers.  So what I have        11:15:14
23   is a very targeted and appropriate survey      11:15:17
24   universe.                                      11:15:19
25       Q.    Okay.  So that's the third time     11:15:20
```

```
                                      Page 65

 1              BRIAN SOWERS
 2   I asked the question and I don't believe      11:15:22
 3   you answered it, sir.  So I am just going     11:15:24
 4   to move on.  And I'll assume that you         11:15:26
 5   don't know whether your survey excluded       11:15:29
 6   purchasers of Tom's toothpaste or             11:15:33
 7   deodorant.                                     11:15:38
 8      A.    Well --                              11:15:39
 9           MS. WESTCOT:  Objection.  This        11:15:39
10      is a little argumentative,                 11:15:40
11      Mr. Savaresse.  Is there a pending         11:15:46
12      question?                                  11:15:46
13           MR. SAVARESSE:  No, there is no       11:15:48
14      question, Sarah.                           11:15:49
15      A.    And I thought I answered your        11:15:50
16   question.  I am trying to answer it.  I       11:15:51
17   apologize if it's not coming across           11:15:53
18   clearly.                                       11:15:55
19           But as I said, my survey             11:15:56
20   universe is appropriately defined for the    11:15:59
21   research question I'm asking.                  11:16:03
22      Q.    Okay.  So just turning back to       11:16:04
23   your paragraph 7, you say that you            11:16:10
24   "tested whether the toothpaste or            11:16:22
25   deodorant packaging communicates to          11:16:24
```

Page 66

BRIAN SOWERS

1
2    relevant consumers that the product          11:16:26
3    contains only natural ingredients (i.e.,     11:16:29
4    no artificial ingredients)."                 11:16:32
5         Is that right?                          11:16:38
6    A.    That's correct.                        11:16:39
7    Q.    So what are natural                    11:16:40
8    ingredients?                                 11:16:42
9    A.    What I said, i.e., no                  11:16:42
10   artificial ingredients.                      11:16:47
11   Q.    So a natural ingredient is one         11:16:55
12   that is not an artificial ingredient?        11:16:58
13   A.    That's my understanding based          11:17:00
14   on plaintiffs' allegation, yes.              11:17:02
15   Q.    Did you do any additional              11:17:04
16   research to determine what a natural         11:17:10
17   ingredient was?                              11:17:12
18   A.    I am not a chemist.  That's            11:17:13
19   outside the scope of my assignment.  But     11:17:15
20   this is the allegation that plaintiffs       11:17:21
21   have made and I was simply testing their     11:17:23
22   allegation.                                  11:17:25
23   Q.    Okay.  And what is an                  11:17:25
24   artificial ingredient?                       11:17:31
25   A.    It's my understanding it's one        11:17:32

```
                                            Page 67
 1              BRIAN SOWERS
 2   that is, something that is synthetic or      11:17:34
 3   chemically processed.                        11:17:39
 4       Q.   What does synthetic mean?           11:17:46
 5       A.   Artificial.  Not natural.           11:17:48
 6       Q.   So help me out here, sir.  A        11:17:54
 7   natural ingredient is one that is not        11:18:10
 8   artificial; is that your testimony?          11:18:13
 9       A.   That's my understanding based       11:18:13
10   on plaintiffs' allegations, yes.             11:18:14
11       Q.   An artificial ingredient is one     11:18:20
12   that is not synthetic?                       11:18:22
13       A.   No, an artificial ingredient is     11:18:23
14   one that is synthetic or chemically          11:18:26
15   processed.                                   11:18:29
16       Q.   Apologies.  So an artificial        11:18:30
17   ingredient is one that is synthetic?         11:18:32
18       A.   That is my understanding, yes.      11:18:34
19       Q.   And a synthetic ingredient is       11:18:36
20   one that is artificial or not natural?       11:18:38
21       A.   Artificial.                         11:18:44
22       Q.   Okay.  Anything else, sir?          11:18:44
23       A.   That's my understanding.            11:18:49
24       Q.   And what's a chemically             11:18:55
25   processed ingredient?                        11:18:56
```

Page 68

1              BRIAN SOWERS

2      A.    Again, I am not a chemist.         11:18:58

3    This is based on my understanding of the    11:19:01

4    facts of the case.  But one that goes       11:19:03

5    through a process in which the chemical      11:19:05

6    compound is broken down into a different     11:19:08

7    type of compound.                            11:19:11

8      Q.    I understand that you're not a       11:19:18

9    scientist.  So are you saying that there     11:19:20

10   is a change in chemical structure, and       11:19:28

11   that's what chemical processing is?          11:19:31

12            MS. WESTCOT:  Objection to form.    11:19:35

13       This is outside the scope of             11:19:36

14       Mr. Sowers's report.                     11:19:38

15      A.    Yeah.  It's really just based       11:19:40

16   on my understanding of the facts.  I have    11:19:43

17   done no research on what that is.  But       11:19:45

18   it's my understanding that it takes a        11:19:47

19   chemical compound and through a process      11:19:49

20   of something turns it into a different       11:19:51

21   type of compound.                            11:19:54

22      Q.    Okay.  So I'm asking because        11:19:59

23   your testimony today is that an              11:20:00

24   artificial ingredient is one that is         11:20:04

25   chemically processed?                        11:20:07

```
                                      Page 69
 1            BRIAN SOWERS
 2            MS. WESTCOT:  Objection.        11:20:08
 3     Q.    I am asking you what you mean    11:20:10
 4   by that?                                 11:20:11
 5            MS. WESTCOT:  Objection to form.  11:20:12
 6       Asked and answered.  Misstates his   11:20:13
 7       prior testimony.                     11:20:14
 8     A.    It's my understanding that an    11:20:18
 9   artificial ingredient is one that is     11:20:20
10   synthetic or has been chemically         11:20:22
11   processed.                               11:20:24
12     Q.    Okay.  And I am just trying to   11:20:25
13   understand, sir, what you mean when you  11:20:27
14   say "chemically processed"?              11:20:28
15            MS. WESTCOT:  Objection.  Asked 11:20:30
16       and answered.                        11:20:31
17     A.    It's my understanding, I am not  11:20:32
18   providing an opinion in my report on what 11:20:34
19   chemically processed is.  It's simply my 11:20:37
20   understanding from the complaint that    11:20:38
21   it's a process in which a chemical       11:20:42
22   compound is broken down and transformed  11:20:44
23   into some other type of compound.        11:20:47
24            That may not be the accurate    11:20:49
25   statement, but that's my non-scientific  11:20:50
```

```
                                            Page 70

 1                  BRIAN SOWERS
 2   understanding of what it is.  That that      11:20:53
 3   would be considered artificial.             11:20:58
 4      Q.    So did you do any additional       11:21:00
 5   research to determine what a natural        11:21:04
 6   ingredient is other than reading the        11:21:06
 7   complaint?                                  11:21:08
 8      A.    I think the complaint lays out     11:21:09
 9   the allegation that plaintiffs have made    11:21:16
10   here.  I am testing the allegations         11:21:18
11   alleged in the complaint.  So I am using    11:21:20
12   that as the facts of the case.             11:21:22
13      Q.    Okay.  And so how did you test     11:21:24
14   the allegation about what natural           11:21:28
15   ingredient means?                           11:21:34
16      A.    Well, I tested natural             11:21:34
17   ingredient, i.e., no artificial            11:21:41
18   ingredients.  So my surveys answer that     11:21:43
19   question.                                   11:21:46
20      Q.    Well, so did you ask consumers     11:21:49
21   what they thought the words "natural        11:21:52
22   ingredients" mean?                          11:21:54
23      A.    My assignment wasn't to ask        11:21:56
24   consumers what they think "natural"         11:22:01
25   means.  My assignment was to test whether   11:22:03
```

Page 71

```
 1              BRIAN SOWERS
 2    consumers take away the belief that the      11:22:06
 3    products contain only natural               11:22:08
 4    ingredients, that is no artificial          11:22:11
 5    ingredients.                                11:22:13
 6        Q.    I understand that.  I guess I      11:22:13
 7    am asking whether you tested whether        11:22:16
 8    consumers believe that natural              11:22:18
 9    ingredients mean no artificial              11:22:20
10    ingredients?                                11:22:25
11              MS. WESTCOT:  Objection.  Asked    11:22:25
12        and answered.                           11:22:26
13        A.    That's what question 5 in both    11:22:27
14    of my surveys specifically is designed to   11:22:29
15    do.                                         11:22:32
16        Q.    Other than question 5, did you    11:22:33
17    ask consumers whether natural ingredients   11:22:39
18    means artificial ingredients?               11:22:43
19              MS. WESTCOT:  Objection.  Asked    11:22:45
20        and answered.                           11:22:46
21        A.    Question 5 in both surveys is     11:22:47
22    what I base my opinion on.                  11:22:53
23              I guess maybe I don't             11:22:54
24    understand your question.  But those are    11:22:55
25    the questions I relied on for purposes of   11:22:57
```

Page 72

```
 1              BRIAN SOWERS
 2   my opinion.                              11:22:59
 3       Q.   I am asking, sir, whether you  11:22:59
 4   relied on anything else?                 11:23:01
 5            MS. WESTCOT:  Objection.  Asked 11:23:03
 6       and answered.                        11:23:03
 7       A.   For purposes of my opinion      11:23:04
 8   question 5 is what I base my opinion on. 11:23:08
 9       Q.   Did you attempt to determine    11:23:34
10   what consumers believe an artificial     11:23:36
11   ingredient is?                           11:23:38
12            MS. WESTCOT:  Objection.  Asked 11:23:39
13       and answered.                        11:23:40
14       A.   Question 5 covers that.  I      11:23:41
15   guess to the extent you're asking, I     11:23:49
16   pretested the survey and no one had any  11:23:52
17   misunderstanding of what I meant by      11:23:54
18   either "natural" or "artificial," if     11:23:55
19   that's what you're asking.  But for      11:23:57
20   purposes of my opinion, I rely on        11:23:59
21   question 5.                              11:24:01
22       Q.   And did you ask anyone, any     11:24:02
23   consumers, what they understood          11:24:06
24   artificial ingredient to mean?           11:24:08
25       A.   That's question 5.  Artificial 11:24:10
```

```
                                      Page 73

 1                   BRIAN SOWERS
 2    means -- no artificial means only natural      11:24:18
 3    inhibitors, that's what's tested in Q5.        11:24:22
 4        Q.    Other than question 5, did you       11:24:26
 5    ask any consumers what they understand         11:24:27
 6    the term "artificial ingredient" to mean?      11:24:29
 7              MS. WESTCOT:  Objection.  Asked       11:24:32
 8        and answered.                              11:24:33
 9        A.    Again, I pretested both of the       11:24:34
10    surveys.  I have no respondents in the         11:24:36
11    pretest indicate that they didn't             11:24:39
12    understand what I meant by it.  So there       11:24:41
13    is nothing to suggest that people didn't       11:24:44
14    understand what it meant.                      11:24:45
15        Q.    Okay.  And in your pretest, did      11:24:49
16    you ask the respondents what they              11:24:51
17    understood the term "artificial               11:24:54
18    ingredient" to mean?                           11:24:55
19        A.    We asked whether there were any      11:24:56
20    questions or wording that they didn't          11:24:59
21    understand or had a hard time answering.       11:25:01
22    No one indicated that they didn't             11:25:04
23    understand what natural or artificial         11:25:05
24    ingredients meant in the pretest.              11:25:07
25        Q.    And did you ask them                 11:25:09
```

```
                                        Page 74
 1              BRIAN SOWERS
 2   specifically whether they understood what   11:25:10
 3   those terms mean?                           11:25:13
 4      A.    That's not how a pretest works.    11:25:13
 5   We ask it in a broad way, if there are      11:25:18
 6   any words that they didn't understand.      11:25:20
 7   If they didn't understand natural,          11:25:22
 8   artificial, they could have brought it up   11:25:23
 9   in the pretest.                             11:25:25
10          And typically in a pretest, if       11:25:26
11   someone doesn't understand a term, we ask   11:25:27
12   what would be a better term to use here,    11:25:29
13   something that you would have understood.   11:25:32
14   No one mentioned anything about not         11:25:34
15   understanding it.  So there is no reason    11:25:37
16   to believe that they didn't.                11:25:38
17      Q.    So the answer to my question is    11:25:39
18   no, you did not ask them specifically       11:25:40
19   whether they understood what the terms      11:25:43
20   "natural" or "artificial" or "synthetic"    11:25:45
21   mean?                                       11:25:49
22          MS. WESTCOT:  Objection.             11:25:49
23      Misstates the testimony.                 11:25:50
24      A.    Again, the pretest allowed         11:25:53
25   respondents to indicate if there was        11:25:54
```

```
                                    Page 75

 1              BRIAN SOWERS
 2   something that they didn't understand.      11:25:56
 3   No respondents indicated that they didn't   11:25:58
 4   understand what natural meant or what       11:26:01
 5   artificial meant.                           11:26:02
 6       Q.    Okay.  Let's try this a           11:26:03
 7   different way.                              11:26:05
 8              You disclosed the questions      11:26:07
 9   that you asked in the pretest?              11:26:09
10       A.    Yes.                              11:26:12
11       Q.    Okay.  And let's go ahead and     11:26:12
12   get those into the record here, just a      11:26:17
13   moment.  So I marked as Exhibit 4 to your   11:26:19
14   deposition a document that was produced     11:27:05
15   to us last week.  If you can let me know    11:27:08
16   when you have that in front of you, sir.    11:27:11
17              (Sowers Exhibit 4, Pretest for
18         the deodorant survey, was so marked
19         for identification, as of this date.)  11:27:13
20       A.    I do.                             11:27:13
21       Q.    Okay.  And so do you recognize    11:27:14
22   Exhibit 4 to your deposition, sir?          11:27:16
23       A.    Yes, I do.                        11:27:18
24       Q.    Okay.  What is it?                11:27:19
25       A.    These are the pretests for the    11:27:22
```

```
                                            Page 76
  1               BRIAN SOWERS
  2   deodorant.  This is the pretest for the      11:27:26
  3   deodorant survey.                            11:27:34
  4      Q.    And so there are six questions       11:27:40
  5   listed here?                                 11:27:40
  6      A.    Yes.                                 11:27:41
  7      Q.    And you asked those six              11:27:44
  8   questions of each of the respondents?        11:27:46
  9      A.    Yes.                                 11:27:48
 10      Q.    And I said "you."  Did you,          11:27:49
 11   yourself, ask these questions or did you     11:27:51
 12   have a supplier do it?                       11:27:54
 13      A.    There was a team at AMS who was      11:27:55
 14   under my direction, but I listened in on     11:28:01
 15   the pretest personally.                      11:28:04
 16      Q.    And there were five respondents      11:28:04
 17   in the pretest?                              11:28:11
 18      A.    There were five respondents for     11:28:11
 19   the deodorant survey and five for the        11:28:14
 20   toothpaste survey.                           11:28:17
 21      Q.    Okay.  And you asked the five        11:28:19
 22   deodorant pretest respondents the same       11:28:23
 23   six questions?                               11:28:26
 24      A.    Yes.                                 11:28:29
 25      Q.    Okay.  And those six questions,      11:28:30
```

Page 95

|    |                                             |          |
|----|---------------------------------------------|----------|
| 1  |                BRIAN SOWERS                  |          |
| 2  | are people who want to participate in       | 11:47:47 |
| 3  | surveys and want to be helpful.             | 11:47:48 |
| 4  |         So they target it to that           | 11:47:50 |
| 5  | demographic.  People who would be           | 11:47:52 |
| 6  | interested in providing their opinions on   | 11:47:53 |
| 7  | different topics.                           | 11:47:56 |
| 8  |     Q.    And the respondents also get, I   | 11:48:01 |
| 9  | think it's something called swag bucks      | 11:48:03 |
| 10 | for participating?                          | 11:48:06 |
| 11 |     A.    If they qualify and complete      | 11:48:07 |
| 12 | the survey, they are given a certain        | 11:48:09 |
| 13 | amount of swag bucks, yes.                  | 11:48:11 |
| 14 |     Q.    What do you mean by "complete     | 11:48:13 |
| 15 | the survey"?                                | 11:48:14 |
| 16 |     A.    So some respondents come in, so   | 11:48:19 |
| 17 | for example, in this survey, if I am        | 11:48:20 |
| 18 | someone who would not purchase natural      | 11:48:21 |
| 19 | toothpaste, for example, I wouldn't         | 11:48:24 |
| 20 | qualify for this survey so they would get   | 11:48:26 |
| 21 | a message that says, "We're sorry, you      | 11:48:29 |
| 22 | don't qualify for this survey.  Thank you   | 11:48:31 |
| 23 | for your time."  Those individuals don't    | 11:48:33 |
| 24 | receive the compensation.                   | 11:48:39 |
| 25 |         Additionally, anybody who           | 11:48:40 |

```
                                         Page 96
 1                BRIAN SOWERS
 2   completes the survey but we scrub for        11:48:42
 3   reasons like they have given nonsensical     11:48:45
 4   responses or other indications that they     11:48:48
 5   weren't following the rules, we tell         11:48:51
 6   Prodege and they don't provide the           11:48:56
 7   incentive and those respondents are also     11:48:57
 8   generally removed from the panel.            11:48:59
 9       Q.    And I think, if I am               11:49:06
10   remembering correctly, some of the survey    11:49:07
11   respondents were filtered out before they    11:49:13
12   got to question 5?                           11:49:15
13       A.    That's correct.                    11:49:15
14       Q.    Do I have that right?              11:49:20
15       A.    That's correct.                    11:49:21
16       Q.    If I was filtered out at           11:49:23
17   question 3, for example, does that count     11:49:24
18   as completing the survey?                    11:49:26
19       A.    It does, yes.                      11:49:28
20       Q.    If we could just focus again on    11:49:36
21   your report.  I am looking at paragraph      11:49:38
22   10A?                                         11:49:49
23       A.    Okay.                              11:50:04
24       Q.    What do you mean by "Net level     11:50:05
25   of deception"?                               11:50:07
```

Page 97

1                   BRIAN SOWERS

2      A.     The net level of deception is        11:50:08

3   the number when you subtract the amount        11:50:10

4   of noise from the control, a similar          11:50:13

5   percentage of noise from the test.            11:50:16

6           So the net deception is the           11:50:18

7   difference between the test group and the     11:50:20

8   control group.                                11:50:21

9      Q.     So let's kind of separate that       11:50:25

10  out a little bit.                             11:50:27

11          What is the test group?              11:50:27

12     A.     The test group are the              11:50:28

13  individuals who saw the Tom's packaging       11:50:31

14  as it exists in the marketplace, alleged      11:50:34

15  to be deceptive.                              11:50:38

16     Q.     And then what's the control          11:50:39

17  group?                                        11:50:40

18     A.     The control group is               11:50:40

19  individuals who saw the same packaging,       11:50:43

20  but for the modifications that I made to      11:50:48

21  the packaging to correct for the             11:50:51

22  allegedly deceptive content.                 11:50:53

23     Q.     So I am just going to summarize      11:50:55

24  it, but if I got this wrong, just let me      11:50:58

25  know.  I am just trying to be efficient.      11:50:59

Page 98

BRIAN SOWERS

1

2        So you calculate the percentage        11:51:01

3    of individuals in the test group who your   11:51:04

4    survey identified as deceived, and you      11:51:10

5    subtract that from the percentage of        11:51:15

6    participants in the control group whom      11:51:18

7    your survey identified as deceived.  And    11:51:22

8    that's your net level of deception?         11:51:23

9        A.    Yes, that's correct.             11:51:25

10       Q.    Okay.  Thank you.                 11:51:26

11            And then you have footnote 5       11:51:36

12   here on page 4?                             11:51:38

13       A.    Yes.                             11:51:39

14       Q.    Are you offering an opinion in    11:51:39

15   this case on what the net level of          11:51:44

16   deception would corroborate a finding of    11:51:46

17   actionable consumer deception?              11:51:51

18            MS. WESTCOT:  Objection to form.   11:51:55

19       A.    I am not making a legal           11:51:56

20   conclusion.  My footnote is only to         11:51:58

21   provide a frame of reference for the        11:52:00

22   trier of fact.                              11:52:02

23       Q.    So is it your intention, sir,     11:52:04

24   to testify to the trier of fact that        11:52:07

25   Courts have found a net deception rate of   11:52:11

Page 99

```
 1              BRIAN SOWERS
 2   15 to 20 percent as corroborating a          11:52:17
 3   finding of likely confusion?                 11:52:20
 4      A.    Yes, it is.                          11:52:21
 5      Q.    And do you think that or is it       11:52:25
 6   your opinion that a finding of likely        11:52:31
 7   confusion in a trademark case is             11:52:36
 8   analogous to a finding of deception in a     11:52:40
 9   false advertising case?                      11:52:44
10           MS. WESTCOT:  Objection to form.     11:52:46
11      A.    My opinion is based on what          11:52:47
12   Professor McCarthy says are the              11:52:51
13   appropriate thresholds to consider when      11:52:54
14   using a deceptive advertising survey.        11:52:56
15           It's his opinion, and one that       11:53:01
16   I am simply citing to, that the issue of     11:53:02
17   consumer deception from a false              11:53:04
18   advertisement is closely analogous to        11:53:06
19   likely confusion and therefore it's          11:53:09
20   proper to use the percentage figures         11:53:11
21   accepted in likelihood of confusion          11:53:14
22   surveys.  I am simply citing to Professor     11:53:15
23   McCarthy.                                    11:53:19
24      Q.    I guess, I think -- I think I        11:53:19
25   am asking the right question here, but       11:53:25
```

```
 1                BRIAN SOWERS
 2      Q.    Did you review any of the        12:04:12
 3   academic or other articles or literature  12:04:16
 4   that Dr. Kivetz's cited?                   12:04:18
 5      A.    Some of them I am familiar with   12:04:20
 6   already, so I didn't necessarily review   12:04:23
 7   them.  I am aware of them.  Some I note    12:04:26
 8   that he, you know -- well, he doesn't      12:04:28
 9   give a full explanation of the document    12:04:34
10   he's citing to.                            12:04:36
11           So again, in response to          12:04:38
12   Dr. Kivetz's criticisms, there are some   12:04:40
13   documents that I already know about that  12:04:42
14   he misstated.                              12:04:44
15      Q.    And which documents are those?    12:04:48
16      A.    I think one of the -- one of     12:04:49
17   his criticisms was about my use of a      12:04:52
18   closed-end question versus an open-ended  12:04:55
19   question.  And he writes how -- he cites  12:04:59
20   to Bruce Keller who wrote a chapter in    12:05:03
21   Shari Diamond's book on deceptive         12:05:06
22   advertising surveys.  And Mr. Keller      12:05:09
23   talks about advantages and disadvantages  12:05:15
24   of open-ended questions.                   12:05:18
25           Dr. Kivetz's only mentions the    12:05:19
```

```
                                        Page 111

 1                   BRIAN SOWERS

 2    advantages and not the disadvantages.  He      12:05:21

 3    suggests in his report that only open-         12:05:27

 4    ended questions are appropriate for            12:05:29

 5    deceptive advertising surveys and cites        12:05:31

 6    to Mr. Keller.  But Mr. Keller actually        12:05:32

 7    says that it's the rare survey that            12:05:36

 8    doesn't asked a closed-end question to         12:05:38

 9    get at the ultimate issue.  And that if        12:05:41

10    it's asked after the filtering and             12:05:44

11    funneling of open-ended questions, the         12:05:45

12    Courts will generally accept that as           12:05:47

13    evidence of confusion.                         12:05:48

14           So there is just certain things         12:05:50

15    he omits in his criticisms of my survey        12:05:52

16    that I would certainly cite to in              12:05:55

17    response.                                      12:05:57

18        Q.    So other than this chapter from      12:06:00

19    Professor Keller, were there any other         12:06:04

20    documents that you would like to address       12:06:08

21    that were cited in Dr. Kivetz's report?        12:06:17

22           MS. WESTCOT:  Objection to form.        12:06:21

23        A.    I think, again, in response to       12:06:22

24    Dr. Kivetz's specific criticisms, he           12:06:27

25    cites to Dr. Jacobi, for example.  But         12:06:31
```

|    |                                                  |          |
|----|--------------------------------------------------|----------|
| 1  | BRIAN SOWERS                                      |          |
| 2  | again, he doesn't -- he, again, I believe        | 12:06:33 |
| 3  | talks about Dr. Jacobi's, the advantages         | 12:06:35 |
| 4  | of open-ended questions.  But he doesn't         | 12:06:39 |
| 5  | provide the disadvantages of open-ended          | 12:06:41 |
| 6  | questions.  I would certainly cite to            | 12:06:43 |
| 7  | that in response to Dr. Kivetz's critique        | 12:06:45 |
| 8  | of my survey.                                    | 12:06:49 |
| 9  | Q.   Are there any other articles or             | 12:06:54 |
| 10 | publications that Dr. Kivetz's cited in          | 12:06:56 |
| 11 | his report, in his rebuttal report, that         | 12:07:01 |
| 12 | you would like to address?                       | 12:07:05 |
| 13 | A.   I think those are the two.                  | 12:07:06 |
| 14 | Nothing else comes to mind as I sit here.        | 12:07:13 |
| 15 | Q.   Okay.  And did you read -- I                | 12:07:14 |
| 16 | guess let me take a step back.                   | 12:07:22 |
| 17 | I think you mentioned you were                   | 12:07:23 |
| 18 | familiar with some of the articles and           | 12:07:27 |
| 19 | treatises that Dr. Kivetz cited; is that         | 12:07:28 |
| 20 | correct?                                         | 12:07:32 |
| 21 | A.   That's correct.                             | 12:07:32 |
| 22 | Q.   So there were some that you                 | 12:07:33 |
| 23 | weren't familiar with?                           | 12:07:35 |
| 24 | A.   That's correct, yeah.                       | 12:07:36 |
| 25 | Q.   Have you looked at those                    | 12:07:42 |

```
                                         Page 113
 1              BRIAN SOWERS
 2   articles and publications?              12:07:43
 3       A.    No, I have not because I      12:07:44
 4   disagreed with his criticisms overall. 12:07:46
 5   And generally where he had the          12:07:48
 6   criticisms, I could point to more       12:07:54
 7   relevant literature for surveys for     12:07:55
 8   litigation and response, so no.         12:07:58
 9       Q.    When you were constructing and 12:08:08
10   executing your surveys in this case, did 12:08:10
11   you look for any published or academic  12:08:13
12   research on consumer responses to natural 12:08:15
13   claims on packaged goods?               12:08:19
14       A.    I don't believe that I did, no. 12:08:21
15   Not specifically to those.              12:08:28
16           The survey I constructed was    12:08:29
17   more to test deceptive advertising, not 12:08:31
18   limited to one particular type of product 12:08:33
19   or claim.                               12:08:36
20       Q.    Well, I just want to make sure 12:08:44
21   I understand.  Your objective was to test 12:08:46
22   consumer perception of the natural claim 12:08:49
23   on Tom's package; is that correct?      12:08:52
24       A.    It was to test whether        12:08:55
25   consumers take away a belief that it    12:08:58
```

Page 114

1              BRIAN SOWERS

2    communicates that the products contain      12:09:01

3    only natural ingredients and no             12:09:01

4    artificial ingredients, that's correct.     12:09:05

5        Q.    And in constructing and           12:09:07

6    executing your tests, you did not           12:09:08

7    consider any academic or other published    12:09:14

8    research on how consumers respond to        12:09:16

9    natural claims on consumer packaged         12:09:21

10   goods?                                       12:09:23

11           MS. WESTCOT:  Objection.            12:09:23

12       Misstates the witness's testimony.      12:09:24

13       A.    Again, for the survey             12:09:26

14   construction, the survey needs to follow    12:09:27

15   generally accepted survey principles,       12:09:29

16   which mine follow for testing deceptive     12:09:32

17   advertising.  That applies regardless of    12:09:34

18   the product type or the category type.      12:09:38

19   So that's what I focused on.                12:09:42

20       Q.    And what's the answer to my       12:09:43

21   question, sir?                              12:09:44

22           MS. WESTCOT:  Objection.            12:09:45

23       Argumentative.  Asked and answered.     12:09:49

24       A.    I relied upon the research to     12:09:49

25   developing generally accepted survey        12:09:51

|    |                                           |          |
|----|-------------------------------------------|----------|
| 1  | BRIAN SOWERS                              |          |
| 2  | methodologies for testing deceptive       | 12:09:54 |
| 3  | advertising surveys.  For purposes of the | 12:09:56 |
| 4  | natural claim, those surveys are the same | 12:09:58 |
| 5  | regardless of the product type or the     | 12:10:01 |
| 6  | category.                                 | 12:10:03 |
| 7  | Q.    So I will ask one more time and     | 12:10:09 |
| 8  | your answer will be what your answer is   | 12:10:11 |
| 9  | and we can deal with the Court.           | 12:10:13 |
| 10 | In constructing and executing             | 12:10:14 |
| 11 | your test, you did not research how       | 12:10:16 |
| 12 | consumers respond to "natural" claims on  | 12:10:19 |
| 13 | consumer packaged goods by referring to,  | 12:10:22 |
| 14 | for example, publications or academic     | 12:10:25 |
| 15 | research on consumer responses to         | 12:10:29 |
| 16 | "natural" claims; is that correct?        | 12:10:31 |
| 17 | MS. WESTCOT:  Objection to form.          | 12:10:34 |
| 18 | Asked and answered.  Argumentative.       | 12:10:34 |
| 19 | A.    Again, my survey is a deceptive     | 12:10:38 |
| 20 | advertising survey.  I followed best      | 12:10:41 |
| 21 | practices for conducting surveys for      | 12:10:42 |
| 22 | litigation, deceptive advertising         | 12:10:44 |
| 23 | specifically.  Regardless of the product  | 12:10:46 |
| 24 | or claim type at issue, those surveys     | 12:10:47 |
| 25 | follow the same general pattern.          | 12:10:49 |

```
                                              Page 116
 1              BRIAN SOWERS
 2      Q.    Is the answer to my question      12:10:53
 3   then no?                                   12:10:55
 4           MS. WESTCOT:  Objection.           12:10:56
 5      Argumentative.  Mr. Savaresse, just     12:10:56
 6      because you don't like his answer       12:11:00
 7      doesn't mean he hasn't answered the     12:11:02
 8      question.  He answered the question     12:11:04
 9      multiple times now.                     12:11:06
10      Q.    You can answer.                   12:11:06
11      A.    Again, regardless of the          12:11:07
12   product type or category or claim, what I  12:11:08
13   followed was the proper protocol for       12:11:10
14   testing deceptive advertising claims per   12:11:12
15   the relevant research.                     12:11:14
16      Q.    I have not asked you about the    12:11:18
17   proper protocol for testing deceptive      12:11:19
18   advertising claims.  I asked you whether   12:11:22
19   you considered academic research about     12:11:23
20   consumer perceptions of natural claims.    12:11:26
21   And you have not answered that question.   12:11:28
22   So I am going to move on.  We can deal      12:11:30
23   with the Court.                            12:11:34
24           MS. WESTCOT:  Mr. Savaresse, he    12:11:34
25      answered your question multiple times.  12:11:35
```

```
                                          Page 117
 1              BRIAN SOWERS
 2      Q.    Did you receive drafts of any      12:11:42
 3  reports from other experts retained by       12:11:44
 4  plaintiffs in this case?                     12:11:47
 5      A.    No, I did not.                      12:11:49
 6      Q.    Have you received final            12:11:51
 7  versions of any reports?                     12:11:52
 8      A.    No, I haven't.                      12:11:53
 9      Q.    Are you aware that plaintiffs      12:11:57
10  have submitted reports by other purported    12:11:59
11  experts?                                     12:12:05
12      A.    Only from what I read in the       12:12:05
13  motion for class certification.  But         12:12:09
14  beyond that, I don't know the scope or       12:12:11
15  what the results were.                       12:12:12
16      Q.    Okay.  And subsequent to the       12:12:13
17  class certification motion and order, are    12:12:17
18  you aware of whether plaintiffs have         12:12:20
19  retained and issued or submitted reports     12:12:23
20  by other purported experts?                  12:12:27
21           MS. WESTCOT:  Objection to form.    12:12:30
22      A.    I am not aware, no.                 12:12:31
23           MR. SAVARESSE:  So we have been     12:12:36
24       going a little more than an hour now.   12:12:37
25       Is this a good time for us to take a    12:12:39
```

```
                                    Page 163

 1              BRIAN SOWERS

 2   "No Opinion" or "I Don't Know/Unsure,"        13:39:51

 3   which captures everything else, if they       13:39:52

 4   didn't take away that perception.             13:39:55

 5       Q.    How did you decide to include       13:40:05

 6   those five answers for closed-ended           13:40:06

 7   question 5?                                    13:40:12

 8       A.    The "contain only natural           13:40:12

 9   ingredients (i.e., no artificial              13:40:14

10   ingredients)" was included because that's     13:40:16

11   actually, you know, that's the measure of     13:40:18

12   deception in the survey.                       13:40:19

13          The second one is "contains            13:40:24

14   some natural ingredients and some             13:40:25

15   artificial ingredients," because that's       13:40:27

16   what I understand plaintiffs to say           13:40:29

17   should be listed.  That there are some        13:40:31

18   natural ingredients and some unnatural        13:40:33

19   ingredients.                                   13:40:35

20          And the third one was included         13:40:36

21   because I needed to include it to make        13:40:40

22   sure that the list of options was             13:40:41

23   exhaustive.  If I had only said contains      13:40:43

24   only or contains some, that could, people     13:40:45

25   could assume that it must contain at          13:40:48
```

```
                                    Page 164

 1              BRIAN SOWERS
 2    least some natural ingredients when that      13:40:50
 3    may not be their takeaway.                    13:40:52
 4        Q.    Well, you didn't include the        13:40:59
 5    option "contains mostly natural               13:41:01
 6    ingredients," right?                          13:41:04
 7        A.    Well, if someone saw "mostly,"      13:41:05
 8    I think they would have selected              13:41:08
 9    "contains some."  Or if they thought          13:41:09
10    "mostly" and none of those response           13:41:11
11    options covered that, they had the option     13:41:13
12    to choose "No Opinion" or "Don't              13:41:17
13    Know/Unsure."                                 13:41:19
14        Q.    That's not the question I           13:41:19
15    asked, sir.  I mean, the question says        13:41:20
16    what it says.  There is no option for a       13:41:23
17    survey respondent to have selected            13:41:26
18    contains mostly natural ingredients,          13:41:28
19    right?                                        13:41:30
20              MS. WESTCOT:  Objection.  Asked     13:41:30
21        and answered.                             13:41:31
22        A.    I mean, there is not a response     13:41:32
23    option that says you can purchase it only     13:41:34
24    on the moon either.  I think you're           13:41:35
25    limited by certain response options to        13:41:37
```

```
                                          Page 165

 1                 BRIAN SOWERS
 2   make it manageable for consumers.          13:41:39
 3          If a respondent truly thought       13:41:42
 4   that it contains mostly natural            13:41:44
 5   ingredients and didn't feel like any of    13:41:46
 6   these response options covered it, they    13:41:48
 7   would have put "Don't Know/Unsure."        13:41:49
 8   That's exactly what that question is for.  13:41:51
 9     Q.    And how did you determine to       13:41:57
10   associate natural ingredients with no      13:42:03
11   artificial ingredients?                    13:42:07
12     A.    It's my understanding that that    13:42:08
13   is plaintiffs' obligation.  They took      13:42:15
14   away when they purchased the product that  13:42:18
15   it contained only natural ingredients,     13:42:21
16   that is no artificial ingredients.         13:42:23
17   That's the hypothesis that I am testing    13:42:25
18   in the survey.                             13:42:27
19     Q.    And that's the only basis for      13:42:28
20   associating artificial ingredients         13:42:33
21   with -- no artificial ingredients with     13:42:39
22   natural ingredients?                       13:42:43
23     A.    I think we talked about this       13:42:44
24   before.  What does "artificial" mean.      13:42:45
25   It's my understanding that it's synthetic  13:42:47
```

```
                                          Page 166

 1                  BRIAN SOWERS
 2    or chemically processed.  It's language        13:42:49
 3    that is included in the complaint.  But I      13:42:53
 4    understand that to be synonymous with no       13:42:57
 5    artificial ingredients.  So that's the         13:42:59
 6    allegation that I tested.                       13:43:02
 7        Q.    Right.  I may have                    13:43:03
 8    misunderstood your testimony earlier.          13:43:06
 9    But it's my understanding that, that you       13:43:08
10    based your hypothesis here and the             13:43:11
11    association between artificial or no           13:43:15
12    artificial ingredients and natural            13:43:17
13    ingredients based solely on the               13:43:20
14    complaint.  You didn't do additional          13:43:22
15    research; is that right?                       13:43:24
16        A.    That's correct.  I am testing        13:43:25
17    plaintiffs' allegation here.  So the          13:43:27
18    complaint lays out the allegation in this     13:43:29
19    matter.  I've tested that allegation, as      13:43:30
20    I understand it.                               13:43:33
21        Q.    And for question 5, there was       13:43:33
22    no way for consumers to include an answer     13:43:42
23    different from one of the five that you       13:43:46
24    provided here, right?                          13:43:47
25        A.    No.  These are their only five      13:43:48
```

```
                                              Page 167

 1              BRIAN SOWERS

 2   options.  But like I said, important      13:43:54

 3   thing is that if a consumer took away a   13:43:55

 4   perception different than the first three 13:43:58

 5   response options, they had the option to  13:44:00

 6   select "No Opinion" or "Don't             13:44:03

 7   Know/Unsure."                             13:44:05

 8       Q.    And the results of question 5   13:44:05

 9   are the basis for your ultimate opinion   13:44:14

10   about the level of or the net level of    13:44:17

11   deception in this case?                   13:44:20

12       A.    That's correct.                 13:44:23

13       Q.    Did you consider including as   13:44:37

14   one of the answers to question 5 contains 13:44:39

15   ingredients that are naturally sourced or 13:44:43

16   naturally derived?                        13:44:46

17       A.    I didn't test that.  That       13:44:47

18   wasn't what I was asked to test, whether  13:44:52

19   their perceptions were that.              13:44:55

20              Again, if respondents took away 13:44:57

21   that message or only that message, they   13:44:58

22   had the option to select "No Opinion" or  13:45:00

23   "Don't Know/Unsure" in response to the    13:45:02

24   question.                                 13:45:04

25       Q.    So that was the only way for    13:45:04
```

```
                                        Page 168
 1             BRIAN SOWERS
 2   them to answer?                       13:45:07
 3      A.    I mean, two out of the five  13:45:11
 4   response options allow them to select 13:45:16
 5   something to suggest that the first three 13:45:18
 6   don't correspond to any takeaway they  13:45:22
 7   took away from the packaging.          13:45:24
 8      Q.    Okay.  Well, does the packaging 13:45:26
 9   say "no artificial ingredients"?       13:45:30
10      A.    Well, it's my understanding -- 13:45:34
11   it says "natural."  It's my understanding 13:45:39
12   that plaintiffs allege that that implies 13:45:40
13   that it contains only natural          13:45:45
14   ingredients, which is no artificial    13:45:47
15   ingredients.                           13:45:49
16      Q.    Okay.                         13:45:50
17          MS. WESTCOT:  We have been going 13:46:13
18      about an hour, when we get to a good 13:46:15
19      stopping point, can we take a short  13:46:18
20      break?                              13:46:19
21          MR. SAVARESSE:  Now is fine.    13:46:20
22          THE VIDEOGRAPHER:  We are now    13:46:22
23      going off the record at approximately 13:46:23
24      1:46 p.m.                           13:46:24
25          (Off the record.)               13:52:14
```

Page 169

```
 1            BRIAN SOWERS
 2            THE VIDEOGRAPHER:  We are now      13:58:39
 3     going back on the record at              13:58:40
 4     approximately 1:58 p.m., beginning of    13:58:41
 5     media four.  Go ahead, sir.              13:58:43
 6            MR. SAVARESSE:  All right.  So     13:58:45
 7     we're back on the record here.           13:58:47
 8     Welcome back everyone.                   13:58:49
 9            While we were on break there was  13:58:51
10     an issue that arose for plaintiffs'      13:58:54
11     counsel, Ms. Sarah Westcot.  So          13:59:00
12     plaintiffs are subbing in attorneys.     13:59:04
13     And Stephen, I will just allow you to    13:59:09
14     make your appearance.                    13:59:12
15            MR. BECK:  Stephen Beck for       13:59:13
16     plaintiffs from Bursor & Fisher.         13:59:15
17            MR. SAVARESSE:  All right.  So    13:59:18
18     with that, Stephen, and Mr. Sowers, I    13:59:20
19     think we'll get back into it.            13:59:22
20   BY MR. SAVARESSE:                          
21     Q.    And we are looking at Exhibit 3    13:59:24
22   to your deposition, Mr. Sowers.  That's a  13:59:30
23   copy of your report with the appendices.   13:59:34
24     A.    Yes.                               13:59:37
25     Q.    I just want to start again with    13:59:41
```

```
                                      Page 185
 1              BRIAN SOWERS
 2   Opinion" in response to question 5, did      14:15:29
 3   you ask them whether they shared the same    14:15:34
 4   definition of "natural" as the one           14:15:36
 5   provided in question 5?                       14:15:37
 6      A.    I don't believe anybody             14:15:39
 7   selected "Don't Know" or "Unsure" or "No     14:15:41
 8   Opinion" in the pretest.  If they had, I     14:15:43
 9   would have asked.  But again, they had       14:15:45
10   the opportunity to bring it up and           14:15:48
11   didn't.                                       14:15:50
12           So there is nothing, again,          14:15:50
13   nothing in my data, nothing from my          14:15:52
14   pretest to suggest that people didn't        14:15:54
15   understand what I was talking about.         14:15:57
16      Q.    All right.  I want to talk          14:15:59
17   about the control packaging.  So there is    14:16:13
18   an image of that on page 11 for the          14:16:19
19   toothpaste.                                   14:16:23
20      A.    Okay.                               14:16:29
21      Q.    And page 24 for the deodorant.      14:16:30
22           So what's the difference             14:16:36
23   between the test toothpaste packaging and    14:16:39
24   the control toothpaste packaging?            14:16:42
25      A.    The test packaging has just         14:16:45
```

```
                                        Page 186
 1              BRIAN SOWERS
 2   simply the "natural" representation.  The    14:16:48
 3   difference is for the control I replaced     14:16:51
 4   "natural" with "contains some natural        14:16:54
 5   ingredients," and provided an explicit       14:16:56
 6   definition of what "natural" means.          14:16:58
 7        Q.   Okay.  Did you make any other      14:17:03
 8   changes to the control packaging versus      14:17:05
 9   the test packaging for the toothpaste?       14:17:09
10        A.   No.  They were completely the      14:17:11
11   same except for those changes.               14:17:13
12        Q.   Why didn't you make any other      14:17:14
13   changes?                                     14:17:16
14        A.   It's the "natural"                 14:17:16
15   representation that I'm measuring            14:17:19
16   perceptions of.  So I created my control     14:17:21
17   condition to convey the information          14:17:28
18   plaintiff alleges should have been           14:17:33
19   conveyed in order to test to control for     14:17:34
20   that element.                                14:17:38
21        Q.   Got it.  So it's just the --       14:17:39
22   the only thing you tested for was the        14:17:42
23   "natural" representation on the front of     14:17:45
24   the toothpaste packaging, right?             14:17:48
25        A.   That's correct.  Everything        14:17:51
```

```
                                          Page 187
 1              BRIAN SOWERS
 2   else was completely the same.          14:17:51
 3       Q.    Okay.  And then is that also  14:17:53
 4   true for the deodorant, that's the only 14:17:55
 5   thing that you tested was the "natural"  14:17:58
 6   representation on the front of the      14:18:00
 7   deodorant packaging?                     14:18:03
 8       A.    Well, I controlled for that,  14:18:03
 9   but yes, yeah.                           14:18:05
10       Q.    Okay.  And so you mentioned   14:18:06
11   that you changed some of the wording,    14:18:10
12   right, from "natural" to "contains some  14:18:13
13   natural ingredients" and then there is   14:18:16
14   the little asterisks disclosure?         14:18:18
15       A.    Yes.                           14:18:21
16       Q.    You didn't just change the    14:18:21
17   words, right?                            14:18:23
18       A.    I'm sorry, can you clarify?  I 14:18:24
19   am not sure I understood your question.  14:18:29
20       Q.    Well, you didn't just change  14:18:30
21   the wording; isn't that right?           14:18:32
22       A.    Well, I replaced the word     14:18:33
23   "natural" with a definition that         14:18:38
24   plaintiff alleges is what should have    14:18:39
25   been communicated.                       14:18:41
```

```
                                        Page 188

 1              BRIAN SOWERS

 2      Q.    Okay.  Well, you also changed     14:18:42

 3   the color?                                 14:18:46

 4      A.    Yes.                              14:18:46

 5      Q.    So on the toothpaste packaging,   14:18:47

 6   the word "natural" is the same color as    14:18:50

 7   "with fluoride"?                           14:19:00

 8      A.    Yes.                              14:19:01

 9      Q.    And in your packaging, you        14:19:05

10   changed it to red?                         14:19:07

11      A.    That's correct.                   14:19:08

12      Q.    Why did you do that?              14:19:09

13      A.    It allows me to -- again,         14:19:10

14   plaintiffs' allegation is that            14:19:14

15   individuals are going to take away a      14:19:17

16   belief that the product contains only     14:19:18

17   natural ingredients, i.e., no artificial  14:19:20

18   ingredients.  So what I need to control   14:19:23

19   for is how many people would take away    14:19:25

20   that belief even if Tom's splashed it on  14:19:27

21   front of their product packaging.  So I   14:19:30

22   put it in there in a way so that it's     14:19:33

23   clearly communicated as plaintiffs allege 14:19:35

24   it should have been all along.            14:19:38

25      Q.    So is it the same answer for      14:19:45
```

```
                                    Page 189

 1                BRIAN SOWERS
 2    the deodorant packaging, you changed the      14:19:47
 3    coloring to red to draw attention to that     14:19:49
 4    representation?                               14:19:55
 5        A.    Well, I wouldn't say draw           14:19:55
 6    attention to it.  I put it to clearly         14:19:58
 7    communicate is what I did.                    14:20:01
 8        Q.    I think you said splashed it on     14:20:03
 9    the front of their product packaging?         14:20:06
10        A.    Yeah, so it's really, thinking      14:20:07
11    about a test and a control, part of noise     14:20:09
12    is someone will always -- even if Tom's       14:20:10
13    put this information on the front of the      14:20:17
14    packaging, there are likely some             14:20:19
15    percentage of people that would still        14:20:21
16    say, "Yes, I think it's all natural, no      14:20:23
17    artificial ingredients" even with that       14:20:25
18    information.                                 14:20:27
19            So what I am doing is               14:20:27
20    controlling for the people who would have    14:20:28
21    said that, even if Tom's had put it          14:20:30
22    prominently on the front of the package.     14:20:34
23        Q.    And you also made it all caps?     14:20:44
24        A.    Yes.                               14:20:48
25        Q.    And you underlined the word        14:20:48
```

```
                                          Page 190

 1              BRIAN SOWERS
 2    "some"?                               14:20:50
 3       A.    Yes.                         14:20:50
 4       Q.    And did you make those changes  14:20:51
 5    for the same reason?                  14:20:53
 6       A.    Again, yes, it's controlling  14:20:57
 7    for what plaintiffs claim should have  14:20:58
 8    been communicated all along.  That's what  14:21:00
 9    the control is doing.                 14:21:02
10       Q.    Well, is the same thing true  14:21:20
11    for the asterisks disclosure, "Contains  14:21:41
12    one or more artificial ingredients"?  14:21:44
13       A.    I'm sorry, is the same true of  14:21:49
14    what?                                 14:21:51
15       Q.    That you included that in red  14:21:52
16    lettering to test what consumer       14:21:54
17    perception would be if that disclosure  14:22:00
18    were displayed prominently on the     14:22:03
19    packaging?                            14:22:06
20       A.    Not to control for.  To control  14:22:07
21    for what perceptions would be even if  14:22:09
22    that was clearly communicated on the  14:22:11
23    packaging.                            14:22:12
24       Q.    I think you mentioned this, but  14:22:31
25    there was some percentage of respondents  14:22:33
```

```
                                    Page 191
 1              BRIAN SOWERS
 2   who believed that the controlled         14:22:42
 3   packaging communicated that the product   14:22:43
 4   contained only natural ingredients even   14:22:45
 5   though you included the language in red   14:22:49
 6   on the package?                           14:22:57
 7       A.    That's correct.                 14:23:03
 8       Q.    It's about a third of           14:23:03
 9   respondents?                              14:23:05
10       A.    Yes, it's 33.5 percent in       14:23:05
11   control group for the toothpaste.  And    14:23:09
12   for the deodorant it is 38.5 percent.     14:23:12
13       Q.    38.5?                           14:23:26
14       A.    Yes.                            14:23:27
15       Q.    Did it concern you at all that  14:23:33
16   a third or more of respondents selected   14:23:37
17   "contains only natural ingredients" in    14:23:42
18   response to the control?                  14:23:45
19       A.    No, the exact opposite,         14:23:47
20   actually.  I think it confirmed that I    14:23:51
21   had a strong control doing exactly what   14:23:52
22   it was designed to do, which is to pick   14:23:55
23   up noise.                                 14:23:57
24       Q.    So what noise do you think you  14:24:00
25   picked up?                                14:24:02
```

Page 192

1                    BRIAN SOWERS

2        A.    33.5 percent in the toothpaste.    14:24:02

3    It's impossible to parse out what exactly   14:24:06

4    the noise is.  It could be people           14:24:08

5    guessing.  It could be people who weren't   14:24:09

6    paying attention to the question.  It       14:24:12

7    could have been a whole host of things.     14:24:18

8    It's really just noise and that's all       14:24:21

9    it's intended to capture.                   14:24:22

10       Q.    Okay.  And one of the answers      14:24:24

11   to question 5 is "contains some natural     14:24:29

12   ingredients and some artificial             14:24:36

13   ingredients," right?                        14:24:38

14       A.    Yes.                               14:24:40

15       Q.    And the language that you added    14:24:43

16   to the control stimulus is "contains some   14:24:46

17   natural ingredients"?                       14:24:51

18       A.    Yes, that's correct.              14:24:51

19       Q.    So in the toothpaste survey, 47   14:25:02

20   percent of respondents remembered that      14:25:12

21   the packaging said "contains some natural   14:25:18

22   ingredients" and selected that response     14:25:21

23   to question 5?                              14:25:24

24       A.    Well, I don't think that's        14:25:25

25   fair.  "Contains some natural ingredients   14:25:27

```
                                            Page 193

  1                BRIAN SOWERS

  2   and some artificial ingredients."  So        14:25:28

  3   47.1 percent of responses to the control     14:25:31

  4   group took away that impression from the     14:25:34

  5   packaging, yes.                              14:25:36

  6       Q.    From the red all capitalized       14:25:37

  7   and underlined stimulus that you             14:25:41

  8   designed?                                    14:25:46

  9       A.    Yes, that's correct.               14:25:46

 10       Q.    And that control stimulus also     14:25:51

 11   says "contains one or more artificial        14:25:53

 12   ingredients"?                                14:25:55

 13       A.    Yes.                               14:25:56

 14       Q.    So let's talk about question 1     14:26:30

 15   of your survey.  "What was the main          14:26:33

 16   message communicated to you by the           14:26:39

 17   product packaging?"  Right?                  14:26:40

 18       A.    Yes.                               14:26:45

 19       Q.    You ask the same question for      14:26:45

 20   toothpaste and deodorant respondents?        14:26:48

 21       A.    Yes, I did.                        14:26:51

 22       Q.    Same question for the test and     14:26:52

 23   the control?                                 14:26:54

 24       A.    Yeah.                              14:26:54

 25       Q.    Would you agree with me that's     14:26:55
```

```
                                        Page 194
 1              BRIAN SOWERS
 2   an open-ended question?               14:26:57
 3      A.    Yes, it is.                   14:26:58
 4      Q.    Why did you ask that question?  14:26:59
 5      A.    For deceptive advertising    14:27:02
 6   surveys they follow what's called the  14:27:04
 7   traditional filter and funnel approach.  14:27:06
 8   And the literature on surveys for      14:27:10
 9   deceptive advertising surveys say that  14:27:12
10   you always start at the top of the filter  14:27:15
11   with a broad open-ended question about  14:27:18
12   what was the main message of the       14:27:19
13   advertisement.                         14:27:21
14      Q.    Okay.  And you coded or your  14:27:22
15   team coded responses to question 1?    14:27:29
16      A.    Yes.                          14:27:31
17      Q.    Those were the verbatim       14:27:32
18   responses that we were looking at      14:27:33
19   earlier?                               14:27:36
20      A.    That's correct.              14:27:36
21      Q.    So what did your team code for?  14:27:38
22      A.    Really just how many people  14:27:42
23   mentioned anything about natural, the  14:27:45
24   natural representation in general, versus  14:27:47
25   everything else.                       14:27:51
```

```
                                          Page 195
 1              BRIAN SOWERS
 2     Q.    And did you look at any        14:28:00
 3   responses not related to the natural   14:28:01
 4   representation?                        14:28:05
 5     A.    If it wasn't related -- if it  14:28:06
 6   didn't mention "natural" or anything   14:28:08
 7   about the natural representation, it was 14:28:09
 8   just coded as "other," which in the    14:28:11
 9   report says no mention of a natural    14:28:13
10   representation.                        14:28:15
11     Q.    Did you look for any specific  14:28:27
12   language to code for "natural"?        14:28:28
13     A.    No.  I think, you know, it's   14:28:32
14   really -- this is just the top of the  14:28:34
15   funnel.  As the literature says, it sets 14:28:37
16   the stage for more detailed closed-end  14:28:42
17   questions which are the focus of test.  14:28:47
18          So for purposes of my opinion,  14:28:48
19   it doesn't really matter what they say in 14:28:50
20   question 1 or 2, as long as it's not   14:28:52
21   gibberish, which I removed from the data 14:28:56
22   set.  I am not forming any opinions based 14:28:58
23   on question 1 and 2.                   14:29:00
24     Q.    Is there a reason why you      14:29:09
25   didn't form any opinions based on the  14:29:11
```

```
                                          Page 196

 1              BRIAN SOWERS
 2   responses to questions 1 and 2?           14:29:12
 3       A.    They are such broad questions.  14:29:13
 4   They were never designed to answer the    14:29:18
 5   research question.  They are really only   14:29:20
 6   used to filter and funnel down to the      14:29:22
 7   closed-end question.  Even if someone      14:29:24
 8   didn't take away something about           14:29:27
 9   "natural" as the main message, that        14:29:29
10   doesn't mean that they didn't take it      14:29:31
11   away as a message overall.                 14:29:33
12            So like I said, it's really not   14:29:35
13   designed to answer the relevant research   14:29:37
14   question.  And it's just simply a tool to  14:29:39
15   filter and funnel to Q5.                   14:29:41
16       Q.    Okay.  So the second question    14:29:43
17   was "What other messages, if any, were     14:29:45
18   communicated to you by the product         14:29:48
19   packaging?"  Right?                        14:29:49
20       A.    Yes.                             14:29:52
21       Q.    So why did you ask that          14:29:52
22   question?                                  14:29:54
23       A.    Again, in following best         14:29:54
24   practices, which, you know, establishes    14:29:56
25   that you ask what is the main message      14:30:00
```

```
                                        Page 197
 1               BRIAN SOWERS
 2   question and then you ask a follow-up      14:30:02
 3   question, just to allow people to add any  14:30:03
 4   other thoughts to probe if there was       14:30:06
 5   something that maybe they forgot or         14:30:07
 6   wanted to add in response, that once they  14:30:10
 7   got to that question they said, "Oh, and   14:30:12
 8   I also took away this impression."          14:30:14
 9       Q.    But the answers to those two      14:30:18
10   questions were not relevant to your        14:30:20
11   analysis; is that fair?                     14:30:21
12       A.    That's exactly.  It's really      14:30:22
13   just used to begin the filtering and        14:30:25
14   funneling process down to Q5.               14:30:27
15       Q.    Okay.  Do you know, the chart     14:30:29
16   that you have on page 17 here, lumps the    14:30:35
17   question 1 and question 2 responses         14:30:40
18   together.  Do you know how many survey      14:30:42
19   respondents mentioned something about the  14:30:47
20   "natural" representation in response to     14:30:49
21   question 1?                                  14:30:54
22       A.    I don't recall.  You know, it's   14:30:54
23   in the data.  I can look, but I don't       14:30:56
24   recall as I sit here.                        14:30:57
25       Q.    Where is that data?               14:30:58
```

```
                                         Page 198

 1                 BRIAN SOWERS
 2      A.    When we were looking at the      14:31:04
 3   Excel sheet before, it would be the      14:31:06
 4   difference between question 1 and        14:31:07
 5   question 2.                              14:31:09
 6      Q.    So to find out, I would look at  14:31:15
 7   the verbatim responses to question 1 and 14:31:17
 8   see who mentions "natural"?              14:31:19
 9      A.    Yeah, you could look to see how  14:31:24
10   many mention in question 1 and then if   14:31:27
11   they don't, then they should be in       14:31:29
12   question 2, and you could parse it out   14:31:31
13   that way.                                14:31:33
14      Q.    When you say something about     14:31:35
15   the natural representation, do you mean  14:31:36
16   just the word "natural," like if that    14:31:37
17   appears in one of the verbatims to 1 or  14:31:39
18   2, in the "Yes" column, and if they      14:31:41
19   don't, then they are in the "No" column? 14:31:47
20      A.    The problem is, and we'll get    14:31:51
21   into this I'm sure, a lot of the         14:31:52
22   open-ended responses are vague.  That's a 14:31:54
23   lot of the drawbacks of open-ended       14:31:56
24   questions.                               14:31:58
25             So if someone simply said,     14:31:58
```

```
                                              Page 199

 1                  BRIAN SOWERS
 2   "What was the main message, that it's        14:32:00
 3   natural," I counted them as part of that     14:32:01
 4   mentioned something about the natural        14:32:03
 5   representation.                              14:32:04
 6            Again, I am not using the 68.4      14:32:10
 7   percent for purposes of my opinion for       14:32:12
 8   any reason.                                  14:32:13
 9      Q.    And the response in the control     14:32:21
10   group was even higher, right?                14:32:24
11      A.    Yes.                                14:32:25
12      Q.    72.8 percent?                       14:32:25
13      A.    Yeah, I don't know that that is     14:32:27
14   statistically different, but, yeah, it's     14:32:30
15   a little bit different.                      14:32:33
16      Q.    Well, I guess if you were going     14:32:37
17   to run the net deception calculation just    14:32:39
18   based off the questions or the answers to    14:32:41
19   questions 1 or 2, you would have zero net    14:32:43
20   deception, right?                            14:32:48
21      A.    Well, I mean, if you just use       14:32:48
22   these numbers, but you couldn't use that     14:32:51
23   calculation because, for example, people     14:32:53
24   who said, let's just say in the test         14:32:54
25   group, it says that it's natural, I don't    14:32:57
```

Page 200

BRIAN SOWERS

1

2    know until I get to question 5 if they          14:33:01

3    mean natural, meaning no artificial             14:33:03

4    ingredients or something else.  So it           14:33:05

5    would be calculating a net on really            14:33:08

6    vague data.  I don't think you could draw       14:33:13

7    any conclusions about it.                       14:33:16

8        Q.    Did you look at questions 1 or        14:33:17

9    2 to determine whether survey respondents       14:33:21

10   had indicated that "natural" meant no           14:33:27

11   artificial ingredients to them?                 14:33:33

12       A.    Again, I got so many vague            14:33:35

13   responses.  I don't remember how many           14:33:37

14   specifically said.  But there were a lot        14:33:39

15   of people who simply said, it says that         14:33:42

16   it's natural.  Or in the control group          14:33:45

17   maybe it says that it contains some             14:33:47

18   natural ingredients because they mention        14:33:49

19   natural as a main message.  I just lump         14:33:51

20   that together.                                  14:33:53

21            So I don't think, it would be          14:33:54

22   impossible from questions 1 and 2 to            14:33:58

23   calculate any level of deception               14:34:00

24   accurately or reliably.                         14:34:02

25       Q.    Do you know how many test group       14:34:12

```
                                            Page 212
 1            BRIAN SOWERS
 2     to talk about it.                    14:45:56
 3            MR. SAVARESSE:  Thank you.    14:45:57
 4     Q.    Now, question 4, is that       14:46:06
 5  discussed in your report?              14:46:16
 6     A.    Only that I removed individuals 14:46:22
 7  from question 4 who said that they do not 14:46:23
 8  have -- they didn't know or were unsure 14:46:26
 9  what the packaging communicated about   14:46:29
10  whether or not the product is natural.  I 14:46:31
11  didn't report on them otherwise.        14:46:36
12     Q.    Okay.  So I am looking at D12  14:46:37
13  of your report.  And this reports that  14:46:50
14  question 4 is "What did the product     14:46:56
15  packaging communicate about whether or  14:46:59
16  not the toothpaste is natural."         14:47:00
17     A.    Yes.                           14:47:03
18     Q.    And you asked that same        14:47:03
19  question of deodorant survey respondents 14:47:08
20  and toothpaste respondents?             14:47:12
21     A.    Yes, I did.                    14:47:14
22     Q.    Same question for test and     14:47:15
23  control?                                14:47:16
24     A.    Yes.                           14:47:17
25     Q.    So why did you ask question 4? 14:47:21
```

Page 213

BRIAN SOWERS

2    A.    It's really to -- I asked in         14:47:23
3    question 3 whether they took away a         14:47:29
4    message.  I asked in question 4 what that   14:47:31
5    message was.  You get a lot of vague and    14:47:33
6    ambiguous responses and I see this in the   14:47:37
7    recoding that Dr. Kivetz did.  People       14:47:39
8    that just say it's natural.  Those codes    14:47:41
9    don't really help anything.  They don't     14:47:47
10   tell whether people take away a mistaken    14:47:48
11   impression or not.                          14:47:51
12        So that question is simply used        14:47:52
13   to eliminate anyone who answered "Don't     14:47:54
14   Know/Unsure" in that response option, so    14:47:58
15   that I am filtering them into question 5,   14:48:00
16   which is the focus of my opinion.           14:48:03
17   Q.    So did you yourself conduct any       14:48:08
18   coding in response to question 4?           14:48:10
19   A.    No, again, because I think I          14:48:15
20   wasn't relying on it for purposes of the    14:48:17
21   opinion, I was reviewing the data.          14:48:19
22        I saw that there were a lot of         14:48:21
23   vague responses.  People just saying what   14:48:22
24   does it say?  It's natural.  Natural.  So   14:48:25
25   if anything, it just simply confirmed my    14:48:30

```
                                       Page 214

 1                BRIAN SOWERS
 2   belief that the open ends will not, first      14:48:36
 3   of all are not designed to answer the         14:48:37
 4   relevant question.  And second, it's why      14:48:40
 5   you're allowed a closed-end question,         14:48:43
 6   because you get such vague and ambiguous      14:48:45
 7   responses that don't really tell you          14:48:46
 8   anything.                                      14:48:48
 9       Q.   So for what purpose did you ask      14:48:50
10   question 4 if you did not think that you      14:48:54
11   would be able to rely on the results?         14:48:57
12       A.    It's really to filter out           14:48:58
13   anyone who said in question 3 that it         14:49:00
14   communicated something about whether or       14:49:04
15   not it's natural.  But then in response       14:49:06
16   in question 4, when asked "What does it       14:49:10
17   communicate," they answered "Don't            14:49:12
18   Know/Unsure," which means they may have       14:49:15
19   been not answering question 3 in a manner     14:49:16
20   that they should have been and they           14:49:23
21   needed to be filtered out before I asked      14:49:24
22   them question 5.                               14:49:26
23       Q.    Okay.  And other than that          14:49:29
24   filtering function for question 4, you        14:49:31
25   didn't really consider the responses?         14:49:36
```

```
                                       Page 215

 1              BRIAN SOWERS
 2      A.    No, I think, you know, as        14:49:37
 3   Mr. Keller writes and we talked about     14:49:39
 4   today, really the open-ended questions    14:49:41
 5   are a method to filter and funnel down to 14:49:45
 6   the detailed closed-in question, which is 14:49:47
 7   the focus of the test.  That's really all 14:49:50
 8   I did.                                     14:49:52
 9           A lot of reports I don't even     14:49:52
10   report on the open ends at all because    14:49:54
11   they don't provide any relevance to what  14:49:56
12   my ultimate opinion is.                    14:50:00
13      Q.    Right.  And this is just at       14:50:01
14   your report where you didn't write on the 14:50:05
15   responses to question 4?                   14:50:07
16      A.    I'm sorry, I didn't what on       14:50:09
17   question 4?                                14:50:15
18      Q.    You didn't include in your        14:50:15
19   report anything about question 4?          14:50:16
20      A.    Only that in footnote 20 from     14:50:17
21   the deodorant survey -- hang on one        14:50:23
22   second.  I'm sorry.  Footnote 20 of the    14:50:30
23   toothpaste survey, and footnote 31 of the 14:50:36
24   deodorant survey, just to explain how I    14:50:44
25   filtered out individuals from question 4  14:50:48
```

Page 216

```
1              BRIAN SOWERS
2    who provided "Don't Know" responses,        14:50:50
3    which is really the purpose of that         14:50:51
4    question is a filter and funnel.            14:50:53
5        Q.    So you mentioned Dr. Kivetz's     14:51:12
6    coding of question 4.  Do you have any      14:51:21
7    opinions about the coding that Professor    14:51:26
8    Kivetz conducted for the toothpaste and     14:51:29
9    deodorant surveys on question 4?            14:51:32
10       A.    I think what he did really        14:51:35
11   shows the problems with trying to rely on   14:51:36
12   open-ended codes.                           14:51:39
13            For example, he parsed on          14:51:43
14   anyone who said in response to question 4   14:51:44
15   that it's natural as a "natural"            14:51:46
16   response, which was about 50 percent of     14:51:52
17   the total sample I believe.  And he just    14:51:54
18   arbitrarily assumed that they were not      14:51:55
19   deceived.                                   14:52:00
20            And I think that's one of the      14:52:00
21   problems that Dr. Jacobi talks about        14:52:01
22   open-ended coding.  That because it's       14:52:03
23   open to subjectivity, different coders      14:52:05
24   can come up with different                  14:52:09
25   interpretations of the data.  He coded      14:52:10
```

```
                                        Page 217
 1              BRIAN SOWERS
 2   those individuals as "not confused."  I        14:52:13
 3   could have looked at them and said              14:52:17
 4   because they said "natural," I do think         14:52:18
 5   they are confused.  So really what he           14:52:20
 6   does, he points out how the subjectivity,       14:52:22
 7   the vague and ambiguous answers and             14:52:25
 8   open-ended coding really make them              14:52:28
 9   unreliable for anything other than a            14:52:31
10   filtering and funneling process to get to       14:52:33
11   the closed-end question, which is the           14:52:37
12   focus of my opinion.                            14:52:39
13       Q.    Right.  And for any consumers         14:52:43
14   that may have had a different                   14:52:45
15   understanding of the word "natural," you        14:52:46
16   didn't actually ask them what they think        14:52:49
17   the word "natural" means, right?                14:52:51
18       A.    Well, that's part of the             14:52:55
19   problem.  What Dr. Kivetz coded as quote        14:52:56
20   unquote natural, again he's arbitrarily         14:53:00
21   said they are not deceived.                     14:53:03
22            If those same respondents,            14:53:04
23   though, were asked question 5, some of         14:53:06
24   them may say they take away a message          14:53:08
25   that it communicates that it's only            14:53:10
```

```
                                    Page 218

  1              BRIAN SOWERS

  2    natural ingredients, no artificial          14:53:12

  3    ingredients.  Some of those respondents     14:53:15

  4    may answer "Don't Know, Unsure, No          14:53:17

  5    Opinion," because they have a different     14:53:19

  6    interpretation.  But you need to look at    14:53:20

  7    question 5 to understand that.  You can't   14:53:22

  8    look at question 4, for example, to         14:53:25

  9    decide arbitrarily whether they are or      14:53:28

 10    are not deceived.  You need the responses   14:53:31

 11    to question 5.                              14:53:32

 12       Q.    And in question 5, you're          14:53:33

 13    basically asking consumers whether they     14:53:34

 14    agree with your definition of "natural";    14:53:38

 15    is that a fair characterization?            14:53:40

 16       A.    No, I don't think so.  I think     14:53:42

 17    it's asking them whether based on --        14:53:44

 18    actually, let me go to my actual survey     14:53:45

 19    question.                                   14:53:48

 20            It asked them, based on the         14:53:57

 21    product packaging, do you believe the       14:53:59

 22    toothpaste shown, and again three           14:54:00

 23    different interpretations for what it       14:54:03

 24    could mean or two options to give the       14:54:04

 25    respondent if they didn't take away that    14:54:07
```

Page 219

```
 1              BRIAN SOWERS
 2  interpretation.  So if they didn't        14:54:09
 3  believe that any of those definitions     14:54:12
 4  applied, they could have put "No Opinion"  14:54:13
 5  or "Don't Know, Unsure," which there are   14:54:15
 6  respondents who selected that.             14:54:18
 7      Q.    And I think we went over this    14:54:27
 8  earlier, but did you provide an option     14:54:28
 9  for question 5 survey respondents to       14:54:32
10  indicate that they believed a natural      14:54:36
11  product is one that is sourced or derived  14:54:39
12  from nature?                               14:54:42
13      A.    Again, that wasn't the           14:54:43
14  hypothesis I was testing.  I was testing   14:54:45
15  whether they understand it to mean         14:54:47
16  contains only natural ingredients.  That   14:54:49
17  is not artificial ingredients.             14:54:51
18            If they took away that           14:54:53
19  particular definition, and came with this  14:54:55
20  question, they would have answered "No     14:54:59
21  Opinion" or "Don't Know/Unsure," because   14:55:01
22  their belief wouldn't align with what's    14:55:03
23  presented here.  And they had the option   14:55:05
24  to say "I don't know" or "I have no        14:55:08
25  opinion."                                  14:55:09
```

```
                                        Page 220

 1                BRIAN SOWERS
 2      Q.    And did you include a response     14:55:15
 3   for question 5 for consumers who believed    14:55:19
 4   "natural" means sustainably sourced?         14:55:28
 5      A.    Again, if they took away that       14:55:30
 6   impression and they did not take away an     14:55:35
 7   impression about any of these three, they    14:55:37
 8   would have been "Don't Know/Unsure" or       14:55:39
 9   "No Opinion."                                14:55:40
10      Q.    Well, do you agree with me that     14:55:43
11   consumers could believe that "natural" on   14:55:45
12   a toothpaste or deodorant product refers     14:55:46
13   to an aspect of the product other than       14:55:50
14   its ingredients?                             14:55:54
15      A.    I think if that were true, then     14:55:54
16   they had the option to say "No Opinion"      14:56:00
17   or "Don't Know/Unsure," which is what        14:56:01
18   those questions are for.                     14:56:03
19      Q.    And would you agree that            14:56:04
20   consumers could believe that "natural" on   14:56:07
21   a toothpaste or deodorant product refers     14:56:10
22   to the product being derived from a          14:56:13
23   natural elements?                            14:56:16
24      A.    I think, again, if they took        14:56:16
25   away that impression, that would be          14:56:18
```

```
                                        Page 221

 1                  BRIAN SOWERS

 2    reflected in the "No Opinion" and the        14:56:19

 3    "Don't Know/Unsure" options in my survey.    14:56:22

 4        Q.    And would you agree that           14:56:24

 5    consumers could believe that "natural" on    14:56:26

 6    a toothpaste or deodorant product refers     14:56:29

 7    to the product being sourced from a          14:56:31

 8    natural element?                             14:56:33

 9        A.    Again, if that was the belief      14:56:39

10    that they took and it didn't comport with    14:56:40

11    these three response options, it would be    14:56:42

12    reflected in the "No Opinion" or "Don't      14:56:44

13    Know/Unsure" response options.               14:56:46

14        Q.    Would you agree with me that       14:56:47

15    consumers could believe that "natural" on    14:56:49

16    a toothpaste or deodorant product refers     14:56:52

17    to a product that is simple?                 14:56:54

18        A.    What do you mean by simple?  I     14:56:55

19    guess I don't know what you mean by          14:57:04

20    simple.                                      14:57:06

21        Q.    Okay.  So you don't agree or       14:57:06

22    disagree with that?                          14:57:08

23        A.    I just don't understand your       14:57:09

24    question.  I don't know what simple means    14:57:12

25    in that context.                             14:57:18
```

```
                                              Page 224

 1              BRIAN SOWERS

 2              MR. SAVARESSE:  Welcome back        15:16:17

 3       everyone.  Welcome back from a short       15:16:17

 4       break.                                     15:16:19

 5   BY MR. SAVARESSE:

 6       Q.    So Professor, or Doctor or           15:16:20

 7   Mr. Sowers.                                    15:16:25

 8       A.    Mr.                                  15:16:25

 9       Q.    So sorry about that.  Just a         15:16:26

10   few more questions here.  I think we           15:16:29

11   talked a little bit about this earlier.        15:16:32

12   But I think you mentioned or you counted       15:16:36

13   15 false advertising cases in which you        15:16:38

14   offered opinion or testimony in the last       15:16:42

15   five years?                                    15:16:44

16       A.    Yes, I think so.                     15:16:45

17       Q.    Do you recall how many of those      15:16:49

18   cases were on behalf of plaintiffs?            15:16:50

19       A.    Hold on.  Give me a second and       15:16:53

20   I can tell you.                                15:16:56

21              11 of the 15 have been for          15:18:02

22   plaintiff.                                     15:18:04

23       Q.    And then for the other four,         15:18:04

24   were your opinions or testimony offered        15:18:08

25   on behalf of defendants?                       15:18:11
```

Page 225

1              BRIAN SOWERS

2      A.    Yes, they were.              15:18:13

3      Q.    Which four cases were those?    15:18:14

4      A.    Hold on.  On page A3 it's      15:18:15

5   Organic Consumers Association versus      15:18:30

6   Handsome Brook Farm.                     15:18:34

7           Page A5, Louisiana Pacific       15:18:36

8   Corporation versus James Hardie Building  15:18:45

9   Products.                                15:18:47

10          Provepharm versus Akorn.        15:18:48

11          FTC versus Nudge LLC.           15:18:56

12     Q.    Which page is that one?        15:19:17

13     A.    A8, the top of the page, and   15:19:19

14  Hansen versus Newegg on the same page.   15:19:27

15     Q.    Okay.  And of the 15 false     15:19:48

16  advertising cases that you've been       15:19:58

17  involved in over the last five years, how 15:20:02

18  many of those, if any, were with Bursor & 15:20:04

19  Fisher?                                  15:20:10

20     A.    None I believe.  I don't       15:20:11

21  believe I worked with them before.       15:20:14

22     Q.    Okay.  And sorry, I am just     15:20:15

23  going to be skipping around a little bit. 15:20:23

24  We are in sort of hopefully the end phase 15:20:26

25  here.                                    15:20:30

```
                                         Page 226

 1               BRIAN SOWERS
 2          So just turning back to your      15:20:30
 3     control design.                        15:20:33
 4     A.    Yes.                             15:20:36
 5     Q.    Do you agree, just sort of       15:20:37
 6     generally, with the proposition that a 15:20:45
 7     control, a control packaging design    15:20:48
 8     should, should simulate real world market 15:20:51
 9     conditions?                           15:20:56
10     A.    It should.  That's why in my     15:20:57
11     survey I allow people to look at it from 15:21:03
12     multiple angles and to zoom in like they 15:21:05
13     could in the real world, so, yes, I    15:21:07
14     agree.                                15:21:09
15     Q.    Did you take any steps to        15:21:09
16     confirm whether there were any oral care 15:21:13
17     or personal care products that had red, 15:21:20
18     red labeling on them indicating that the 15:21:29
19     products contain some natural          15:21:34
20     ingredients?                          15:21:35
21     A.    I'm sorry, you broke up on me a  15:21:36
22     little bit and I just got a little thing 15:21:38
23     saying my internet is slow.  Would you 15:21:40
24     mind repeating that, please?          15:21:42
25     Q.    Sure.  Did you take any steps    15:21:43
```

```
                                          Page 227
 1              BRIAN SOWERS
 2   to confirm whether there were any oral    15:21:45
 3   care or personal care products on store   15:21:48
 4   shelves that had red labeling on them     15:21:51
 5   indicating that the products contained    15:21:54
 6   some natural ingredients?                 15:21:55
 7       A.    I don't think that's -- when    15:21:57
 8   you say replicating marketplace           15:22:01
 9   conditions, I mean you're able to see the 15:22:03
10   product as it exists in the real world.   15:22:05
11   And I think in terms of the control that  15:22:07
12   I used, I'm correcting for what           15:22:08
13   plaintiffs allege is defendant's          15:22:12
14   deceptive advertising.                    15:22:15
15            So I am not trying to mimic any  15:22:15
16   particular product on the shelf.  My      15:22:19
17   control is to control for perceptions in  15:22:21
18   the test condition.  So that's a little   15:22:25
19   bit different, I think, than marketplace  15:22:26
20   conditions.                               15:22:28
21       Q.    Sure.  I think I understand the 15:22:29
22   distinction you're making.  So let me try 15:22:32
23   to ask my other question a little bit     15:22:34
24   differently.                              15:22:36
25            Do you agree that control        15:22:36
```

Page 228

1              BRIAN SOWERS

2    packaging should resemble a commercially      15:22:42

3    viable product package?                       15:22:45

4              MR. BECK:   Form.                    15:22:49

5         A.    I think it depends on the          15:22:50

6    nature of the allegation.  I mean here        15:22:52

7    what plaintiffs have alleged is that          15:22:57

8    Tom's natural representation is deceptive     15:23:00

9    and that it should have communicated this     15:23:06

10   all along.                                    15:23:08

11             So it's really -- not to come       15:23:09

12   off flippant, because it's not meant to       15:23:13

13   be -- it's not up to me to correct Tom's      15:23:15

14   advertising for the marketplace.  For         15:23:18

15   purposes of my survey, I crafted up an        15:23:19

16   appropriate control to be able to control     15:23:22

17   for the element that I needed to in the       15:23:24

18   survey.                                       15:23:26

19        Q.    I think the question I am          15:23:28

20   trying to ask is, do you believe or do        15:23:30

21   you agree that the control packaging          15:23:32

22   should resemble the packaging of a            15:23:36

23   product that a consumer might find on         15:23:39

24   store shelves?                                15:23:41

25        A.    Well, I mean, it does.  My         15:23:42

Page 229

|       |                                  |          |
|-------|----------------------------------|----------|
|       | BRIAN SOWERS                     |          |
| 1     |                                  |          |
| 2     | control is the package just controlling | 15:23:46 |
| 3     | for the element that needs to be | 15:23:48 |
| 4     | controlled.                      | 15:23:50 |
| 5     |     In some situations, a control | 15:23:51 |
| 6     | for trade dress, for example, you remove | 15:23:53 |
| 7     | the name of the brand on there.  And | 15:23:55 |
| 8     | that's an appropriate control.  So I | 15:23:58 |
| 9     | think I disagree with that concept.  I | 15:24:03 |
| 10    | think a control should be as similar to | 15:24:05 |
| 11    | the test but for whose element for the | 15:24:10 |
| 12    | influence that you're testing, which is | 15:24:12 |
| 13    | what I have done here.            | 15:24:14 |
| 14    |     Q.    I guess another way to | 15:24:15 |
| 15    | accomplish that would be to just remove | 15:24:16 |
| 16    | the word "natural," right?        | 15:24:18 |
| 17    |     A.    Well, that wouldn't be an | 15:24:19 |
| 18    | appropriate control for what I am | 15:24:24 |
| 19    | testing.  If I had simply removed the | 15:24:26 |
| 20    | word "natural," all that would control | 15:24:27 |
| 21    | for is whether people may say there is a | 15:24:30 |
| 22    | "natural" representation on the product | 15:24:32 |
| 23    | when in fact there isn't.  That's not | 15:24:34 |
| 24    | what we needed to be controlled in my | 15:24:37 |
| 25    | survey.                          | 15:24:39 |

```
                                              Page 230

 1              BRIAN SOWERS
 2         My survey needed to control how      15:24:40
 3   many people, even if Tom's put on the      15:24:42
 4   package that it contains some natural      15:24:44
 5   ingredients, it contains one or more       15:24:46
 6   artificial ingredients, would still take   15:24:48
 7   away the mistaken impression.  It          15:24:57
 8   wouldn't be the appropriate control for    15:25:00
 9   this survey.                               15:25:01
10    Q.    I guess I still think you           15:25:02
11   haven't answered the prior question.       15:25:04
12         Do you agree that the control        15:25:06
13   packaging design should resemble a         15:25:09
14   product that consumers would find in the   15:25:12
15   marketplace?                               15:25:16
16         MR. BECK:  Form.                      15:25:17
17    A.    Again, as it relates to this,       15:25:18
18   there are surveys for litigation where     15:25:25
19   the control is something completely        15:25:26
20   different and is meant to be something     15:25:28
21   that is not found in the marketplace.  So  15:25:30
22   as a general rule, no, I don't agree with  15:25:32
23   that statement.                            15:25:35
24         As it applies to my survey,          15:25:36
25   again, my control is a product that's in   15:25:38
```

Page 231

1              BRIAN SOWERS

2  the marketplace.  I have simply added        15:25:42

3  what plaintiffs allege should have been       15:25:44

4  included all along.                           15:25:47

5      Q.    Okay.  Well, did you do            15:25:48

6  anything to confirm that the packaging        15:25:51

7  that you designed looked like the package     15:25:56

8  that a consumer might find on store           15:26:04

9  shelves?                                      15:26:07

10     A.    It is a Tom's packaging, so it      15:26:08

11  is a product that's found on consumer        15:26:11

12  shelves.                                      15:26:15

13     Q.    Well, the package that you          15:26:15

14  designed with the red lettering "Contains    15:26:18

15  Some Natural Ingredients" in all caps is     15:26:22

16  not a package that consumers see today,       15:26:26

17  right?                                        15:26:29

18     A.    No.  Again, I am correcting for     15:26:30

19  what -- plaintiffs allege that Tom's has     15:26:33

20  been using deceptive advertising by using    15:26:37

21  the phrase "natural."  What I have done      15:26:39

22  is corrected to account for plaintiffs'      15:26:41

23  allegation.                                   15:26:44

24          So I think plaintiffs would          15:26:44

25  agree that if Tom's had had this in the      15:26:46

```
                                        Page 232

 1              BRIAN SOWERS

 2   marketplace in the beginning, it would      15:26:50

 3   have gone a way towards dispelling the      15:26:51

 4   confusion.  We know from my control that    15:26:53

 5   there is still a large number of people     15:26:56

 6   that still don't take away the              15:26:58

 7   appropriate message.  So it's capturing     15:27:00

 8   guessing.  But this package is supposed     15:27:03

 9   to represent something that would be, in    15:27:05

10   plaintiffs' mind, not allegedly            15:27:07

11   infringing, and that's the purpose of the  15:27:09

12   control.  Not commercially viable.         15:27:11

13       Q.    Understood.  Thank you.           15:27:13

14             And then just flipping back to    15:27:17

15   the screener questions that you asked, do   15:27:19

16   you know what portion of likely            15:27:24

17   prospective purchasers who participated    15:27:28

18   in your toothpaste or deodorant surveys    15:27:31

19   are likely prospective purchasers of       15:27:36

20   Tom's products?                            15:27:40

21       A.    I don't.  So for purposes of      15:27:41

22   the survey, I am not looking for Tom's      15:27:45

23   purchasers specifically.  But for          15:27:48

24   deceptive advertising surveys, it's        15:27:50

25   potential purchasers of the goods and      15:27:52
```

Page 233

BRIAN SOWERS

2   services at issue.  So it's natural          15:27:53

3   toothpaste or natural deodorant, not         15:27:55

4   necessarily Tom's.                           15:27:58

5      Q.    So in your survey, do you test      15:28:07

6   or control for whether reasonable            15:28:08

7   consumers believe "natural" on toothpaste    15:28:13

8   or deodorant packaging means naturally       15:28:15

9   sourced or naturally derived?                15:28:18

10     A.    Again, that's not what I am         15:28:19

11  controlling for.  I am controlling for       15:28:23

12  plaintiffs' hypothesis that it contains      15:28:26

13  only natural ingredients, i.e., no           15:28:28

14  artificial ingredients.                      15:28:30

15          Again, if someone took away          15:28:32

16  that impression, they would have had the     15:28:34

17  option to select the "Don't Know/Unsure,"    15:28:36

18  the "No Opinion" response option, or if      15:28:39

19  they felt they were being forced to          15:28:44

20  guess, that would have been accounted for    15:28:48

21  in my control condition.  So it's            15:28:49

22  covered, but not controlled.                 15:28:51

23     Q.    Okay.  So are you offering an       15:28:52

24  opinion in this case on whether              15:28:54

25  reasonable consumers believe "natural" on    15:28:57

```
                                          Page 234
 1              BRIAN SOWERS
 2   toothpaste or deodorant packaging means    15:29:01
 3   naturally sourced or naturally derived?     15:29:03
 4       A.    My opinion is based solely on     15:29:05
 5   what I state is my opinion in paragraph 7   15:29:06
 6   of my background and assignment; whether    15:29:14
 7   consumers believed the "natural"           15:29:16
 8   representation communicates that the       15:29:19
 9   product contains only natural              15:29:21
10   ingredients, i.e., no artificial           15:29:24
11   ingredients.                               15:29:24
12       Q.    Okay.  Did you test whether       15:29:26
13   reasonable consumers equate the "natural"  15:29:29
14   representation with a product that's       15:29:31
15   sustainably sourced?                       15:29:34
16       A.    That wasn't part of my           15:29:36
17   assignment.                                15:29:40
18       Q.    So you're not offering an        15:29:40
19   opinion on that question?                  15:29:41
20       A.    No.  Again, I think if asked     15:29:43
21   about it, if someone took away that        15:29:48
22   impression from my survey, they would be   15:29:50
23   selected and accounted for in my "No       15:29:52
24   Opinion, Don't Know" response options.     15:29:57
25       Q.    Did you test whether reasonable  15:29:58
```

```
                                        Page 237
 1              BRIAN SOWERS
 2   took that away as an unnatural          15:32:05
 3   ingredient, that they would have        15:32:09
 4   indicated as such in the survey.        15:32:09
 5       Q.   Let me ask the question again. 15:32:19
 6            Did you test, sir, whether     15:32:21
 7   reasonable consumers consider propylene 15:32:24
 8   glycol to be a natural ingredient?      15:32:27
 9            MR. BECK:  Form.               15:32:29
10       A.   Again, if that's one of the    15:32:30
11   ingredients in the products at issue and 15:32:32
12   respondents all had access to the product 15:32:35
13   packaging, to the labeling in the back, 15:32:37
14   they could see that, so that information 15:32:39
15   was available to them.                  15:32:41
16            If they reviewed that and felt 15:32:42
17   that that was an artificial ingredient, 15:32:46
18   then that would be reflected in the     15:32:52
19   survey responses.                       15:32:54
20       Q.   Would it also be reflected if  15:32:54
21   they thought it was a natural ingredient? 15:32:56
22       A.   It would.  They had access to  15:32:59
23   that information.  So if the inclusion of 15:33:01
24   that information would enhance or dispel 15:33:04
25   deception, it was available to          15:33:07
```

```
                                          Page 238
 1              BRIAN SOWERS
 2   respondents to see in the survey.        15:33:09
 3      Q.    And the same question, did you   15:33:13
 4   test whether reasonable consumers        15:33:15
 5   consider xylitol to be a natural         15:33:17
 6   ingredient?                              15:33:21
 7      A.    Again, to the extent it was     15:33:23
 8   included in the products at issue, every 15:33:24
 9   respondent in the survey had the ability 15:33:28
10   to look at the back of the packaging to  15:33:30
11   see the ingredients.  If they saw that   15:33:32
12   information and they were still deceived, 15:33:34
13   that would be reflected in the responses. 15:33:39
14              Alternatively, if that        15:33:42
15   dispelled their deception, that would be 15:33:43
16   reflected in the survey response as well. 15:33:45
17      Q.    But you didn't ask them         15:33:48
18   directly whether they think xylitol is a 15:33:49
19   natural ingredient?                      15:33:52
20      A.    No, I think, thinking about     15:33:54
21   Dr. Kivetz's report, he was saying the   15:33:58
22   fact that this information was available  15:34:00
23   would dispel deception.                  15:34:01
24              Every respondent in my survey 15:34:04
25   had access to look at the product        15:34:06
```

Page 239

1            BRIAN SOWERS

2    packaging, to look at the ingredients.        15:34:08

3    So the extent that was something that         15:34:10

4    they would look at to make that               15:34:12

5    determination, it was available to them       15:34:13

6    in the survey.                                15:34:15

7        Q.    So you have a survey               15:34:18

8    respondent.  They see xylitol on the          15:34:20

9    ingredient list on the back of the            15:34:24

10   packaging.  And in response to question 5     15:34:26

11   they say that they believe the product        15:34:30

12   contains only natural ingredients.  Is it     15:34:32

13   your belief that that survey respondent       15:34:39

14   believes xylitol is a natural ingredient?     15:34:41

15       A.    It would be my opinion that        15:34:48

16   that respondent had the ability to see        15:34:48

17   that ingredient.  If they saw that            15:34:50

18   ingredient and still took away an             15:34:52

19   impression that it contained only natural     15:34:54

20   ingredients, then, yes, I would say that      15:34:57

21   that respondent would have indicated          15:34:59

22   that -- would have believed that xylitol      15:35:00

23   was a natural ingredient.                     15:35:03

24       Q.    Same question for sodium lauryl    15:35:09

25   sulfate.  Did your surveys test whether       15:35:12

```
                                          Page 240
 1              BRIAN SOWERS
 2   reasonable consumers consider sodium        15:35:19
 3   lauryl sulfate to be a natural             15:35:22
 4   ingredient?                                15:35:24
 5      A.    The same answers.  Every          15:35:24
 6   respondent had the ability to see the      15:35:25
 7   ingredients list and to zoom in very       15:35:27
 8   closely.  If they looked at it and took    15:35:30
 9   away the impression that it was a natural  15:35:32
10   ingredient, then that would be reflected   15:35:33
11   in their survey response.                  15:35:36
12      Q.    Okay.  And in the interest of     15:35:37
13   these efficiencies, I am going to lump     15:35:41
14   the rest of these ingredients into one     15:35:43
15   question.  Did your survey test whether    15:35:45
16   reasonable consumers consider sorbitol or  15:35:46
17   sorbic acid, glycerin or xanthan gum to    15:35:50
18   be a natural ingredient?                   15:35:54
19      A.    To the extent those ingredients   15:36:00
20   are included in the products that I        15:36:01
21   tested, every respondent had access to     15:36:02
22   the ingredient list and could zoom in      15:36:05
23   very closely.  So if they took away an     15:36:07
24   impression from the survey that it was a   15:36:09
25   natural ingredient, that would be          15:36:12
```

Page 241

1              BRIAN SOWERS

2   reflected in their survey response.          15:36:12

3       Q.    Did you test, sir, what            15:36:20

4   reasonable consumers understand the term     15:36:33

5   "artificial ingredient" to mean?            15:36:34

6       A.    Again, it's defined in the         15:36:39

7   survey as natural ingredients, i.e., no      15:36:41

8   artificial ingredients.                      15:36:44

9           As I said before, I pretested        15:36:45

10   the survey and didn't have any              15:36:49

11   respondents indicate that they didn't       15:36:50

12   understand what that definition meant.      15:36:52

13       Q.    Do you have any opinions, sir,    15:36:54

14   on any redesigned Tom's packaging that      15:37:00

15   does not include the word "natural" on      15:37:02

16   the front?                                  15:37:04

17       A.    I wasn't asked to test any of     15:37:09

18   the redesigned packaging.                   15:37:11

19           MR. SAVARESSE:  I have no           15:37:18

20       further questions.                      15:37:19

21           MR. BECK:  No redirect.            15:37:19

22           THE VIDEOGRAPHER:  Now going off    15:37:27

23       the record at approximately 3:37 p.m.  15:37:28

24           (Time noted:  3:37 p.m.)

25

Page 243

1

2                    CERTIFICATION

3

4      I, DAWN MATERA, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12     I further certify that I am not

13  related to any of the parties to this

14  action by blood or marriage, and that I

15  am in no way interested in the outcome of

16  this matter.

17     IN WITNESS WHEREOF, I have hereunto

18  set my hand this 16th day of September,

19  2022.

20

21

22   DAWN MATERA

23

24

25