# EXHIBIT 26

Page 1

1  UNITED STATES DISTRICT COURT
2  SOUTHERN DISTRICT OF NEW YORK
3  -----------------------------------x
4  ANNE DE LACOUR, ANDREA WRIGHT, and
   LOREE MORAN, individually and on
5  behalf of all others similarly
   situated,
6
                        Plaintiffs,
7
      -against-        Civil Action
8                      No. 1:16-cv-08364
   COLGATE-PALMOLIVE CO.,
9  and TOM'S OF MAINE INC.,
10                     Defendants.
11 -----------------------------------x
12                     July 17, 2018
                       9:42 a.m.
13
14     Videotaped Deposition of LOREE
15 MORAN, taken by Defendants, pursuant to
16 Notice, at the offices of Latham &
17 Watkins LLP, 885 Third Avenue, New York,
18 New York, before ERIC J. FINZ, a
19 Shorthand Reporter and Notary Public
20 within and for the State of New York.
21
22
23
24

1       it easier.

2            Q.    Did you feel that there was

3       some problem with the -- with this Kind

4       product before you talked to anybody at

5       Bursor & Fisher, or was it only after you

6       talked to them that you felt there was a

7       problem?

8            A.    No, I felt there was a problem

9       before.

10           Q.    Okay.  So how is it that you

11      figured out that there was a problem with

12      the Kind Bars before you talked to your

13      lawyers?

14           A.    I don't remember.  I don't

15      remember.

16           Q.    Do you remember anything about

17      it at all?

18           A.    No.

19           Q.    Do you recall anything about

20      what things on the package that you felt

21      were incorrect?

22           A.    Not offhand without -- no, I

23      don't.

24           Q.    So you don't remember what

1    specific things about the Kind packaging

2    were problematic, and you don't remember

3    in what way you figured out those

4    statements were problematic.  Is that

5    accurate?

6            A.    Yes.

7            Q.    Okay.  Let's talk about how

8    you came to be a plaintiff in this case.

9    Okay?

10               I understand that you had

11   purchased Tom's deodorant products

12   before.  Is that correct?

13           A.    Yes.

14           Q.    Tell me about the -- when was

15   the first time you purchased a Tom's

16   deodorant product that's the subject in

17   this case?

18           A.    It was several years ago.

19           Q.    How many years ago?

20           A.    I don't know exactly.

21           Q.    What's the best -- what's the

22   most accurate range you can give me for

23   when was the first time you purchased a

24   Tom's deodorant product?

1          A.      2015, 2016.

2          Q.      And how do you know that?

3          A.      I was specifically looking --

4    it was a conversation in the faculty room

5    where I teach regarding deodorants.

6          Q.      And how does that help you

7    recall that it was sometime in either

8    2015 or 2016?

9          A.      Because it was after school

10   started.  So that would have been

11   September of '15, into '16.  Sometime in

12   that time frame.

13         Q.      And so my question I guess is,

14   do you have a specific recollection that

15   it was September of 2015 or later that

16   you had -- that you first purchased a

17   Tom's deodorant product?

18         A.      Yes.

19         Q.      How do you know that it was

20   2015?

21              MR. KOPEL:  Objection; asked

22        and answered.

23              You can respond.

24         A.      Because I recall the

Page 21

1    conversation, I recall other things that
2    were going on at the time.
3         Q.    Okay.  Tell me what else you
4    recall that was going on at the time you
5    first purchased the Tom's deodorant
6    that's at issue in this case.
7         A.    There was another teacher in
8    my building who she's extremely health
9    conscious, and very knowledgeable about
10   health issues, health products.  There
11   had been some literature at the time
12   regarding -- regarding, I don't know, it
13   was a finding at the time regarding
14   deodorants, and we got into a whole
15   conversation in the faculty room.  She's
16   a very passionate person, so she stands
17   out in my mind.
18            Unfortunately she's no longer
19   in my building, so that time frame, you
20   know, I remember when she was there, my
21   classroom had just been moved.  So there
22   were some things that -- I had been moved
23   into her hallway so I was seeing much
24   more of her.

1        action complaint.)

2    BY MR. CALLAHAN:

3        Q.    I've put in front of you what

4    we've marked as Exhibit 3, which is

5    entitled the declaration of Loree Moran.

6            Do you see that?

7        A.    Yes, I do.

8        Q.    And is this a -- let me just

9    ask, is it your signature on page 3 of

10   Exhibit 3?

11       A.    That is.

12       Q.    And did you prepare this

13   declaration for the purpose of this

14   lawsuit?

15       A.    This appears to be the one,

16   yes.

17       Q.    Okay.  The declaration itself,

18   your signature is on page 3, but the

19   declaration itself is just pages 1 and 2

20   of Exhibit 3.  Do you see anything in

21   here about your purchase of Tom's of

22   Maine toothpaste?

23       A.    No, I didn't.

24       Q.    Why not?

1          A.     No particular reason.

2          Q.     Is that one of the things that

3     you're complaining about in this case, is

4     the accuracy of the representations on

5     Tom's of Maine's toothpaste products?

6          A.     I was talking about the

7     deodorant.

8          Q.     Okay.  But in this case are

9     you also, you, Loree Moran, also

10    complaining about Tom's of Maine's

11    toothpaste products?

12         A.     The toothpaste -- I was

13    concerned with the deodorant.

14         Q.     So you're not concerned with

15    the toothpaste product?

16         A.     Not specifically, no.

17         Q.     Okay.  Let me ask you to take

18    a look at Exhibit 4.  Which is the first

19    amended complaint.

20              If you take a look, page 4,

21    paragraph 8.  Paragraph 8 relates to your

22    specifics of this case as they relate to

23    you.  Is that correct?

24         A.     That's correct.

1        Q.    And does paragraph 8 have
2    anything -- paragraph 8 of Exhibit 4,
3    which is the first amended class action
4    complaint in this case, does that have
5    anything to do with toothpaste?
6        A.    No, it doesn't.
7        Q.    Okay.  Again, this reflects
8    that your focus in this case is on --
9    your concern in this case has to do with
10   deodorant and not toothpaste.  Correct?
11       A.    That's correct.
12       Q.    What type of toothpaste do you
13   use now?
14       A.    I don't know the brand
15   offhand.  I don't know the brand offhand.
16       Q.    Do you know what kind of
17   toothpaste it is?
18       A.    What do you mean?
19       Q.    Well, let me ask this
20   question:  Do you always buy the same
21   toothpaste or do you buy whatever's on
22   sale?
23       A.    I don't -- I'm not
24   consistently using the same brand of

Page 80

```
 1    toothpaste, no.
 2         Q.    What brands of toothpaste have
 3    you used over the last say two years?
 4         A.    Colgate, Crest, what is it,
 5    Arm & Hammer baking soda toothpaste.
 6         Q.    So not natural toothpastes?
 7         A.    The Arm & Hammer baking soda I
 8    believe is the most natural.
 9         Q.    What about the Colgate and
10    Crest?
11         A.    No.
12         Q.    And do you have -- well, let
13    me take a step back.
14              Why not?  Why don't you use a
15    natural toothpaste?
16         A.    No particular reason.
17         Q.    Are you unconcerned with the
18    ingredients that are in toothpastes?
19    When I say toothpastes, I mean sort of
20    mainstream toothpastes.
21         A.    I'm not unconcerned.  I'm not
22    aware of any issues with mainstream
23    toothpaste.
24         Q.    When you say you're not aware
```

Page 132

1    litigation, are there documents that

2    relate to the resolution of that

3    litigation?

4         A.    Yes.

5         Q.    Okay.

6              MR. CALLAHAN:   Counsel, we'll

7         follow up with this, but we're

8         going to ask for both of those

9         documents.

10             (Request for production.)

11   BY MR. CALLAHAN:

12        Q.    Can you go back, Ms. Moran, to

13   Exhibit 4, it's the complaint, the first

14   amended complaint in this case.  If you

15   take a look at paragraph 8, the last

16   sentence there says, "In purchasing Tom's

17   products Ms. Moran paid a price premium

18   over and above other deodorants that did

19   not purport to be natural."

20             Do you see that?

21        A.    Yes.

22        Q.    At the store that you

23   purchased the Tom's of Maine deodorants

24   from, Trader Joe's in Oceanside, New

```
1    York, what were the deodorants that did
2    not purport to be natural?  What was
3    offered there?
4         A.    I don't know.  I don't recall.
5         Q.    Do you know any of them?
6         A.    I think I already answered
7    that this morning.  I don't recall.
8         Q.    And maybe you answered this as
9    well, what was the price premium over --
10   of the Tom's product that you say you
11   purchased over and above the other
12   products that did not purport to be
13   natural?
14        A.    Are you asking what the price
15   premium is over -- on the Tom's product
16   over other products I've purchased?
17        Q.    Well, I'm asking what it says
18   in your complaint.  This is your
19   complaint.  And I understand you've
20   worked with your lawyers on that.  It
21   says, "In purchasing Tom's products,
22   Ms. Moran paid a price premium over and
23   above other deodorants that did not
24   purport to be natural."
```

                                        Page 134

1               So my first question is, what

2       are the other deodorants that are

3       referred to there, do you know?

4          A.    As I said this morning, I've

5       used Secret, I've used Arid, I've used

6       Mitchum.

7          Q.    Okay.  And what is the price

8       premium of the Tom's product that you

9       purchased over and above any of those

10      products?

11         A.    I don't know exactly.

12         Q.    Do you know if there is a

13      price premium?

14         A.    Yes.

15         Q.    Do you know how much it is?

16         A.    I've already said I don't know

17      an exact amount.

18         Q.    And the products that you

19      referred to here, the other deodorants,

20      were those deodorants that were available

21      at Trader Joe's?

22         A.    No.

23         Q.    Were there -- do any of the

24      other deodorants that are referred to in

1    paragraph 7 of Exhibit 4, were any of

2    those products at Trader Joe's?

3         A.    Did I go now to paragraph 7,

4    because you were on paragraph 8?

5         Q.    No, I'm still on paragraph 8,

6    I'm sorry.  If I misspoke I apologize.

7              My question is this:  The

8    other deodorants that you referred to in

9    the last sentence of paragraph 8 of

10   Exhibit 4, were any of those products at

11   the Trader Joe's in Oceanside?

12        A.    Not that I recall.

13        Q.    Okay.  So your choice, I take

14   it, was either buy the Tom's product at

15   Trader Joe's or get one of those other

16   deodorants that would have been, I take

17   it, cheaper at a different store.  Is

18   that right?

19        A.    That would be correct.

20        Q.    Okay.  And is that store CVS,

21   is that where you typically had

22   previously purchased deodorant products,

23   or underarm protection products?

24        A.    CVS is one of the places I've

1    purchased those products, yes.

2         Q.    Where else?

3         A.    King Kullen, Target.

4         Q.    Any others?

5         A.    Stop & Shop.

6         Q.    And at present you purchase

7    your underarm protection products online.

8    Is that right?  From Amazon.

9         A.    Not exclusively.

10        Q.    Where else do you buy it from?

11        A.    I haven't purchased anything

12   else recently, so my most recent

13   purchases have been online.

14        Q.    Have you purchased any of the

15   Crystal, the Crystal deodorant product

16   that you use now?

17        A.    Um-hum.

18        Q.    Have you purchased any of that

19   other than Amazon?

20        A.    No.

21        Q.    So, and subsequent to your,

22   when you stopped using the Tom's of Maine

23   deodorant, have you used any other

24   deodorant or underarm protection product

Page 137

```
 1    other than the Crystal product available
 2    from Amazon?
 3         A.    I don't think so.  I'm not 100
 4    percent certain.
 5         Q.    Let me ask you to take a look
 6    on page 9 of Exhibit 4, paragraph 24.
 7    And there you say, "The term 'natural'
 8    means existing in nature and not made or
 9    caused by people, coming from nature."
10              Do you see that?
11         A.    Yes, I do.
12         Q.    Is that your definition of
13    "natural"?
14         A.    That is very -- that aligns
15    and agrees with my definition of
16    "natural."
17         Q.    So not made by people, is what
18    you say natural is?
19         A.    No, I didn't say that.
20         Q.    Well, that's what your
21    complaint says.  That's why I'm a little
22    bit confused.  Your complaint says, "The
23    term 'natural' means existing in nature
24    and not made or caused by people."
```

```
 1        A.    The product itself would need
 2    to be assembled by people, put in a
 3    factory, and that involves people.  So
 4    it's a fine line, the question you're
 5    asking, the role of people in the
 6    creation of a product.  Short of going
 7    outside and grabbing a leaf off a tree
 8    and rubbing it under your arms, people
 9    have to be involved somewhere.  So the
10    degree that people are involved is the
11    question.
12              So I'm not sure what you're
13    asking.  I mean, if you're asking me are
14    people involved at all.
15        Q.    I'm just reading what's in
16    your complaint, Ms. Moran.  I'm trying to
17    understand what it is you're alleging
18    here.  And what you say is "natural means
19    existing in nature and not made or caused
20    by people."  That sounds now like you're
21    hedging a little bit on that.  Is that
22    the case?
23        A.    I'm not hedging.
24        Q.    Okay.  So not made by people
```

1    and existing in nature is what "natural"

2    means to you.  Is that right?

3         A.    Existing in nature, not made

4    or caused by people.  As in the

5    development of a chemical, would be my

6    understanding of that.

7         Q.    So not made by people means --

8         A.    This actually isn't my

9    definition, it's the Miriam Webster

10   Dictionary definition.

11        Q.    I understand that.  I see the

12   citation to it.  I thought that its

13   presence in this complaint to which

14   you're a party meant that you signed on

15   to that.

16             But maybe I'll just ask it

17   this way:  Do you agree that that is a

18   definition of "natural" that is useful in

19   this case, not made by people?

20        A.    Am I understanding that you're

21   taking one part of the definition and

22   using it as the whole?

23        Q.    Well, let's use the whole

24   thing.  "Existing in nature and," right,

Page 140

1    you know as an educator, that means it

2    has to be both of those things, that is,

3    existing in nature, one of the things it

4    has to be, and not made or caused by

5    people.  Right?  And then there is a

6    semicolon, "coming from nature," that's

7    another way of saying the same thing,

8    isn't it?  Am I reading English

9    correctly?

10        A.    Well, the following word is

11    "or."  So you have "and" and "or" within

12    the same sentence.  They are not mutually

13    exclusive.

14        Q.    Okay.  So are we looking

15    really at just what follows "or," the

16    "not having any extra substances or

17    chemicals added, not containing anything

18    artificial," is that what you're more

19    focused on?

20        A.    No.

21        Q.    You're focused on both of

22    them?

23        A.    I'm inclusive of all of it.

24        Q.    "Or" is disjunctive, right, it

```
 1    means one or the other?
 2         A.    Correct.
 3         Q.    Okay.  So you could pick from
 4    those two, or you could say I agree with
 5    both of them as they're written.  Which
 6    one is it?
 7         A.    I agree in essence with all of
 8    it as written.
 9         Q.    Okay.  So you stand by the
10    existing in nature and not made or caused
11    by people, semicolon, coming from nature.
12    Is that right?
13         A.    Yes.
14         Q.    Okay.  And you think that
15    that's the way other people think of
16    natural in the context of underarm
17    protection products.  Is that right?
18         A.    I can't speak for what other
19    people are saying.
20         Q.    Let me ask you, for purposes
21    of this case you believe that this
22    definition that you like of "natural,"
23    "existing in nature, not made or caused
24    by people; coming from nature," is
```

1    representative of the way other people
2    think of this.  Is that right?
3           A.    Yes.
4           Q.    Let me ask you to look at page
5    -- paragraph 25, which is on the next
6    page of Exhibit 4.  And there it says,
7    "The United States Food and Drug
8    Administration, FDA, has also issued
9    guidance on the term 'natural' in the
10   context of food," and then it goes on.
11           Do you see that?
12          A.    Yes, I do.
13          Q.    What does the food definition
14   of "natural" have to do with the products
15   in this case, if anything, in your view?
16          A.    I'm not sure, except that the
17   FDA, it's the Food and Drug
18   Administration.
19          Q.    Right.
20          A.    So wouldn't they encompass
21   other than food?
22          Q.    Is deodorant, do you know if
23   deodorant is regulated by the FDA?
24           MR. KOPEL:  Objection; calls

```
 1          for a legal conclusion.
 2                  MR. CALLAHAN:  It just calls
 3          whether you know.
 4          A.    I don't know.
 5          Q.    Okay.  I take it we could
 6     agree that neither deodorant nor
 7     toothpaste are food.  Is that right?  You
 8     agree with me on that?
 9          A.    Yes.
10          Q.    Okay, you can set that aside.
11                (Defendants' Exhibit 6 for
12          identification, plaintiff Loree
13          Moran's responses to defendants'
14          first set of requests for
15          admission.)
16    BY MR. CALLAHAN:
17          Q.    Could you take a look at
18     Exhibit 6, Ms. Moran, which is plaintiff
19     Loree Moran's responses to defendants'
20     first set of requests for admission.
21                And let me know if you
22     recognize this document.
23                Have you reviewed Exhibit 6
24     and do you recognize it, Ms. Moran?
```

Page 155

1           C E R T I F I C A T E

2  STATE OF NEW YORK    )

                         : ss.

3  COUNTY OF NEW YORK   )

4

5       I, ERIC J. FINZ, a Shorthand

6  Reporter and Notary Public within and for

7  the State of New York, do hereby certify:

8       That LOREE MORAN, the witness whose

9  deposition is hereinbefore set forth, was

10  duly sworn by me and that such deposition

11  is a true record of the testimony given

12  by the witness.

13      I further certify that I am not

14  related to any of the parties to this

15  action by blood or marriage, and that I

16  am in no way interested in the outcome of

17  this matter.

18      IN WITNESS WHEREOF, I have hereunto

19  set my hand this 30th day of July,

20  2018.

21

22

23              ERIC J. FINZ

24