# EXHIBIT 27

Page 1

```
 1           UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
 2
             Civil Action No. 1:16-cv-08364
 3
 4     ANNE DE LACOUR, ANDREA WRIGHT
       AND LOREE MORAN, individually
 5     and on behalf of all others
       similarly situated,
 6
                   Plaintiffs,
 7     vs.
 8     COLGATE-PALMOLIVE CO., and TOM'S
       OF MAINE, INC.,
 9
                   Defendants.
10     _____/
11
12             VIDEOTAPED DEPOSITION OF
13                  ANNE DE LACOUR
14             Wednesday, July 18, 2018
                10:30 a.m. - 12:34 p.m.
15
16            Veritext Legal Solutions
              One East Broward Boulevard
17             Fort Lauderdale, Florida
18
19
20
21
22
23          Stenographically Reported By:
24            Kimberly Fontalvo, RPR,CLR
25         Realtime Systems Administrator
```

1    understand you don't know the specific date that
2    this case took place.  What you've told me is it
3    could have been as long as ten years ago.  What I
4    would like to know is what's the latest that that
5    case might have been going on?
6         A.   I don't know.
7         Q.   So is it possible that it was only last
8    year?
9         A.   I do not remember when it was.
10        Q.   So you can't say any better than from ten
11   years ago to perhaps last year?
12        A.   No, I cannot.
13        Q.   Okay.  How is it that you become a
14   Plaintiff in this case?
15        A.   I heard that the attorney company was
16   investigating on this product, and I asked them to
17   take action.
18        Q.   You said -- you heard that the attorneys,
19   is that Bursor & Fisher?
20        A.   Yes.
21        Q.   Were investigating this case?
22        A.   Was investigating the component of the
23   product.
24        Q.   Who did you hear that from?
25             MS. WESTCOT:  I'm going to object to

Page 17

1       attorney-client privilege and instruct the
2       witness not to answer.
3              MR. CALLAHAN:  It's not privileged who it
4       came from.  What, you said it might be
5       privileged.
6              MS. WESTCOT:  You can answer who it came
7       from but nothing more.
8         A.   It came from the attorneys' office.
9      BY MR. CALLAHAN:
10        Q.   Which attorney?
11        A.   Bursor & Fisher.
12        Q.   Okay.  Those are two different people.
13   Did somebody call you on the phone?
14        A.   No, I received an email.
15        Q.   From whom?
16        A.   Bursor & Fisher.
17        Q.   What person at Bursor & Fisher sent you
18   that email?
19        A.   I don't recall.  I recall being in contact
20   with Ms. Westcot here.
21        Q.   But you don't know who first sent you --
22        A.   No.
23        Q.   -- the email that led to your becoming a
24   Plaintiff in this case; is that correct?
25        A.   Yes.

1     Q.   Before receiving an email from the
2  Bursor & Fisher attorneys in this case, did you have
3  any concerns or issues about Tom's products?
4     A.   No.
5     Q.   And I understand -- is it accurate that
6  subsequent to being contacted by the Bursor & Fisher
7  law firm, you stopped purchasing Tom's deodorant
8  products?
9     A.   Can you rephrase?
10    Q.   Yeah.  Do you still buy Tom's deodorant
11 products?
12    A.   No.
13    Q.   At what point in time did you stop
14 purchasing Tom's deodorant products?
15    A.   I stopped using these products when I
16 heard there was an investigation about this product.
17    Q.   And when was it that you were contacted by
18 Bursor & Fisher about the investigation into these
19 products?
20    A.   2015.
21    Q.   Do you know when in 2015?
22    A.   No.  2015, end of year.
23    Q.   And this first contact was by means of an
24 email; is that right?
25    A.   Yes.

Page 19

1    Q.   And did this contact take place before you
2    agreed to be represented by Bursor & Fisher in
3    connection with this case?
4    A.   Can you rephrase your question?
5    Q.   Sure.  At what point in time -- well, let
6    me ask it this way:  Did you ask or agree to be
7    represented by Bursor & Fisher after they sent you
8    this email toward the end of 2015?
9    A.   Yeah, I did ask to be represented.
10   Q.   After you received the email from Bursor &
11   Fisher?
12   A.   After I received the email saying that
13   they were investigating.
14   Q.   And after Bursor & Fisher contacted you,
15   you stopped purchasing Tom's deodorant products; is
16   that correct?
17   A.   I don't remember when exactly I stopped.
18   Q.   Do you know if you purchased -- do you
19   know whether you purchased any Tom's deodorant
20   products after you were contacted by Bursor & Fisher
21   about this case?
22   A.   Yes.
23   Q.   And did you -- do you think you did
24   purchase Tom's deodorant products after Bursor &
25   Fisher contacted you?

1    A.   I had some in my drawer in my bathroom, so
2    I had no reason to go buy more.
3         Q.   Okay.  So my question is:  Did you, after
4    Bursor & Fisher contacted you about this case, buy
5    any more Tom's of Maine deodorant products?
6         A.   No.
7         Q.   Why not?
8         A.   Because I had some in my bathroom already,
9    I didn't need to buy more.
10        Q.   Did you continue to use the Tom's of Maine
11   deodorant products that you had subsequent to being
12   contacted by Bursor & Fisher?
13        A.   No.
14        Q.   What did you do with them?
15        A.   I discarded them.
16        Q.   Why?
17        A.   Why?  Because I -- when a product is being
18   investigated, I don't want to use it anymore.  There
19   is -- I don't want to use it.
20        Q.   Any other reasons?
21        A.   No.
22        Q.   Were there any particular aspects about
23   the Tom's of Maine deodorant products that you were
24   purchasing until contacted by Bursor & Fisher that
25   caused you to stop purchasing them and stop using

1  them?
2      A.   Can you repeat the question?
3      Q.   Sure.  Were there any particular things
4  about the Tom's of Maine deodorant products that
5  caused you to stop using them after you had been
6  contacted by Bursor & Fisher?
7      A.   The characteristic of not being what it
8  says it is, meaning not being natural product.
9      Q.   And why, in your view, was the product not
10 natural?
11     A.   Because it contains manmade manufactured
12 elements in it that are not natural like it is
13 stated on the packaging.
14     Q.   And what ingredients are those?
15     A.   The propylene glycol that is a manmade and
16 the rest of it, I don't remember, but it is not a
17 hundred percent natural.
18     Q.   One of the ingredients you mentioned was
19 propylene glycol; is that correct?
20     A.   Yes.
21     Q.   Are there any others that you feel are not
22 natural?
23     A.   I am not a -- I'm not a chemist.  I don't
24 know about the others.  But this one is enough to
25 harm people.

```
 1   underarm protection?
 2        A.   Baking soda.
 3        Q.   Just straight baking soda?
 4        A.   With water.
 5        Q.   Anything else?
 6        A.   No.
 7        Q.   Any commercial products at all?
 8        A.   No.
 9        Q.   Have you, subsequent to stopping using
10   Tom's product, used any other underarm protection
11   besides baking soda and water?
12        A.   No.
13        Q.   Have you looked into or researched at all
14   any other underarm protection products?
15        A.   No.
16        Q.   Now, you said when you see natural, you
17   typically don't look at an ingredient list.  You see
18   natural on a product, you don't look at an
19   ingredient list; is that correct?
20        A.   Yes.
21        Q.   If you purchase a product in Whole Foods
22   that doesn't say natural, do you then look at the
23   ingredient list?
24        A.   It can say organic, which is also good.
25        Q.   If you see a product that says organic, do
```

Page 29

1   you also skip reviewing the ingredients?
2        A.   Yes.
3        Q.   So what about a product that doesn't say
4   organic or natural, do you then read the
5   ingredients?
6        A.   Yes.
7        Q.   And what kind of other cosmetic products
8   do you use?  So, for example, I see today you've got
9   lipstick on?
10       A.   Yes.
11       Q.   What kind of lipstick do you use?
12       A.   Bee.
13       Q.   Burt's Bees?
14       A.   Yes.  It's not the lipstick.
15       Q.   What is it?
16       A.   It's a moisturizer tinted.  I don't use
17  lipstick.
18       Q.   Do you use any other cosmetic products
19  besides Burt's Bees moisturizer?
20       A.   Life Extension products.
21       Q.   Life Extension products, what is that?
22       A.   This is natural products.
23       Q.   Is it a line of natural cosmetics?
24       A.   Yes.
25       Q.   What types of cosmetics would that

```
 1   include?
 2       A.   All natural ingredients, no manufactured
 3   ingredients, no harmful ingredients.
 4       Q.   And have you looked at the ingredients on
 5   the Life Extension products?
 6       A.   I trust Life Extension.
 7       Q.   I understand you may trust them, but
 8   that's not my question.  My question is:  Have you
 9   looked at the ingredients that are contained in the
10   Life Extension products that you use?
11       A.   No.
12       Q.   Now, when you say you rely on natural,
13   what is it you understand natural to mean?  What
14   does that mean to you?
15       A.   Not altered, chemically altered, comes
16   from nature.
17       Q.   So like comes directly from a plant or
18   something?
19       A.   Yes.
20       Q.   And what do you mean by not chemically
21   altered?
22       A.   Not manually, chemically altered, meaning
23   manufactured with chemicals.
24       Q.   What about products that are made as the
25   result of chemical reaction?
```

1        A.    Can you clarify?
2        Q.    Sure.  Like soap is made as the result of
3   chemical reaction.
4        A.    I don't know how soaps are made.
5        Q.    I'm just trying to understand what is your
6   expectation of a product that is not chemically
7   altered?
8        A.    It comes from a nature, it has to be
9   natural.
10       Q.    Again, when you say comes from nature, is
11  that something that somebody just takes a plant and,
12  like, squeezes something out of it or --
13       A.    Yes.
14       Q.    Anything else?  I mean, is anything beyond
15  that something that you consider to be nonnatural?
16       A.    Chemically altered.
17       Q.    Did you ever, in your many, many years of
18  utilizing Tom's of Maine deodorant products, did you
19  ever look at the ingredients?
20       A.    No.
21             (Thereupon, marked as Defendants' 1.)
22    BY MR. CALLAHAN:
23       Q.    Ms. de Lacour, the court reporter has
24  handed you what's been previously marked as
25  Defendants' Exhibit 1.  It is a copy of the

1   documents that Plaintiffs in this case produced.
2            And I would like you to look through it
3   and let me know if any of the materials in Exhibit 1
4   came from you.  If you know already that you didn't
5   give your lawyers any documents, you can tell me
6   that, too.
7        A.   I gave my attorney documents, of course.
8   I've been working on this, but I cannot say if this
9   is the document that I provided to my attorney or
10  has been given by somebody else.
11       Q.   Okay.  So I know, for example, that
12  Exhibit -- that the first two pages of this exhibit
13  came from Ms. Moran, who says that she doesn't know
14  where the other pages came from.  So if you can take
15  a look through and see if you recognize any of these
16  things as having come from you, I would appreciate
17  it.
18       A.   Can you phrase your question about this,
19  please?
20       Q.   Sure.  Did any of the documents in
21  Exhibit 1 come from you?
22       A.   I don't know.
23       Q.   Do you know what you did provide to your
24  lawyers --
25       A.   Of course.

Page 33

1  Q.  -- in terms of documents?
2  A.  Of course.
3  Q.  What documents did you provide to your
4  lawyers?
5  A.  I provide pictures of the deodorant that
6  were in my bathroom drawers at home that I was
7  using. So ...
8  Q.  Are the first four pages of Exhibit 1, are
9  those pictures of the deodorant product that you
10 were using that came from your home?
11 A.  Okay. Yeah, probably. However, I'm not
12 sure. Anybody could have sent those pictures.
13 Q.  Besides the pictures of the deodorant
14 products that came from your home, did you provide
15 your lawyers with any other documents?
16 A.  No.
17 Q.  Just all you provided your lawyers were
18 just pictures of the product that came from your
19 home?
20 A.  And emails.
21 Q.  But none of the other materials that are
22 included in Exhibit 1; is that right?
23 A.  Right.
24 Q.  Apart from the deodorants that you
25 purchased -- Tom's deodorants that you purchased,

Page 34

1  have you ever purchased any other Tom's products?
2       A.   I did purchase the toothpaste once and
3  that was it.
4       Q.   When?
5       A.   In the course of the years of my shopping.
6       Q.   How many years ago?
7       A.   I don't recall.
8       Q.   Is it more than five?
9       A.   Yes.
10      Q.   More than ten?
11      A.   No.
12      Q.   What toothpaste do you use at present,
13 Ms. de Lacour, if any?
14      A.   Arm & Hammer.
15      Q.   Arm & Hammer toothpaste?
16      A.   Yes.
17      Q.   And have you looked at the ingredients in
18 Arm & Hammer toothpaste?
19      A.   No.
20      Q.   Why not?
21      A.   Because it's made out of baking soda.
22      Q.   Is it made out of only baking soda or are
23 there other things in there?
24      A.   I didn't look.
25      Q.   So for use of deodorant, you mix up water

```
 1   and baking soda, correct?
 2        A.   Yes, I do.
 3        Q.   And is that similar in consistency to the
 4   Arm & Hammer that you use?
 5        A.   What is consistency?
 6        Q.   Does the Arm & Hammer toothpaste that you
 7   use to brush your teeth look like the mixture of
 8   water and baking soda --
 9        A.   Yes.
10        Q.   You've got to let me finish the question.
11   You don't know what my question is going to be.
12   That's why it's important for you to wait until I'm
13   done asking the question --
14        A.   Sorry.
15        Q.   -- before you answer.  It won't go any
16   faster if you try to answer more quickly.  It will
17   go slower.  Okay?
18             So does the Arm & Hammer toothpaste that
19   you use to brush your teeth look like the mixture
20   you make of baking soda and water to use as underarm
21   protection?
22        A.   Yes.
23        Q.   Why is it that you just don't use baking
24   soda and water to brush your teeth?
25        A.   I do that, too.
```

1    Q.   And is it accurate that you have never
2  looked at the ingredients of any of the Arm & Hammer
3  toothpaste products that you purchased?
4    A.   Yes.
5    Q.   Have you used anything other than Arm &
6  Hammer the one time you purchased Tom's and baking
7  soda and water to brush your teeth?
8    A.   Can you rephrase, please?
9    Q.   Yes.  Other than the Arm & Hammer
10  toothpaste, baking soda and water and the one time
11  you purchased Tom's toothpaste, do you recall using
12  any other toothpaste or other things to clean your
13  teeth?
14    A.   No.
15    Q.   Let's go back to the Tom's deodorant that
16  you purchased.  Did you always purchase Tom's
17  deodorant products from Whole Foods?
18    A.   Yes.
19         (Thereupon, marked as Defendants'
20     Exhibit 7.)
21         MR. CALLAHAN:  Mark this as Exhibit 7.
22   BY MR. CALLAHAN:
23    Q.   We've put in front of you what the court
24  reporter has marked as Defendants' Exhibit 7, which
25  is Plaintiff Anne de Lacour response to

Page 64

1                    CERTIFICATE OF OATH

4     STATE OF FLORIDA
5     COUNTY OF BROWARD

9              I, the undersigned authority, certify

11    that ANNE DE LACOUR personally appeared before me

13    and was duly sworn on the 18th day of July, 2018.

15              Signed this 20th day of July, 2018.

22              KIMBERLY FONTALVO, RPR, CLR
23              Notary Public, State of Florida
24              My Commission No. FF 226848
25              Expires: 7/12/2019

Page 65

1        CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6            I, KIMBERLY FONTALVO, Registered

7    Professional Reporter, do hereby certify that I

8    was authorized to and did stenographically report

9    the foregoing videotaped deposition of ANNE DE

10   LACOUR; that a review of the transcript was

11   requested; and that the transcript is a true

12   record of my stenographic notes.

13           I FURTHER CERTIFY that I am not a

14   relative, employee, attorney, or counsel of any

15   of the parties, nor am I a relative or employee

16   of any of the parties' attorneys or counsel

17   connected with the action, nor am I financially

18

19   interested in the action.

20

21            Dated this 20th day of July, 2018.

22

23

24

25            KIMBERLY FONTALVO, RPR, CLR