**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ANNE DE LACOUR, ANDREA WRIGHT, and LOREE MORAN, individually and on behalf of all others similarly situated, <br><br>          Plaintiffs, <br><br>     v. <br><br> COLGATE-PALMOLIVE CO. and TOM'S OF MAINE, INC., <br><br>          Defendants. | Case No. 16-cv-8364-KMW-OTW |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO EXCLUDE REPORT AND TESTIMONY OF**
**<u>PLAINTIFFS' EXPERT BRIAN SOWERS</u>**

**BURSOR & FISHER, P.A.**
Scott A. Bursor
Sarah N. Westcot (admitted *pro hac vice*)
701 Brickell Ave, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: scott@bursor.com
       swestcot@bursor.com

**BURSOR & FISHER, P.A.**
Neal J. Deckant
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ndeckant@bursor.com

*Counsel for Plaintiffs and the Classes*

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ......................................................................................... 2

I.      SOWERS' CONSUMER PERCEPTION SURVEYS ............................................... 2

II.     RESULTS OF SOWERS' TOOTHPASTE AND DEODORANT
           SURVEYS ........................................................................................................... 4

LEGAL STANDARD ..................................................................................................... 6

ARGUMENT .................................................................................................................. 7

I.      SOWERS' OPINIONS ARE RELEVANT AND WILL ASSIST THE
           TRIER OF FACT ............................................................................................... 7

II.     SOWERS' SURVEY CONTROLS WERE APPROPRIATE AND IN
           LINE WITH STANDARD PRACTICES FOR SURVEY DESIGN ...................... 10

III.    SOWERS' SURVEYS FOLLOWED PROPER FILTER AND
           FUNNEL APPROACH ....................................................................................... 15

        A.     Sowers' Surveys Properly Evaluated Plaintiffs' Theory Of
                The Case ............................................................................................16

        B.     Sowers' Terminology Was Appropriate And Did Not Lead To
                Guessing ...........................................................................................17

        C.     Sowers' Closed-Ended Questions Properly Tested Plaintiffs'
                Theory Of Liability .........................................................................19

CONCLUSION ............................................................................................................. 21

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Am. Footwear Corp. v. Gen. Footwear Co.*,
  1978 WL 21442 (S.D.N.Y. May 31, 1978) ............................................................................ 13

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  137 F.Supp.2d 147 (E.D.N.Y. 2001) .................................................................................... 6

*Borawick v. Shay*,
  68 F.3d 597 (2d Cir. 1995) .................................................................................................... 6

*Borghese Trademarks Inc. v. Borghese*,
  2013 WL 143807 (S.D.N.Y. Jan. 14, 2013) ......................................................................... 5

*Cardenas v. Toyota Motor Corp. et al.*,
  2021 WL 5811741 (S.D. Fla. Dec. 6, 2021) .......................................................................... 1

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .............................................................................................................. 6

*Daubert v. Merrell Down Pharms., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ................................................................................................ 7

*Edmondson v. RCI Hosp. Holdings, Inc.*,
  2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) ...................................................................... 14

*Energybrands, Inc. v. Beverage Mktg. USA, Inc.*,
  2002 WL 826814 (S.D.N.Y. May 1, 2002) ........................................................................... 5

*In re KIND "Healthy and All Natural" Litigation*,
  2022 WL 4125065 (S.D.N.Y. Sept. 9. 2022) ......................................................... 8, 16, 19, 21

*In re Zyprexa Prod. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) .................................................................................. 6

*Kind LLC v. Clif Bar & Co.*,
  2014 WL 2619817 ................................................................................................................ 5

*Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*,
  831 F. Supp. 123 (S.D.N.Y. 1993) ....................................................................................... 5

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........................................................................ 12, 13, 16

*Messick v. Novartis Pharms. Corp.*,
   747 F.3d 1196 (9th Cir. 2014) ........................................................................ 7

*Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*,
   2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006) ............................................... 20

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997) ............................................................................. 6

*Schering Corp. v. Pfizer Inc.*,
   189 F.3d 218 (2d Cir. 1999) ........................................................................... 1

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
   648 F. App'x 609 (9th Cir. 2016) ............................................................... 7, 8

*THOIP v. Walt Disney Co.*,
   788 F. Supp. 2d 168 (S.D.N.Y. 2011) ........................................... 11, 12, 13

*Tiffany and Co. v. Costco Wholesale Corp.*,
   127 F. Supp. 3d 241 (S.D.N.Y. 2015) ........................................................... 1

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
   800 F. Supp. 2d 515 (S.D.N.Y. 2011) ......................................................... 11

*Universal City Studios, Inc. v. Nintendo Co.*,
   746 F.2d 112 (2d Cir. 1984) ......................................................................... 17

*Victoria's Secret Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*,
   2009 WL 959775 n.9 (S.D.N.Y. Apr. 8, 2009) ...................................... 1, 14

*Volkswagen Aktiengesellschaft v. Uptown Motors*,
   1995 WL 605605 (S.D.N.Y. May 11, 1995) ................................................. 5

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
   571 F.3d 206 (2d Cir. 2009) ........................................................................... 6

**RULES**

Fed. R. Evid. 401(a) and (b) .................................................................................. 7

Fed. R. Evid. 702 .............................................................................................. 5, 6

Fed. R. Evid. 702(a) .............................................................................................. 7

**OTHER AUTHORITIES**

McCarthy on Trademarks and Unfair Competition § 32:193 (5th ed.) ................ 5

## INTRODUCTION

Defendants Tom's of Maine, Inc. and Colgate-Palmolive Co. (collectively "Defendants" or "Tom's") move to exclude the opinions of Plaintiffs' expert, Brian M. Sowers.  ECF No. 233 ("Motion").  Defendants' arguments against Sowers are three-fold: (1) Sowers' opinions are irrelevant because he didn't ask consumers for a definition of "natural," (2) his control was "circular and biased," and (3) he relies on leading, closed-ended questions.  None of Defendants' criticisms warrant exclusion.

First, each of Defendants' criticisms are meritless for purposes of a *Daubert* motion as they simply challenge Sowers' survey methodology.  Such challenges to survey methodology have consistently been found to go to the weight of an expert's testimony and not to the overall admissibility of an expert's opinion.  *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) (Sotomayor, J.) ("[E]rrors in methodology [of consumer surveys] . . . go only to the weight of the evidence."); *Victoria's Secret Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *11 n.9 (S.D.N.Y. Apr. 8, 2009) (holding that criticism of methodology used for consumer surveys "bear[ed] exclusively on the weight to be given the survey rather than bearing on an admissibility determination"); *Tiffany and Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 250 (S.D.N.Y. 2015) (criticism that "study was not designed in a way that approximated actual marketplace conditions," "goes to weight, rather than the admissibility.").  This conclusion has been upheld in "district courts from sea to shining sea."  *Cardenas v. Toyota Motor Corp., et al.*, 2021 WL 5811741, at *5 (S.D. Fla. Dec. 6, 2021) (collecting cases).  Defendants' Motion should be denied on this basis alone.

Defendants make no attempt to question Sowers' expertise, or the vast experience Sowers has in the field of market research.  That is because Sowers' expertise in this area cannot be truly called into question.  Sowers is a Principal at Applied Marketing Science, Inc., and has been

working in the field of market research since 1996.  Chanoine Declaration in Support of

Defendants' Motion to Exclude the Testimony and Opinions of Brian M. Sowers ("Chanoine

Decl.") Ex. 2 (Sowers Report) ¶ 1.  He has personally designed and conducted hundreds of

market research surveys across a broad range of modalities and a broad range of populations.  *Id.*

¶ 2.  He is a member of the American Association for Public Opinion Research (AAPOR), the

Institute for Operations Research and Management Science (INFORMS), and the Insights

Association, and frequently serves as a testifying expert in Federal and State Courts on behalf of

both plaintiffs and defendants.  *Id.* ¶ 3.

Utilizing that expertise and experience, Sowers conducted two double-blind consumer

surveys to test consumers' perceptions of the "natural" representation on Tom's of Maine

toothpaste and deodorant products.  In designing and executing the consumer perception surveys,

Sowers relied on generally accepted principles of market research as well as his extensive

expertise in survey development and the interpretation of qualitative and quantitative data.  *Id.* ¶

8.  His surveys reliably test Plaintiffs' theory of liability (whether Tom's packaging

communicates to consumers the products at issue contain only natural ingredients).  It does so

with a standard test-control design, and with the appropriate use of closed-ended questions

(supplemented with a funnel approach utilizing open-ended questions).  For all of these reasons,

Defendants' motion to exclude should be denied in its entirety.

## FACTUAL BACKGROUND

## I.   SOWERS' CONSUMER PERCEPTION SURVEYS

Plaintiffs contend that Tom's "natural" representations are "false and misleading because

each of the products contain at least one, and in most instances several, ingredients that are

synthetic or chemically processed."  Chanoine Decl. Ex. 4 (First Amended Class Action

Complaint) ¶ 23.  Specifically, Plaintiffs allege that these misrepresentations are likely to deceive

reasonable consumers "into believing that the Tom's products are natural when, in fact, the products contain ingredients that are not natural."  *Id.*  ¶ 103.  Sowers was asked by Plaintiffs to design and conduct two consumer surveys to test this allegation.  Chanoine Decl. Ex. 2 (Sowers Report) ¶ 7.  He submitted a 253-page report detailing the two double-blind consumer surveys he designed and conducted to test consumers' perceptions of the "natural" representation on Tom's of Maine toothpaste and deodorant products.  *See* Chanoine Decl. Ex. 2 (Sowers Report).

In designing and executing the consumer perception surveys, Sowers relied on generally accepted principles of market research as well as his extensive expertise in survey development and interpretation of qualitative and quantitative data.  *Id.* ¶ 8.  The two surveys were designed and conducted in accordance with generally accepted principles of survey research, as set forth in the Federal Judicial Center's Manual for Complex Litigation "Reference Guide on Survey Research."  *See id.* ¶ 11 (citing Diamond, Shari S. (2011). Reference Guide on Survey Research In Federal Judicial Center and The National Academies Press, *Reference Manual on Scientific Evidence* (pp. 359-423)).

Sowers used two "double-blind" surveys.  The first survey tested whether the "natural" representation on the Tom's toothpaste packaging communicates to relevant consumers that the product contains only natural ingredients (i.e., no artificial ingredients).  Chanoine Decl. Ex. 2 (Sowers Report) ¶ 7.  The second survey tested whether the "natural" representation on the Tom's deodorant packaging communicates to relevant consumers that the product contains only natural ingredients (i.e., no artificial ingredients).  *Id.*  The surveys were administered via programmed Internet questionnaire, eliminating the need for a human interviewer.  Chanoine Decl. Ex. 2 (Sowers Report) ¶ 12.  The main questionnaires did not provide any information about the actual purpose of the survey or the survey sponsor.  *Id.*  It is standard survey practice to

instruct respondents not to guess.  *Id.* ¶ 13.  Accordingly, the instructions at the beginning of each survey stated, "If you don't know an answer to a question or are unsure, please indicate this by selecting the 'Don't know/Unsure' option.  It is very important that you do not guess."  *Id.*  In addition, the surveys included explicit "Don't know/Unsure" and "No opinion" response options. *Id.*

To reach a representative sample of the appropriate population, Sowers' surveys included U.S. adults aged 18 and older who reside in California, Florida, or New York who indicated they planned to personally purchase natural toothpaste in the next six months.  This survey population is appropriate given that Plaintiffs represent three classes of purchasers of Tom's of Maine toothpaste and deodorant products in the states of California, Florida, and New York.  *See* ECF No. 146 (order granting class certification).

Sowers used a test-control experimental design. Chanoine Decl. Ex. 2 (Sowers Report) ¶¶ 20, 52.  The purpose of a test-control experimental design is to isolate the influence of the "natural" representation on the toothpaste packaging to determine whether this claim communicates to relevant consumers that the product contains only natural ingredients (i.e., no artificial ingredients).  *Id.*  This design is used to account for the level of respondent guessing and other forms of survey noise (i.e., factors that introduce error or bias into the survey estimates, causing them to deviate from the "true" level of deception).  *Id.*

## II.   RESULTS OF SOWERS' TOOTHPASTE AND DEODORANT SURVEYS

Sowers concluded that a substantial proportion of relevant consumers who viewed the Tom's of Maine toothpaste and deodorant packaging took away a mistaken belief that the product contains only natural ingredients.  *Id*. ¶ 10.  Specifically, he found that 59.8% of toothpaste survey respondents in the test group indicated that, based on the product packaging, they believe Defendants' toothpaste products contains only natural ingredients (i.e., no artificial

ingredients), compared to just 33.5% in the control group.  After adjusting for survey noise, Sowers found the "net level of deception" in the toothpaste survey to be 26.3%.  *Id*.

Similarly, in the deodorant survey, Sowers found that 62.5% of test group indicated that, based on the product packaging, they believe Defendants' deodorant products contain only natural ingredients (i.e., no artificial ingredients) compared to just 38.5% in the Control Group. After adjusting for survey noise, Sowers found the "net level of deception" in the deodorant survey to be 24.0%.

These net levels of deception are indicative of a finding of likely confusion.  *See* McCarthy on Trademarks and Unfair Competition § 32:193 (5th ed.) ("Since the issue of likely customer deception from an allegedly false advertisement is closely analogous to the issue of likely confusion from an allegedly infringing mark, it is proper to use the percentage figures accepted in likelihood of confusion surveys.").  Courts in the Second Circuit have found that a 15-20% net confusion rate is sufficient to show actual consumer confusion.  *See Id.* at § 32:188 ("the Second Circuit found that a 15-20% rate corroborates a finding of likely confusion."); *Kind LLC v. Clif Bar & Co.*, 2014 WL 2619817, at *9 (15% net confusion rate sufficient); *Borghese Trademarks Inc. v. Borghese*, 2013 WL 143807, at *11 (S.D.N.Y. Jan. 14, 2013) (15% net confusion rate sufficient); *Volkswagen Aktiengesellschaft v. Uptown Motors*, 1995 WL 605605, at *5 (S.D.N.Y. May 11, 1995) (17.2% and 15.8% net confusion rates sufficient); *Energybrands, Inc. v. Beverage Mktg. USA, Inc.*, 2002 WL 826814, at *2 (S.D.N.Y. May 1, 2002) (17% net confusion rate sufficient); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 131 (S.D.N.Y. 1993) (26% net confusion rate sufficient).

## <u>LEGAL STANDARD</u>

Fed. R. Evid. 702 permits expert testimony from "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education," if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702. The reliability of the proposed testimony depends on its scientific validity. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). "In assessing the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus, not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F.Supp.2d 147, 162 (E.D.N.Y. 2001).

The Second Circuit has "emphasize[d] the need for flexibility in assessing whether evidence is admissible." *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995). Since "Fed. R. Evid. 702 embodies a liberal standard of admissibility for expert opinions…the assumption the court starts with is that a well qualified expert's testimony is admissible." *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007). Lesser criticisms or other contentions that assumptions are "unfounded" go to the weight and not the admissibility of the testimony. *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009). As do disputes as to the validity of the underlying data. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence," and "are the appropriate safeguards where the basis of scientific

testimony meets the standards of Rule 702." *Daubert*, 509 U.S. at 596.

<u>**ARGUMENT**</u>

## I.    SOWERS' OPINIONS ARE RELEVANT AND WILL ASSIST THE TRIER OF FACT

Defendants move to exclude Sowers' opinions on the basis that they are "irrelevant" because his survey "did not even ask what respondents understood by the terms 'natural' or 'artificial.'" Motion at 12-13.  That is wrong.

Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401(a) and (b).  Expert witnesses' specialized knowledge is admissible if "it will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). "The relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1196, 1196 (9th Cir. 2014) (quoting *Daubert v. Merrell Down Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

Sowers tested whether the "natural" representation on Tom's toothpaste and deodorant packaging communicates to relevant consumers that the products contain only natural ingredients (i.e., no artificial ingredients).  *See* Chanoine Decl. Ex. 2 (Sowers Report) ¶ 7.  The subject of Sowers' survey goes to the heart of Plaintiffs' theory of liability and directly advances one of the key issues in Plaintiffs' case – whether consumers were misled by the "natural" representation on Defendants product packaging.  While it does not "ask what respondents understood by the terms 'natural' and 'artificial,'" as Defendants claim it should have, that is not the standard.  *See ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 613 (9th Cir. 2016) (finding the district court erred in excluding an expert's opinion for not opining on

whether products at issue were "safe," and holding the court "applied too high a relevancy bar"
and that the expert's opinion need only "logically advance the issue" at hand).  The aim of the
survey was not to determine a consumers' definition of "natural," but rather simply to determine
whether or not consumers understood the "natural" representation to mean the Products would or
would not contain artificial or synthetic ingredients.  The definition is irrelevant for purposes of
determining a consumers' expectation of the contents of the Products displaying the "natural"
representation.  The results of Sowers' toothpaste survey indicate that 59.8% of respondents in
the test group believed, based on the product packaging, that Defendants' toothpaste products
contain only natural ingredients (i.e., no artificial ingredients), compared to just 33.5% in the
control group.  Chanoine Decl. Ex. 2 (Sowers Report) ¶ 46.   Similarly, the results of Sowers'
deodorant survey indicate that 62.5% of respondents in the test group believed, based on the
product packaging, that Defendants' deodorant products contain only natural ingredients (i.e., no
artificial ingredients), compared to just 38.5% in the control group.  *Id.* ¶ 78.  These results are
relevant and assist the trier of fact in evaluating issues in the case, and certainly "logically
advance the issue at hand" as required to be deemed relevant.  *See ThermoLife Int'l,* 648 F.
App'x 609 at 613.

Defendants woefully fail to put forth any support for their baseless relevance argument.
Instead, Defendants rely almost exclusively on one non-binding district court opinion (currently
on appeal), where a court found a different expert's survey "did not address key issues for the
trier of fact" in that case.  Motion at 12.  There, the court found, among a myriad of other distinct
issues, that plaintiffs' survey expert did not provide useful information about how a reasonable
consumer understands "all natural."  *In re KIND "Healthy and All Natural" Litigation*, 2022 WL
4125065 at *12-14 (S.D.N.Y. Sept. 9, 2022).

Here, in contrast, Sowers' consumer survey *is* directly relevant to key issues in this case. Plaintiffs allege that Tom's "natural" representations are "false and misleading because each of the products contain at least one, and in most instances, several, ingredients that are synthetic or chemically processed." Chanoine Decl. Ex. 4 (First Amended Class Action Complaint) ¶ 9. Plaintiffs also allege the "natural" representation is "likely to deceive reasonable consumers into believing that Tom's products are natural, when, in fact, the products contain ingredients that are not natural." *Id.* ¶¶ 15, 17. Sowers' survey tested those allegations. Chanoine Decl. Ex. 2 (Sowers Report) ¶¶ 6-7.

Sowers' survey sought to evaluate consumer perception of Tom's Product packaging, and specifically, Defendants' "natural" label representation, to determine if the representation communicates to consumers that the products contain only natural ingredients. *Id.* Sowers survey questions asked respondents about their interpretation of Tom's packaging, if the packaging communicated anything about whether the products are "natural," and if based on the label representation, respondents believed that the products contained only natural ingredients. *Id.* ¶¶ 30-40; 62-72 (setting forth the full list of questions posed in the toothpaste and deodorant surveys).

Defendants' relevance arguments are not relevant arguments at all, but rather critiques of Sowers' survey design. Defendants argue that Sowers "did not even ask what respondents understood by the terms 'natural' and 'artificial,'" and that he did not attempt to test whether consumers thought particular ingredients were natural or synthetic. Motion at 12-13. But Sowers' survey sought to test consumer perception of the "natural" representation *as it appears on Tom's packaging* – a representation that is made to consumers without any definition or explanation. If respondents did not understand natural to be related to the presence or absence of

artificial ingredients, that would have been reflected in responses to the closed-ended questions.

However, only 5.2% of respondents in the toothpaste test group and 6.5% of respondents in the

deodorant test group answered "don't know/unsure or no opinion," suggesting that only a small

percentage of respondents did not have the same interpretation of natural as described in the

question.  Chanoine Decl. Ex. 2 (Sowers Report) at p. 19, Table 3; p. 32, Table 6.  Furthermore,

even if Defendants were correct that Sowers should have included their additional areas of

inquiry (they are not), failure to include those questions would not render Sowers' survey results

irrelevant.

## II.   SOWERS' SURVEY CONTROLS WERE APPROPRIATE AND IN LINE WITH STANDARD PRACTICES FOR SURVEY DESIGN

Defendants argue the control test in Sowers' survey was circular and biased, and his

opinions should therefore be excluded.  Motion at 13-17.  That is wrong.

### *Sowers Test-Control Design*

Sowers utilized a test-control experimental design.  Chanoine Decl. Ex. 2 (Sowers

Report) ¶ 20.  The purpose of a test-control experimental design is to isolate the influence of the

"natural" representation on the product packaging to determine whether this claim communicates

to relevant consumers that the product contains only natural ingredients (i.e., no artificial

ingredients).  *Id*.  The control is therefore built into the survey design itself.  As Sowers explains:

> "The use of a test-control design is analogous to the use of a placebo
> in the test of, for example, a new drug. To test a new drug, some
> patients are given the test drug, and some are given a placebo (such
> as a sugar pill) or some other drug with a known efficacy.
> Patients are randomly assigned to receive either the test drug or the
> control. The effect of the drug is measured by the difference in
> response between those receiving the test drug (the "test" group) and
> those receiving the placebo (the "control" group). The use of a
> control in the drug testing situation is important because some
> people will get well even with no treatment at all, and some get well
> just because they think their disease is being treated. The critical
> measure in a test-control design, such as the one used here, is the

10

> difference in responses between the test and control Groups, known
> as the "net" effect.

*Id.* ¶ 21.

In creating the control stimulus, Sowers followed generally accepted principles of survey research; that is, the control stimulus was identical to the test stimulus except that the "natural" claim was replaced with "CONTAINS SOME NATURAL INGREDIENTS*" and a disclosure was added to inform respondents that the product contains one or more artificial ingredients. *Id.* ¶ 22. Thus, the only difference between the test group and the control group was the replacement of the "natural" claim with "CONTAINS SOME NATURAL INGREDIENTS*" and the disclosure that the product contains one or more artificial ingredients. Because nothing else differed between the two stimuli, any difference about whether the "natural" claim communicates that the product contains only natural ingredients (i.e., no artificial ingredients) can only be attributed to the "CONTAINS SOME NATURAL INGREDIENTS*" statement and the disclosure that the product contains one or more artificial ingredients. *Id.*

*Defendants' Misplaced Criticisms of Sowers' Control*

Defendants' reliance on *THOIP II* and *Polo Ass'n, Inc.* in assessing Sowers' control is misplaced. Those are both trademark infringement cases where the consumer surveys at issue involved likelihood of confusion of comparable products. *See THOIP v. Walt Disney Co.,* 788 F. Supp. 2d 168 (S.D.N.Y. 2011); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515 (S.D.N.Y. 2011). They were not false advertising cases. This is a critical distinction for purposes of analyzing the control because controls for false advertising cases are not the same as controls for likelihood of confusion cases. *See* Declaration of Sarah N. Westcot in Opposition to Defendants' Motion ("Westcot Decl.") Ex. 1 (Diamond, S.S. & Swann, J.B. (2012). Trademark and Deceptive Advertising Surveys: Law, Science, and Design. American Bar Association,

Section of Intellectual Property Law).  In arguing that Sowers' control should have "retained the overall look and feel of the test stimulus," used the same font typeface and layout, eliminated the element being assessed, etc., Defendants conflate the standard for controls in likelihood of confusions cases with the criteria for controls in false advertising cases.

In false advertising cases, the control needs to "correct" the allegedly deceptive representation which can be through the use of a disclosure, as Sowers' control did.  *See Id.* at pp. 226-228.  The Federal Trade Commission has said that disclosures should be "clear and conspicuous," and specifically: (1) must be communicated effectively so that consumers <u>are likely to notice and understand them</u> in connection with the representations that the disclosures modify; (2) should be <u>at least as large as the claim</u> to which they relate are more likely to be effective; and (2) be both <u>a different color from other text and underscored</u>, making it more likely they will be recognized.  *See* Westcot Decl. Ex. 2 (Federal Trade Commission, March 2013 Guidance, *How to Make Disclosures in Digital Advertising*).  Sowers' control met each of these requirements.  *See* Chanoine Decl. Ex. 2 (Sowers Report) ¶¶ 22-23, 54-55.  His control was at least as large as the original claim, in a different color from other text, and was likely to be noticed and understood by respondents.  *Id.*  Defendants' suggestion that "respondents wondered if it was a 'joke,'" is misleading.  Motion at 13-14.  In response to the open-ended questions, *one individual respondent* questioned the disclaimers in the control group, which suggests that consumers are so accustomed to seeing Defendants' representation that they would find a representation stating the truth about the products to be suspect.

Defendants argue Sowers' control stimulus "does not resemble a commercially viable product."  Motion at 15.  Again, Defendants improperly rely on trademark infringement cases, *Malletier* and *Am. Footwear Corp.*, as support for this critique of Sowers' control.  *Malletier*

involved a supplier of handbags suing a competitor for trademark infringement. *Malletier v.*
*Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007).  Consumer surveys in that
case sought to test the likelihood of confusion of two trademarked brand logos – Louis Vuitton
and Dooney & Burke, Inc.  The court there found the survey must "replicate how the marks are
viewed by consumers in real life," excluding a survey because it "altered forms of the
defendant's mark" therefore failing to replicate market conditions.  *Id.* at 592.  The survey in *Am.*
*Footwear Corp.*, was similar in that it sought to test the likelihood of confusion between two
trademarks.  *Am. Footwear Corp. v. Gen. Footwear Co.*, No. 76 CIV. 3594, 1978 WL 21442, at
*4-6 (S.D.N.Y. May 31, 1978).  As discussed in detail above, a control in false advertising cases
has different requirements from a control in a case testing likelihood of confusion in the context
for trademark infringement.  The control in a false advertising case must "correct" the allegedly
deceptive representation which can be through the use of a disclosure, as Sowers' control did.
*See* Westcot Decl. Ex. 1 (Diamond, S.S. & Swann, J.B. (2012)).  As Sowers testified, "it was not
up to him" to make the control product "commercially viable," but rather for the control to
properly correct Defendants' deceptive representation such that the influence of the "natural"
representation could be isolated.  Chanoine Decl. Ex. 1 (Sowers Tr.) 228:12-18 ("it's not up to
me to correct Tom's advertising for the marketplace. For purposes of my survey, I crafted up an
appropriate control to be able to control for the element that I needed to in the survey.")  Sowers
also explained that simply removing the "element being assessed" as Defendants suggest, would
not create an appropriate control.  *Id.* at 228:14-229-9 ("If I had simply removed the word
'natural,' all that would control for is whether people may say there is a 'natural' representation
on the product when in fact there isn't.  That's not what needed to be controlled in my survey.
My survey needed to control how many people, even if Tom's put on the package that it contains

some natural ingredients, it contains one or more artificial ingredients, would still take away the mistaken impression.") For these reasons, Defendants' arguments regarding Sowers' control design fail.

Defendants' claim that Sowers' survey was nothing more than a "circular matching test" is also without merit.  Motion at 16.  Defendants argue Sowers leads participants to select the "correct" answer choice, but that is simply not true.  If it were true, then control results would have been zero, but instead Sowers' control got 33.5% in the toothpaste survey and 38.5% in the deodorant survey.  Chanoine Decl. Ex. 2 (Sowers Report) at p. 19, Table 3; p. 32, Table 6. Defendants provide no explanation for those results.  If anything, Sowers' results show that the control was perhaps not prominent enough.  Chanoine Decl. Ex. 1 (Sowers Tr.) 191:20-23 ("I think it confirmed that I had a strong control doing exactly what it was designed to do, which is to pick up noise.")  Furthermore, there was nothing to "match," as Defendants suggest.  The closed-ended survey questions were based on respondents recall of the stimulus, which was removed from view at the time of questioning.  As such, the survey was not a reading or matching test – as there was nothing visible for respondents to "match."

Defendants' reliance on *Edmondson* is also misplaced, as the circumstances in that case are easily distinguishable.  *Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020).  Defendants state that the court in *Edmondson* "exclude[ed] a similar consumer survey" for "failure to include an adequate control."  Motion at 13.  They fail to mention that in *Edmondson*, the exclusion of the survey was based on the survey expert's failure to use *any* control, not that the control was inadequate.  *Edmondson*, 2020 WL 1503452 at *7. Even failure to use *any* control has been found by other courts to go to weight not admissibility of a consumer survey.  *See Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts,*

*LLC*, 2009 WL 959775, at *11 (S.D.N.Y. Apr. 8, 2009) (holding that criticism that consumer survey "failed to incorporate a control group," bore "exclusively on the weight to be given the survey rather than bearing on an admissibility determination").

## III.   SOWERS' SURVEYS FOLLOWED PROPER FILTER AND FUNNEL APPROACH

Defendants argue Sowers survey relied on "leading, closed-ended questions, and ignore[d] respondents' unprompted answers to open-ended questions."  Motion at 17-23.  There is no basis for this criticism of Sowers' survey.

Sowers relied on his experience and scientific literature in designing surveys with closed-ended questions rather than open-ended questions.  As Sowers references in his deposition, scientific literature suggests that closed-ended questions are typically recognized by both applied and basic social scientists as being more objective than answers to open-ended questions, and that "closed-ended questions do a more thorough job of assessing the details of what a person knows, thinks, and so on."  *See* Westcot Decl.  Ex. 3, Jacoby, J. (2013). Trademark Surveys: Designing, Implementing, and Evaluating Surveys (Vol. 1). American Bar Association, p.641.

Defendants' argument that Sowers should have used open-ended questions is contrary to scientific literature.  *See, e.g.*, Westcot Decl. Ex. 1, Diamond, S.S. & Swann, J.B. (2012), Trademark and Deceptive Advertising Surveys: Law, Science, and Design. American Bar Association, Section of Intellectual Property Law, p. 192 ("Closed-ended questions often focus the respondent on the ultimate issue being surveyed... It is the rare survey that does not, at some point, directly attempt to get at the ultimate issue: whether the participants are confused or not by the advertisement.").

The same literature suggests that there are issues with using open-ended questions, as "open ended questions generally fail to capture all pertinent information respondents actually

have in mind," and that "respondents may leave something out either deliberately, or because they forget, or because they feel that the answer is so obvious that it couldn't possibly be what the investigator was looking for."   Westcot Decl. Ex. 3 (Jacoby, J. (2013).  Trademark Surveys: Designing, Implementing, and Evaluating Surveys (Vol. 1).  American Bar Association at pp. 643, 649).  "Another problem with the [open-ended] question is that some respondents will neglect to state their most pertinent observation simply because they seem so obvious." *Id.* at p. 649.

Contrary to Defendants' argument, Sowers' closed-ended questions are not leading, and provide unambiguous selections that require no further interpretation by the researcher in order to be useful for quantitative analysis.  Unlike the survey in *KIND*, Sowers' survey did not direct respondents with the phrase "because of this [all natural] descriptor, what is your expectation for this product."  *KIND*, 2022 WL 4125065, at *10.  Instead, Sowers simply asks "Based on the product packaging, do you believe the [product] shown…?"  He then provides an exhaustive list of possible responses.  *See* Section III.C; *see also* Westcot Decl. Ex. 5 (Sowers Tr.) 158:23-159:9 (disagreeing with Defendants' expert's criticism of Sowers' use of closed-ended questions, responding that any perceived "disadvantages of the closed-ended questions can be avoided through many of the steps that I took in my own survey, like including a control question…").

A.    **Sowers' Surveys Properly Evaluated Plaintiffs' Theory Of The Case**

Without any support, Defendants claim "the whole point of Sowers' survey was to get participants to rubberstamp Plaintiffs' theories," again, attempting to argue that Sowers' should have surveyed what consumers think about "natural."  Motion at 18-21.  But again, Defendants assertion that Sowers somehow conducted a survey on the wrong subject matter does nothing to tarnish Sowers' credibility or survey methodology for the survey he *did* conduct – that is a survey directly testing Plaintiffs' theory of liability.  *See supra* Section I.

Defendants' reliance on *Nintendo* to support their contention that Sowers' questions were leading is not persuasive, as that case is easily distinguishable.  *Nintendo* is not a false advertising case, but a trademark infringement case brought by Universal City Studios, Inc. (owner of the trademark name and story of "King Kong") against Nintendo Co., who engaged in the design and sale of a video game known as "Donkey Kong."  *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 113-114 (2d Cir. 1984).  Universal filed suit against Nintendo claiming false designation of the origin of the Donkey Kong name and character, violation of New York's anti-dilution statute, and unfair competition.  *Id.*  Universal conducted a likelihood of confusion survey that the court found too badly flawed to be used to demonstrate the existence of likelihood of consumers confusion because survey participants were presented with an "obviously leading question that suggested its own answer."  *Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984).  The court reached this conclusion because instead of neutrally asking if respondents knew who makes Donkey Kong, the survey presented participants with the connection between Donkey-Kong and King-Kong directly in the question itself – essentially suggesting an answer and leading respondents to make the connection between the two trademarked names.  *Id.* at 118.  That is in obvious contrast to Sowers' questions here, where Sowers suggests no answer in his neutrally worded questions.  *See* Chanoine Decl. Ex. 2 (Sowers Report) ¶¶ 39, 71.  Sowers' questions do not suggest the answer, but rather provide participants with five possible responses, including responses indicating "no opinion" and "don't know/unsure."

### B.    Sowers' Terminology Was Appropriate And Did Not Lead To Guessing

Defendants argue Sowers failed to define key terms, leading participants to guess about the questions they were answering.  Motion at 21-22.  That is wrong.

Sowers' survey questions sought to test consumers' perceptions of the "natural" representation on Tom's of Maine toothpaste and deodorant products.  In questioning respondents on their perception of the representation, there were no key terms left undefined, nor were any questions ambiguous.  Sowers' questions simply asked what Defendants' product label communicated.  In eliciting a response to the question of whether the label communicated that the product contain only natural ingredients, Sowers *did* provide a definition for the term "natural" by including the following descriptor: "(i.e., no artificial ingredients)." Westcot Decl. Ex. 5 (Sowers Tr.) 236:13-15 ("It was defined in my survey as no artificial ingredients.  So it was defined for them.").  That description of the term "natural" is line with Plaintiffs' theory of liability (that Defendants' products contain artificial ingredients), and the theory Sowers sought to test.  To suggest some other definition would be nonsensical.  Furthermore, the "key terms" Defendants argue are left undefined are not terms that need any explanation.  For example, Defendants argue Sowers failed to define "contains."  This argument is far-fetched.  Consumers and survey respondents have a general understanding of the plain English meaning of the word "contains."  They also have a general understanding of the plain English meaning of the word "natural."  *See* Chanoine Decl. (Sowers Tr.) 241:6-12 (Sowers testified that he conducted pretests and "didn't have any respondents indicate that they didn't understand what that definition meant.").  Defendants' suggestion that respondents would be confused or left guessing when attempting to answer questions including these two terms is farcical.  Additionally, if respondents did have any difficulty understanding survey questions, respondents were provided with a "don't know/unsure" selection to express that uncertainty.  Chanoine Decl. Ex. 2 (Sowers Report) ¶ 35-39; 68-71.  However, given the extremely small percentage of respondents selecting that choice, it seems clear respondents had no issues understanding the questions presented.  *Id.*

18

p. 17, Table 2; p. 19, Table 3; p. 30, Table 5; p. 32, Table 6. (indicating percentages of responses selecting "don't know/unsure").

Defendants' reliance on *KIND* here is again misplaced.  In that case, the survey expert did (as Defendants admit) seek to test consumers' understanding of the term "all natural." Motion at 23.  The court's survey criticisms in that case do not apply to Sowers' survey, where he plainly is not seeking to evaluate respondents' definition of "natural."  *See KIND*, 2022 WL 4125065 at *11.

### C.   Sowers' Closed-Ended Questions Properly Tested Plaintiffs' Theory Of Liability

Defendants argue Sowers' survey should be excluded because "it did not give participants a complete set of answer choices to his closed-ended questions."  Motion at 22-24. That is incorrect.  As discussed in Section III above, Sowers' survey questions focused the respondent on the ultimate issue being surveyed – whether Tom's "natural" representation communicates to relevant consumers that the products contain only natural ingredients (i.e., no artificial ingredients).  *See* Chanoine Decl. Ex. 2 (Sowers Report) ¶ 7.  The list of answers provided to respondents was exhaustive in the context of the question posed.  In addition, respondents were given the option of answering "no opinion" or "don't know/unsure."  *See Id*. ¶ 35-39; 68-71.  The purpose of the "don't know/unsure" option is to provide respondents with an option if their opinion was not reflected in the other answer choices.  Sowers explained as much in his deposition.  Westcot Decl. Ex. 5 (Sowers Tr.) 162:5-9 (Q: "So is it your testimony that this is an exhaustive list of possible interpretations of the 'natural' representation on the Tom's packaging" A: "Yes, it is.").  Sowers went on to explain that "if [he] had only put 'contains only natural ingredients,' 'contains some natural ingredients' that would be incomplete because there would be no way for a respondent to indicate 'I don't think it contains any natural ingredient,'

but that his list was exhaustive because if a respondent didn't take away an opinion from any of the first three options "they have an option, not just once, but twice, they could answer either 'no opinion' or 'I don't know/unsure' which captures everything else." *Id.* at 162:12-163:4.

      Defendants' reliance on *Proctor Gamble Pharms.* here is misleading.  Defendants cite *Proctor Gamble Pharms.* for the proposition that a "closed-ended question will be considered leading and suggestive unless it provides respondents with all possible options to any question." Motion at 23.  But Defendants cherry pick a quotation from that decision, leaving out a very critical and directly on point portion of the decision in which the court states that the provision of a "neither" or "don't know" option is what was missing from plaintiff's survey.  *Procter & Gamble Pharms., Inc. v. Hoffmann-LaRoche Inc.*, 2006 WL 2588002 at *23 (S.D.N.Y. Sept. 6, 2006) ("the survey should have provided respondents with all possible options to any question (including the option of 'neither' or 'don't know'")).  Here, Sowers *does* provide that "don't know/unsure" option to respondents.  As such, Defendants' argument on this point is completely without merit.

      Finally, Defendants argue Sowers' "closed-ended questions associated 'natural' with some quantum of 'artificial' ingredients," and that "he did not provide any other conceptions of 'natural.'"  Motion at 23-24.  But again, Sowers did not set out to test consumers' interpretation of the term "natural," but instead sought to test Plaintiffs' case theory – whether Tom's "natural" representation communicates to relevant consumers that the products contain only natural ingredients (i.e., no artificial ingredients).  Plaintiffs specifically allege that consumers would be confused into believing that Tom's products are natural, when they in fact "contain at least one, and in most instances, several ingredients that are synthetic and highly chemically processed." Chanoine Decl. Ex. 4 (Complaint) ¶ 23.  Respondents were provided with an exhaustive list of

answer choices, and again, given the opportunity to select a "no opinion" or "don't know/unsure"

option.  Defendants' reliance on *KIND* is again misplaced, because as discussed above, in that

case, the survey sought to test consumers' understanding of the term "all natural."  Motion at 23.

The court's survey criticisms in that case do not apply to Sowers' survey, where he plainly is not

seeking to evaluate any potentially competing definitions of "natural."  *See KIND*, 2022 WL

4125065 at *11.  Sowers' use of closed-ended questions to test Plaintiffs' theory of liability is

line with abundant support from literature suggesting that closed-ended questions are

"recognized by both applied and basic social scientists as being more objective than answers to

open-ended questions, are more reliable, and often able to focus the respondent on the ultimate

issue being surveyed."  *See* Section III.

## CONCLUSION

      For the foregoing reasons, Defendants' motion should be denied in its entirety.

Dated: December 1, 2022              Respectfully submitted,

                            By: */s/ Sarah N. Westcot*
                                Sarah N. Westcot

                            **BURSOR & FISHER, P.A**
                            Scott A. Bursor
                            Sarah N. Westcot (admitted *pro hac vice*)
                            701 Brickell Ave, Suite 1420
                            Miami, FL 33131-2800
                            Telephone: (305) 330-5512
                            Email: scott@bursor.com
                                  swestcot@bursor.com

                            **BURSOR & FISHER, P.A**
                            Neal J. Deckant
                            1990 North California Boulevard, Suite 940
                            Walnut Creek, CA 94596
                            Telephone: (925) 300-4455
                            Email: ndeckant@bursor.com

                            *Counsel for Plaintiffs and the Classes*